## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

---

**NAMITA GOSWAMI,**

                Plaintiff,

    v.                                       Case No.

**DEPAUL UNIVERSITY**

**and**

**PEG BIRMINGHAM,**

                Defendants.

---

## COMPLAINT

## <u>INTRODUCTION</u>

Plaintiff Namita Goswami, by and through her undersigned counsel, seeks redress for gender, race, color, and national origin discrimination and retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; and for breach of contract under Illinois state law. Defendant DePaul University denied tenure and promotion to Dr. Goswami on the basis of her gender, race, color, and national origin, in retaliation for her complaints of discrimination, and in denial of her right to academic freedom to teach and research in the areas of feminist and critical race studies.

## <u>JURISDICTION AND VENUE</u>

1.      This action is authorized and instituted pursuant to Section 1981; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; and by Illinois common law.

2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1343, and 1367.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because all of the unlawful employment practices alleged herein occurred in this district.

4.      Dr. Goswami timely filed a Charge of Discrimination, Charge No. 440-2011-03135, with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of race, color, national origin, gender, and retaliation on April 5, 2011.

5.      The EEOC issued Dr. Goswami a Notice of Right to Sue on Charge No. 440-2011-03135 on June 11, 2012.

## THE PARTIES

6.      Dr. Goswami is a female residing in Illinois, is of Indian national origin, and was an employee of DePaul within the meaning of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e(f).

7.      Defendant DePaul University is a not-for-profit corporation properly recognized and sanctioned by the laws of the State of Illinois.  At all times relevant hereto, DePaul has conducted and continues to conduct business in the State of Illinois.  DePaul is engaged in an industry that affects commerce and is an employer for the purposes of 42 U.S.C. § 2000e(b).

8.      At all relevant times, DePaul employed more than fifteen employees.

9.      Defendant Peg Birmingham resides in Illinois and is employed as a Professor of Philosophy at DePaul University.

## Dr. Goswami's Professional Background and Hiring by DePaul

10.     Dr. Goswami earned her Ph.D. degree in Women's Studies from Emory University in 2003.

11.     DePaul circulated a job advertisement in October 2002 specifically seeking candidates to teach in its Department of Philosophy with a focus on critical race and/or feminist

theories. This description corresponded to Dr. Goswami's research background and expertise.

12. No other member of the faculty in the Department of Philosophy at DePaul had a background or expertise combining multidisciplinary philosophy, critical race theory, and feminist theory. Only one other faculty member has background or expertise in critical race theory. Dr. Goswami is the only member of the faculty with background or expertise in postcolonial theory and U.S. minority and non-western feminism. DePaul's undergraduate and graduate students have increasingly requested courses and thesis advisors with expertise in non-traditional areas of philosophy, including the study of philosophers who belonged to racial or ethnic minority groups.

13. While in graduate school, Dr. Goswami published a book chapter on postcolonial feminists in India and the female Indian philosopher, feminist, and postcolonial theorist Gayatri Spivak.

14. In July 2003, DePaul hired Dr. Goswami as an Assistant Professor in a tenure track position, to fill the position described in paragraph 9 above. During her first seven years at DePaul, Dr. Goswami continued to publish and authored four articles in peer-reviewed journals and two further book chapters. Dr. Goswami also had a book manuscript accepted for publication by SUNY Press for its Series in Continental Philosophy. Unlike other faculty members in the Department of Philosophy who received tenure, Dr. Goswami's book manuscript was not a revision of her dissertation, but rather, a new project that she began in 2006.

15. As of fall 2009, Dr. Goswami also had one additional book chapter and two additional journal articles accepted for publication, and had accepted invitations to contribute a review essay to a philosophy journal and an essay to an edited volume.

16. Dr. Goswami's courses, publications, and presentations focused on minority

3

philosophers who had been overlooked in traditional scholarship, and applied critical race, postcolonial, and feminist interdisciplinary approaches.

17.     In 2005, DePaul's College of Liberal Arts and Sciences awarded Dr. Goswami a highly competitive Faculty Research and Development Grant to research postcolonial and African-American feminism.  In 2008, the College of Liberal Arts and Sciences again awarded Dr. Goswami the Faculty Research and Development Grant to research the European philosopher Theodor Adorno and postcolonial theory.

18.     From 2003 to 2009, Dr. Goswami gave eleven invited presentations and thirteen conference presentations at prestigious and competitive venues including the American Philosophical Association, the Society for Women in Philosophy, the Society for Phenomenology and Existential Philosophy (the most important professional organization in continental philosophy), the International Association of Philosophy and Literature, and the Society for Asian and Comparative Philosophy.  She also presented at the Cultural Studies Association, the National Women's Studies Association, and the American Conference for Irish Studies.  In 2010, she was invited to present at five conferences and symposia held at prestigious venues including the University of Chicago Society of Fellows and the Philosophy Department at Penn State University.

19.     Dr. Goswami taught both undergraduate and graduate courses in philosophy at DePaul, ranging from introductory courses to graduate-level seminars.  She consistently received superb evaluations from her students.

20.     In May 2007, DePaul's College of Liberal Arts and Sciences awarded Dr. Goswami the highly prestigious Excellence in Teaching Award.  DePaul, which is known as a teaching college, gives this award every year to its top three teachers.

4

21.     Dr. Goswami served as an advisor and mentor to numerous students in the Department of Philosophy as well as in the Women's and Gender Studies Department and the International Studies Department.  She served as the director of two Department of Philosophy Ph.D. dissertation committees, the co-director of one Department of Philosophy Ph.D. dissertation committee, and a reader on four other Department of Philosophy Ph.D. dissertation committees.  She served as an advisor on nine M.A. thesis committees (four in the Department of Philosophy, two in the Department of International Studies, and three in the Women's and Gender Studies Program) and on three undergraduate Department of Philosophy senior thesis committees.  She also supervised two undergraduate research assistantships and two Doctoral and Undergraduate Opportunities for Scholarship ("DUOS") projects, which train undergraduates to do graduate-level research and graduate students to advise such research. Both the undergraduate research assistantships and the DUOS projects are competitive awards.

22.     Dr. Goswami initiated and developed five new courses for the Philosophy Department: three new upper-level undergraduate courses on postcolonial theory and multicultural and transnational feminism, and two new graduate courses on postcolonial feminism and the female Indian philosopher, feminist, and postcolonial theorist Gayatri Spivak.

23.     Dr. Goswami also provided extensive service to DePaul, at the level of the Department, the College of Liberal Arts and Sciences, and the University.

24.     Within the Department of Philosophy, she served on the Undergraduate Affairs Committee (2003 to the present), the Public Events Committee (2003 to 2005), and the Critical Race Committee (2003 to 2006).  She served as Chair from 2004 to 2005 and organized a conference, "How to Practice Postcolonial Theory in a Secular Way?" in September 2004. DePaul awarded Dr. Goswami a competitive University Research Council Grant for this national

5

conference. She served on two hiring committees and consistently participated in the yearly undergraduate "Philosophy Circle" by presenting her research.

25.     Within the College of Liberal Arts and Sciences, Dr. Goswami served on numerous programs, task forces, and committees, including the Advising Pilot Program (2007 to 2009), the Advising Training Program (2009 to 2010), the Liberal Arts and Sciences Advising Task Force (2006 to 2007), the Philosophical Inquiry Domain Committee (2007 to present), and the College of Liberal Arts and Sciences Awards Committee (2007 to 2009). She has been a Liberal Arts and Sciences Summer Advisor since 2004. She also serves on the Advisory Boards of the Center for Culture and History of Black Diaspora (2005 to present) and the Women's and Gender Studies Program (2004 to 2006 and 2008 to present), on the Women's and Gender Studies Program Committee (2004 to present) and Curriculum Committee (2008 to present), and she previously served on the Women's and Gender Studies Program Transnational Feminism Committee (2004 to 2006).

26.     At the University level, Dr. Goswami served on the University Strategic Planning Committee's Diversity Blue Team (2003 to 2004), and was selected as an alternate delegate in Humanities to the Faculty Governance Council in 2006 and 2007, but was unable to serve in that position because she was on academic leave that year.

27.     Dr. Goswami also serves her professional field as member of the Program Committee for the Society for Women in Philosophy (Eastern Division). Since 2006 she has been a member of the Committee on the Status of Racial and Ethnic Diversity for the Society for Phenomenology and Existential Philosophy, the preeminent research society in the field of continental philosophy. As Chair of the committee from 2008 to 2009, Dr. Goswami organized two panels on race, gender, and nationalism in collaboration with the Committee on the Status of

Women for the Society's 2009 Annual Meeting.

28.     Of all the tenure candidates in the Department of Philosophy whose applications were reviewed during the 2009-2010 academic year, Dr. Goswami was the only minority tenure candidate and the only candidate whose professional work included teaching, research, and service related to critical race, postcolonial, and feminist studies and minority philosophers.

**The Tenure Process at DePaul**

29.     DePaul's Faculty Handbook governs the tenure and review process.  The tenure procedure in place at DePaul during the 2009-2010 academic year consisted of four levels of review.  Tenure track applicants were eligible for tenure after having served a six-year "probationary period" at the University, or after having been credited for some of those six years for service at another university.

30.     DePaul's three criteria for tenure decisions are the quality of the candidate's teaching, scholarship or research, and service.

31.     DePaul is comprised of 12 colleges and schools, each of which is led by a Dean. DePaul's colleges, schools and departments more fully describe in writing the University's three requirements for tenure.  The Faculty Handbook provides for a tenure process in which defined criteria are applied consistently, and in which faculty members are notified of the applicable tenure standards from the beginning of their probationary period.

32.     It was DePaul's established policy and practice throughout Dr. Goswami's probationary period to grant tenure and promotion to candidates who met at least two out of the three tenure criteria.

33.     During a May 9, 2008 workshop held to provide guidance for faculty members beginning the tenure process, Dr. Raphaela Weffer, Associate Vice President of Academic

Affairs at DePaul, stated that tenure candidates were required to be good to excellent in two of the three tenure criteria to receive tenure, and to be adequate in the third.

34.     President Dennis Holtschneider stated in a May 19, 2009 letter to a male tenure applicant that tenure applicants were required to demonstrate "good to excellent performance" in two of the three tenure criteria.

35.     DePaul characterizes itself as primarily a "teaching" university, which means it emphasizes and values teaching more than scholarship.  The tenure criteria of DePaul's College of Liberal Arts and Sciences specify that "[i]f tension should arise between teaching and research, the college supports effective teachers who have limited research agendas . . . ."

36.     The tenure process begins with a review and recommendation by tenured faculty members in the applicant's department or program, or the applicant's school if there is no department or program.  The Faculty Handbook provides that "the determination that an individual meets [the University's tenure] criteria is made primarily on the basis of guidelines promulgated by the candidate's department."

37.     Upon receiving the recommendation of the candidate's department, school or college, the dean of the college assembles a College or School Personnel Committee, whose members consist of senior faculty from the college.  The Committee, after reviewing the applicant's file, then makes a recommendation to the dean, which the dean either accepts or rejects.  The Committee's review serves the purpose of ensuring that the department's review is consistent with department- and college-specific criteria and standards and with University procedures.

38.     The Dean's recommendation is then forwarded to the Provost, who presides over the deliberations of the University Board on Promotion and Tenure ("UBPT"), which is made up

8

of senior faculty members from across the University who have been elected by the Faculty Council.

39.     The UBPT makes recommendations to the President on all faculty promotion and tenure decisions, including promotion to full professor.

40.     The UBPT is charged with ensuring that the lower levels of review of a tenure application consistently apply University criteria.  Section 3.2.3 of the Faculty Handbook also requires the UBPT and the college/school committees to consider questions of "stringency, consistency and fairness" when reviewing the decisions of the lower levels.

41.     When evaluating applicants for tenure, § 3.2.3 of the Faculty Handbook requires the UBPT to consider "the institutional demands made on faculty."

42.     The Faculty Handbook requires the Provost to forward the UBPT's recommendation to the President, who makes the final tenure decision.

43.     Section 3.6.1 of the Faculty Handbook establishes a framework for a transparent and reasoned tenure review process.  It provides that "[t]he candidate shall have access to all internal documents being considered" and that "reports will be filed with the next higher level *only when the candidate has had the opportunity to review such reports in order to respond appropriately*."

44.     The Faculty Handbook provides that in cases of a negative decision, the President will inform any unsuccessful applicant of the reasons for the decision.

45.     An unsuccessful applicant has the opportunity to appeal the decision internally.  If an applicant invokes the appeal provision of the Faculty Handbook, the Faculty Council must appoint a review panel to examine the recommendation and ensure that it did not violate the applicant's academic freedom or contravene the tenure policies and procedures of the University.

9

46.     The Faculty Handbook requires each tenure track faculty member's department, program or school to issue annual performance reviews, which must be approved by the Dean.

47.     Section 3.2.2 of the Faculty Handbook explains that the purpose of the annual probationary review is "to assess progress toward promotion and tenure by evaluating performance in the context of promotion and tenure standards and to provide guidance and establish priorities for satisfying established criteria." The formal reviews, therefore, are intended to give tenure track faculty members guidance about their progress toward tenure.

48.     It is DePaul's practice not to renew a faculty member's contract early in his or her probationary period if it appears clear that the faculty member will be unable to meet the tenure criteria in the future.

49.     On at least one occasion, President Holtschneider overturned a tenure denial and granted tenure to a faculty member on the ground that his annual reviews had provided him no notice that there were deficiencies in his record or that he needed to improve his performance to satisfy the tenure criteria.

50.     The Faculty Handbook guarantees academic freedom, asserting that professors have the right to "freedom as they participate in the various forms of open inquiry and debate, as for example, . . . research and publication . . . ."

51.     The Faculty Handbook also incorporates by reference the guidelines of the American Association of University Professors ("AAUP"), which provide that "[t]eachers are entitled to full freedom in research and in the publication of the results . . ." and that "[f]reedom in research is fundamental to the advancement of truth." The AAUP guidelines specify that "[d]uring the probationary period a teacher should have the academic freedom that all other members of the faculty have."

10

52.     With respect to tenure, the AAUP guidelines state, "The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated."

53.     The AAUP's *Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments* states, "Good practice requires that the institution (department, college, or university) define its criteria for reappointment and tenure and its procedures for reaching decisions on these matters . . . . [F]airness to probationary faculty members prescribes that they be informed, early in their appointments, of the substantive and procedural standards that will be followed in determining whether or not their appointments will be renewed or tenure will be granted . . . . Any special standards adopted by their particular departments or schools should also be brought to their attention."

54.     In violation of the Faculty Handbook, the UBPT failed to provide Dr. Goswami copies of its recommendation of denial of tenure or the reasons for its recommendations.  She, therefore, did not have the opportunity to respond to the denials before the UBPT sent its negative recommendations to the President.  Nor did she have the opportunity to review the recommendations prior to submitting her internal appeal.  In fact, the UBPT has not provided her with its decision to this day.

55.     During the 2009-2010 academic year, DePaul rejected a disproportionate number of minority tenure applicants in favor of white tenure applicants with similar or inferior qualifications.  According to statistics provided by the University, every applicant denied tenure during the 2009-2010 academic year was a minority, while only 35.3 percent of the tenure applicants were minorities.  President Holtschneider did not deny tenure to a single white applicant; instead, he granted tenure to each of the 22 white applicants.

56.     During the 2009-2010 academic year, DePaul's Provost, Helmut Epp, unilaterally and in circumvention of DePaul's usual tenure process, promoted two non-tenure track white male professors to the rank of associate professor with tenure, even though they were not eligible for tenure at the time of their appointment to tenure positions.  The Provost's action violated the Faculty Handbook's requirement that "only a faculty member with a tenure track appointment is eligible for tenure" and that only the President, not the Provost, can grant tenure.

57.     DePaul has consistently discriminated against minority applicants in making its tenure decisions.  According to statistics provided by the University, in the twenty years preceding the 2009-2010 academic year, only 23.8 percent of the applicants for tenure were minorities, but 38.1 percent of the denied applicants were minorities.  Minority applicants for tenure were approximately twice as likely as white applicants to be denied tenure.  White tenure applicants had a 7.3 percent denial rate, while African-American tenure applicants had a 17.9 percent denial rate, Hispanic tenure applicants had a 12.5 percent denial rate, and Asian tenure applicants had a 12.2 percent denial rate.

58.     During the 2008-2009 academic year President Holtschneider denied tenure to only one white male professor.  Unlike Dr. Goswami, that professor was warned about serious deficiencies in his teaching and scholarship well in advance of his submission of his tenure application, and President Holtschneider found that the professor had demonstrated no intention of altering his teaching approach.  Unlike Dr. Goswami, the professor met only one of the three tenure performance criteria.  The UBPT vote to deny tenure in his case was unanimous and in agreement with the lower levels of review, unlike in Dr. Goswami's case.

59.     Between 2003 and 2010, white members of the Department of Philosophy repeatedly stated that Dr. Goswami had a problem with white men and was uncollegial toward

her white male colleagues because (referring to the fact that her husband is white) "she already had a white man to take care of her." Members of the department also used a Nazi salute to honor European philosopher Martin Heidegger.

60. On information and belief, President Holtschneider granted a faculty position to a white, male faculty member despite the fact that he lacked a doctoral degree and was not qualified for the position.

## Defendant's Denial of Tenure to Dr. Goswami

61. Dr. Goswami began her six-year probationary period at DePaul in August 2003.

62. As set forth below, Dr. Goswami exhibited overwhelmingly positive performance throughout her years as a tenure track professor at DePaul. Until the year she was denied tenure, DePaul gave her no indication that her performance was lacking in the areas of teaching, scholarship, or service, or that she was unlikely to receive tenure.

63. During her first five years at DePaul, Dr. Goswami received both annual "merit reviews," biennial "informal reviews," and biennial "formal reviews," the last of which are used to assess a candidate's progress toward tenure.

64. Dr. Goswami's first annual merit review, which covered her first five months at DePaul (August 2003 through December 2003), resulted in an overall recommendation of "Very Good."

65. Dr. Goswami's first biennial formal review, conducted during the second year of her probationary period, took place in November 2004. The review committee favorably evaluated her performance in all three areas of teaching, research and service. The committee wrote, "Given this strong beginning in the areas of teaching, research, and service, the review committee highly recommends that Namita Goswami's contract be renewed . . . . On the whole

the committee is pleased with the progress Namita is making as a teacher, a scholar, and a citizen of the department, college, and university." Regarding teaching: "On the whole, the committee is impressed with the good start Namita is making in her teaching." Regarding research: "The review committee noted that her research adds an important dimension to the department and hopes that more can be done to integrate her scholarship into departmental course offerings." Regarding service: "The committee is very pleased with her record of service to date."

66.    Dr. Goswami's second annual merit review (for calendar year 2004) similarly ranked her as "Very Good" overall, with rankings of "Very Good" in the areas of teaching and service, and "Good" in the area of research. However, Dr. Peg Birmingham (then chair of the Department of Philosophy) unfairly criticized Dr. Goswami for her alleged lack of collegiality in department meetings, conferences, and committee meetings. Dr. Birmingham racially stereotyped Dr. Goswami by stating that she was "needlessly confrontational" because she mentioned race and class issues when those issues were relevant to the discussion. In addition, when Dr. Goswami disagreed with a senior colleague regarding the diversity of the faculty invited for the department's visiting speaker's series, Dr. Birmingham criticized Dr. Goswami for making the senior colleague feel like a "passé old white guy."

67.    Dr. Birmingham assigned Dr. David Krell to conduct Dr. Goswami's first peer teaching review in 2004. After attending a class taught by Dr. Goswami which was cross-listed in the Department of Philosophy and the Women's and Gender Studies Program, Dr. Krell criticized the course as being "a women's studies or postcolonial women's studies" class rather than a philosophy class, and suggested that Dr. Goswami teach what he termed "our tradition," meaning "Plato, Aristotle, Kant, Hegel, de Beauvoir, Irigary, and Kristeva" – all white, European philosophers.

14

68.     Dr. Goswami sought several avenues of mediation to resolve her differences with Dr. Birmingham, including writing a formal letter to the dean on April 12, 2005, meeting with the dean on April 20, 2005, meeting with the University's ombudsperson on April 27, 2005, and meeting with the University's Senior Executive for Institutional Diversity on April 26, 2005.  Dr. Goswami also met with Dr. Birmingham on June 7, 2005.  After this meeting, Dr. Birmingham sent an email on June 7, 2005 in which she apologized for criticizing Dr. Goswami's collegiality and for using hearsay and an improper tone in the evaluation, and promised that her email would be kept in Dr. Goswami's permanent personnel file.  However, Dr. Birmingham never placed her email retracting her earlier remarks in Dr. Goswami's personnel file.

69.     On June 15, 2005, Dr. Birmingham conducted the first "informal review" of Dr. Goswami, as part of the evaluation process.  Once again, Dr. Birmingham raised an alleged lack of collegiality in this review, and based her allegations on hearsay, even though she had sent Dr. Goswami an email the week before in which she apologized for improperly relying upon unsupported hearsay.

70.     Dr. Birmingham assigned Dr. Peter Steeves to conduct Dr. Goswami's second peer teaching review in 2005.  Despite the fact that after her first peer teaching review, Dr. Goswami had requested that her second peer teaching review be conducted by a colleague with an understanding of interdisciplinary techniques and the core principles of critical race studies, Dr. Steeves lacked these qualifications.  After attending Dr. Goswami's introductory philosophy course, Dr. Steeves objected to Dr. Goswami's inclusion of African-American Nobel Laureate Toni Morrison's novel *Beloved* in the course materials.  *Beloved* was the only critical race text taught in the course, which included texts by the European philosophers Plato, Derrida, Adorno, and Kierkegaard.  Dr. Steeves stated that *Beloved* was a "nonphilosophic source" and that Dr.

15

Goswami should teach more "straightforward philosophic content."

71.     Also in 2005, Dr. Birmingham improperly criticized and undercut Dr. Goswami's authority after Dr. Goswami uncovered plagiarism in her class when two students, one white (an American citizen) and one black (a student from Africa), turned in the same paper. As Dr. Goswami could not tell whether one student had copied the other student's paper or both had obtained their paper from a third source, she reported her finding to the office responsible for handling plagiarism cases at DePaul. Dr. Birmingham repeatedly tried to force Dr. Goswami to "negotiate a settlement" with the white student, whose father had complained to Dr. Birmingham, in violation of the University's academic integrity policy. Dr. Birmingham did not make similar efforts with the black student. Dr. Birmingham had evidently concluded, on the basis of racial stereotypes, that the black student copied the white student's original research. In fact, a member of the academic integrity board met with both students and concluded that both students had acquired the same paper from a third source, *i.e.*, both were plagiarists. But that summer, after an expedited academic integrity hearing that Dr. Goswami could not participate in because she was abroad, the white student was found innocent while the black student was found guilty. Dr. Birmingham or another faculty member, without any input from Dr. Goswami, arbitrarily gave only the white student a final grade of A-minus for the course.

72.     Dr. Goswami's third annual merit review, for calendar year 2005, was conducted by Dr. Richard Lee, who was then the Chair of the Department of Philosophy. As in her second annual merit review, Dr. Goswami's overall rating was "Very Good," but this time, her teaching was rated as "Outstanding," her research as "Very Good" – both improvements from 2004 – and her service as "Very Good." Dr. Lee wrote regarding <u>teaching</u>: "You have found a way to make canonical philosophical texts speak about issues in conjunction with literature and other forms of

16

expression. This is having incredible success in reaching students. I note also that students feel your classes are challenging, and yet you are helpful in allowing them to succeed. *Your teaching seems inspired.*" (emphasis added). Regarding research: "I know from our conversations that you also have a substantial, on-going research agenda that currently focuses on your book manuscript. I am convinced that with your leave you will make great progress on this work. All in all, a very good research record." Regarding service: "If anything, I would say you need not have so much service, but you are obviously committed to participating in the governance of the institution and to helping it live up to its best potential."

73.     Dr. Goswami's fourth annual merit review, for calendar year 2006, was even more laudatory. Dr. Goswami's overall assessment was "Outstanding Minus," with both teaching and service rated as "Outstanding" and research as "Very Good Minus." Dr. Lee wrote regarding teaching: "The evaluations for these courses—all of them—are among the best I have ever seen. Not only are the numbers literally off the charts, but I have seldom seen such positive comments and so many of them. Both the numbers and the positive comments are across all the courses, from PHL 100 to your graduate seminar . . . . They comment on the rigor of your courses and the challenge your courses present . . . . Students are obviously responding to the questions you raise and the level of theoretical sophistication you bring to those issues." Regarding research: "In sum, this is a strong, substantial, and on-going research agenda." Regarding service: "All in all, this is an amazing record of service and you should be proud of your accomplishments."

74.     During the 2006-2007 academic year, Dr. Goswami's tenure clock was stopped for a full year due to her award of Competitive Paid Research Leave. Dr. Goswami spent that year working on her book project. She also wrote two essays that were accepted for publication,

presented at a scholarly conference, and continued to serve on the Committee for the Status of

Racial and Ethnic Diversity of the Society for Phenomenology and Existential Philosophy.

75.     In May 2007, Dr. Goswami was awarded the University's most prestigious

teaching prize, the Excellence in Teaching Award, and was chosen from among the other award

recipients to present the keynote address at the DePaul Honors Convocation.

76.     During her fifth annual merit review, for calendar year 2007, Dr. Goswami

received a rating of "Outstanding" in all three categories of teaching, research, and service, for

an overall rating of "Outstanding."  Once again, Dr. Lee commended her for her

accomplishments.  He wrote regarding <u>teaching</u>:  "What more could the department ask?"

Regarding <u>research</u>:  "This is an excellent record, particularly for someone who is on paid

leave."  Regarding <u>service</u>:  "This is an amazing record of service, particularly for a pre-tenure

faculty member."

77.     During the 2007-2008 academic year, Dr. Goswami observed that her own

contributions to the Department were being ignored or slighted.  For example, during the

departmental orientation in the fall of 2007, her Excellence in Teaching Award from May 2007

was not even mentioned, although a graduate student's teaching award was mentioned.

78.     In the fall of 2007, several graduate students expressed concern with the lack of

courses offered by the Department of Philosophy dealing with diversity in philosophy, and the

general hostility to the students' interest in pursuing critical race, feminist, and postcolonial

theories.  On October 17, 2007, Dr. Tina Chanter sent a message to the faculty of the Department

of Philosophy regarding the graduate students' concerns.  She stated, "Despite the fact that the

department advertises itself as representing diverse interests, students have found that there is in

general, not only a distinct lack of support for these areas, but that there is sometimes an active

18

hostility or dismissive attitude towards them . . . .  So grave are the concerns that some students have expressed serious reservations about remaining in the program . . . .  First, there is a pervasive atmosphere that students feel is unsupportive.  This includes both faculty and students reacting negatively to questions in the classroom coming from minority points of view.  Issues around gender, sexuality, race and disability are relevant here.  Students report that sometimes professors close down their questions, or tell them that their questions are not 'philosophical.'  As a result, these students are feeling marginalized, and alienated, and that they have been encouraged to come here under false pretenses.  Second, students think that there are not enough course offerings in these areas.  Third, students think that there are certain structural ways in which the department does not actively reflect its alleged commitment to diversity.  Gender ratios in graduate classrooms are disproportionate, a fact that contributes to the dominant masculinity of classroom atmosphere."

79.     In response to Dr. Chanter's message, Dr. Birmingham sent an email to the entire faculty criticizing postcolonial theory, the very area that Dr. Goswami had been hired to teach.  A number of minority graduate students have complained that Dr. Birmingham treated them poorly as compared to white graduate students and a disproportionate number have dropped out of the departmental graduate program because of Dr. Birmingham.

80.     In May 2008, Dr. Goswami had her second biennial formal review.  Dr. Lee, the department chair, convened an *ad hoc* Personnel Committee to conduct the review.  The Personnel Committee requested that Dr. Goswami provide them her CV, a personal statement, sample syllabi, teaching evaluations, and samples of her recently published work.  The Personnel Committee recommended that Dr. Goswami's contract be renewed for the 2009-2010 academic year, which would be the year of her tenure application.  Dean Charles Suchar accepted that

recommendation consistent with § 3.2.2 of the Faculty Handbook. Dean Suchar informed Dr. Goswami, on June 16, 2008, that based upon the Department's review, he was accepting their recommendation to renew her contract, and he stated, "[Y]our colleagues are quite pleased with your work. Happily, my own review of your record leads to the same conclusion."

81.     During the 2008-2009 academic year, Dr. Goswami took advantage of DePaul's "Flexible Scheduling" program. Even though faculty members on Flexible Scheduling typically do not stay in Chicago but travel elsewhere to conduct their research, Dr. Birmingham singled Dr. Goswami out for not having attended departmental talks and faculty meetings during that period, and used that to downgrade her "service" rating in her 2008 merit review. In December 2008, Dr. Goswami expressed her interest in participating in the prestigious *Collegium* seminar in Italy, a prominent professional opportunity. Dr. Birmingham was in charge of this seminar, and most of the DePaul philosophy faculty members have been invited to participate. However, Dr. Birmingham refused to invite Dr. Goswami despite the fact that she knew that the topic of that year's seminar was directly relevant to Dr. Goswami's research.

82.     In fall 2008, Dr. Birmingham became Interim Chair of the Department of Philosophy while Dr. Lee was on leave for the 2008-2009 academic year. Dr. Birmingham conducted Dr. Goswami's sixth annual merit review, for calendar year 2008, and downgraded Dr. Goswami in all three areas of evaluation even though 2008 was Dr. Goswami's best year in teaching, research, and service. Dr. Birmingham's review covered part of the same time period that had also been reviewed by Dr. Lee and the *ad hoc* Personnel Committee during the second biennial formal review, and had resulted in an overall rating of "Outstanding." Yet Dr. Birmingham rated Dr. Goswami as "Very Good Plus" in teaching, "Very Good" in research, and "Good" in service, for an overall rating of "Very Good Minus." This was Dr. Goswami's lowest

20

rating in an annual merit review for what was objectively her highest-achieving year at DePaul.

83.     Dr. Birmingham's evaluation of Dr. Goswami was based on several deliberate misstatements.  For example, Dr. Birmingham incorrectly stated that Dr. Goswami had only published one article in 2008, even though Dr. Goswami had published three articles during that period.  According to department policy, faculty members receive an "Outstanding" rating for research if they have two articles appear in print during the calendar year under review.  Dr. Birmingham also did not credit Dr. Goswami for the formal acceptances she had received in 2008 for two of her essays, but, instead, unfairly penalized Dr. Goswami for having done editorial revisions on those formally accepted essays.  Editorial revisions (based on reader reports) of formally accepted essays are a normal part of the publishing process.  In addition, Dr. Birmingham penalized Dr. Goswami for not having published most of what she had written in 2008, even though the academic publishing process normally takes at least a year.

84.     Similarly, Dr. Birmingham misrepresented Dr. Goswami's teaching in Dr. Goswami's sixth annual merit review.  She ignored students' comments regarding Dr. Goswami's success in building bridges with the European philosophical canon as well as the importance of the course for their own projects in European philosophy.  She also ignored Dr. Goswami's outstanding evaluations in the introductory level philosophy course.

85.     Dr. Birmingham also denigrated Dr. Goswami's service by deliberately ignoring her work on the Committee on the Status of Racial and Ethnic Diversity of the Society for Phenomenology and Existential Philosophy (of which Dr. Birmingham had served as co-director until October 2008), her service on the Undergraduate Affairs Committee, and her work building alliances with DePaul's interdisciplinary programs and institutes.

86.     Rather than crediting Dr. Goswami for her University-wide and field-wide

21

service, Dr. Birmingham actually punished Dr. Goswami for it, criticizing Dr. Goswami for not participating in the "life of the department." Dr. Birmingham also improperly singled out Dr. Goswami for allegedly not attending departmental talks and other public events, even though faculty on Flexible Scheduling are not expected to attend department meetings and events, attendance at events has never been used as a criterion in faculty members' evaluations, and the department has no means of measuring faculty members' attendance at events. Dr. Birmingham also repeated her past practice of using hearsay from anonymous colleagues to bolster her critiques, even though she had previously apologized in writing for the inappropriate use of unsubstantiated hearsay.

87.     On March 25, 2009, Dr. Goswami submitted a formal response to Dean Charles Suchar in response to Dr. Birmingham's sixth annual merit review, for calendar year 2008. Dr. Goswami's letter stated, "Regrettably, over the last 5 years, I have noticed a pattern of distortion and misrepresentation by Dr. Birmingham in her evaluation of my record, which includes Formal and Informal Reviews as well as Merit Evaluations. This review is the 4th time that her evaluation has misrepresented my record and relied on innuendo and hearsay. I experience these repeated distortions of my record as harassment and the creation and maintenance of a hostile workplace environment." Dr. Goswami also met with DePaul's Vice-President for Institutional Diversity to express her concerns about her discriminatory treatment.

88.     Dr. Goswami met with Dean Suchar during the week of March 30, 2009, and on April 8, 2009, Dean Suchar raised Dr. Goswami's overall rating for her 2008 merit review from "Very Good Minus" to "Very Good" on the basis of the research record. The merit review was not, however, rewritten, and therefore Dr. Birmingham's unsubstantiated criticisms remained in Dr. Goswami's personnel record.

89.     In April 2009, Dr. Birmingham, who was still serving as the department's Interim

Chair, improperly convened a third, *ad hoc* formal review – even though this review was not

permitted by the Faculty Handbook or by the department's written procedures, since Dr.

Goswami's second biennial formal review had taken place in May 2008.  Dr. Birmingham also

departed from department policy and precedent by not announcing the review to all department

faculty.  In violation of department policy and practice, Dr. Birmingham hand-selected the *ad*

*hoc* Personnel Committee to conduct Dr. Goswami's third formal review.

90.     Dr. Goswami was never told what documents Dr. Birmingham provided to the *ad*

*hoc* Personnel Committee.  Although the chair of the committee told Dr. Goswami that the

committee did not consider Dr. Goswami's annual merit reviews, one member of the committee

quoted directly from Dr. Birmingham's 2008 annual merit review of Dr. Goswami during a

committee meeting on May 1, 2009.  Another committee member told Dr. Goswami that Dr.

Birmingham gave the committee her own 2004 and 2008 annual merit reviews and 2005 biennial

informal review of Dr. Goswami.  Dr. Birmingham did not, however, give the committee Dr.

Goswami's formal letters of response to these reviews, Dr. Birmingham's June 2007 apology to

Dr. Goswami, or Dean Suchar's correction of Dr. Goswami's 2008 annual merit review.  Dr.

Birmingham also did not provide the committee with any of the stellar reviews for the previous

three years written by then-Chair Dr. Lee.

91.     Upon request, Dr. Goswami examined the contents of her personnel file, and

discovered that only the reviews written by Dr. Birmingham and Dr. Goswami's 2004 and 2005

peer teaching evaluations, which criticized Dr. Goswami's area of focus, were in Dr. Goswami's

personnel file.  All of the other materials had been removed from Dr. Goswami's personnel file.

92.     Dr. Goswami provided the *ad hoc* Personnel Committee with her CV, sample

syllabi for five courses, and a sample of published articles. At the request of one committee member, she also provided an initial rough draft of the prospectus of her forthcoming book manuscript, a work that was then still in progress. When Dr. Goswami expressed reservations about submitting an initial rough draft to the committee, she was told that unless she submitted the rough draft of the prospectus, the committee would not believe that she had a book project at all.

93.     In this same year, two white male colleagues (Drs. Avery Goldman and Sean Kirkland), were also being reviewed; both teach traditional European philosophy (Kant and Aristotle, respectively). However, while Drs. Goldman and Kirkland were evaluated based upon their peer-reviewed publications, teaching evaluations, and conference presentations, the Personnel Committee ignored those criteria in evaluating Dr. Goswami.

94.     The *ad hoc* Personnel Committee improperly considered whether Dr. Goswami – who had been hired specifically to focus on minority philosophers and interdisciplinary postcolonial, critical race, and feminist perspectives that had been overlooked in the traditional canon – shared the department's focus on European philosophy, which was diametrically opposed to the focus for which DePaul had hired her and which she had been instructed to apply in her scholarship and teaching. Specifically, the committee criticized Dr. Goswami for her background in postcolonialism and women's studies despite the fact that she had been hired to serve as an interdisciplinary scholar bridging multiple fields; the committee devalued Dr. Goswami's stellar teaching and research accomplishments by falsely stating that those accomplishments were not in the field of philosophy; and the committee criticized Dr. Goswami for not applying traditional methodologies or focusing on the traditional European philosophical canon, even though Dr. Goswami had been hired precisely because of her non-traditional focus.

95.     Based on its flawed evaluation criteria, the *ad hoc* Personnel Committee determined that Dr. Goswami was ineligible to apply for tenure during the 2009-2010 academic year.

96.     Never before in her probationary period had Dr. Goswami been informed that although she had been recruited and hired to teach in non-traditional fields in philosophy, she would be required to demonstrate achievements in a different area – traditional European philosophy – on which most of the department focused.

97.     The *ad hoc* Personnel Committee's determination was also based on deliberate misstatements of fact.  The committee falsely claimed that Dr. Goswami was unlikely to finish her book in the foreseeable future, even though she received an advance contract in August 2009 from SUNY Press, a highly respected University press, all five chapters were included in her tenure dossier, and her book was finished in February 2010.

98.     Citing "anonymous reports," the *ad hoc* Personnel Committee also falsely claimed that Dr. Goswami had a poor record of attendance at meetings and events, even though the Chair of the Undergraduate Affairs Committee and other faculty members attested to Dr. Goswami's exemplary participation, and the department has no accurate means of measuring faculty members' attendance at meetings and events.

99.     The *ad hoc* Personnel Committee made false, disparaging comments about questions that Dr. Goswami had asked during a graduate student's thesis defense, and stated falsely that Dr. Goswami did not possess the requisite commitment or preparation necessary properly to train graduate students.  The Personnel Committee's recollection of Dr. Goswami's conduct during the thesis defense contradicted the remarks of the student who had presented the defense.

100.     During a May 1, 2009 meeting with Dr. Goswami, members of the *ad hoc* Personnel Committee stated that critical race, postcolonial, and feminist theory are political and ideological rather than philosophical, criticized Dr. Goswami for her ostensible lack of service in the department even though all department service is assigned, and repeatedly prevented her from explaining the philosophical nature of her interdisciplinary scholarship and teaching.

101.     Following Dr. Goswami's May 1, 2009 meeting with the *ad hoc* Personnel Committee, one committee member stated that many members of the Department of Philosophy had never forgiven Dr. Goswami for having a degree in Women's Studies.

102.     On May 21, 2009, the *ad hoc* Personnel Committee recommended to Dean Suchar that Dr. Goswami's contract be terminated effective June 30, 2009, one month later.  This was entirely improper, because in June 2008 DePaul had approved Dr. Goswami's contract for the 2009-2010 academic year as a result of Dr. Goswami having received a rating of "Outstanding" during her 2008 biennial formal review.  The Faculty Handbook and the department's policies and procedures did not provide for an *ad hoc* review of the faculty member's eligibility to apply for tenure in the fifth year of the probationary period, just three months before the faculty member was scheduled to apply for tenure.  Summary revocation of Dr. Goswami's contract – if upheld at higher levels – would have also constituted a firing without cause and without advance notice, in violation of the Faculty Handbook and AAUP's *Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments*.

103.     Dr. Goswami was not provided with a copy of the *ad hoc* Personnel Committee's report when it was issued, despite repeatedly requesting it from Dr. Birmingham and the committee chair.  Instead, the committee's report and recommendation were submitted directly to Dean Suchar.  Many faculty in the Department of Philosophy did not know that the committee

had recommended that Dr. Goswami be summarily terminated. Dr. Goswami did not receive a copy of the committee's report, and the entire department was not made aware of the committee's recommendation, until Dean Suchar rejected the committee's recommendation and directed that the entire department consider the recommendation.

104. The *ad hoc* Personnel Committee recommended that the contracts of Dr. Goswami's two white male colleagues, Drs. Goldman and Kirkland, be renewed despite the fact that Dr. Goswami's qualifications were equivalent or superior to those of Drs. Goldman and Kirkland.

105. On May 25, 2009, seventeen graduate students in the Department of Philosophy wrote Dean Suchar a letter "to express [their] appreciation and respect for Professor Namita Goswami." The letter stated, "Professor Goswami has distinguished herself as a teacher and mentor--engaging our discipline's history, advancing our methodological depth, helping us develop mature philosophical projects, and deeply influencing our pedagogy. Professor Goswami is an incredibly effective graduate instructor. Her expertise is manifest, and her enthusiasm contagious. When she lectures on course texts, she does not impose her own views as the most important or valuable ones, but instead explains her own textual interpretations and accounts for why they are philosophically interesting, while always inviting further reflection and criticism. She knows how to appreciate students' comments, and encourages views other than her own. Professor Goswami's areas of expertise have been influential for the development of our work: The significance of post colonial theory on philosophical inquiry into questions related to the subject, the political and the ethical is immeasurable."

106. Dean Suchar rejected the *ad hoc* Personnel Committee's recommendation to revoke Dr. Goswami's 2009-2010 contract renewal, effective June 2009. Instead, he asked that

the entire Department of Philosophy review and vote on the *ad hoc* Personnel Committee's recommendation. This violated the Faculty Handbook and the Department of Philosophy's practice and written procedures.

107. Consistent with Dean Suchar's directive, the entire Department of Philosophy met on May 29, 2009. Dr. Birmingham did not tell Dr. Goswami before the May 29, 2009 meeting that summary termination or rescission of Dr. Goswami's contract was even a possibility. Nor did the Department of Philosophy follow any of the procedures that the Faculty Handbook established for termination.

108. During its May 29, 2009 meeting, the Department of Philosophy voted 9 to 6 to terminate Dr. Goswami effective June 30, 2010. The department voted to allow Dr. Goswami to apply for tenure during the 2009-2010 academic year, but to deny Dr. Goswami her 2010-2011 year of employment, which she was entitled to under the Faculty Handbook and the AAUP guidelines, which required the University to grant Dr. Goswami a "terminal year" of employment.

109. During the May 29, 2009 meeting, department faculty stated that most of Dr. Goswami's publications were "invited" and not peer reviewed in the "usual sense." There was no evidence to support the statement that Dr. Goswami's publications were not peer reviewed. Moreover, never before in considering a tenure candidate's dossier had the Department of Philosophy questioned the peer review process. For example, in Dr. Goldman's case, short conference presentations published in conference proceedings were counted as peer-reviewed journal publications.

110. Dr. Birmingham refused to allow the department to consider any of the materials that Dr. Goswami submitted, including drafts of in-progress book chapters, drafts of publications

that had been accepted for publication through a highly competitive blind peer-review process, and a letter from the editor of one of her publications attesting to the nature and rigor of the peer review process.

111.　During the May 29, 2009 meeting, members of the *ad hoc* Personnel Committee used racial stereotypes to falsely portray Dr. Goswami as having acted in an aggressive manner during her meeting with them on May 1, 2009.  The *ad hoc* Personnel Committee also suggested that Dr. Goswami's overall attitude was overly aggressive and that she should have been more deferential to her colleagues.  Department faculty also used race, color and national origin-based stereotypes by stating that Dr. Goswami had an "irremediable writing problem."

112.　During the same meeting, the Department voted to endorse the tenure applications of the two white male professors whose records were equivalent or inferior to Dr. Goswami's.

113.　The same day the Department of Philosophy voted to terminate Dr. Goswami, seven members of the Department of Philosophy, including one member of the *ad hoc* Personnel Committee, submitted a "minority report" in support of Dr. Goswami based on a full and fair assessment of her record.  The minority report stated that Dr. Goswami should be allowed to apply for tenure during the 2009-2010 academic year and contested the 2009 *ad hoc* Personnel Committee's characterization of the traditional identity and mission of the department as being focused on European philosophy.  The report stated, "Professor Goswami's teaching and scholarship . . . have contributed to the Department's continued distinction.  Her work on postcolonial theory, particularly her work on Gayatri Chakravorty Spivak, substantially expands our offerings both in feminist theory and in race theory, bringing important coverage to an area of feminist theory that was previously only addressed sporadically, and expanding our race theory offerings in a feminist direction.  Her teaching and scholarship employ a systematic and

philosophical point of view, meaning that her approach is simultaneously rooted within and yet also critical of the field." The minority report also observed that "Professor Goswami has proved herself to be an exceptional teacher . . . . Professor Goswami's scholarly credentials are also impressive . . . . Not only do Professor Goswami's scholarly articles demonstrate a fertile and sustained engagement with canonical texts; they also embody a theoretically sound, philosophically important, and conceptually coherent project. These interventions . . . constitute an original and incisive contribution to philosophical discourse."

114.   Dr. Richard Lee, the Department Chair, also wrote a letter in support of Dr. Goswami.

115.   Dean Suchar again rejected the recommendation of the Department that Dr. Goswami be terminated effective June 30, 2010, and concluded that she had the right to have a full year of employment for the 2010-2011 academic year and to be considered for tenure in the 2009-2010 academic year.

116.   In the fall of 2009, Dr. Goswami attempted to prepare for her tenure review, but the department chair and other senior members refused to give her any guidance on how to proceed. Dean Suchar sent a memo to the entire departmental faculty on September 15, 2009, reminding them of the department's obligation to comply with the established departmental, college, and university procedures for tenure and promotion.

117.   Opponents of Dr. Goswami attempted to put pressure on Dr. Lee to prevent Dr. Goswami from being granted tenure. In a letter to Dean Suchar, Dr. Goswami's opponents complained about the fact that Dr. Lee had supported Dr. Goswami. In response to the controversy caused by these complaints, Dr. Lee attempted to resign as department chair. Dr. Goswami's opponents also attempted to act as the "reporters" of her tenure review to the higher

levels in the University, which Dean Suchar rejected.

118.    Despite Dean Suchar's intervention, other faculty members continued to interfere with the fair evaluation of Dr. Goswami's credentials.  Dr. Elizabeth Rottenberg, a close friend of Dr. Birmingham, raised unsubstantiated concerns about Dr. Lee's involvement with Dr. Goswami's tenure review.  Dr. David Pellauer, the chair of the 2009 *ad hoc* Personnel Committee, demanded that Dr. Goswami provide additional documentation for her tenure application, despite the fact that department, college, and university protocol did not require such additional documentation, and other tenure candidates in the Department of Philosophy, including Dr. Goldman, were not required to submit such documentation.

119.    Dr. Pellauer also sent a survey to every faculty member in the department to determine how many departmental talks Dr. Goswami had attended in the previous year, even though attending talks is voluntary and not a criterion for tenure, and demanded that Dr. Goswami's prior informal and formal reviews be included in her tenure dossier (some of which criticized Dr. Goswami for not contributing to the department's "heritage" in European philosophy), even though the tenure dossier was not supposed to include these prior reviews.  Dr. Pellauer also attempted to provide the College Personnel Committee and the UBPT with the May 21, 2009 *ad hoc* Personnel Committee report recommending that Dr. Goswami be summarily terminated without cause effective June 30, 2009.  Dean Suchar rejected Dr. Pellauer's requests on the grounds that it was an improper change in procedure, which could not apply to current tenure candidates.

120.    During a departmental meeting on January 8, 2010, several faculty members in the Department of Philosophy disparaged Dr. Goswami's teaching skills by claiming that she had asked the students to nominate her for the Excellence in Teaching Award in May 2007 and that

students had been forced to sign the letter in support of Dr. Goswami's nomination. This was utterly false. In fact, a class of graduate students who had taken Dr. Goswami's Spring 2006 seminar on postcolonialism had chosen to nominate her for the award. Dr. Goswami was on academic paid leave when she was nominated, and until she received the award, she did not even know who had nominated her.

121. Faculty members also attempted to disparage Dr. Goswami's teaching skills in spite of her superb teaching evaluations by stating that it was "difficult to separate appreciation for the topics from appreciation for the instructor." The Department did not make this false distinction in considering the teaching evaluations of any white candidates.

122. In addition, several members of the Department of Philosophy criticized Dr. Goswami for not being fluent in German, despite the fact that fluency in German had never before been raised as a job requirement or an evaluation criterion, fluency in German was not necessary in Dr. Goswami's areas of focus, and Dr. Goswami is fluent in Hindi, Punjabi, and Urdu, and proficient in Spanish and French. On information and belief, Dr. Goswami is proficient in more languages than any other faculty member in the Department of Philosophy.

123. In addition, faculty members asserted ad hominem attacks on Dr. Goswami's qualifications during the January 8, 2010 departmental meeting. For example, faculty members asserted that the "problem" with Dr. Goswami's scholarship was "'not a 'writing problem,' it's a 'thinking problem,'" stated that "when the philosophical issues get hard [Dr. Goswami's work] either goes rhetorical or it becomes trite," and stated that Dr. Goswami's "grasp of basic philosophical concepts is shallow and trite . . . . It is not likely that she would ever be able to produce scholarship of a high quality." A faculty member also stated that the essay that Dr. Goswami had co-authored with her husband, a white male, was the strongest of her published

work.  The only concrete example that any faculty member referred to in Dr. Goswami's scholarship was a paragraph quoted from an article that Dr. Goswami had co-authored as a graduate student and submitted with her initial job application in 2002.  The faculty member stated erroneously that that article was co-authored with Dr. Goswami's husband.

124.    Faculty members also stated that one of Dr. Goswami's external peer reviewers, Dr. Charles Mills, was unfairly biased in her favor.  Dr. Mills had offered an "enthusiastic endorsement" of Dr. Goswami's work and stated that he was "struck by the thoroughness of Goswami's research and the conscientiousness of the canvassing of the existing literature . . . . Praiseworthy also is the . . . measuredness of her tone in a field(s) where the lapse into polemic is a standing temptation."  The faculty members' claim of bias was based on the fact that an unidentified faculty member claimed to have seen Dr. Goswami dining with Dr. Mills at an unidentified conference.  But Dr. Mills had been chosen by the *department*, not by Dr. Goswami, to serve as an external peer reviewer of Dr. Goswami's scholarship.  Dr. Goswami had never suggested that Dr. Mills be chosen.  Moreover, it is commonplace for professors in the same field to socialize at professional events.  Aside from Dr. Goswami's case, the Department of Philosophy has never viewed such affiliation as giving rise to unfair bias in a peer review.  For example, one of Dr. Rottenberg's external peer reviewers was a personal friend of hers, and one of Dr. Goldman's external peer reviewers stated that he knew Dr. Goldman personally from having served on panels with him.

125.    In contrast, the department evaluated white, male candidates according to the criteria enumerated in the Faculty Handbook, considering their peer-reviewed publications, teaching evaluations, and conference presentations.

126.    During its January 8, 2010 meeting, the Department of Philosophy voted 11 to 7

33

(with one abstention) to recommend that Dr. Goswami's application for tenure and promotion be denied. Dr. Lee prepared the majority report, which cut and pasted verbatim much of the department's May 29, 2009 meeting minutes. Statements made during the May 2009 meeting were altered to make it appear that they had been made during the January 8, 2010 meeting.

127. Every faculty member who voted to recommend that Dr. Goswami's application for tenure and promotion be denied is white. All of the minority faculty members either voted that Dr. Goswami's tenure application be granted or abstained.

128. The two minority reports submitted by faculty members documented in detail the numerous procedural and substantive errors in the department's evaluation of Dr. Goswami. These included the majority's improper change to Dr. Goswami's job description by rejecting her teaching and research in transnational and multicultural feminism, critical race, and postcolonial studies – the very areas for which she had been hired – and instead evaluating her work by whether it would contribute to European philosophy, as well as their failure to substantiate their allegations of inadequacies in her teaching and research.

129. During the January 8, 2010 meeting, the Department voted to grant tenure to Dr. Goldman even though his scholarship, teaching, and service were inferior to that of Dr. Goswami. His book had not been accepted for publication at the time of the department vote, a fact omitted in the Department discussion of his case. Dr. Goswami's book had been accepted for publication by that time.

130. In February 2010, Provost Epp unilaterally solicited a vote from DePaul's Women's and Gender Studies Program faculty to accept Dr. Goswami being transferred from the Philosophy Department into the Women's and Gender Studies Program. After that department unanimously voted to accept Dr. Goswami, Provost Epp rescinded the offer to transfer her to that

34

program.

131. On March 13, 2010, the College Personnel Committee, with Dean Suchar's concurrence, unanimously rejected the decision of the Department of Philosophy to deny Dr. Goswami's tenure application. The CPC sharply criticized the "unfair," "offensive, baseless and illogical" departmental report. Specifically, the CPC "question[ed] the conclusions of aspects of the departmental report that particularly relate to Dr. Goswami's competency as a philosopher and the quality of her scholarship and its adequacy for promotion and tenure."

132. Regarding teaching, the CPC wrote that it was clear from Dr. Goswami's awards and student evaluations that her teaching skills were outstanding. "It is notable," the CPC wrote, "that the very positive results of student course evaluations and the very positive tone of the peer evaluations are at some odds with the tone of the departmental evaluation for promotion and tenure with regard to Dr. Goswami's teaching. The CPC notes this inconsistency and is, frankly, puzzled by it."

133. Similarly, regarding scholarship, the CPC wrote that it was "puzzled by the majority evaluation of [Dr. Goswami's] record. The CPC questions the stringency of her review by the department on the merits of her scholarship. The CPC is particularly concerned with the tone of the departmental report that makes such statements describing her 'problem' as '. . . it is not a writing problem, it's a thinking problem . . .', among other statements." The CPC concluded that Dr. Goswami "demonstrate[d] her remarkable engagement with philosophy as a field" and "definitely refute[d] the claim that she is not a strong thinker, and not 'doing' philosophy effectively. Strong, well-placed publications, a new book completed from scratch and placed in a top university press – all speak to her ability to continue a strong record of research."

134.    The CPC noted that Dr. Goswami's external reviewers agreed that her work was "of 'high quality'" and "original and insightful." The CPC stated that "[i]t was, therefore, of some concern to the CPC that even these generally positive evaluations were 'sampled' for a few negative-sounding comments" intended to imply "that aspects of her scholarship were problematic."

135.    Finally, the CPC found that Dr. Goswami's record of <u>service</u> was "excellent to outstanding." Citing the many committees on which Dr. Goswami served, the CPC concluded, "the CPC sees this as an impressive service record for a faculty member during their probationary period."

136.    The CPC strongly and unanimously recommended that Dr. Goswami's tenure application be granted.

137.    Dean Suchar, Dean of the College of Liberal Arts and Sciences, also strongly recommended that Dr. Goswami's tenure application be granted.

138.    The recommendation of the CPC and Dean Suchar was forwarded to the UBPT, which was presided over by Provost Epp.

139.    In violation of § 3.6.1 of the Faculty Handbook, Provost Epp failed to ensure that graduate student representatives address the UBPT. Upon information and belief, he did so to deny Dr. Goswami the support that the department's graduate students were known to have of her tenure.

140.    Dr. Lee conducted Dr. Goswami's seventh annual merit review, for calendar year 2009, based on her tenure dossier. He rated her as "Outstanding Minus" overall, even as these were the same materials on which the Department of Philosophy based its denial of tenure to Dr. Goswami. Though Dr. Lee omitted separate ratings and comments for teaching, research, and

service, he commended her on her contributions to her department and to the University.

141.    Dr. Goswami met with the UBPT on April 30, 2010.  During the meeting, the UBPT did not ask Dr. Goswami any questions about her scholarship.  Rather, the UBPT focused on the conflict between the members of her department that supported her and the majority of her department advocating that she be terminated.  The questions that the members of the UBPT asked made it clear that the UBPT intended to support the department majority's position rather than credit the College Personnel Committee's impartial evaluation or impose its own subjective evaluation of Dr. Goswami's tenure application.  For example, the UBPT stated, "They say you teach gender and not philosophy," and "They say that students confuse enjoying the material and your teaching."  The UBPT also asked Dr. Goswami, "How do you explain the department vote?", "Do you think your department is biased against you?", and "Do you have any personal conflicts in the department?"

142.    The UBPT, by a majority vote (6 to 1), recommended that Dr. Goswami's application for tenure and promotion to associate professor be denied.

143.    In violation of DePaul's tenure procedures, DePaul did not provide Dr. Goswami with the UBPT Report.

144.    On June 14, 2010, Present Holtschneider informed Dr. Goswami in a cursory letter that he accepted the UBPT's recommendation, based on the fact that the majority of the UBPT agreed with the Department of Philosophy "that [her] record of scholarship did not sufficiently meet the criteria for promotion and tenure."  He did not provide substantiation for his conclusion, as none existed.

145.    Dr. Goswami requested a formal review by the Faculty Council, which submitted its findings to Provost Epp on November 19, 2010.  The Review Board concluded, by a vote of 2

to 1, that the evaluation of her petition for tenure and promotion had not been conducted in accordance with the Faculty Handbook policies and procedures, that the failure to award her tenure violated her academic freedom, and that her negative tenure decision should be reversed.

146.    Under § 5.1.1 of the Faculty Handbook, once the Review Board found that Dr. Goswami's "academic freedom ha[d] been violated," DePaul had two options: "the dean may recommend that another contract be offered or that a review of the case be conducted in accord with those procedures ordinarily reserved for tenured faculty being dismissed for cause."

147.    On December 1, 2010, President Holtschneider ignored the Appeal Board's findings and the procedures provided for in the Faculty Handbook. Relying solely on the Departmental review which had been demonstrated to have serious flaws and procedural violations and whose conclusions were unsubstantiated by Dr. Goswami's factual record of achievement, President Holtschneider found "no evidence that [Professor Goswami's] academic freedom was violated, and, therefore, he denied her appeal.

148.    President Holtschneider improperly preempted the procedures called for by the Faculty Handbook governing findings by a Review Board on violations of academic freedom. First, President Holtschneider violated § 5.1.1 of the Faculty Handbook by denying Dr. Goswami's appeal despite the fact that such a decision was to be made by the Appeal Board, which had already voted to grant the appeal. Second, President Holtschneider violated § 5.1.1 of the Faculty Handbook by removing the Dean's ability to make a recommendation with regard to further review of the complaint. President Holtschneider has never upheld a Review Board finding in favor of a female candidate while upholding a Review Board finding in favor of at least one male candidate.

149.    Because Dean Suchar was not given the opportunity to recommend that another

contract be offered to Dr. Goswami, DePaul's only remaining option was for Dr. Goswami's case to be reviewed "in accord with those procedures ordinarily reserved for tenured faculty being dismissed for cause," under § 4.4.2 of the Faculty Handbook.

150.    President Holtschneider also violated the Faculty Handbook by refusing to grant Dr. Goswami a review of her case pursuant to § 4.4.2 of the Faculty Handbook.

151.    On December 15, 2010, the AAUP informed President Holtschneider that his actions violated both the Faculty Handbook and the AAUP's *Recommended Institutional Regulations on Academic Freedom and Tenure*.  The AAUP noted that there were a number of other reported problems with tenure applications at DePaul, which has disproportionately and adversely affected female and minority faculty members.

152.    A representative of the AAUP met with counsel for DePaul on February 23, 2011, and again emphasized that DePaul's conduct with respect to Dr. Goswami's tenure denial violates the Faculty Handbook and the AAUP's guidelines.

153.    Since August 2011, Dr. Goswami has written five scholarly articles that have been either accepted or are in press at prestigious peer reviewed journals and edited volumes. She has continued revising her book manuscript.  In addition, Dr. Goswami is co-editing a volume *Women in Philosophy: Why Race and Gender Still Matter* to be published by Pickering & Chatto (Cambridge University Press).  Dr. Goswami and her two co-editors have also been invited by Pickering & Chatto to be editors of a book series on Women in Philosophy.

154.    Since August 2011, Dr. Goswami has continued to present her scholarship at major national venues.  In October 2011, she was a featured plenary speaker at the Society for Phenomenology and Existential Philosophy (SPEP), the most prestigious professional organization in Continental Philosophy.  In April 2012, Dr. Goswami presented work at the

annual Philosophia conference. She will be presenting at other prestigious venues such as the
California Roundtable on Philosophy and Race and the Radical Philosophy Association. She has
received invitations to present her work to the Department of Philosophy at Lewis University
(IL) and the Department of Philosophy at University of North Carolina (Charlotte). In addition,
she served as chair of the program committee for the Society for Women in Philosophy (SWIP)
for their annual North-Eastern Division meeting (April 2012).

## COUNT I – BREACH OF CONTRACT

155.   The foregoing paragraphs are incorporated by reference as if restated herein.

156.   Defendant DePaul University, through its Faculty Handbook, its tenure practice,
and the statements of its agents, has defined the procedures and criteria for tenure and promotion,
and thereby created the terms of employment contracts between Dr. Goswami and Defendant.

157.   By accepting her appointment as a tenure track faculty member at DePaul, Dr.
Goswami and Defendant DePaul University agreed that her tenure application was to be
governed by the Faculty Handbook's tenure criteria and procedures, as further clarified by
criteria specific to Dr. Goswami's school and department, her annual departmental reviews, and
verbal and formal pronouncements of University officials guiding tenure track faculty.

158.   The Faculty Handbook and AAUP guidelines, which form part of Dr. Goswami's
contract with Defendant DePaul University, guarantee academic freedom, and prohibit denial of
tenure because of disagreement with faculty members' substantive work or because of bias
against professors' areas of research.

159.   The AAUP guidelines also require that faculty members "be informed, early in
their appointments, of the substantive and procedural standards that will be followed in
determining whether or not . . . tenure will be granted."

160.    The Faculty Handbook and the AAUP Guidelines also provide that DePaul will provide annual evaluations of the faculty members' progress toward tenure standards.

161.    Throughout her first four years as a tenure track faculty member DePaul represented to Dr. Goswami that she was making excellent progress toward tenure, and at no time did DePaul inform Dr. Goswami of any significant deficiencies that she needed to cure in order to receive tenure.

162.    In denying Dr. Goswami's tenure application, Defendant DePaul University applied new criteria that exceeded the scope of the criteria set forth in the Faculty Handbook or otherwise explained by the guidance of Dr. Goswami's department and the University and in Dr. Goswami's formal performance evaluations.

163.    Defendant DePaul University improperly discounted Dr. Goswami's focus on critical race studies and interdisciplinary studies, despite the fact that DePaul had hired Dr. Goswami specifically to focus on those areas of study and had never informed her during her probationary period that that focus would be viewed as a deficiency.

164.    In determining that Dr. Goswami's teaching and research were not acceptable because the University disagreed with her areas of research and deciding not to credit scholarship that dealt with critical race studies or diversity issues – areas of study in which the University disagreed with Dr. Goswami – the University violated Dr. Goswami's right to academic freedom as set forth in the Faculty Handbook and by the AAUP.

165.    Defendant DePaul University distorted Dr. Goswami's record of scholarship by failing to credit all of her publications, failing to credit her substantial work toward a book, speculating that her book was unlikely to be published without any legitimate basis for doing so when in fact she has a contract for publication, and openly ridiculing critical race and diversity

41

studies.

166.     In denying Dr. Goswami's tenure application, Defendant DePaul University applied extraneous, ad hoc, and discriminatory criteria to Dr. Goswami's application, which had never been applied to other tenure applicants and of which Dr. Goswami had never been informed, based on race and gender-based stereotypes and animus toward Dr. Goswami's area of focus.  For example, Defendant erroneously alleged that most of Dr. Goswami's publications had not been peer-reviewed, but did not draw a distinction between peer-reviewed publications and non-peer-reviewed publications for any other tenure candidate; Defendant erroneously criticized Dr. Goswami for having poor attendance at department events while she was on academic leave, but did not expect other faculty members to attend events while on academic leave; Defendant falsely claimed that Dr. Goswami's receipt of the Excellence in Teaching award was not indicative of her excellent teaching ability; and Defendant criticized Dr. Goswami for not being fluent in German, even though fluency in German was not necessary and had never before been raised as an evaluation criterion.  President Holtschneider refused to accept the Review Board decision on Dr. Goswami's tenure appeal and refused to grant Dr. Goswami a hearing, in violation of the Faculty Handbook and the AAUP guidelines.

167.     Defendant's denial of Dr. Goswami's tenure application breached its contract with her.

168.     Dr. Goswami suffered harm to her career, lost wages and benefits, future economic harm, and other consequential damages as a result of Defendant's unlawful conduct.

## COUNT II  –  INTENTIONAL INTERFERENCE WITH CONTRACT

169.     The foregoing paragraphs are incorporated by reference as if fully stated herein.

170.     Dr. Goswami had an enforceable contract with DePaul University.

171.    Defendant Peg Birmingham was aware of Dr. Goswami's contract with DePaul University.

172.    Dr. Birmingham intentionally procured a termination of Dr. Goswami's contractual relationship with DePaul by unfairly criticizing Dr. Goswami for her alleged lack of collegiality; racially stereotyping Dr. Goswami by stating that she was "needlessly confrontational" and that she made a senior colleague feel like a "passé old white guy;" improperly relying upon unsupported hearsay in her evaluations of Dr. Goswami's performance; sending an email to the entire Department of Philosophy faculty criticizing postcolonial theory, the very area that Dr. Goswami had been hired to teach; singling Dr. Goswami out for not attending departmental talks and faculty meetings; refusing to invite Dr. Goswami to a prestigious collegiums despite the fact that she knew that the topic of that year's seminar was directly relevant to Dr. Goswami's research; downgrading Dr. Goswami in all three areas of evaluation in her sixth annual merit review based on deliberate misstatements and omissions, resulting in the lowest rating during her probationary period; improperly convened a third, *ad hoc* formal review in April 2009 even though this review was not permitted by the Faculty Handbook or by the department's written procedures; voting in May 2009 to terminate Dr. Goswami effective June 30, 2010 in violation of Dr. Goswami's contract with DePaul; refusing to allow the department to consider any of the materials that Dr. Goswami submitted before making its May 2009 vote; using racial stereotypes to falsely portray Dr. Goswami as having acted in an aggressive manner; voting to deny Dr. Goswami's tenure application; and voting to grant the tenure applications of the two white male professors whose records were equivalent or inferior to Dr. Goswami's.

173.    Dr. Birmingham took these actions knowing that they would lead to termination

43

of Dr. Goswami's contractual relationship with DePaul.

174.    DePaul terminated its contractual relationship with Dr. Goswami as a result of Dr. Birmingham's interference with Dr. Goswami's contractual relationship with DePaul.

175.    Dr. Goswami has suffered economic and reputational damages arising from Dr. Birmingham's intentional procurement of the termination of Dr. Goswami's contract with DePaul.

176.    Dr. Birmingham's actions were taken in bad faith, were intentional, and directly and proximately caused, and continue to cause, Dr. Goswami a loss of income and other financial benefits, emotional distress, embarrassment, humiliation, indignity, and damage to her professional reputation, the exact amount to be proven at trial, plus interest thereon.

## COUNT III  –  RACE AND COLOR DISCRIMINATION
## IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981

177.    The foregoing paragraphs are incorporated by reference as if restated herein.

178.    The Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), prohibits discrimination on the basis of race or color in the making, enforcement, performance, modification, and termination of contracts, including employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

179.    Section 1981 prohibits an employer from engaging in harassment that creates a hostile or offensive working environment by subjecting an employee to intimidation, ridicule, or insult because of the employee's race.

180.    Dr. Goswami's qualifications and work performance were excellent, and but for her race and color, defendants would have continued to employ her.

181.    Defendants DePaul University and Peg Birmingham discriminated against Dr. Goswami on the basis of her race (Indian) and her color (brown), by downgrading her

44

evaluations, criticizing her teaching and research in critical race studies, criticizing her involvement with diversity issues, and by terminating her employment, unfairly criticizing her teaching and research, attempting to terminate her employment early to deny her the opportunity to come up for tenure, denying her tenure, denying her appeal, refusing to grant her a hearing as required by findings of academic freedom violations by the appeal board, and refusing to grant her appeal.

182.    Defendants DePaul University and Peg Birmingham discriminated against Dr. Goswami based on her race and color by suggesting that Dr. Goswami teach "our tradition," meaning white, European philosophers; by criticizing Dr. Goswami for not contributing to the philosophy department's "heritage" in European philosophy; by asserting that Dr. Goswami had a "thinking problem;" by stating that Dr. Goswami was "needlessly confrontational" because she discussed race and class when those issues were relevant; by stating that the essay that Dr. Goswami had co-authored with her husband was the strongest of her published work, implying that Dr. Goswami could only produce quality scholarship with the assistance of a white man; by criticizing Dr. Goswami for making a white, male colleague feel like a "passé old white guy" after she raised issues of diversity during a meeting; by repeatedly stating that Dr. Goswami had a "problem" with white men and was uncollegial toward her white male colleagues because she "already had a white man to take care of her;" and by using a Nazi salute to honor European philosopher Martin Heidegger.

183.    Defendants DePaul University and Peg Birmingham did not subject similarly situated white male professors such as Dr. Goldman to discriminatory conduct.

184.    Defendants DePaul University and Peg Birmingham granted tenure to similarly situated white male professors such as Dr. Goldman despite the fact that their qualifications are

equivalent or inferior to those of Dr. Goswami.

185.    Defendants' actions toward Dr. Goswami described above constitute race and color discrimination, including the creation of a racially hostile work environment, in violation of 42 U.S.C. § 1981.

186.    Defendants DePaul University and Peg Birmingham exhibited a pattern and practice of race and color discrimination by denying tenure to a disproportionate number of qualified minority tenure candidates while granting tenure to a disproportionate number of equally qualified or less qualified white tenure candidates.

187.    Defendants engaged in their discriminatory actions intentionally, willfully, maliciously, with reckless indifference to Dr. Goswami's federally protected rights, and with intent to harm her.

188.    Defendants' actions described above directly and proximately have caused, and continue to cause, Dr. Goswami to suffer severe emotional distress, anguish, pain and suffering, humiliation, indignity, personal embarrassment, damage to her reputation and loss of past income and benefits, and future income and benefits.

## COUNT IV – RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981

189.    The foregoing paragraphs are incorporated by reference as if restated herein.

190.    Dr. Goswami engaged in statutorily protected activities when she complained to Defendant that she had been subjected to a hostile work environment and unlawful discrimination in March 2009.

191.    On May 21, 2009, the *ad hoc* Personnel Committee of the Department of Philosophy recommended to Dean Suchar that Dr. Goswami's contract be terminated.

192.    Defendant DePaul University denied Dr. Goswami tenure in retaliation for Dr.

46

Goswami's complaints of discrimination.

## COUNT V – DISCRIMINATION ON THE BASIS OF
## RACE, COLOR, NATIONAL ORIGIN, AND GENDER IN VIOLATION OF TITLE VII

193.     The foregoing paragraphs are incorporated by reference as if restated herein.

194.     Defendant DePaul University denied Plaintiff tenure because of her race, color, national origin, and gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

195.     Throughout her probationary period Plaintiff met or exceeded DePaul's tenure expectations.

196.     Defendant DePaul University denied Plaintiff tenure because of her race, color, national origin, and gender by suggesting that Dr. Goswami teach "our tradition," meaning white, European philosophers; by criticizing Dr. Goswami for not contributing to the philosophy department's "heritage" in European philosophy; by criticizing her background in women's studies and her scholarship in feminist theory; by asserting that Dr. Goswami had a "thinking problem;" by stating that Dr. Goswami was "needlessly confrontational" because she discussed race and class when those issues were relevant; by stating that the essay that Dr. Goswami had co-authored with her husband was the strongest of her published work, implying that Dr. Goswami could only produce quality scholarship with the assistance of a white man; by criticizing Dr. Goswami for making a white, male colleague feel like a "passé old white guy" after she raised issues of diversity during a meeting; by repeatedly stating that Dr. Goswami had a "problem" with white men and was uncollegial toward her white male colleagues because she "already had a white man to take care of her;" and by using a Nazi salute to honor European philosopher Martin Heidegger; by unfairly criticizing her teaching and research; by attempting to terminate her employment early to deny her the opportunity to come up for tenure; by denying

her tenure; by denying her appeal; by refusing to grant her a hearing as required by findings of

academic freedom violations by the appeal board; by refusing to grant her appeal; by denying

tenure to a disproportionate number of women; and by denying the appeals of all female

candidates after findings in their favor by appeal boards and granted the appeal of at least one

man.

197.    Defendant DePaul University's actions were taken in bad faith, were intentional,

and directly and proximately caused, and continue to cause, Dr. Goswami a loss of income and

other financial benefits, emotional distress, embarrassment, humiliation, indignity, and damage

to her professional reputation, the exact amount to be proven at trial, plus interest thereon.

## COUNT VI – RETALIATION IN VIOLATION OF TITLE VII

198.    The foregoing paragraphs are incorporated by reference as if restated herein.

199.    Dr. Goswami engaged in statutorily protected activity when she complained to

Defendant that she had been subjected to harassment and discrimination on the basis of her race,

color, national origin, and gender.

200.    Defendant DePaul University denied Dr. Goswami tenure in retaliation for her

complaints of discrimination and harassment.

201.    Defendant DePaul University denied tenure to a disproportionate number of

women, denied the appeals of all female candidates after findings in their favor by appeal boards,

and granted the appeal of at least one man after Dr. Goswami publicly protested the

discrimination in her tenure denial, including in several newspaper articles.

202.    Defendant DePaul University's actions were taken in bad faith, were intentional,

and directly and proximately caused, and continue to cause, Dr. Goswami a loss of income and

other financial benefits, emotional distress, embarrassment, humiliation, indignity, and damage

to her professional reputation, the exact amount to be proven at trial, plus interest thereon.

WHEREFORE, Plaintiff respectfully requests:

A.    Reinstatement at the rank of Associate Professor with Tenure at DePaul;

B.    Compensation for lost wages and benefits;

C.    Compensation for future lost wages if Plaintiff is not reinstated;

D.    Emotional distress damages;

E.    Other compensatory damages;

F.    Punitive damages;

G.    Attorney's fees and costs;

H.    Pre- and post-judgment interest; and

I.    Such other relief as law and justice allow.

Dated:  September 7, 2012

Respectfully Submitted,

s/ Marc Siegel

Marc J. Siegel, Esq. (No. 06238100)
Caffarelli & Siegel Ltd.
180 N. Stetson, Suite 3150
Chicago, IL  60601
Phone: (312) 540-1230
Fax: (312) 540-1231
m.siegel@caffarelli.com

Lynne Bernabei (No. 938936)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C.  20009-7124
Phone: (202) 745-1942
Fax: (202) 745-2627
bernabei@bernabeipllc.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

_____

|  |  |
|---|---|
| NAMITA GOSWAMI, | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )          Civil Action No. _____ |
| | ) |
| DEPAUL UNIVERSITY | ) |
| | ) |
| Defendant | ) |
| | ) |
| _____ | ) |

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.


Respectfully Submitted,

s/ Marc Siegel

Marc J. Siegel, Esq. (No. 06238100)
Caffarelli & Siegel Ltd.
180 N. Stetson, Suite 3150
Chicago, IL 60601
Phone: (312) 540-1230
Fax: (312) 540-1231
m.siegel@caffarelli.com

Lynne Bernabei (No. 938936)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
Phone: (202) 745-1942
Fax: (202) 745-2627
bernabei@bernabeipllc.com

50