**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Namita Goswami, | |
| Plaintiff, | |
| v. | No. 12-CV-07167 |
| DePaul University, | |
| and | |
| Peg Birmingham, | |
| Defendants. | |

**ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT DEPAUL UNIVERSITY
AND DEFENDANT PEG BIRMINGHAM**

Now come the Defendants DePaul University ("DePaul") and Peg Birmingham ("Dr. Birmingham) (collectively, "Defendants"), by and through their attorneys, Michael Best and Friedrich LLP, and for their Answer to Plaintiff's Complaint, state as follows:

*INTRODUCTION*

*Plaintiff Namita Goswami, by and through her undersigned counsel, seeks redress for gender, race, color, and national origin discrimination and retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; and for breach of contract under Illinois state law. Defendant DePaul University denied tenure and promotion to Dr. Goswami on the basis of her gender, race, color, and national origin, in retaliation for her complaints of discrimination, and in denial of her right to academic freedom to teach and research in the areas of feminist and critical race studies.*

**ANSWER:**

Defendants deny the allegations in the Introduction. Defendants specifically deny that Plaintiff is entitled to redress for gender, race, color, or national origin discrimination or redress

for retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.; and for breach of contract under Illinois state law.

## JURISDICTION AND VENUE

*1.      This action is authorized and instituted pursuant to Section 1981; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; and by Illinois common law.*

**ANSWER:**

1.      The allegations in Paragraph 1 state a legal conclusion to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 1.

*2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1343, and 1367.*

 **ANSWER:**

2.       Defendants admit that the Court has subject matter jurisdiction to hear this matter.

*3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because all of the unlawful employment practices alleged herein occurred in this district.*

**ANSWER:**

3.      Defendants admit that venue is proper in this Court.  Defendants deny the remaining allegations in Paragraph 3.

*4.      Dr. Goswami timely filed a Charge of Discrimination, Charge No. 440-2011-03135, with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging*

*discrimination on the basis of race, color, national origin, gender, and retaliation on April 5, 2011.*

**ANSWER:**

4.     Defendants admit that Plaintiff filed a Charge of Discrimination, Charge No. 440-2011-03135, with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of race, color, sex, national origin, and retaliation on April 5, 2011. Defendants state that Dr. Goswami's EEOC Charge speaks for itself and is the best evidence of its contents.  Defendants otherwise deny the allegations in Paragraph 4.

*5.     The EEOC issued Dr. Goswami a Notice of Right to Sue on Charge No. 440-2011-03135 on June 11, 2012.*

**ANSWER:**

5.     Defendants admit the allegations in Paragraph 5.

*THE PARTIES*

*6.     Dr. Goswami is a female residing in Illinois, is of Indian national origin, and was an employee of DePaul within the meaning of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e(f).*

**ANSWER:**

6.     Defendants admit that Plaintiff is a female and was an employee of DePaul. Defendants lack knowledge or information sufficient to form a belief as to Plaintiff's national origin, and therefore deny the allegation regarding the same and demand strict proof thereof. Defendants further lack knowledge or information sufficient to form a belief as to Dr. Goswami's current residence, and therefore deny the allegations regarding the same and demand strict proof thereof.  The remaining allegations in Paragraph 6 set forth a legal conclusion to which no response is required.

7.     *Defendant DePaul University is a not-for-profit corporation properly recognized and sanctioned by the laws of the State of Illinois.  At all times relevant hereto, DePaul has conducted and continues to conduct business in the State of Illinois.  DePaul is engaged in an industry that affects commerce and is an employer for the purposes of 42 U.S.C. § 2000e(b).*

**ANSWER:**

7.     Defendants admit that DePaul is a not-for-profit corporation properly recognized and sanctioned by the laws of the State of Illinois.  Defendants further admit that at all times relevant hereto, it has conducted and continues to conduct business in the State of Illinois.  Defendants further admit that DePaul is engaged in an industry that affects commerce.  The remaining allegations in Paragraph 7 set forth a legal conclusion to which no response is required.

8.     *At all relevant times, DePaul employed more than fifteen employees.*

**ANSWER:**

8.     Defendants admit the allegations in Paragraph 8.

9.     *Defendant Peg Birmingham resides in Illinois and is employed as a Professor of Philosophy at DePaul University.*

**ANSWER:**

9.     Defendants admit that Dr. Birmingham resides in Illinois and is employed by DePaul.  Defendants further admit that Dr. Birmingham is a Professor in DePaul's Department of Philosophy.  Defendants deny the remaining allegations in Paragraph 9.

## *Dr. Goswami's Professional Background and Hiring by DePaul*

10.     *Dr. Goswami earned her Ph.D. degree in Women's Studies from Emory University in 2003.*

**ANSWER:**

10. Defendants admit the allegations in Paragraph 10.

*11.     DePaul circulated a job advertisement in October 2002 specifically seeking candidates to teach in its Department of Philosophy with a focus on critical race and/or feminist theories. This description corresponded to Dr. Goswami's research background and expertise.*

**ANSWER:**

11. Defendants admit that DePaul circulated a job advertisement in October 2002 seeking candidates to teach in its Department of Philosophy who had areas of specialty in critical race and/or feminist theories. Further answering, Defendants state that the job advertisement speaks for itself and is the best evidence of its contents. Defendants deny the remaining allegations in Paragraph 11.

*12.     No other member of the faculty in the Department of Philosophy at DePaul had a background or expertise combining multidisciplinary philosophy, critical race theory, and feminist theory. Only one other faculty member has background or expertise in critical race theory. Dr. Goswami is the only member of the faculty with background or expertise in postcolonial theory and U.S. minority and non-western feminism. DePaul's undergraduate and graduate students have increasingly requested courses and thesis advisors with expertise in non-traditional areas of philosophy, including the study of philosophers who belonged to racial or ethnic minority groups.*

**ANSWER:**

12. Defendants lack knowledge or information sufficient to form a belief as to what Plaintiff characterizes as "multidisciplinary philosophy," and therefore deny the allegations concerning the same. Defendants deny the remaining allegations in Paragraph 12.

*13.     While in graduate school, Dr. Goswami published a book chapter on postcolonial feminists in India and the female Indian philosopher, feminist, and postcolonial theorist Gayatri Spivak.*

**ANSWER:**

13.     Defendants admit that while in graduate school, Plaintiff had published a co-authored book chapter entitled, "Who was Roop Kanwar?  *Sati*, Law, Religion, and Post-Colonial Feminism."  Defendants state that the co-authored book chapter speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 13.

*14.     In July 2003, DePaul hired Dr. Goswami as an Assistant Professor in a tenure track position, to fill the position described in paragraph 9 above.  During her first seven years at DePaul, Dr. Goswami continued to publish and authored four articles in peer-reviewed journals and two further book chapters.  Dr. Goswami also had a book manuscript accepted for publication by SUNY Press for its Series in Continental Philosophy.  Unlike other faculty members in the Department of Philosophy who received tenure, Dr. Goswami's book manuscript was not a revision of her dissertation, but rather, a new project that she began in 2006.*

**ANSWER:**

14.     Defendants admit that in July 2003, DePaul entered into a Contract of Faculty Employment with Plaintiff, pursuant to which it appointed Plaintiff as a Faculty Member effective September 1, 2003.  Defendants assert that this initial appointment was at the academic rank of Instructor (ABD) in a non-tenure-track position for the 2003-2004 academic year.  Defendants otherwise deny the remaining allegations concerning Plaintiff's hire.  Defendants admit that during her first seven years at DePaul, Plaintiff authored four articles in peer-reviewed journals and two further book chapters.  Defendants admit that Plaintiff did not succeed in

turning her dissertation into a published book, unlike other faculty members in the Department of Philosophy. Defendants lack knowledge or information sufficient to form a belief as to precisely when Plaintiff started her book project, and therefore deny the allegations regarding the same and demand strict proof thereof. Defendants deny the remaining allegations in Paragraph 14.

15.     *As of fall 2009, Dr. Goswami also had one additional book chapter and two additional journal articles accepted for publication, and had accepted invitations to contribute a review essay to a philosophy journal and an essay to an edited volume.*

**ANSWER:**

15.     Defendants admit that Plaintiff's *curriculum vitae* as of fall 2009 listed all of the forthcoming works referenced in Paragraph 15, except the "essay to an edited volume." Further answering, Defendants state that Plaintiff co-authored one of the listed forthcoming articles. Defendants lack knowledge or information sufficient to form a belief as to the status of these submissions as of the fall of 2009, and therefore deny the allegations regarding the same.

16.     *Dr. Goswami's courses, publications, and presentations focused on minority philosophers who had been overlooked in traditional scholarship, and applied critical race, postcolonial, and feminist interdisciplinary approaches.*

**ANSWER:**

16.     Defendants admit that Plaintiff's courses, publications, and presentations applied critical race, postcolonial, and feminist interdisciplinary approaches. Defendants lack knowledge or information sufficient to form a belief as to what Plaintiff considers "traditional scholarship," and who Plaintiff describes as "minority philosophers," and therefore deny the allegations concerning the same and demand strict proof thereof.

17.     *In 2005, DePaul's College of Liberal Arts and Sciences awarded Dr. Goswami a highly competitive Faculty Research and Development Grant to research postcolonial and African-American feminism.  In 2008, the College of Liberal Arts and Sciences again awarded Dr. Goswami the Faculty Research and Development Grant to research the European philosopher Theodor Adorno and postcolonial theory.*

**ANSWER:**

17.     Defendants admit that Faculty Research and Development Grants are awarded through a competitive process, but deny that this process is "highly competitive."  Defendants admit the remaining allegations in Paragraph 17.

18.     *From 2003 to 2009, Dr. Goswami gave eleven invited presentations and thirteen conference presentations at prestigious and competitive venues including the American Philosophical Association, the Society for Women in Philosophy, the Society for Phenomenology and Existential Philosophy (the most important professional organization in continental philosophy), the International Association of Philosophy and Literature, and the Society for Asian and Comparative Philosophy.  She also presented at the Cultural Studies Association, the National Women's Studies Association, and the American Conference for Irish Studies.  In 2010, she was invited to present at five conferences and symposia held at prestigious venues including the University of Chicago Society of Fellows and the Philosophy Department at Penn State University.*

**ANSWER:**

18.     Defendants admit that from 2003 to 2009, Plaintiff gave eleven invited presentations and thirteen conference presentations, including presentations for the organizations listed in Paragraph 18.  Defendants admit that the Society for Phenomenology and Existential

Philosophy is an important professional organization in continental philosophy. Defendants lack knowledge or information sufficient to form a belief as to invitations that Plaintiff received in 2010, and therefore deny the allegations regarding the same. Defendants deny the remaining allegations in Paragraph 18.

19.     *Dr. Goswami taught both undergraduate and graduate courses in philosophy at DePaul, ranging from introductory courses to graduate-level seminars. She consistently received superb evaluations from her students.*

**ANSWER:**

19.     Defendants admit that Plaintiff taught undergraduate and graduate courses in philosophy at DePaul, ranging from introductory courses to graduate-level seminars. Further answering, Defendants state that Plaintiff's student evaluations speak for themselves and are the best evidence of their contents. Defendants deny the remaining allegations in Paragraph 19.

20.     *In May 2007, DePaul's College of Liberal Arts and Sciences awarded Dr. Goswami the highly prestigious Excellence in Teaching Award. DePaul, which is known as a teaching college, gives this award every year to its top three teachers.*

**ANSWER:**

20.     Defendants admit that in 2007, Plaintiff received an Excellence in Teaching Award. Defendants admit that DePaul's Quality of Instruction Council makes these awards each year, and that the College of Liberal Arts and Sciences can nominate up to three faculty members each year to receive the award. Defendants lack knowledge or information sufficient to form a belief as to what Plaintiff considers to be "highly prestigious," and therefore deny the allegations concerning the same. Defendants further lack knowledge or information sufficient to form a

belief as to how and to whom DePaul "is known as a teaching college," and therefore deny the allegations concerning the same. Defendants deny the remaining allegations in Paragraph 20.

21.   *Dr. Goswami served as an advisor and mentor to numerous students in the Department of Philosophy as well as in the Women's and Gender Studies Department and the International Studies Department. She served as the director of two Department of Philosophy Ph.D. dissertation committees, the co-director of one Department of Philosophy Ph.D. dissertation committee, and a reader on four other Department of Philosophy Ph.D. dissertation committees. She served as an advisor on nine M.A. thesis committees (four in the Department of Philosophy, two in the Department of International Studies, and three in the Women's and Gender Studies Program) and on three undergraduate Department of Philosophy senior thesis committees. She also supervised two undergraduate research assistantships and two Doctoral and Undergraduate Opportunities for Scholarship ("DUOS") projects, which train undergraduates to do graduate-level research and graduate students to advise such research. Both the undergraduate research assistantships and the DUOS projects are competitive awards.*

**ANSWER:**

21.   Defendants lack knowledge or information sufficient to form a belief as to whether Plaintiff engaged in all of the activities set forth in Paragraph 21, and therefore deny the allegations concerning the same and demand strict proof thereof. Defendants deny that Plaintiff had to "compete" or oversee any "competition" as part of any supervision of a research assistantship or DUOS project.

22.   *Dr. Goswami initiated and developed five new courses for the Philosophy Department: three new upper-level undergraduate courses on postcolonial theory and*

*multicultural and transnational feminism, and two new graduate courses on postcolonial feminism and the female Indian philosopher, feminist, and postcolonial theorist Gayatri Spivak.*

**ANSWER:**

22. Defendants deny the allegations in Paragraph 22.

*23. Dr. Goswami also provided extensive service to DePaul, at the level of the Department, the College of Liberal Arts and Sciences, and the University.*

**ANSWER:**

23. Defendants deny the allegations in Paragraph 23.

*24. Within the Department of Philosophy, she served on the Undergraduate Affairs Committee (2003 to the present), the Public Events Committee (2003 to 2005), and the Critical Race Committee (2003 to 2006). She served as Chair from 2004 to 2005 and organized a conference, "How to Practice Postcolonial Theory in a Secular Way?" in September 2004. DePaul awarded Dr. Goswami a competitive University Research Council Grant for this national conference. She served on two hiring committees and consistently participated in the yearly undergraduate "Philosophy Circle" by presenting her research.*

**ANSWER:**

24. Defendants admit that Plaintiff served on the Undergraduate Affairs Committee, the Public Events Committee (2003 to 2005), and the Critical Race Committee (2003 to 2006). Defendants admit that Dr. Birmingham appointed Plaintiff the Chair of the Critical Race Committee for 2004 to 2005, and that Plaintiff organized a national conference, "How to Practice Postcolonial Theory in a Secular Way?" in September 2004. Defendants admit that Plaintiff received a competitive University Research Council Grant for the conference. Defendants lack knowledge or information sufficient to form a belief as to what Plaintiff considers to be

- 11 -

"consistently participated," and therefore deny the allegations concerning the same. Defendants also lack knowledge or information sufficient to form a belief as to the "hiring committees" referenced in Paragraph 24, and therefore deny the allegations concerning the same and demand strict proof thereof. Defendants deny the remaining allegations in Paragraph 24.

25.     *Within the College of Liberal Arts and Sciences, Dr. Goswami served on numerous programs, task forces, and committees, including the Advising Pilot Program (2007 to 2009), the Advising Training Program (2009 to 2010), the Liberal Arts and Sciences Advising Task Force (2006 to 2007), the Philosophical Inquiry Domain Committee (2007 to present), and the College of Liberal Arts and Sciences Awards Committee (2007 to 2009). She has been a Liberal Arts and Sciences Summer Advisor since 2004. She also serves on the Advisory Boards of the Center for Culture and History of Black Diaspora (2005 to present) and the Women's and Gender Studies Program (2004 to 2006 and 2008 to present), on the Women's and Gender Studies Program Committee (2004 to present) and Curriculum Committee (2008 to present), and she previously served on the Women's and Gender Studies Program Transnational Feminism Committee (2004 to 2006).*

**ANSWER:**

25.     Defendants admit that Plaintiff engaged in the activities set forth in Paragraph 25. Defendants deny that any of these activities have continued "to present." Defendants deny the remaining allegations in Paragraph 25.

26.     *At the University level, Dr. Goswami served on the University Strategic Planning Committee's Diversity Blue Team (2003 to 2004), and was selected as an alternate delegate in Humanities to the Faculty Governance Council in 2006 and 2007, but was unable to serve in that position because she was on academic leave that year.*

**ANSWER:**

26. Defendants lack knowledge or information sufficient to form a belief as to whether Plaintiff was "unable to serve" as the alternate delegate in 2006 and 2007 due to her leave, and therefore deny the allegations regarding the same. Defendants admit the remaining allegations in Paragraph 26.

27. *Dr. Goswami also serves her professional field as member of the Program Committee for the Society for Women in Philosophy (Eastern Division). Since 2006 she has been a member of the Committee on the Status of Racial and Ethnic Diversity for the Society for Phenomenology and Existential Philosophy, the preeminent research society in the field of continental philosophy. As Chair of the committee from 2008 to 2009, Dr. Goswami organized two panels on race, gender, and nationalism in collaboration with the Committee on the Status of Women for the Society's 2009 Annual Meeting.*

**ANSWER:**

27. Defendants admit that Plaintiff previously was a member of the Committee on the Status of Racial and Ethnic Diversity for the Society for Phenomenology and Existential Philosophy, and that she served as Chair of that committee from 2008 to 2009. Defendants further admit that Plaintiff organized two panels on race, gender, and nationalism in collaboration with the Committee on the Status of Women for the Society's 2009 Annual Meeting. Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning her activities with the Society for Women in Philosophy (Eastern Division), and therefore deny the same and demand strict proof thereof. Defendants deny the remaining allegations in Paragraph 27.

28.     *Of all the tenure candidates in the Department of Philosophy whose applications were reviewed during the 2009-2010 academic year, Dr. Goswami was the only minority tenure candidate and the only candidate whose professional work included teaching, research, and service related to critical race, postcolonial, and feminist studies and minority philosophers.*

**ANSWER:**

28.     Defendants state that only two faculty members in the Department of Philosophy applied for tenure during the 2009-2010 academic year.  Defendants admit that Plaintiff was one of the two tenure candidates, that Plaintiff's professional work included teaching, research, and service related to critical race, postcolonial, and feminist studies, and that the second tenure candidate's professional work did not focus on those areas.  Defendants lack knowledge or information sufficient to form a belief as to Plaintiff's definition of "minority philosophers," and therefore deny the allegations regarding the same and demand strict proof thereof.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of Plaintiff's assertion that she was the "only minority tenure candidate," and therefore deny her allegation regarding the same and demand strict proof thereof.  Defendants deny the remaining allegations in Paragraph 28.

*The Tenure Process at DePaul*

29.     *DePaul's Faculty Handbook governs the tenure and review process.  The tenure procedure in place at DePaul during the 2009-2010 academic year consisted of four levels of review.   Tenure track applicants were eligible for tenure after having served a six-year "probationary period" at the University, or after having been credited for some of those six years for service at another university.*

**ANSWER:**

29.     Defendants admit that its Faculty Handbook governs the tenure and review process.  Further answering, Defendants state that the Faculty Handbook speaks for itself and is the best evidence of its contents.  Defendants deny that the remaining allegations in Paragraph 16 represent a complete or accurate representation of the tenure and promotion process contained in the Faculty Handbook.

30.     *DePaul's three criteria for tenure decisions are the quality of the candidate's teaching, scholarship or research, and service.*

**ANSWER:**

30.     Defendants admit the allegations in Paragraph 30, but deny that Paragraph 30 is a complete or accurate representation of the tenure and promotion process contained in the Faculty Handbook.  Further answering, Defendants state that the Faculty Handbook speaks for itself and is the best evidence of its contents.

31.     *DePaul is comprised of 12 colleges and schools, each of which is led by a Dean. DePaul's colleges, schools and departments more fully describe in writing the University's three requirements for tenure.  The Faculty Handbook provides for a tenure process in which defined criteria are applied consistently, and in which faculty members are notified of the applicable tenure standards from the beginning of their probationary period.*

**ANSWER:**

31.     Defendants deny that DePaul is comprised of 12 colleges and schools. Defendants admit that each college or school is led by a dean.  Defendants deny that its colleges, schools, and departments more fully describe in writing the University's three requirements for tenure.  Defendants admit that the Faculty Handbook provides for a tenure process in which defined criteria are applied consistently, and in which faculty members are notified of the

applicable standards from the beginning of their probationary period; but deny that this is a complete or accurate representation of the tenure and promotion process outlined in the Faculty Handbook. Further answering, Defendants state that the Faculty Handbook speaks for itself and is the best evidence of its contents.

32.    *It was DePaul's established policy and practice throughout Dr. Goswami's probationary period to grant tenure and promotion to candidates who met at least two out of the three tenure criteria.*

**ANSWER:**

32.    Defendants deny the allegations in Paragraph 32 of the Complaint.

33.    *During a May 9, 2008 workshop held to provide guidance for faculty members beginning the tenure process, Dr. Raphaela Weffer, Associate Vice President of Academic Affairs at DePaul, stated that tenure candidates were required to be good to excellent in two of the three tenure criteria to receive tenure, and to be adequate in the third.*

**ANSWER:**

33.    Defendants deny the allegations in Paragraph 33.

34.    *President Dennis Holtschneider stated in a May 19, 2009 letter to a male tenure applicant that tenure applicants were required to demonstrate "good to excellent performance" in two of the three tenure criteria.*

**ANSWER:**

34.    Defendants deny that President Dennis Holtschneider stated in a May 19, 2009 letter to a male tenure applicant that tenure and promotion applicants were required to demonstrate "good to excellent performance" in only two of the three tenure criteria; rather, President Holtschneider's May 19, 2009 letter to a male tenure applicant stated that "university

criteria for promotion and tenure call for good to excellent performance in at least two of the three primary areas of evaluation: teaching, scholarship and service." Further answering, Defendants state that President Holtschneider's May 19, 2009 letter speaks for itself and is the best evidence of its contents.

35. *DePaul characterizes itself as primarily a "teaching" university, which means it emphasizes and values teaching more than scholarship. The tenure criteria of DePaul's College of Liberal Arts and Sciences specify that "[i]f tension should arise between teaching and research, the college supports effective teachers who have limited research agendas . . . ."*

**ANSWER:**

35. Defendants admit that DePaul is characterized as a "teaching" university, but deny that DePaul emphasizes and values teaching more than scholarship. Defendants admit that the College Promotion and Tenure Procedures of the College of Liberal Arts and Sciences contain the quoted language. Defendants deny that this excerpted language constitutes a complete or accurate description of the College's procedures with respect to faculty seeking tenure. Further answering, Defendants state that the College Promotion and Tenure Procedures speak for themselves and are the best evidence of their contents. Defendants deny the remaining allegations in Paragraph 35.

36. *The tenure process begins with a review and recommendation by tenured faculty members in the applicant's department or program, or the applicant's school if there is no department or program. The Faculty Handbook provides that "the determination that an individual meets [the University's tenure] criteria is made primarily on the basis of guidelines promulgated by the candidate's department."*

**ANSWER:**

36. Defendants deny that the tenure process begins with a review and recommendation by tenured faculty members in the applicant's department or program, or the applicant's school if there is not department or program. Answering further, Defendants state that the first stage of the review of an eligible candidate's application for promotion and tenure is conducted by the department or, in the absence of a departmental structure, another appropriate initial review body (personnel committee, faculty of the whole and/or academic dean) according to its established procedures. Defendants admit that the Faculty Handbook contains the quoted language, but deny that this is a complete or accurate excerpt from the tenure and promotion process contained in the Faculty Handbook. Defendants state that the Faculty Handbook speaks for itself and is the best evidence of its contents.

*37. Upon receiving the recommendation of the candidate's department, school or college, the dean of the college assembles a College or School Personnel Committee, whose members consist of senior faculty from the college. The Committee, after reviewing the applicant's file, then makes a recommendation to the dean, which the dean either accepts or rejects. The Committee's review serves the purpose of ensuring that the department's review is consistent with department- and college-specific criteria and standards and with University procedures.*

**ANSWER:**

37. Defendants deny the allegations in Paragraph 25. Answering further, Defendants state that the second stage of the review of an eligible candidate's application for promotion and tenure is conducted by the academic dean of the respective college or school, at which time the dean may be advised by a college or personnel committee. The dean must submit a comprehensive review of each candidate. If the dean's recommendation differs from the tenured

faculty, college or school personnel committee (where one exists) or departmental recommendation, the dean must notify all involved parties. Whether or not they are in agreement, the dean and the college or school personnel committee may submit separate recommendations to the University Board on Promotion and Tenure ("UBPT"), if desired.

38.    *The Dean's recommendation is then forwarded to the Provost, who presides over the deliberations of the University Board on Promotion and Tenure ("UBPT"), which is made up of senior faculty members from across the University who have been elected by the Faculty Council.*

**ANSWER:**

38.    Defendants deny the allegations in Paragraph 38. Answering further, Defendants state that the dean's recommendation, the recommendation and numerical vote of the personnel committee, along with the candidate's supporting material are to be submitted to the Provost on or before the appropriate date as specified for a specific college or school. The University Board on Faculty Promotion and Tenure ("UBPT") is comprised of seven faculty members appointed by Faculty Council and only tenured faculty members are eligible to be representatives of the UBPT. The Provost serves as a convener and non-voting member of UBPT.

39.    *The UBPT makes recommendations to the President on all faculty promotion and tenure decisions, including promotion to full professor.*

**ANSWER:**

39.    Defendants deny the allegations in Paragraph 39. Answering further, Defendants state that the third stage of the review of an eligible candidate's application for promotion and tenure is conducted by the UBPT and the Provost makes a recommendation to the University President based on the UBPT's recommendation. The President makes final decisions regarding

promotion and/or the granting of tenure. Only in rare instances and for compelling reasons will the President overturn a promotion or tenure recommendation made by the UBPT.

40. *The UBPT is charged with ensuring that the lower levels of review of a tenure application consistently apply University criteria. Section 3.2.3 of the Faculty Handbook also requires the UBPT and the college/school committees to consider questions of "stringency, consistency and fairness" when reviewing the decisions of the lower levels.*

**ANSWER:**

40. Defendants admit that the quoted language appears in Section 3.2.3 of the Faculty Handbook. Defendants deny the remaining allegations in Paragraph 40, which are not a complete or accurate representation of the tenure and promotion process contained in the Faculty Handbook. Defendants state that the Faculty Handbook speaks for itself and is the best evidence of its contents.

41. *When evaluating applicants for tenure, § 3.2.3 of the Faculty Handbook requires the UBPT to consider "the institutional demands made on faculty."*

**ANSWER:**

41. Defendants admit that the quoted language appears in Section 3.2.3 of the Faculty Handbook. Defendants deny the remaining allegations in Paragraph 41, which are not a complete or accurate representation of the tenure and promotion process contained in the Faculty Handbook. Defendants state that the Faculty Handbook speaks for itself and is the best evidence of its contents.

42. *The Faculty Handbook requires the Provost to forward the UBPT's recommendation to the President, who makes the final tenure decision.*

**ANSWER:**

42.     Defendants admit the allegations in Paragraph 42.

*43.     Section 3.6.1 of the Faculty Handbook establishes a framework for a transparent and reasoned tenure review process. It provides that "[t]he candidate shall have access to all internal documents being considered" and that "reports will be filed with the next higher level only when the candidate has had the opportunity to review such reports in order to respond appropriately."*

**ANSWER:**

43.     Defendants admit that Section 3.6.1 of the Faculty Handbook establishes a framework for a reasoned tenure review process. Defendants deny that the tenure process is transparent because most of the votes cast during the process are anonymous. Defendants admit that Section 3.6.1 of the Faculty Handbook states that "[t]he candidate shall have access to all internal documents being considered," but deny that this is a complete or accurate excerpt from Section 3.6.1. Defendants further deny that Section 3.6.1 of the Faculty Handbook states that "reports will be filed with the next higher level only when the candidate has had the opportunity to review such reports in order to respond appropriately;" rather Section 3.6.1 states, in part, "[m]inority or other reports will be filed with the next higher level only when the candidate has had the opportunity to review such reports in order to respond appropriately." Defendants state that the Faculty Handbook speaks for itself and is the best evidence of its contents.

*44.     The Faculty Handbook provides that in cases of a negative decision, the President will inform any unsuccessful applicant of the reasons for the decision.*

**ANSWER:**

44.     Defendants admit the allegations in Paragraph 44.

*45.     An unsuccessful applicant has the opportunity to appeal the decision internally. If an applicant invokes the appeal provision of the Faculty Handbook, the Faculty Council must appoint a review panel to examine the recommendation and ensure that it did not violate the applicant's academic freedom or contravene the tenure policies and procedures of the University.*

**<u>ANSWER:</u>**

45.     Defendants deny that an unsuccessful applicant has the opportunity to appeal the decision internally; rather, an unsuccessful applicant can request a formal review of the decision pursuant to Section 5.1.1 of the Faculty Handbook.  Defendants admit that the Faculty Council appoints a Review Board of three tenured faculty members from departments other than that of the faculty member concerned.  Defendants admit that the Review Board conducts a review on the following grounds:  (1) whether the faculty member's academic freedom was violated or (2) that the evaluation of the candidate was not in accord with the policies and procedures of the Faculty Handbook.

*46.     The Faculty Handbook requires each tenure track faculty member's department, program or school to issue annual performance reviews, which must be approved by the Dean.*

**<u>ANSWER:</u>**

46.     Defendants deny the allegations in Paragraph 36.

*47.     Section 3.2.2 of the Faculty Handbook explains that the purpose of the annual probationary review is "to assess progress toward promotion and tenure by evaluating performance in the context of promotion and tenure standards and to provide guidance and establish priorities for satisfying established criteria."  The formal reviews, therefore, are intended to give tenure track faculty members guidance about their progress toward tenure.*

**ANSWER:**

47.     Defendants admit that Section 3.2.2 of the 2010 Faculty Handbook explains that the purpose of the annual probationary review shall be "to assess progress toward promotion and tenure by evaluating performance in the context of promotion and tenure standards and to provide guidance and establish priorities for satisfying established criteria," but deny that this is a complete or accurate excerpt from the Faculty Handbook. Defendants state that the Faculty Handbook speaks for itself and is the best evidence of its contents. Defendants deny the remaining allegations in Paragraph 47.

48.     *It is DePaul's practice not to renew a faculty member's contract early in his or her probationary period if it appears clear that the faculty member will be unable to meet the tenure criteria in the future.*

**ANSWER:**

48.     Defendants deny the allegations in paragraph 39.

49.     *On at least one occasion, President Holtschneider overturned a tenure denial and granted tenure to a faculty member on the ground that his annual reviews had provided him no notice that there were deficiencies in his record or that he needed to improve his performance to satisfy the tenure criteria.*

**ANSWER:**

49.     Defendants deny the allegations in Paragraph 49.

50.     *The Faculty Handbook guarantees academic freedom, asserting that professors have the right to "freedom as they participate in the various forms of open inquiry and debate, as for example, . . . research and publication . . . ."*

**ANSWER:**

50.     Defendants admit that the Faculty Handbook guarantees academic freedom, asserting that professors have the right to "freedom as they participate in the various forms of open inquiry and debate, as for example, . . . research and publication . . .," but deny that this is a complete or accurate excerpt from the Faculty Handbook.  Further answering, Defendants state that the Faculty Handbook speaks for itself and is the best evidence of its contents.

*51.     The Faculty Handbook also incorporates by reference the guidelines of the American Association of University Professors ("AAUP"), which provide that "[t]eachers are entitled to full freedom in research and in the publication of the results . . ." and that "[f]reedom in research is fundamental to the advancement of truth."  The AAUP guidelines specify that "[d]uring the probationary period a teacher should have the academic freedom that all other members of the faculty have."*

**ANSWER:**

51.     Defendants deny that the Faculty Handbook incorporates by reference the guidelines of the AAUP; rather, the Faculty Handbook, Chapter 6.1, states that DePaul is guided by the AAUP's *1940 Statement of Principles on Academic Freedom and Tenure* ("1940 Statement").  Defendants admit that the 1940 Statement contains the language quoted in Paragraph 51.  Defendants deny that this quoted language is a complete or accurate excerpt from the AAUP's 1940 Statement.  The AAUP's 1940 Statement speaks for itself and is the best evidence of its contents.

*52.     With respect to tenure, the AAUP guidelines state, "The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated."*

**ANSWER:**

53.    Defendants admit that the 1940 Statement contains the language quoted in Paragraph 53.  Defendants deny that this quoted language is a complete or accurate excerpt from the AAUP's 1940 Statement.  The AAUP's 1940 Statement speaks for itself and is the best evidence of its contents.

*53.    The AAUP's Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments states, "Good practice requires that the institution (department, college, or university) define its criteria for reappointment and tenure and its procedures for reaching decisions on these matters . . . .  [F]airness to probationary faculty members prescribes that they be informed, early in their appointments, of the substantive and procedural standards that will be followed in determining whether or not their appointments will be renewed or tenure will be granted . . . .  Any special standards adopted by their particular departments or schools should also be brought to their attention."*

**ANSWER:**

53.    Defendants admit the allegations in Paragraph 53, but deny that this is a complete or accurate excerpt from the AAUP's *Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments.*   The AAUP's *Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments* speaks for itself and is the best evidence of its contents.

*54.    In violation of the Faculty Handbook, the UBPT failed to provide Dr. Goswami copies of its recommendation of denial of tenure or the reasons for its recommendations.  She, therefore, did not have the opportunity to respond to the denials before the UBPT sent its negative recommendations to the President.  Nor did she have the opportunity to review the*

*recommendations prior to submitting her internal appeal. In fact, the UBPT has not provided her with its decision to this day.*

**ANSWER:**

54.     Defendants admit that the UBPT has not provided Plaintiff with a copy of its recommendation to deny her tenure. Defendants deny the remaining allegations in Paragraph 54.

*55.     During the 2009-2010 academic year, DePaul rejected a disproportionate number of minority tenure applicants in favor of white tenure applicants with similar or inferior qualifications. According to statistics provided by the University, every applicant denied tenure during the 2009-2010 academic year was a minority, while only 35.3 percent of the tenure applicants were minorities. President Holtschneider did not deny tenure to a single white applicant; instead, he granted tenure to each of the 22 white applicants.*

**ANSWER:**

55.     Defendants lack knowledge or information sufficient to form a belief as to the meaning of the term "minority" as used by Plaintiff, and therefore deny the allegations concerning the same. Defendants also lack knowledge or information sufficient to form a belief as to the source or content of the statistics referenced in Paragraph, and therefore deny the allegations regarding the same. Any statistics provided by DePaul speak for themselves and are the best evidence of their contents. Defendants admit that President Holtschneider accepted the recommendations of the UBPT to grant tenure to white applicants in 2009-2010, as well as to applicants of color. Defendants deny the remaining allegations in Paragraph 55.

*56.     During the 2009-2010 academic year, DePaul's Provost, Helmut Epp, unilaterally and in circumvention of DePaul's usual tenure process, promoted two non-tenure track white male professors to the rank of associate professor with tenure, even though they were*

*not eligible for tenure at the time of their appointment to tenure positions. The Provost's action violated the Faculty Handbook's requirement that "only a faculty member with a tenure track appointment is eligible for tenure" and that only the President, not the Provost, can grant tenure.*

**ANSWER:**

    56.     Defendants deny the allegations in Paragraph 56.

    *57.     DePaul has consistently discriminated against minority applicants in making its tenure decisions. According to statistics provided by the University, in the twenty years preceding the 2009-2010 academic year, only 23.8 percent of the applicants for tenure were minorities, but 38.1 percent of the denied applicants were minorities. Minority applicants for tenure were approximately twice as likely as white applicants to be denied tenure. White tenure applicants had a 7.3 percent denial rate, while African-American tenure applicants had a 17.9 percent denial rate, Hispanic tenure applicants had a 12.5 percent denial rate, and Asian tenure applicants had a 12.2 percent denial rate.*

**ANSWER:**

    57.     Defendants lack knowledge or information sufficient to form a belief as to the source or content of the "statistics provided by the University" as alleged in Paragraph 57, and therefore deny the allegations concerning the same and demand strict proof thereof. Any such statistics speak for themselves and are the best evidence of their contents. Defendants deny the remaining allegations in Paragraph 57.

    *58.     During the 2008-2009 academic year President Holtschneider denied tenure to only one white male professor. Unlike Dr. Goswami, that professor was warned about serious deficiencies in his teaching and scholarship well in advance of his submission of his tenure*

*application, and President Holtschneider found that the professor had demonstrated no intention of altering his teaching approach. Unlike Dr. Goswami, the professor met only one of the three tenure performance criteria. The UBPT vote to deny tenure in his case was unanimous and in agreement with the lower levels of review, unlike in Dr. Goswami's case.*

**ANSWER:**

58. Defendants admit that during the 2008-2009 academic year, President Holtschneider denied tenure to two male professors, and one of them is white. Defendants admit that the UBPT's vote to deny tenure to the white male candidate was unanimous and in agreement with the lower levels of review, unlike in Plaintiff's case, where the UBPT's negative vote agreed with the Department's recommendation but reversed the College's recommendation. Defendants deny the remaining allegations in Paragraph 58.

59. *Between 2003 and 2010, white members of the Department of Philosophy repeatedly stated that Dr. Goswami had a problem with white men and was uncollegial toward her white male colleagues because (referring to the fact that her husband is white) "she already had a white man to take care of her." Members of the department also used a Nazi salute to honor European philosopher Martin Heidegger.*

59. Defendants deny the allegations in Paragraph 59.

60. *On information and belief, President Holtschneider granted a faculty position to a white, male faculty member despite the fact that he lacked a doctoral degree and was not qualified for the position.*

**ANSWER:**

60. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 – which fail to identify the faculty member in question – and therefore deny the same and demand strict proof thereof.

<em><u>Defendant's Denial of Tenure to Dr. Goswami</u></em>

61. *Dr. Goswami began her six-year probationary period at DePaul in August 2003.*

**ANSWER:**

61. Defendants deny the allegations in Paragraph 61.

62. *As set forth below, Dr. Goswami exhibited overwhelmingly positive performance throughout her years as a tenure track professor at DePaul. Until the year she was denied tenure, DePaul gave her no indication that her performance was lacking in the areas of teaching, scholarship, or service, or that she was unlikely to receive tenure.*

**ANSWER:**

62. Defendants deny the allegations in Paragraph 62.

63. *During her first five years at DePaul, Dr. Goswami received both annual "merit reviews," biennial "informal reviews," and biennial "formal reviews," the last of which are used to assess a candidate's progress toward tenure.*

**ANSWER:**

63. Defendants admit that Plaintiff received "merit reviews," "informal reviews," and "formal reviews." Defendants deny the remaining allegations in Paragraph 63.

64. *Dr. Goswami's first annual merit review, which covered her first five months at DePaul (August 2003 through December 2003), resulted in an overall recommendation of "Very Good."*

**ANSWER:**

64.     Defendants admit that Plaintiff's first annual merit review for her time at DePaul in 2003 resulted in an overall evaluation rating of "Very Good." Further answering, Defendants state that the review speaks for itself and is the best evidence of its contents. Defendants deny the remaining allegations in Paragraph 64.

65.     *Dr. Goswami's first biennial formal review, conducted during the second year of her probationary period, took place in November 2004. The review committee favorably evaluated her performance in all three areas of teaching, research and service. The committee wrote, "Given this strong beginning in the areas of teaching, research, and service, the review committee highly recommends that Namita Goswami's contract be renewed . . . . On the whole the committee is pleased with the progress Namita is making as a teacher, a scholar, and a citizen of the department, college, and university." Regarding teaching: "On the whole, the committee is impressed with the good start Namita is making in her teaching." Regarding research: "The review committee noted that her research adds an important dimension to the department and hopes that more can be done to integrate her scholarship into departmental course offerings." Regarding service: "The committee is very pleased with her record of service to date."*

**ANSWER:**

65.     Defendants admit that Plaintiff's first formal probationary review, conducted during the second year of her probationary period, took place in November 2004. Defendants admit that the written report of the review committee contains the quoted language. Defendants deny that the quoted language sets forth the complete or accurate contents of the review. The

review speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 65.

66.     *Dr. Goswami's second annual merit review (for calendar year 2004) similarly ranked her as "Very Good" overall, with rankings of "Very Good" in the areas of teaching and service, and "Good" in the area of research.  However, Dr. Peg Birmingham (then chair of the Department of Philosophy) unfairly criticized Dr. Goswami for her alleged lack of collegiality in department meetings, conferences, and committee meetings.  Dr. Birmingham racially stereotyped Dr. Goswami by stating that she was "needlessly confrontational" because she mentioned race and class issues when those issues were relevant to the discussion.  In addition, when Dr. Goswami disagreed with a senior colleague regarding the diversity of the faculty invited for the department's visiting speaker's series, Dr. Birmingham criticized Dr. Goswami for making the senior colleague feel like a "passé old white guy."*

**ANSWER:**

66.     Defendants admit that Plaintiff's annual merit review for calendar year 2004 included a "Very Good" overall rating, "Very Good" ratings in the areas of teaching and service, and a "Good" rating in research.  Defendants deny that that these descriptors accurately or completely set forth the ratings conveyed in the review.  Defendants state that the review speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 66.

67.     *Dr. Birmingham assigned Dr. David Krell to conduct Dr. Goswami's first peer teaching review in 2004.  After attending a class taught by Dr. Goswami which was cross-listed in the Department of Philosophy and the Women's and Gender Studies Program, Dr. Krell criticized the course as being "a women's studies or postcolonial women's studies" class rather*

*than a philosophy class, and suggested that Dr. Goswami teach what he termed "our tradition," meaning "Plato, Aristotle, Kant, Hegel, de Beauvoir, Irigary, and Kristeva" – all white, European philosophers.*

**ANSWER:**

67.     Defendants admit that Dr. Birmingham assigned Dr. David Krell to conduct Plaintiff's first peer teaching review in 2004, and that Dr. Krell attended a class taught by Plaintiff.  Defendants admit that the quoted language appears in Dr. Krell's review.  Defendants deny that Paragraph 67 accurately characterizes that quoted language, or that the quoted language sets forth the complete or accurate contents of the review.  Further answering, Defendants state that Dr. Krell's teaching review speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 67.

*68.     Dr. Goswami sought several avenues of mediation to resolve her differences with Dr. Birmingham, including writing a formal letter to the dean on April 12, 2005, meeting with the dean on April 20, 2005, meeting with the University's ombudsperson on April 27, 2005, and meeting with the University's Senior Executive for Institutional Diversity on April 26, 2005.  Dr. Goswami also met with Dr. Birmingham on June 7, 2005.  After this meeting, Dr. Birmingham sent an email on June 7, 2005 in which she apologized for criticizing Dr. Goswami's collegiality and for using hearsay and an improper tone in the evaluation, and promised that her email would be kept in Dr. Goswami's permanent personnel file.  However, Dr. Birmingham never placed her email retracting her earlier remarks in Dr. Goswami's personnel file.*

**ANSWER:**

68.     Defendants admit that Plaintiff wrote a letter to the Dean dated April 12, 2005, met with the Dean, met with the University's ombudsperson, and met with the University's

Senior Executive for Institutional Diversity. Defendants lack knowledge or information sufficient to form a belief as to the dates of these meetings, and therefore deny the allegations regarding the same and demand strict proof thereof. Defendants admit that Plaintiff met with Dr. Birmingham on June 7, 2005. Defendants further admit that Dr. Birmingham sent an e-mail to Plaintiff, which contained an apology and indicated that the e-mail would be attached to her 2004 evaluation in her personnel file. Further answering, Defendants state that the e-mail speaks for itself and is the best evidence of its contents. Defendants deny that Dr. Birmingham was the custodian of Dr. Goswami's personnel file. Defendants deny the remaining allegations in Paragraph 68.

69.     *On June 15, 2005, Dr. Birmingham conducted the first "informal review" of Dr. Goswami, as part of the evaluation process. Once again, Dr. Birmingham raised an alleged lack of collegiality in this review, and based her allegations on hearsay, even though she had sent Dr. Goswami an email the week before in which she apologized for improperly relying upon unsupported hearsay.*

**ANSWER:**

69.     Defendants admit that Dr. Birmingham conducted an informal review of Plaintiff, the written report of which was dated June 15, 2005. Defendants admit that Dr. Birmingham stated in the review that "Professor Goswami's collegiality continues to be a concern." Further answering, Defendants state that the review speaks for itself and is the best evidence of its contents. Defendants admit that Dr. Birmingham had sent Plaintiff an e-mail the week before, which contained an apology. Defendants further state that this e-mail speaks for itself and is the best evidence of its contents. Defendants deny the remaining allegations in Paragraph 69.

70.     *Dr. Birmingham assigned Dr. Peter Steeves to conduct Dr. Goswami's second peer teaching review in 2005.  Despite the fact that after her first peer teaching review, Dr. Goswami had requested that her second peer teaching review be conducted by a colleague with an understanding of interdisciplinary techniques and the core principles of critical race studies, Dr. Steeves lacked these qualifications.  After attending Dr. Goswami's introductory philosophy course, Dr. Steeves objected to Dr. Goswami's inclusion of African-American Nobel Laureate Toni Morrison's novel Beloved in the course materials.  Beloved was the only critical race text taught in the course, which included texts by the European philosophers Plato, Derrida, Adorno, and Kierkegaard.  Dr. Steeves stated that Beloved was a "nonphilosophic source" and that Dr. Goswami should teach more "straightforward philosophic content."*

**ANSWER:**

70.     Defendants admit that Dr. Birmingham assigned Dr. Peter Steeves to conduct Plaintiff's second peer teaching review in 2005.  Defendants admit that Dr. Steeves attended an introductory course (PHL 100) taught by Plaintiff.  Defendants admit that Plaintiff made a request as to who would conduct her teaching review.  Defendants admit that texts taught by Plaintiff in the course included African-American Nobel Laureate Tony Morrison's novel *Beloved*, as well as texts by Plato and Kierkegaard.  Defendants lack knowledge or information sufficient to form a belief as to all of the texts taught in the course, and therefore deny the remaining allegations concerning the same.  Defendants admit that the review referenced "nonphilosophic sources" and "straightforward philosophic content."  Defendants deny that Paragraph 70 accurately characterizes those references, or that the references constitute a complete or accurate statement of the review.  Defendants state that the review speaks for itself

and is the best evidence of its contents. Defendants deny the remaining allegations in Paragraph 70.

*71.    Also in 2005, Dr. Birmingham improperly criticized and undercut Dr. Goswami's authority after Dr. Goswami uncovered plagiarism in her class when two students, one white (an American citizen) and one black (a student from Africa), turned in the same paper. As Dr. Goswami could not tell whether one student had copied the other student's paper or both had obtained their paper from a third source, she reported her finding to the office responsible for handling plagiarism cases at DePaul. Dr. Birmingham repeatedly tried to force Dr. Goswami to "negotiate a settlement" with the white student, whose father had complained to Dr. Birmingham, in violation of the University's academic integrity policy. Dr. Birmingham did not make similar efforts with the black student. Dr. Birmingham had evidently concluded, on the basis of racial stereotypes, that the black student copied the white student's original research. In fact, a member of the academic integrity board met with both students and concluded that both students had acquired the same paper from a third source, i.e., both were plagiarists. But that summer, after an expedited academic integrity hearing that Dr. Goswami could not participate in because she was abroad, the white student was found innocent while the black student was found guilty. Dr. Birmingham or another faculty member, without any input from Dr. Goswami, arbitrarily gave only the white student a final grade of A-minus for the course.*

**ANSWER:**

71.    Defendants admit that during the 2005 Spring Quarter, two students who took a course taught by Plaintiff were accused by Plaintiff of violating DePaul's Academic Integrity Policy because the two students submitted near identical papers in the course. Defendants admit that one of these students is white, and the other student is black. Further answering, Defendants

state that Plaintiff gave both students an "F" grade in the course. Defendants admit that Plaintiff reported the matter to the Associate Vice President for Academic Affairs. Defendants admit that a member of the Academic Integrity Board met with both students, and that the matter then went before the Academic Integrity Board, which held a hearing for each student. Defendants admit that the Academic Integrity Board determined that the black student had violated the Academic Integrity Policy by submitting a paper that he had not written, but that the white student had not violated the Academic Integrity Policy. Defendants admit that Plaintiff did not attend the hearings of the Academic Integrity Board in these matters. Defendants lack knowledge or information sufficient to form a belief as to why Plaintiff did not attend the hearings, and therefore deny the allegations concerning the same. Defendants deny the remaining allegations in Paragraph 71.

72. *Dr. Goswami's third annual merit review, for calendar year 2005, was conducted by Dr. Richard Lee, who was then the Chair of the Department of Philosophy. As in her second annual merit review, Dr. Goswami's overall rating was "Very Good," but this time, her teaching was rated as "Outstanding," her research as "Very Good" – both improvements from 2004 – and her service as "Very Good." Dr. Lee wrote regarding teaching: "You have found a way to make canonical philosophical texts speak about issues in conjunction with literature and other forms of expression. This is having incredible success in reaching students. I note also that students feel your classes are challenging, and yet you are helpful in allowing them to succeed. Your teaching seems inspired." (emphasis added). Regarding research: "I know from our conversations that you also have a substantial, on-going research agenda that currently focuses on your book manuscript. I am convinced that with your leave you will make great progress on this work. All in all, a very good research record." Regarding service: "If anything, I would*

*say you need not have so much service, but you are obviously committed to participating in the governance of the institution and to helping it live up to its best potential."*

**ANSWER:**

72.     Defendants admit that Dr. Richard Lee, then the Chair of the Department of Philosophy, completed the annual merit review for Plaintiff for calendar year 2005.  Defendants further admit that this review included the noted ratings, and the ratings given to Plaintiff for teaching and research on her 2005 annual merit review were higher than the ratings that she received in those areas on her 2004 annual merit review.  Defendants admit that the 2005 annual merit review includes the quoted language set forth in Paragraph 72, but Defendants deny that those quoted excerpts set forth the complete or accurate contents of the review.   Further answering, DePaul states that the 2005 annual merit review speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 72.

73.     *Dr. Goswami's fourth annual merit review, for calendar year 2006, was even more laudatory.  Dr. Goswami's overall assessment was "Outstanding Minus," with both teaching and service rated as "Outstanding" and research as "Very Good Minus."  Dr. Lee wrote regarding teaching:  "The evaluations for these courses—all of them—are among the best I have ever seen.  Not only are the numbers literally off the charts, but I have seldom seen such positive comments and so many of them.  Both the numbers and the positive comments are across all the courses, from PHL 100 to your graduate seminar . . . .  They comment on the rigor of your courses and the challenge your courses present . . . .  Students are obviously responding to the questions you raise and the level of theoretical sophistication you bring to those issues."  Regarding research:  "In sum, this is a strong, substantial, and on-going research agenda."*

*Regarding service: "All in all, this is an amazing record of service and you should be proud of your accomplishments."*

**ANSWER:**

73.     Defendants admit that the annual merit review for Plaintiff for calendar year 2006 included the noted ratings.  Defendants admit that the 2006 annual merit review includes the quoted language set forth in Paragraph 73, but Defendants deny that those quoted excerpts set forth the complete or accurate contents of the review.  Further answering, Defendants state that the 2006 annual merit review speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 73.

*74.     During the 2006-2007 academic year, Dr. Goswami's tenure clock was stopped for a full year due to her award of Competitive Paid Research Leave.  Dr. Goswami spent that year working on her book project.  She also wrote two essays that were accepted for publication, presented at a scholarly conference, and continued to serve on the Committee for the Status of Racial and Ethnic Diversity of the Society for Phenomenology and Existential Philosophy.*

**ANSWER:**

74.     Defendants admit that Plaintiff's tenure clock stopped for the 2006-2007 academic year after she received a Competitive Research Leave, which was paid.  Defendants admit that Plaintiff gave a conference presentation while on leave.  Defendants further admit that during her leave, Plaintiff served on the Committee for the Status of Racial and Ethnic Diversity of the Society for Phenomenology and Existential Philosophy.  Defendants lack knowledge or information sufficient to form a belief as to how Plaintiff otherwise spent her time on leave, and therefore deny the allegations concerning the same and demand strict proof thereof.  Defendants similarly lack knowledge or information sufficient to form a belief as to what essays were

accepted for publication during her leave, and therefore deny the allegations concerning the same and demand strict proof thereof. Defendants deny the remaining allegations in Paragraph 74.

75.     *In May 2007, Dr. Goswami was awarded the University's most prestigious teaching prize, the Excellence in Teaching Award, and was chosen from among the other award recipients to present the keynote address at the DePaul Honors Convocation.*

**ANSWER:**

75.     Defendants admit that in 2007, Plaintiff received the Excellence in Teaching Award. Defendants lack knowledge or information sufficient to form a belief as to what Plaintiff considers to be "most prestigious," and therefore deny the allegations concerning the same. Defendants admit that Plaintiff was the Distinguished Faculty Speaker at the College of Liberal Arts and Sciences 2006-2007 Honors Convocation held on May 14, 2007. Defendants deny the remaining allegations in Paragraph 75.

76.     *During her fifth annual merit review, for calendar year 2007, Dr. Goswami received a rating of "Outstanding" in all three categories of teaching, research, and service, for an overall rating of "Outstanding." Once again, Dr. Lee commended her for her accomplishments. He wrote regarding teaching: "What more could the department ask?" Regarding research: "This is an excellent record, particularly for someone who is on paid leave." Regarding service: "This is an amazing record of service, particularly for a pre-tenure faculty member."*

**ANSWER:**

76.     Defendants admit that Plaintiff received the noted ratings from Dr. Lee on her annual merit review for calendar year 2007. Defendants further admit that the 2007 annual merit review contains the quoted language. Defendants deny that the quoted excerpts constitute the

complete or accurate contents of the review.  Defendants state that the 2007 annual merit review speaks for itself and is the best evidence of its contents.

77.     *During the 2007-2008 academic year, Dr. Goswami observed that her own contributions to the Department were being ignored or slighted.  For example, during the departmental orientation in the fall of 2007, her Excellence in Teaching Award from May 2007 was not even mentioned, although a graduate student's teaching award was mentioned.*

**ANSWER:**

77.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiff's observations, and therefore deny the same and demand strict proof thereof.  Defendants admit that no faculty award was mentioned at the fall 2007 departmental orientation, which is for graduate students.  Defendants admit that a graduate student's teaching award was mentioned at this orientation.   Defendants deny that Dr. Goswami's award, or any other faculty award, was "ignored or slighted" by not being referenced during this orientation.

78.     *In the fall of 2007, several graduate students expressed concern with the lack of courses offered by the Department of Philosophy dealing with diversity in philosophy, and the general hostility to the students' interest in pursuing critical race, feminist, and postcolonial theories.   On October 17, 2007, Dr. Tina Chanter sent a message to the faculty of the Department of Philosophy regarding the graduate students' concerns.  She stated, "Despite the fact that the department advertises itself as representing diverse interests, students have found that there is in general, not only a distinct lack of support for these areas, but that there is sometimes an active hostility or dismissive attitude towards them . . . .  So grave are the concerns that some students have expressed serious reservations about remaining in the program . . . .*

*First, there is a pervasive atmosphere that students feel is unsupportive. This includes both faculty and students reacting negatively to questions in the classroom coming from minority points of view. Issues around gender, sexuality, race and disability are relevant here. Students report that sometimes professors close down their questions, or tell them that their questions are not 'philosophical.' As a result, these students are feeling marginalized, and alienated, and that they have been encouraged to come here under false pretenses. Second, students think that there are not enough course offerings in these areas. Third, students think that there are certain structural ways in which the department does not actively reflect its alleged commitment to diversity. Gender ratios in graduate classrooms are disproportionate, a fact that contributes to the dominant masculinity of classroom atmosphere."*

**<u>ANSWER:</u>**

78.     Defendants admit that on October 17, 2007, Dr. Tina Chanter sent an e-mail to the faculty of the Department of Philosophy regarding what she reported to be concerns of unnamed "graduate students." Defendants admit that the e-mail included an attachment entitled, "Notes based on graduate student concerns, compiled by T. Chanter, Oct 07" (hereinafter, the "Notes"). Defendants further admit that the Notes contain the quoted language in Paragraph 78. Defendants deny that the quoted language represents the complete or accurate contents of the Notes. Further answering, Defendants state that the Notes speak for themselves and are the best evidence of their contents. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that several graduate students had expressed concerns as alleged in Paragraph 78, and therefore deny the allegation concerning the same and demand strict proof thereof.

79.     *In response to Dr. Chanter's message, Dr. Birmingham sent an email to the entire faculty criticizing postcolonial theory, the very area that Dr. Goswami had been hired to teach. A number of minority graduate students have complained that Dr. Birmingham treated them poorly as compared to white graduate students and a disproportionate number have dropped out of the departmental graduate program because of Dr. Birmingham.*

**ANSWER:**

79.     Defendants admit that Dr. Birmingham sent an e-mail in response to Dr. Chanter's e-mail, which like Dr. Chanter's e-mail, was sent to the faculty in the Department of Philosophy.  Defendants deny the remaining allegations in Paragraph 79.

80.     *In May 2008, Dr. Goswami had her second biennial formal review.  Dr. Lee, the department chair, convened an ad hoc Personnel Committee to conduct the review.  The Personnel Committee requested that Dr. Goswami provide them her CV, a personal statement, sample syllabi, teaching evaluations, and samples of her recently published work.  The Personnel Committee recommended that Dr. Goswami's contract be renewed for the 2009-2010 academic year, which would be the year of her tenure application.  Dean Charles Suchar accepted that recommendation consistent with § 3.2.2 of the Faculty Handbook.  Dean Suchar informed Dr. Goswami, on June 16, 2008, that based upon the Department's review, he was accepting their recommendation to renew her contract, and he stated, "[Y]our colleagues are quite pleased with your work.  Happily, my own review of your record leads to the same conclusion."*

**ANSWER:**

80.     Defendants admit that Dr. Goswami was scheduled to have her second formal probationary review in May 2008, and that Dr. Lee, the Department Chair, convened an ad hoc

Personnel Committee to conduct the review. Defendants admit that the Personnel Committee requested that Plaintiff provide the Committee with her CV, a personal statement, sample syllabi, teaching evaluations, and samples of her recently published work. Defendants admit that it was the Committee's intent to recommend the renewal of Plaintiff's contract for the 2009-2010 academic year. Further answering, Defendants state that no written report was prepared setting forth this recommendation or the results of the review. Defendants admit that Dean Charles Suchar accepted a recommendation of renewal for Plaintiff for the 2009-2010 academic year, which was communicated by Dr. Lee. Defendants admit that Plaintiff received a June 16, 2008 letter from Dean Suchar, in which he accepted the recommendation to renew Plaintiff's contract. Defendants admit that the June 16, 2008 letter contains the quoted language in Paragraph 80, but deny that this language represents a complete or accurate representation of the contents of the letter. Defendants assert that the Dean's June 16, 2008 letter speaks for itself and is the best evidence of its contents. Defendants deny the remaining allegations in Paragraph 80.

*81. During the 2008-2009 academic year, Dr. Goswami took advantage of DePaul's "Flexible Scheduling" program. Even though faculty members on Flexible Scheduling typically do not stay in Chicago but travel elsewhere to conduct their research, Dr. Birmingham singled Dr. Goswami out for not having attended departmental talks and faculty meetings during that period, and used that to downgrade her "service" rating in her 2008 merit review. In December 2008, Dr. Goswami expressed her interest in participating in the prestigious Collegium seminar in Italy, a prominent professional opportunity. Dr. Birmingham was in charge of this seminar, and most of the DePaul philosophy faculty members have been invited to participate. However, Dr. Birmingham refused to invite Dr. Goswami despite the fact that she knew that the topic of that year's seminar was directly relevant to Dr. Goswami's research.*

**ANSWER:**

81.     Defendants admit that Plaintiff took advantage of "Flexible Scheduling" during the fall semester of the 2008-2009 academic year.  Defendants deny that faculty with "Flexible Scheduling" are not expected to participate in departmental activities.  Defendants further admit that in Plaintiff's annual merit review, Dr. Birmingham cited "a very noticeable lack of Professor Goswami's presence in the life of the philosophy department" -- evidenced in part by Plaintiff's absence at departmental lectures and meetings -- in the review's discussion of Plaintiff's service. Defendants admit that Dr. Birmingham directed the Summer 2009 *Collegium Phenomenolicum* in Italy, that Dr. Birmingham asked several DePaul faculty to participate in that program, and that Dr. Birmingham did not invite Plaintiff to attend.  Defendants deny that Plaintiff asked Dr. Birmingham to participate in that *Collegium Phenomenolicum*, or that the topic of the 2009 *Collegium Phenomenolicum* was directly relevant to Plaintiff's research.  Defendants deny the remaining allegations in Paragraph 81.

82.     *In fall 2008, Dr. Birmingham became Interim Chair of the Department of Philosophy while Dr. Lee was on leave for the 2008-2009 academic year.  Dr. Birmingham conducted Dr. Goswami's sixth annual merit review, for calendar year 2008, and downgraded Dr. Goswami in all three areas of evaluation even though 2008 was Dr. Goswami's best year in teaching, research, and service.  Dr. Birmingham's review covered part of the same time period that had also been reviewed by Dr. Lee and the ad hoc Personnel Committee during the second biennial formal review, and had resulted in an overall rating of "Outstanding."  Yet Dr. Birmingham rated Dr. Goswami as "Very Good Plus" in teaching, "Very Good" in research, and "Good" in service, for an overall rating of "Very Good Minus."  This was Dr. Goswami's*

*lowest rating in an annual merit review for what was objectively her highest-achieving year at DePaul.*

**ANSWER:**

82.     Defendants admit that Dr. Birmingham became Interim Chair of the Department of Philosophy in fall 2008, while Dr. Lee was on leave for the 2008-2009 academic year. Defendants admit that Dr. Birmingham conducted Plaintiff's annual merit review for calendar year 2008.   Defendants admit that Dr. Birmingham's annual merit review assessed her performance in certain areas during the calendar year 2008, and that the Personnel Committee reviewed Plaintiff's performance in certain areas for the time period up to May 2008.  Further answering, Defendants state that as set forth in the Faculty Handbook, annual merit reviews and formal probationary reviews serve different purposes and evaluate performance based upon different criteria.  Defendants admit that Dr. Birmingham's 2008 annual merit review contained the ratings set forth in Paragraph 82.  Defendants deny that these ratings constitute the complete or accurate contents of the review.  Defendants state that the 2008 annual merit review speaks for itself and is the best evidence of its contents.  Defendants admit that the overall rating of "Very Good Minus" on Plaintiff's 2008 annual merit review was the lowest overall rating that Plaintiff received on an annual merit review.  Defendants deny the remaining allegations in Paragraph 82.

83.     *Dr. Birmingham's evaluation of Dr. Goswami was based on several deliberate misstatements.  For example, Dr. Birmingham incorrectly stated that Dr. Goswami had only published one article in 2008, even though Dr. Goswami had published three articles during that period.  According to department policy, faculty members receive an "Outstanding" rating for research if they have two articles appear in print during the calendar year under review.  Dr. Birmingham also did not credit Dr. Goswami for the formal acceptances she had received in*

*2008 for two of her essays, but, instead, unfairly penalized Dr. Goswami for having done editorial revisions on those formally accepted essays. Editorial revisions (based on reader reports) of formally accepted essays are a normal part of the publishing process. In addition, Dr. Birmingham penalized Dr. Goswami for not having published most of what she had written in 2008, even though the academic publishing process normally takes at least a year.*

**ANSWER:**

83. Defendants admit that Dr. Birmingham's 2008 annual merit review stated that Plaintiff had published one article. Further answering, Defendants state that the *curriculum vitae* provided by Plaintiff to Dr. Birmingham in connection with the review listed only one article as being published in 2008. Defendants lack knowledge or information sufficient to form a belief as to the source or content of the "department policy" referenced in Paragraph 83, and therefore deny the allegations concerning the same and demand strict proof thereof. Defendants admit that editorial revisions based upon reader reports of formally accepted essays are a normal part of the publishing process. Defendants deny the remaining allegations in Paragraph 83.

84. *Similarly, Dr. Birmingham misrepresented Dr. Goswami's teaching in Dr. Goswami's sixth annual merit review. She ignored students' comments regarding Dr. Goswami's success in building bridges with the European philosophical canon as well as the importance of the course for their own projects in European philosophy. She also ignored Dr. Goswami's outstanding evaluations in the introductory level philosophy course.*

**ANSWER:**

84. Defendants deny the allegations in Paragraph 84.

85. *Dr. Birmingham also denigrated Dr. Goswami's service by deliberately ignoring her work on the Committee on the Status of Racial and Ethnic Diversity of the Society for*

*Phenomenology and Existential Philosophy (of which Dr. Birmingham had served as co-director until October 2008), her service on the Undergraduate Affairs Committee, and her work building alliances with DePaul's interdisciplinary programs and institutes.*

**ANSWER:**

85.     Defendants deny the allegations in Paragraph 85.

*86.     Rather than crediting Dr. Goswami for her University-wide and field-wide service, Dr. Birmingham actually punished Dr. Goswami for it, criticizing Dr. Goswami for not participating in the "life of the department."  Dr. Birmingham also improperly singled out Dr. Goswami for allegedly not attending departmental talks and other public events, even though faculty on Flexible Scheduling are not expected to attend department meetings and events, attendance at events has never been used as a criterion in faculty members' evaluations, and the department has no means of measuring faculty members' attendance at events.  Dr. Birmingham also repeated her past practice of using hearsay from anonymous colleagues to bolster her critiques, even though she had previously apologized in writing for the inappropriate use of unsubstantiated hearsay.*

**ANSWER:**

86.     Defendants admit that Dr. Birmingham criticized Plaintiff for not participating "in the life of the philosophy department," evidenced in part by her failure to attend departmental talks and meetings, in the 2008 annual merit review.  Defendants state that this review speaks for itself and is the best evidence of its contents.  Defendants admit that Dr. Birmingham previously gave an apology to Plaintiff in writing.  Further answering, Defendants state that this writing also speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 86.

87.     *On March 25, 2009, Dr. Goswami submitted a formal response to Dean Charles Suchar in response to Dr. Birmingham's sixth annual merit review, for calendar year 2008. Dr. Goswami's letter stated, "Regrettably, over the last 5 years, I have noticed a pattern of distortion and misrepresentation by Dr. Birmingham in her evaluation of my record, which includes Formal and Informal Reviews as well as Merit Evaluations. This review is the 4th time that her evaluation has misrepresented my record and relied on innuendo and hearsay. I experience these repeated distortions of my record as harassment and the creation and maintenance of a hostile workplace environment." Dr. Goswami also met with DePaul's Vice-President for Institutional Diversity to express her concerns about her discriminatory treatment.*

**ANSWER:**

87.     Defendants admit that Plaintiff submitted a March 25, 2009 letter to Dean Charles Suchar, in which she raised concerns regarding the 2008 annual merit review prepared by Dr. Birmingham. Defendants admit that the March 25, 2009 letter includes the quoted language. Defendants admit that during her employment at DePaul, Plaintiff met with DePaul's Vice-President for Institutional Diversity to discuss concerns regarding her employment. Defendants deny that Plaintiff experienced discriminatory treatment. Defendants deny the remaining allegations in Paragraph 87.

88.     *Dr. Goswami met with Dean Suchar during the week of March 30, 2009, and on April 8, 2009, Dean Suchar raised Dr. Goswami's overall rating for her 2008 merit review from "Very Good Minus" to "Very Good" on the basis of the research record. The merit review was not, however, rewritten, and therefore Dr. Birmingham's unsubstantiated criticisms remained in Dr. Goswami's personnel record.*

**ANSWER:**

88.    Defendants admit that Plaintiff met with Dean Suchar after submitting her March 25, 2009 letter.  Defendants lack knowledge or information sufficient to form a belief as to the date of this meeting, and therefore deny the allegations regarding the same and demand strict proof thereof.  Defendants admit that the overall rating on the 2008 annual merit review was raised from a "Very Good Minus" to a "Very Good" based upon additional, updated information presented on Plaintiff's scholarship performance.  Further answering, Defendants state that Dean Suchar told Plaintiff that elements of her service record remained at issue, and that "[f]lexible scheduling does not absolve faculty from service responsibility to the department during the quarter in which they may have a reduced teaching schedule."  Defendants deny the remaining allegations in Paragraph 88.

89.    *In April 2009, Dr. Birmingham, who was still serving as the department's Interim Chair, improperly convened a third, ad hoc formal review – even though this review was not permitted by the Faculty Handbook or by the department's written procedures, since Dr. Goswami's second biennial formal review had taken place in May 2008.  Dr. Birmingham also departed from department policy and precedent by not announcing the review to all department faculty.  In violation of department policy and practice, Dr. Birmingham hand-selected the ad hoc Personnel Committee to conduct Dr. Goswami's third formal review.*

**ANSWER:**

89.    Defendants admit that Dr. Birmingham remained in her role as Interim Chair in April 2009.  Defendants admit that Plaintiff and two other faculty members in the Department of Philosophy received a formal review in May 2009.  Defendants deny the remaining allegations in Paragraph 89.

90.    *Dr. Goswami was never told what documents Dr. Birmingham provided to the ad hoc Personnel Committee.  Although the chair of the committee told Dr. Goswami that the committee did not consider Dr. Goswami's annual merit reviews, one member of the committee quoted directly from Dr. Birmingham's 2008 annual merit review of Dr. Goswami during a committee meeting on May 1, 2009.  Another committee member told Dr. Goswami that Dr. Birmingham gave the committee her own 2004 and 2008 annual merit reviews and 2005 biennial informal review of Dr. Goswami.  Dr. Birmingham did not, however, give the committee Dr. Goswami's formal letters of response to these reviews, Dr. Birmingham's June 2007 apology to Dr. Goswami, or Dean Suchar's correction of Dr. Goswami's 2008 annual merit review.  Dr. Birmingham also did not provide the committee with any of the stellar reviews for the previous three years written by then-Chair Dr. Lee.*

**ANSWER:**

90.    Defendants admit that Dr. Birmingham did not give the Personnel Committee any documents, including the documents referenced in Paragraph 90.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning the conversations and comments referenced in Paragraph 90, and therefore deny the same and demand strict proof thereof.  Defendants deny the remaining allegations in Paragraph 90.

91.    *Upon request, Dr. Goswami examined the contents of her personnel file, and discovered that only the reviews written by Dr. Birmingham and Dr. Goswami's 2004 and 2005 peer teaching evaluations, which criticized Dr. Goswami's area of focus, were in Dr. Goswami's personnel file.  All of the other materials had been removed from Dr. Goswami's personnel file.*

**ANSWER:**

91.     Defendants deny that any materials were improperly removed from a file maintained on Plaintiff.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 91, and therefore deny the same and demand strict proof thereof.

*92.     Dr. Goswami provided the ad hoc Personnel Committee with her CV, sample syllabi for five courses, and a sample of published articles.  At the request of one committee member, she also provided an initial rough draft of the prospectus of her forthcoming book manuscript, a work that was then still in progress.  When Dr. Goswami expressed reservations about submitting an initial rough draft to the committee, she was told that unless she submitted the rough draft of the prospectus, the committee would not believe that she had a book project at all.*

**ANSWER:**

92.     Defendants admit that Plaintiff provided the Personnel Committee with her CV, sample syllabi for five courses, and a sample of published articles.  Defendants admit that one committee member suggested to Plaintiff that she should submit the initial rough draft of the prospectus of her book manuscript, which was then a work in progress.  Defendants lack knowledge or information sufficient to form a belief as to the remaining communications referenced in Paragraph 92, and therefore deny the same and demand strict proof thereof.

*93.     In this same year, two white male colleagues (Drs. Avery Goldman and Sean Kirkland), were also being reviewed; both teach traditional European philosophy (Kant and Aristotle, respectively).  However, while Drs. Goldman and Kirkland were evaluated based upon*

*their peer-reviewed publications, teaching evaluations, and conference presentations, the*
*Personnel Committee ignored those criteria in evaluating Dr. Goswami.*

**ANSWER:**

93.     Defendants admit that Drs. Avery Goldman and Sean Kirkland, both of whom are
white males, received formal reviews in 2009 from the same Personnel Committee that evaluated
Plaintiff.   Defendants lack knowledge or information sufficient to form a belief as to what
Plaintiff considers to be "traditional European philosophy," and therefore deny the allegations
regarding the same and demand strict proof thereof.   Defendants admit that Dr. Goldman has
taught and conducted research on Kant, and that Dr. Kirkland has taught and conducted research
on Aristotle.   Defendants deny, however, that Paragraph 93 completely or accurately describes
the full scope of the teaching and scholarship of Drs. Goldman and Kirkland.   Defendants deny
the remaining allegations in Paragraph 93.

94.     *The ad hoc Personnel Committee improperly considered whether Dr. Goswami –*
*who had been hired specifically to focus on minority philosophers and interdisciplinary*
*postcolonial, critical race, and feminist perspectives that had been overlooked in the traditional*
*canon – shared the department's focus on European philosophy, which was diametrically*
*opposed to the focus for which DePaul had hired her and which she had been instructed to apply*
*in her scholarship and teaching.   Specifically, the committee criticized Dr. Goswami for her*
*background in postcolonialism and women's studies despite the fact that she had been hired to*
*serve as an interdisciplinary scholar bridging multiple fields; the committee devalued Dr.*
*Goswami's stellar teaching and research accomplishments by falsely stating that those*
*accomplishments were not in the field of philosophy; and the committee criticized Dr. Goswami*

*for not applying traditional methodologies or focusing on the traditional European philosophical canon, even though Dr. Goswami had been hired precisely because of her non-traditional focus.*

**ANSWER:**

94.     Defendants deny the allegations in Paragraph 94, and specifically deny that those allegations accurately characterize the review of the Personnel Committee.  Further answering, Defendants state that the Personnel Committee's review speaks for itself and is the best evidence of its contents.

*95.     Based on its flawed evaluation criteria, the ad hoc Personnel Committee determined that Dr. Goswami was ineligible to apply for tenure during the 2009-2010 academic year.*

**ANSWER:**

95.     Defendants deny the allegations in Paragraph 95.

*96.     Never before in her probationary period had Dr. Goswami been informed that although she had been recruited and hired to teach in non-traditional fields in philosophy, she would be required to demonstrate achievements in a different area – traditional European philosophy – on which most of the department focused.*

96.     Defendants deny that Paragraph 96 accurately states the reasons why Plaintiff was recruited and hired.  Defendants further deny that Paragraph 96 accurately characterizes the content of her 2009 formal review.  Defendants admit that Plaintiff was not told these inaccurate statements at any point in her employment.  Defendants lack knowledge or information sufficient to form a belief as to what Plaintiff considers "traditional European philosophy," and therefore deny the allegations concerning the same and demand strict proof thereof.  Defendants deny the remaining allegations in Paragraph 96.

97. *The ad hoc Personnel Committee's determination was also based on deliberate misstatements of fact. The committee falsely claimed that Dr. Goswami was unlikely to finish her book in the foreseeable future, even though she received an advance contract in August 2009 from SUNY Press, a highly respected University press, all five chapters were included in her tenure dossier, and her book was finished in February 2010.*

**ANSWER:**

97. Defendants admit that the Personnel Committee concluded "on the basis of [Plaintiff's prospectus] and what [Plaintiff] said about it in reply to our questions and suggestions during our interview with her that she is not likely to be able to produce the book she proposes in the foreseeable future, much less continue to produce scholarship of a high order in her area." Defendants admit that Plaintiff received an advance provisional contract from SUNY Press after the formal review. Defendants lack knowledge or information sufficient to form a belief as to precise date on which Plaintiff received the advance provisional contract, and therefore deny the allegations regarding the same and demand strict proof thereof. Defendants deny that Plaintiff included all five chapters in her tenure dossier by the applicable deadline set by the Department's Policies and Procedures of Appointment, Retention, Tenure, and Promotion of Staff. Defendants admit that Plaintiff supplemented her tenure dossier to include two additional chapters days before the Department met to consider her tenure application. Defendants deny that Plaintiff "finished" her book in February 2010 or at any point thereafter. Defendants deny the remaining allegations in Paragraph 97.

98. *Citing "anonymous reports," the ad hoc Personnel Committee also falsely claimed that Dr. Goswami had a poor record of attendance at meetings and events, even though the Chair of the Undergraduate Affairs Committee and other faculty members attested to Dr.*

*Goswami's exemplary participation, and the department has no accurate means of measuring faculty members' attendance at meetings and events.*

**ANSWER:**

98.     Defendants lack knowledge or information sufficient to form a belief as to the context or content of the alleged attestations by the Chair of the Undergraduate Affairs Committee and the unnamed "other faculty members," and therefore deny the allegations concerning the same and demand strict proof thereof. Defendants deny the remaining allegations in Paragraph 98.

*99.     The ad hoc Personnel Committee made false, disparaging comments about questions that Dr. Goswami had asked during a graduate student's thesis defense, and stated falsely that Dr. Goswami did not possess the requisite commitment or preparation necessary properly to train graduate students. The Personnel Committee's recollection of Dr. Goswami's conduct during the thesis defense contradicted the remarks of the student who had presented the defense.*

**ANSWER:**

99.     Defendants deny that the Personnel Committee's formal review contained any comments regarding Plaintiff's questions during a graduate student's thesis defense. Defendants lack knowledge or information sufficient to form a belief as to the context in which Plaintiff claims that the entire "Personnel Committee" made the alleged "false, disparaging comments," and therefore deny the allegations concerning the same and demand strict proof thereof. Defendants further lack knowledge or information sufficient to form a belief as to the alleged "remarks of the student who had presented the defense," and therefore deny the allegations

concerning the same and demand strict proof thereof.  Defendants deny the remaining allegations in Paragraph 99.

*100.    During a May 1, 2009 meeting with Dr. Goswami, members of the ad hoc Personnel Committee stated that critical race, postcolonial, and feminist theory are political and ideological rather than philosophical, criticized Dr. Goswami for her ostensible lack of service in the department even though all department service is assigned, and repeatedly prevented her from explaining the philosophical nature of her interdisciplinary scholarship and teaching.*

**ANSWER:**

100.    Defendants deny the allegations in Paragraph 100.

*101.    Following Dr. Goswami's May 1, 2009 meeting with the ad hoc Personnel Committee, one committee member stated that many members of the Department of Philosophy had never forgiven Dr. Goswami for having a degree in Women's Studies.*

**ANSWER:**

101.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 (which fail to identify the speaker in question), and therefore deny the same.  Defendants further deny that "many members of the Department of Philosophy had never forgiven Dr. Goswami for having a degree in Women's Studies."

*102.    On May 21, 2009, the ad hoc Personnel Committee recommended to Dean Suchar that Dr. Goswami's contract be terminated effective June 30, 2009, one month later.  This was entirely improper, because in June 2008 DePaul had approved Dr. Goswami's contract for the 2009-2010 academic year as a result of Dr. Goswami having received a rating of "Outstanding" during her 2008 biennial formal review.  The Faculty Handbook and the department's policies and procedures did not provide for an ad hoc review of the faculty member's eligibility to apply*

*for tenure in the fifth year of the probationary period, just three months before the faculty member was scheduled to apply for tenure. Summary revocation of Dr. Goswami's contract – if upheld at higher levels – would have also constituted a firing without cause and without advance notice, in violation of the Faculty Handbook and AAUP's Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments.*

**ANSWER:**

102.    Defendants admit that on May 21, 2009, the Personnel Committee recommended to Dean Suchar that Plaintiff's contract be terminated, meaning that it would not be renewed, but deny that the Committee's written recommendation set forth a termination date of June 30, 2009. Defendants admit that as of May 21, 2009, DePaul already had approved Plaintiff's contract for the 2009-2010 academic year. The final allegation in Paragraph 102 ("Summary revocation of Dr. Goswami's contract – if upheld at higher levels . . ."), rests upon speculation and a legal conclusion, to which no response is required. Defendants deny the remaining allegations in Paragraph 102.

*103.    Dr. Goswami was not provided with a copy of the ad hoc Personnel Committee's report when it was issued, despite repeatedly requesting it from Dr. Birmingham and the committee chair. Instead, the committee's report and recommendation were submitted directly to Dean Suchar. Many faculty in the Department of Philosophy did not know that the committee had recommended that Dr. Goswami be summarily terminated. Dr. Goswami did not receive a copy of the committee's report, and the entire department was not made aware of the committee's recommendation, until Dean Suchar rejected the committee's recommendation and directed that the entire department consider the recommendation.*

**ANSWER:**

103.    Defendants admit that the Personnel Committee's recommendation was submitted directly to Dean Suchar.  Defendants deny the remaining allegations in Paragraph 103.

*104.    The ad hoc Personnel Committee recommended that the contracts of Dr. Goswami's two white male colleagues, Drs. Goldman and Kirkland, be renewed despite the fact that Dr. Goswami's qualifications were equivalent or superior to those of Drs. Goldman and Kirkland.*

**ANSWER:**

104.    Defendants admit that the Personnel Committee recommended the renewal of the contracts of Drs. Goldman and Kirkland, who are both white and male.  Defendants deny the remaining allegations in Paragraph 104.

*105.    On May 25, 2009, seventeen graduate students in the Department of Philosophy wrote Dean Suchar a letter "to express [their] appreciation and respect for Professor Namita Goswami."  The letter stated, "Professor Goswami has distinguished herself as a teacher and mentor--engaging our discipline's history, advancing our methodological depth, helping us develop mature philosophical projects, and deeply influencing our pedagogy.  Professor Goswami is an incredibly effective graduate instructor.  Her expertise is manifest, and her enthusiasm contagious.  When she lectures on course texts, she does not impose her own views as the most important or valuable ones, but instead explains her own textual interpretations and accounts for why they are philosophically interesting, while always inviting further reflection and criticism.  She knows how to appreciate students' comments, and encourages views other than her own.  Professor Goswami's areas of expertise have been influential for the development*

*of our work: The significance of post colonial theory on philosophical inquiry into questions related to the subject, the political and the ethical is immeasurable."*

105.    Defendants admit the allegations in Paragraph 105.

*106.    Dean Suchar rejected the ad hoc Personnel Committee's recommendation to revoke Dr. Goswami's 2009-2010 contract renewal, effective June 2009.  Instead, he asked that the entire Department of Philosophy review and vote on the ad hoc Personnel Committee's recommendation.  This violated the Faculty Handbook and the Department of Philosophy's practice and written procedures.*

**ANSWER:**

106.    Defendants deny the allegations in Paragraph 106.

*107.    Consistent with Dean Suchar's directive, the entire Department of Philosophy met on May 29, 2009.  Dr. Birmingham did not tell Dr. Goswami before the May 29, 2009 meeting that summary termination or rescission of Dr. Goswami's contract was even a possibility.  Nor did the Department of Philosophy follow any of the procedures that the Faculty Handbook established for termination.*

**ANSWER:**

107.    Defendants admit that the Department of Philosophy met on May 29, 2009. Defendants admit that Dr. Birmingham did not tell Plaintiff before the May 29, 2009 meeting that summary termination or rescission of Plaintiff's contract was a possibility.  Further answering, Defendants state that Dr. Birmingham did not participate in the Personnel Committee's formal review, and that Dr. Birmingham's decision to abstain from this review was known to Plaintiff.  Defendants deny the remaining allegations in Paragraph 107.

108.    *During its May 29, 2009 meeting, the Department of Philosophy voted 9 to 6 to terminate Dr. Goswami effective June 30, 2010.  The department voted to allow Dr. Goswami to apply for tenure during the 2009-2010 academic year, but to deny Dr. Goswami her 2010-2011 year of employment, which she was entitled to under the Faculty Handbook and the AAUP guidelines, which required the University to grant Dr. Goswami a "terminal year" of employment.*

**ANSWER:**

108.    Defendants admit that during the May 29, 2009 meeting, the tenured faculty of the Department of Philosophy voted 9 to 6 to terminate (*i.e.,* not to renew) Plaintiff's contract for the 2010-2011 academic year.  Defendants deny that the faculty voted "to allow" Plaintiff to go up for tenure, or that the faculty voted to deny her a terminal year of employment following any denial of tenure.  Defendants assert that the allegations regarding the Faculty Handbook and the AAUP guidelines set forth legal conclusions to which no response is required.  Defendants deny the remaining allegations in Paragraph 108.

109.    *During the May 29, 2009 meeting, department faculty stated that most of Dr. Goswami's publications were "invited" and not peer reviewed in the "usual sense."  There was no evidence to support the statement that Dr. Goswami's publications were not peer reviewed.  Moreover, never before in considering a tenure candidate's dossier had the Department of Philosophy questioned the peer review process.  For example, in Dr. Goldman's case, short conference presentations published in conference proceedings were counted as peer-reviewed journal publications.*

**ANSWER:**

109.     Defendants lack knowledge or information sufficient to form a belief as to which unnamed "department faculty" Plaintiff claims made the quoted remarks, and therefore deny the allegations concerning the same and demand strict proof thereof.  Defendants admit that in Dr. Goldman's case, short conference presentations published in conference proceedings were counted as peer reviewed journal publications.  Defendants deny the remaining allegations in Paragraph 109.

*110.     Dr. Birmingham refused to allow the department to consider any of the materials that Dr. Goswami submitted, including drafts of in-progress book chapters, drafts of publications that had been accepted for publication through a highly competitive blind peer-review process, and a letter from the editor of one of her publications attesting to the nature and rigor of the peer review process.*

**ANSWER:**

110.     Defendants deny the allegations in Paragraph 110.

*111.     During the May 29, 2009 meeting, members of the ad hoc Personnel Committee used racial stereotypes to falsely portray Dr. Goswami as having acted in an aggressive manner during her meeting with them on May 1, 2009.  The ad hoc Personnel Committee also suggested that Dr. Goswami's overall attitude was overly aggressive and that she should have been more deferential to her colleagues.  Department faculty also used race, color and national origin-based stereotypes by stating that Dr. Goswami had an "irremediable writing problem."*

**ANSWER:**

111.     Defendants deny the allegations in Paragraph 111.

*112.     During the same meeting, the Department voted to endorse the tenure applications of the two white male professors whose records were equivalent or inferior to Dr. Goswami's.*

**ANSWER:**

112.     Defendants deny the allegations in Paragraph 112.

*113.     The same day the Department of Philosophy voted to terminate Dr. Goswami, seven members of the Department of Philosophy, including one member of the ad hoc Personnel Committee, submitted a "minority report" in support of Dr. Goswami based on a full and fair assessment of her record.   The minority report stated that Dr. Goswami should be allowed to apply for tenure during the 2009-2010 academic year and contested the 2009 ad hoc Personnel Committee's characterization of the traditional identity and mission of the department as being focused on European philosophy.   The report stated, "Professor Goswami's teaching and scholarship . . . have contributed to the Department's continued distinction.   Her work on postcolonial theory, particularly her work on Gayatri Chakravorty Spivak, substantially expands our offerings both in feminist theory and in race theory, bringing important coverage to an area of feminist theory that was previously only addressed sporadically, and expanding our race theory offerings in a feminist direction.   Her teaching and scholarship employ a systematic and philosophical point of view, meaning that her approach is simultaneously rooted within and yet also critical of the field."   The minority report also observed that "Professor Goswami has proved herself to be an exceptional teacher . . . .   Professor Goswami's scholarly credentials are also impressive . . . .   Not only do Professor Goswami's scholarly articles demonstrate a fertile and sustained engagement with canonical texts; they also embody a theoretically sound,*

*philosophically important, and conceptually coherent project. These interventions . . . constitute an original and incisive contribution to philosophical discourse."*

**ANSWER:**

113.    Defendants admit that seven members of the Department of Philosophy, including one member of the Personnel Committee, submitted a "minority report" in support of Plaintiff. Defendants admit that the "minority report" contains the quoted language. Defendants further admit that the "minority report" stated the view that Plaintiff should be allowed to apply for tenure during the 2009-2010 academic year. Defendants deny the remaining allegations in Paragraph 113.

114.    *Dr. Richard Lee, the Department Chair, also wrote a letter in support of Dr. Goswami.*

**ANSWER:**

114.    Defendants admit that Dr. Lee contacted Dean Suchar and expressed support for renewing Plaintiff's contract. Defendants deny the remaining allegations in Paragraph 114.

115.    *Dean Suchar again rejected the recommendation of the Department that Dr. Goswami be terminated effective June 30, 2010, and concluded that she had the right to have a full year of employment for the 2010-2011 academic year and to be considered for tenure in the 2009-2010 academic year.*

**ANSWER:**

115.    Defendants admit that Dean Suchar reversed the recommendation of the Department for the nonrenewal of Plaintiff's contract for the 2010-2011 academic year. Defendants admit that Dean Suchar recognized that Plaintiff would be eligible to apply for

promotion and tenure in the 2009-2010 academic year. Defendants deny the remaining allegations in Paragraph 115.

116.    *In the fall of 2009, Dr. Goswami attempted to prepare for her tenure review, but the department chair and other senior members refused to give her any guidance on how to proceed. Dean Suchar sent a memo to the entire departmental faculty on September 15, 2009, reminding them of the department's obligation to comply with the established departmental, college, and university procedures for tenure and promotion.*

**ANSWER:**

116.    Defendants admit that on September 15, 2009, Dean Suchar sent an e-mail to the faculty in the Department of Philosophy regarding "Departmental representation in tenure and promotioncases [sic]," in which he stated that he expected "that the department will follow both its own and the College's established by-laws and common practices and have the Chair of the Philosophy Department, Rick Lee, represent the departmental recommendations for each of its candidates." Further answering, Defendants state that the e-mail otherwise speaks for itself and is the best evidence of its contents. Defendants lack knowledge or information sufficient to form a belief as to whether Plaintiff "attempted to prepare for her tenure review" in the fall of 2009, and therefore deny the allegations regarding the same and demand strict proof thereof. Defendants deny the remaining allegations in Paragraph 116.

117.    *Opponents of Dr. Goswami attempted to put pressure on Dr. Lee to prevent Dr. Goswami from being granted tenure. In a letter to Dean Suchar, Dr. Goswami's opponents complained about the fact that Dr. Lee had supported Dr. Goswami. In response to the controversy caused by these complaints, Dr. Lee attempted to resign as department chair. Dr.*

*Goswami's opponents also attempted to act as the "reporters" of her tenure review to the higher*

*levels in the University, which Dean Suchar rejected.*

**ANSWER:**

117.    Defendants admit that Dr. Lee attempted to resign as Chair of the Department of

Philosophy.  Defendants lack knowledge or information sufficient to form a belief as to the

existence and content of the "letter to Dean Suchar" referenced in this Paragraph, and therefore

deny the allegations regarding the same and demand strict proof thereof.  Defendants deny the

remaining allegations in Paragraph 117.

*118.    Despite Dean Suchar's intervention, other faculty members continued to interfere*

*with the fair evaluation of Dr. Goswami's credentials.  Dr. Elizabeth Rottenberg, a close friend*

*of Dr. Birmingham, raised unsubstantiated concerns about Dr. Lee's involvement with Dr.*

*Goswami's tenure review.  Dr. David Pellauer, the chair of the 2009 ad hoc Personnel*

*Committee, demanded that Dr. Goswami provide additional documentation for her tenure*

*application, despite the fact that department, college, and university protocol did not require*

*such additional documentation, and other tenure candidates in the Department of Philosophy,*

*including Dr. Goldman, were not required to submit such documentation.*

**ANSWER:**

118.    Defendants admit that Dr. Pellauer, the chair of the Personnel Committee that

completed the formal review for Plaintiff, requested additional detail of paper requirements in

Plaintiff's courses, because he determined that the syllabae she submitted did not clearly spell

out those requirements.  Defendants admit that submission of such material was neither required

nor prohibited.  Defendants lack knowledge or information sufficient to form a belief as to

requests for supplemental information made to Dr. Goldman, and therefore deny the allegations

regarding the same and demand strict proof thereof.  Defendants deny the remaining allegations in Paragraph 118.

119.    *Dr. Pellauer also sent a survey to every faculty member in the department to determine how many departmental talks Dr. Goswami had attended in the previous year, even though attending talks is voluntary and not a criterion for tenure, and demanded that Dr. Goswami's prior informal and formal reviews be included in her tenure dossier (some of which criticized Dr. Goswami for not contributing to the department's "heritage" in European philosophy), even though the tenure dossier was not supposed to include these prior reviews. Dr. Pellauer also attempted to provide the College Personnel Committee and the UBPT with the May 21, 2009 ad hoc Personnel Committee report recommending that Dr. Goswami be summarily terminated without cause effective June 30, 2009.  Dean Suchar rejected Dr. Pellauer's requests on the grounds that it was an improper change in procedure, which could not apply to current tenure candidates.*

**ANSWER:**

119.    Defendants admit that Dr. Pellauer made a request that the preceding informal and formal reviews for all as yet untenured faculty be included in the tenure files.  Defendants state that those reviews speak for themselves and are the best evidence of their contents.  Defendants admit that the Dean or the Dean's office indicated that this would amount to a change in procedure that would need approval from the College Personnel Committee, and that could apply only on a prospective basis.  Defendants deny the remaining allegations in the Paragraph 119.

120.    *During a departmental meeting on January 8, 2010, several faculty members in the Department of Philosophy disparaged Dr. Goswami's teaching skills by claiming that she had asked the students to nominate her for the Excellence in Teaching Award in May 2007 and*

*that students had been forced to sign the letter in support of Dr. Goswami's nomination. This*

*was utterly false. In fact, a class of graduate students who had taken Dr. Goswami's Spring*

*2006 seminar on postcolonialism had chosen to nominate her for the award. Dr. Goswami was*

*on academic paid leave when she was nominated, and until she received the award, she did not*

*even know who had nominated her.*

**ANSWER:**

    120.    Defendants deny the allegations in Paragraph 120.

    *121.    Faculty members also attempted to disparage Dr. Goswami's teaching skills in*

*spite of her superb teaching evaluations by stating that it was "difficult to separate appreciation*

*for the topics from appreciation for the instructor." The Department did not make this false*

*distinction in considering the teaching evaluations of any white candidates.*

**ANSWER:**

    121.    Defendants admit that the Department of Philosophy did not make false

distinctions in evaluating any tenure candidate, including Plaintiff. Defendants admit that faculty

members expressed concern regarding Plaintiff's teaching during the January 8, 2010 meeting.

Defendants deny that Paragraph 121 accurately characterizes those concerns, or that those

concerns rested upon anything other than the good faith, honest judgment of the faculty members

in question. Defendants lack knowledge or information sufficient to form a belief as to whether

the quoted language accurately reflects verbatim statements made during the meeting, and

therefore deny the allegations concerning the same and demand strict proof thereof. Defendants

deny the remaining allegations in Paragraph 121.

    *122.    In addition, several members of the Department of Philosophy criticized Dr.*

*Goswami for not being fluent in German, despite the fact that fluency in German had never*

*before been raised as a job requirement or an evaluation criterion, fluency in German was not necessary in Dr. Goswami's areas of focus, and Dr. Goswami is fluent in Hindi, Punjabi, and Urdu, and proficient in Spanish and French.  On information and belief, Dr. Goswami is proficient in more languages than any other faculty member in the Department of Philosophy.*

122.  Defendants admit that Plaintiff is not fluent in German, yet she has attempted to research and publish on a philosopher whose primary texts are in German.  Defendants admit that during the January 8, 2010 meeting, faculty members questioned the quality of Plaintiff's ability to generate high quality scholarship on this philosopher, in light of her lack of fluency in German.  Defendants deny that those questions rested upon anything other than the good faith, honest judgment of the faculty members.  Defendants deny that Paragraph 122 accurately characterizes the concerns expressed in the January 8, 2010 meeting.  Defendants lack knowledge or information sufficient to form a belief as to the other languages in which Plaintiff has achieved fluency or proficiency, and therefore deny the allegations concerning the same and demand strict proof thereof.  Defendants deny the remaining allegations in Paragraph 122.

*123.  In addition, faculty members asserted ad hominem attacks on Dr. Goswami's qualifications during the January 8, 2010 departmental meeting.  For example, faculty members asserted that the "problem" with Dr. Goswami's scholarship was "'not a 'writing problem,' it's a 'thinking problem,'" stated that "when the philosophical issues get hard [Dr. Goswami's work] either goes rhetorical or it becomes trite," and stated that Dr. Goswami's "grasp of basic philosophical concepts is shallow and trite . . . .  It is not likely that she would ever be able to produce scholarship of a high quality."  A faculty member also stated that the essay that Dr. Goswami had co-authored with her husband, a white male, was the strongest of her published work.  The only concrete example that any faculty member referred to in Dr. Goswami's*

*scholarship was a paragraph quoted from an article that Dr. Goswami had co-authored as a graduate student and submitted with her initial job application in 2002. The faculty member stated erroneously that that article was co-authored with Dr. Goswami's husband.*

**ANSWER:**

123.     Defendants admit that faculty members criticized the quality of Plaintiff's writing and scholarship during the January 8, 2010 meeting to consider her tenure application. Defendants deny that Paragraph 123 accurately characterizes those criticisms, or that those criticisms rested upon anything other than the good faith, honest judgment of the faculty members in question. Defendants lack knowledge or information sufficient to form a belief as to whether the quoted language accurately reflects verbatim statements made during the meeting, and therefore deny the allegations concerning the same and demand strict proof thereof. Defendants deny the remaining allegations in Paragraph 123.

124.     *Faculty members also stated that one of Dr. Goswami's external peer reviewers, Dr. Charles Mills, was unfairly biased in her favor. Dr. Mills had offered an "enthusiastic endorsement" of Dr. Goswami's work and stated that he was "struck by the thoroughness of Goswami's research and the conscientiousness of the canvassing of the existing literature . . . . Praiseworthy also is the . . . measuredness of her tone in a field(s) where the lapse into polemic is a standing temptation." The faculty members' claim of bias was based on the fact that an unidentified faculty member claimed to have seen Dr. Goswami dining with Dr. Mills at an unidentified conference. But Dr. Mills had been chosen by the department, not by Dr. Goswami, to serve as an external peer reviewer of Dr. Goswami's scholarship. Dr. Goswami had never suggested that Dr. Mills be chosen. Moreover, it is commonplace for professors in the same field to socialize at professional events. Aside from Dr. Goswami's case, the Department of*

*Philosophy has never viewed such affiliation as giving rise to unfair bias in a peer review. For example, one of Dr. Rottenberg's external peer reviewers was a personal friend of hers, and one of Dr. Goldman's external peer reviewers stated that he knew Dr. Goldman personally from having served on panels with him.*

**ANSWER:**

124.    Defendants admit that Dr. Mills was selected by the Department, not Plaintiff, to conduct Plaintiff's external peer review. Defendants admit that Plaintiff did not suggest Dr. Mills. Defendants admit that Dr. Mill's evaluation contains the quoted language. Defendants deny that these quoted excerpts set forth a complete or accurate statement of his evaluation. Further answering, Defendants state that the evaluation speaks for itself and is the best evidence of its contents. Defendants lack knowledge or information sufficient to form a belief as to the extent of socializing at unspecified "professional events," and therefore deny the allegations regarding the same. Defendants lack knowledge or information sufficient to form a belief as to what Plaintiff characterizes as a "personal friend," and therefore denies the allegations regarding the same. Defendants deny the remaining allegations in Paragraph 124.

125.    *In contrast, the department evaluated white, male candidates according to the criteria enumerated in the Faculty Handbook, considering their peer-reviewed publications, teaching evaluations, and conference presentations.*

**ANSWER:**

125.    Defendants deny that the Department of Philosophy considered multiple "white, male candidates" for tenure in the 2009-2010 academic year. Defendants admit that the Department evaluated the two 2009-2010 tenure candidates (Plaintiff and Dr. Goldman) in accordance with the Faculty Handbook and the process set forth therein. Defendants admit that

the Department considered peer-reviewed publications, teaching evaluations, and conference presentations as part of the evaluation of the two tenure candidates. Defendants deny that Plaintiff received disparate treatment in the tenure review process, and deny any remaining allegations in Paragraph 125.

126. *During its January 8, 2010 meeting, the Department of Philosophy voted 11 to 7 (with one abstention) to recommend that Dr. Goswami's application for tenure and promotion be denied. Dr. Lee prepared the majority report, which cut and pasted verbatim much of the department's May 29, 2009 meeting minutes. Statements made during the May 2009 meeting were altered to make it appear that they had been made during the January 8, 2010 meeting.*

**ANSWER:**

126. Defendants admit that during a January 8, 2010 meeting to consider the tenure applications, the full-time, tenured faculty of the Department of Philosophy voted 11 to 7 (with one abstention) to recommend the denial of Plaintiff's application for tenure and promotion. Defendants admit that Dr. Lee prepared the report of the Department's recommendation as required under the Faculty Handbook. Defendants deny the remaining allegations in Paragraph 126.

127. *Every faculty member who voted to recommend that Dr. Goswami's application for tenure and promotion be denied is white. All of the minority faculty members either voted that Dr. Goswami's tenure application be granted or abstained.*

127. Defendants admit that the faculty members who voted to recommend that Plaintiff's application for tenure and promotion be denied are white. Defendants lack knowledge or information sufficient to form a belief as to the meaning of "minority," as used by Plaintiff, and therefore deny the allegations regarding the same.

128.     *The two minority reports submitted by faculty members documented in detail the numerous procedural and substantive errors in the department's evaluation of Dr. Goswami. These included the majority's improper change to Dr. Goswami's job description by rejecting her teaching and research in transnational and multicultural feminism, critical race, and postcolonial studies – the very areas for which she had been hired – and instead evaluating her work by whether it would contribute to European philosophy, as well as their failure to substantiate their allegations of inadequacies in her teaching and research.*

128.     Defendants deny the allegations in Paragraph 128.  Defendants specifically deny that Plaintiff's evaluation had "numerous procedural and substantive errors," that Plaintiff experienced an "improper change in her job description," and that the faculty who voted to recommend the denial of tenure and promotion failed to substantiate their evaluation of inadequacies in Plaintiff's teaching and research.

129.     *During the January 8, 2010 meeting, the Department voted to grant tenure to Dr. Goldman even though his scholarship, teaching, and service were inferior to that of Dr. Goswami.  His book had not been accepted for publication at the time of the department vote, a fact omitted in the Department discussion of his case.  Dr. Goswami's book had been accepted for publication by that time.*

129.     Defendants admit that during the January 8, 2010 meeting, the full-time, tenured faculty of the Department voted to recommend granting tenure and promotion to Dr. Goldman. Defendants admit that Dr. Goldman's book was accepted for publication in April 2010, after this meeting, and is presently published and available for purchase.  Defendants deny the remaining allegations in Paragraph 129.

*130.   In February 2010, Provost Epp unilaterally solicited a vote from DePaul's Women's and Gender Studies Program faculty to accept Dr. Goswami being transferred from the Philosophy Department into the Women's and Gender Studies Program.   After that department unanimously voted to accept Dr. Goswami, Provost Epp rescinded the offer to transfer her to that program.*

**ANSWER:**

130.   Defendants deny the allegations in Paragraph 130.

*131.   On March 13, 2010, the College Personnel Committee, with Dean Suchar's concurrence, unanimously rejected the decision of the Department of Philosophy to deny Dr. Goswami's tenure application.   The CPC sharply criticized the "unfair," "offensive, baseless and illogical" departmental report.   Specifically, the CPC "question[ed] the conclusions of aspects of the departmental report that particularly relate to Dr. Goswami's competency as a philosopher and the quality of her scholarship and its adequacy for promotion and tenure."*

**ANSWER:**

131.   Defendants admit that on March 13, 2010, the College Personnel Committee, with Dean Suchar's concurrence, unanimously recommended that Plaintiff be promoted and tenured. Defendants admit that the report of the CPC contains the quoted language.  Defendants deny that Paragraph 131 accurately characterizes those quoted excerpts, or that the quoted excerpts set forth the complete or accurate content of the CPC's report.  Further answering, Defendants state that the report of the CPC speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 131.

*132.   Regarding teaching, the CPC wrote that it was clear from Dr. Goswami's awards and student evaluations that her teaching skills were outstanding.   "It is notable," the CPC*

wrote, *"that the very positive results of student course evaluations and the very positive tone of the peer evaluations are at some odds with the tone of the departmental evaluation for promotion and tenure with regard to Dr. Goswami's teaching. The CPC notes this inconsistency and is, frankly, puzzled by it."*

**ANSWER:**

132.   Defendants admit that the CPC concluded that Plaintiff was an outstanding teacher.   Defendants admit that the CPC's report contains the quoted language.   Further answering, Defendants state that the report speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 132.

*133.   Similarly, regarding scholarship, the CPC wrote that it was "puzzled by the majority evaluation of [Dr. Goswami's] record. The CPC questions the stringency of her review by the department on the merits of her scholarship. The CPC is particularly concerned with the tone of the departmental report that makes such statements describing her 'problem' as '. . . it is not a writing problem, it's a thinking problem . . .', among other statements." The CPC concluded that Dr. Goswami "demonstrate[d] her remarkable engagement with philosophy as a field" and "definitely refute[d] the claim that she is not a strong thinker, and not 'doing' philosophy effectively. Strong, well-placed publications, a new book completed from scratch and placed in a top university press – all speak to her ability to continue a strong record of research."*

**ANSWER:**

133.   Defendants admit that the CPC report contains the quoted language.  Defendants deny that Paragraph 133 accurately characterizes those quoted excerpts, or that the quoted

excerpts set forth the complete or accurate contents of the report. Further answering, Defendants state that the report speaks for itself and is the best evidence of its contents.

*134.    The CPC noted that Dr. Goswami's external reviewers agreed that her work was "of 'high quality'" and "original and insightful." The CPC stated that "[i]t was, therefore, of some concern to the CPC that even these generally positive evaluations were 'sampled' for a few negative-sounding comments" intended to imply "that aspects of her scholarship were problematic."*

**ANSWER:**

134.    Defendants admit that the CPC report contains the quoted language. Defendants deny that Paragraph 134 accurately characterizes those quoted excerpts, or that the quoted excerpts set forth the complete or accurate contents of the report. Further answering, Defendants state that the report speaks for itself and is the best evidence of its contents.

*135.    Finally, the CPC found that Dr. Goswami's record of service was "excellent to outstanding." Citing the many committees on which Dr. Goswami served, the CPC concluded, "the CPC sees this as an impressive service record for a faculty member during their probationary period."*

**ANSWER:**

135.    Defendants admit that the CPC report contains the quoted language. Defendants deny that Paragraph 135 accurately characterizes those quoted excerpts, or that the quoted excerpts set forth the complete or accurate contents of the report. Further answering, Defendants state that the report speaks for itself and is the best evidence of its contents.

*136.    The CPC strongly and unanimously recommended that Dr. Goswami's tenure application be granted.*

**ANSWER:**

136.     Defendants admit that the CPC unanimously recommended that Plaintiff's tenure application be granted.  Defendants deny that the CPC characterized this recommendation as a "strong" recommendation.  Further answering, Defendants state that the report speaks for itself and is the best evidence of its contents.

*137.     Dean Suchar, Dean of the College of Liberal Arts and Sciences, also strongly recommended that Dr. Goswami's tenure application be granted.*

137.     Defendants admit that Dean Suchar concurred with the recommendation of the CPC and recommended that Plaintiff's tenure application be granted.  Defendants deny that Dean Suchar's recommendation was characterized as a "strong" recommendation.  Further answering, Defendants state that the report speaks for itself and is the best evidence of its contents.

*138.     The recommendation of the CPC and Dean Suchar was forwarded to the UBPT, which was presided over by Provost Epp.*

138.     Defendants admit that the recommendation of the CPC and Dean Suchar was forwarded to the UBPT, for which Provost Epp served as the convener and a non-voting member.  Defendants deny the remaining allegations in Paragraph 138.

*139.     In violation of § 3.6.1 of the Faculty Handbook, Provost Epp failed to ensure that graduate student representatives address the UBPT.  Upon information and belief, he did so to deny Dr. Goswami the support that the department's graduate students were known to have of her tenure.*

**ANSWER:**

139.     Defendants deny the allegations in Paragraph 139.

*140.   Dr. Lee conducted Dr. Goswami's seventh annual merit review, for calendar year 2009, based on her tenure dossier. He rated her as "Outstanding Minus" overall, even as these were the same materials on which the Department of Philosophy based its denial of tenure to Dr. Goswami. Though Dr. Lee omitted separate ratings and comments for teaching, research, and service, he commended her on her contributions to her department and to the University.*

**ANSWER:**

140.   Defendants admit that Dr. Lee completed the annual merit review for Plaintiff for the work she performed in calendar year 2009. Defendants state that the annual merit review speaks for itself and is the best evidence of its contents. Defendants deny that the annual merit review served the same purpose and used the same criteria as the tenure review. Defendants deny the remaining allegations in Paragraph 140.

*141.   Dr. Goswami met with the UBPT on April 30, 2010. During the meeting, the UBPT did not ask Dr. Goswami any questions about her scholarship. Rather, the UBPT focused on the conflict between the members of her department that supported her and the majority of her department advocating that she be terminated. The questions that the members of the UBPT asked made it clear that the UBPT intended to support the department majority's position rather than credit the College Personnel Committee's impartial evaluation or impose its own subjective evaluation of Dr. Goswami's tenure application. For example, the UBPT stated, "They say you teach gender and not philosophy," and "They say that students confuse enjoying the material and your teaching." The UBPT also asked Dr. Goswami, "How do you explain the department vote?", "Do you think your department is biased against you?", and "Do you have any personal conflicts in the department?"*

**ANSWER:**

141.    Defendants admit that Plaintiff met with the UBPT on April 30, 2010. Defendants admit that members of the UBPT asked Plaintiff about the legitimate concerns expressed by the majority of the faculty in her Department.  Defendants lack knowledge or information sufficient to form a belief as to whether the quoted remarks represent verbatim comments made during the meeting, and as to who supposedly made such remarks, and therefore deny the allegations regarding the same.  Defendants deny the remaining allegations in Paragraph 141.

*142.    The UBPT, by a majority vote (6 to 1), recommended that Dr. Goswami's application for tenure and promotion to associate professor be denied.*

**ANSWER:**

142.    Defendants admit the allegations in Paragraph 142.

*143.    In violation of DePaul's tenure procedures, DePaul did not provide Dr. Goswami with the UBPT Report.*

**ANSWER:**

143.    Defendants deny the allegations in Paragraph 143.

*144.    On June 14, 2010, Present Holtschneider informed Dr. Goswami in a cursory letter that he accepted the UBPT's recommendation, based on the fact that the majority of the UBPT agreed with the Department of Philosophy "that [her] record of scholarship did not sufficiently meet the criteria for promotion and tenure."  He did not provide substantiation for his conclusion, as none existed.*

**ANSWER:**

144. Defendants admit that President Holtschneider informed Plaintiff by letter dated June 14, 2010 that he accepted the UBPT's recommendation to deny her tenure and promotion. Defendants admit that President Holtschneider stated that the majority of the UPBT agreed with the Department of Philosophy that Plaintiff's "record of scholarship did not sufficiently meet the criteria for promotion and tenure." Defendants further admit that President Holtschneider accepted the majority opinion of Plaintiff's departmental colleagues regarding the quality of her philosophical work. Further answering, Defendants state that President Holtschneider's letter speaks for itself and is the best evidence of its contents. Defendants deny the remaining allegations in Paragraph 144.

*145. Dr. Goswami requested a formal review by the Faculty Council, which submitted its findings to Provost Epp on November 19, 2010. The Review Board concluded, by a vote of 2 to 1, that the evaluation of her petition for tenure and promotion had not been conducted in accordance with the Faculty Handbook policies and procedures, that the failure to award her tenure violated her academic freedom, and that her negative tenure decision should be reversed.*

**ANSWER:**

145. Defendants admit that Plaintiff requested a formal review by the Faculty Council, and that the resulting Review Board submitted its findings to President Holtschneider and Provost Epp on November 19, 2010. Defendants admit the remaining allegations in Paragraph 145.

*146. Under § 5.1.1 of the Faculty Handbook, once the Review Board found that Dr. Goswami's "academic freedom ha[d] been violated," DePaul had two options: "the dean may*

*recommend that another contract be offered or that a review of the case be conducted in accord*

*with those procedures ordinarily reserved for tenured faculty being dismissed for cause."*

**ANSWER:**

146. Defendants deny the allegations in Paragraph 146.

*147. On December 1, 2010, President Holtschneider ignored the Appeal Board's*

*findings and the procedures provided for in the Faculty Handbook. Relying solely on the*

*Departmental review which had been demonstrated to have serious flaws and procedural*

*violations and whose conclusions were unsubstantiated by Dr. Goswami's factual record of*

*achievement, President Holtschneider found "no evidence that [Professor Goswami's] academic*

*freedom was violated, and, therefore, he denied her appeal.*

**ANSWER:**

147. Defendants admit that on December 1, 2010, President Holtschneider issued a

memorandum containing his response to the Review Board's recommendation. Defendants

admit that President Holtschneider found "no evidence that the evaluation of [Plaintiff's] petition

was not conducted in accordance with the policies and procedures set out in the Faculty

Handbook or that [Plaintiff's] academic freedom was violated. Rather, [Plaintiff] fully

participated in and had the full benefit of a faculty-run process with multiple checks and balances

over several levels of review." Defendants admit that President Holtschneider denied Plaintiff's

appeal. Further answering, Defendants state that per the Faculty Handbook, the President makes

the final decision regarding promotion and the granting of tenure, and the President's decision as

set forth in his response to the Review Board was the final decision with respect to Plaintiff's

application for promotion and tenure. Defendants deny the remaining allegations in Paragraph

147.

148.    *President Holtschneider improperly preempted the procedures called for by the Faculty Handbook governing findings by a Review Board on violations of academic freedom. First, President Holtschneider violated § 5.1.1 of the Faculty Handbook by denying Dr. Goswami's appeal despite the fact that such a decision was to be made by the Appeal Board, which had already voted to grant the appeal. Second, President Holtschneider violated § 5.1.1 of the Faculty Handbook by removing the Dean's ability to make a recommendation with regard to further review of the complaint. President Holtschneider has never upheld a Review Board finding in favor of a female candidate while upholding a Review Board finding in favor of at least one male candidate.*

**ANSWER:**

148.    Defendants deny the allegations in Paragraph 148.

149.    *Because Dean Suchar was not given the opportunity to recommend that another contract be offered to Dr. Goswami, DePaul's only remaining option was for Dr. Goswami's case to be reviewed "in accord with those procedures ordinarily reserved for tenured faculty being dismissed for cause," under § 4.4.2 of the Faculty Handbook.*

149.    Defendants deny the allegations in Paragraph 149.

150.    *President Holtschneider also violated the Faculty Handbook by refusing to grant Dr. Goswami a review of her case pursuant to § 4.4.2 of the Faculty Handbook.*

150.    Defendants deny the allegations in Paragraph 150.

151.    *On December 15, 2010, the AAUP informed President Holtschneider that his actions violated both the Faculty Handbook and the AAUP's Recommended Institutional Regulations on Academic Freedom and Tenure. The AAUP noted that there were a number of*

*other reported problems with tenure applications at DePaul, which has disproportionately and adversely affected female and minority faculty members.*

**ANSWER:**

151.    Defendants admit that the AAUP sent President Holtschneider a letter dated December 15, 2010.  Defendants deny that Paragraph 151 accurately characterizes the contents of that letter.  Further answering, Defendants state that the AAUP's letter speaks for itself and is the best evidence of its contents.  Defendants deny the remaining allegations in Paragraph 151.

152.    *A representative of the AAUP met with counsel for DePaul on February 23, 2011, and again emphasized that DePaul's conduct with respect to Dr. Goswami's tenure denial violates the Faculty Handbook and the AAUP's guidelines.*

**ANSWER:**

152.    Defendants deny the allegations in Paragraph 152.

153.    *Since August 2011, Dr. Goswami has written five scholarly articles that have been either accepted or are in press at prestigious peer reviewed journals and edited volumes. She has continued revising her book manuscript.  In addition, Dr. Goswami is co-editing a volume Women in Philosophy: Why Race and Gender Still Matter to be published by Pickering & Chatto (Cambridge University Press).  Dr. Goswami and her two co-editors have also been invited by Pickering & Chatto to be editors of a book series on Women in Philosophy.*

153.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 153, and therefore deny the same and demand strict proof thereof.

154.    *Since August 2011, Dr. Goswami has continued to present her scholarship at major national venues.  In October 2011, she was a featured plenary speaker at the Society for*

*Phenomenology and Existential Philosophy (SPEP), the most prestigious professional organization in Continental Philosophy. In April 2012, Dr. Goswami presented work at the annual Philosophia conference. She will be presenting at other prestigious venues such as the California Roundtable on Philosophy and Race and the Radical Philosophy Association. She has received invitations to present her work to the Department of Philosophy at Lewis University (IL) and the Department of Philosophy at University of North Carolina (Charlotte). In addition, she served as chair of the program committee for the Society for Women in Philosophy (SWIP) for their annual North-Eastern Division meeting (April 2012).*

154. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154, and therefore deny the same and demand strict proof thereof.

## COUNT I – BREACH OF CONTRACT

*155. The foregoing paragraphs are incorporated by reference as if restated herein.*

**<u>ANSWER:</u>**

155. Defendants answers to the foregoing paragraphs are incorporated by reference as if restated herein.

*156. Defendant DePaul University, through its Faculty Handbook, its tenure practice, and the statements of its agents, has defined the procedures and criteria for tenure and promotion, and thereby created the terms of employment contracts between Dr. Goswami and Defendant.*

**ANSWER:**

156.    Defendants deny the allegations in Paragraph 156.

*157.    By accepting her appointment as a tenure track faculty member at DePaul, Dr. Goswami and Defendant DePaul University agreed that her tenure application was to be governed by the Faculty Handbook's tenure criteria and procedures, as further clarified by criteria specific to Dr. Goswami's school and department, her annual departmental reviews, and verbal and formal pronouncements of University officials guiding tenure track faculty.*

**ANSWER:**

157.    Defendants admit that, by accepting her appointment as a tenure-track faculty member at DePaul, Plaintiff's tenure and promotion application was governed by the Faculty Handbook's tenure and promotion procedures.  Defendants deny the remaining allegations in paragraph 157.

*158.    The Faculty Handbook and AAUP guidelines, which form part of Dr. Goswami's contract with Defendant DePaul University, guarantee academic freedom, and prohibit denial of tenure because of disagreement with faculty members' substantive work or because of bias against professors' areas of research.*

**ANSWER:**

158.    Defendants admit that the Faculty Handbook and AAUP guidelines guarantee academic freedom and prohibit denial of tenure because of disagreement with faculty members' substantive work or because of bias against professors' area of research. Defendants deny the remaining allegations in paragraph 158.

*159.    The AAUP guidelines also require that faculty members "be informed, early in their appointments, of the substantive and procedural standards that will be followed in determining whether or not . . . tenure will be granted."*

**ANSWER:**

159.    Defendants admit the allegations in paragraph 159, but deny that this is a complete or accurate excerpt from the AAUP's *Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments.*

*160.    The Faculty Handbook and the AAUP Guidelines also provide that DePaul will provide annual evaluations of the faculty members' progress toward tenure standards.*

**ANSWER:**

160.    Defendants admit the allegations in Paragraph 160.

*161.    Throughout her first four years as a tenure track faculty member DePaul represented to Dr. Goswami that she was making excellent progress toward tenure, and at no time did DePaul inform Dr. Goswami of any significant deficiencies that she needed to cure in order to receive tenure.*

**ANSWER:**

161.    Defendants deny the allegations in Paragraph 161.

*162.    In denying Dr. Goswami's tenure application, Defendant DePaul University applied new criteria that exceeded the scope of the criteria set forth in the Faculty Handbook or otherwise explained by the guidance of Dr. Goswami's department and the University and in Dr. Goswami's formal performance evaluations.*

**ANSWER:**

162.     Defendants deny the allegations in Paragraph 162.

*163.     Defendant DePaul University improperly discounted Dr. Goswami's focus on critical race studies and interdisciplinary studies, despite the fact that DePaul had hired Dr. Goswami specifically to focus on those areas of study and had never informed her during her probationary period that that focus would be viewed as a deficiency.*

**ANSWER:**

163.     Defendants deny the allegations in Paragraph 163.

*164.     In determining that Dr. Goswami's teaching and research were not acceptable because the University disagreed with her areas of research and deciding not to credit scholarship that dealt with critical race studies or diversity issues – areas of study in which the University disagreed with Dr. Goswami – the University violated Dr. Goswami's right to academic freedom as set forth in the Faculty Handbook and by the AAUP.*

**ANSWER:**

164.     Defendants deny the allegations in Paragraph 164.

*165.     Defendant DePaul University distorted Dr. Goswami's record of scholarship by failing to credit all of her publications, failing to credit her substantial work toward a book, speculating that her book was unlikely to be published without any legitimate basis for doing so when in fact she has a contract for publication, and openly ridiculing critical race and diversity studies.*

**ANSWER:**

165.     Defendants deny the allegations in Paragraph 165.

166.    In denying Dr. Goswami's tenure application, Defendant DePaul University applied extraneous, ad hoc, and discriminatory criteria to Dr. Goswami's application, which had never been applied to other tenure applicants and of which Dr. Goswami had never been informed, based on race and gender-based stereotypes and animus toward Dr. Goswami's area of focus.  For example, Defendant erroneously alleged that most of Dr. Goswami's publications had not been peer-reviewed, but did not draw a distinction between peer-reviewed publications and non-peer-reviewed publications for any other tenure candidate; Defendant erroneously criticized Dr. Goswami for having poor attendance at department events while she was on academic leave, but did not expect other faculty members to attend events while on academic leave; Defendant falsely claimed that Dr. Goswami's receipt of the Excellence in Teaching award was not indicative of her excellent teaching ability; and Defendant criticized Dr. Goswami for not being fluent in German, even though fluency in German was not necessary and had never before been raised as an evaluation criterion.  President Holtschneider refused to accept the Review Board decision on Dr. Goswami's tenure appeal and refused to grant Dr. Goswami a hearing, in violation of the Faculty Handbook and the AAUP guidelines.

**ANSWER:**

166.    Defendants deny the allegations in Paragraph 166.

167.    Defendant's denial of Dr. Goswami's tenure application breached its contract with her.

**ANSWER:**

167.    Defendants deny the allegations in Paragraph 167.

168.    Dr. Goswami suffered harm to her career, lost wages and benefits, future economic harm, and other consequential damages as a result of Defendant's unlawful conduct.

**ANSWER:**

168.    Defendants deny the allegations in Paragraph 168.

## COUNT II – INTENTIONAL INTERFERENCE WITH CONTRACT

*169.    The foregoing paragraphs are incorporated by reference as if fully stated herein.*

**ANSWER:**

169.    Defendants' answers to the foregoing paragraphs are incorporated by reference as if fully stated herein.

*170.    Dr. Goswami had an enforceable contract with DePaul University.*

**ANSWER:**

170.    Defendants lack knowledge or information sufficient to form a belief as to the specific contract referenced in Paragraph 170, and therefore deny the allegations regarding the same and demand strict proof thereof.

*171.    Defendant Peg Birmingham was aware of Dr. Goswami's contract with DePaul University.*

**ANSWER:**

171.    Defendants lack knowledge or information sufficient to form a belief as to the specific contract referenced in Paragraph 171, and therefore deny the allegations regarding the same and demand strict proof thereof.

*172.    Dr. Birmingham intentionally procured a termination of Dr. Goswami's contractual relationship with DePaul by unfairly criticizing Dr. Goswami for her alleged lack of collegiality; racially stereotyping Dr. Goswami by stating that she was "needlessly confrontational" and that she made a senior colleague feel like a "passé old white guy;" improperly relying upon unsupported hearsay in her evaluations of Dr. Goswami's performance;*

*sending an email to the entire Department of Philosophy faculty criticizing postcolonial theory, the very area that Dr. Goswami had been hired to teach; singling Dr. Goswami out for not attending departmental talks and faculty meetings; refusing to invite Dr. Goswami to a prestigious collegiums despite the fact that she knew that the topic of that year's seminar was directly relevant to Dr. Goswami's research; downgrading Dr. Goswami in all three areas of evaluation in her sixth annual merit review based on deliberate misstatements and omissions, resulting in the lowest rating during her probationary period; improperly convened a third, ad hoc formal review in April 2009 even though this review was not permitted by the Faculty Handbook or by the department's written procedures; voting in May 2009 to terminate Dr. Goswami effective June 30, 2010 in violation of Dr. Goswami's contract with DePaul; refusing to allow the department to consider any of the materials that Dr. Goswami submitted before making its May 2009 vote; using racial stereotypes to falsely portray Dr. Goswami as having acted in an aggressive manner; voting to deny Dr. Goswami's tenure application; and voting to grant the tenure applications of the two white male professors whose records were equivalent or inferior to Dr. Goswami's.*

**ANSWER:**

 172. Defendants deny the allegations in Paragraph 172.

 *173. Dr. Birmingham took these actions knowing that they would lead to termination of Dr. Goswami's contractual relationship with DePaul.*

**ANSWER:**

 173. Defendants deny the allegations in Paragraph 173.

 *174. DePaul terminated its contractual relationship with Dr. Goswami as a result of Dr. Birmingham's interference with Dr. Goswami's contractual relationship with DePaul.*

**ANSWER:**

174.    Defendants deny the allegations in Paragraph 174.

*175.    Dr. Goswami has suffered economic and reputational damages arising from Dr. Birmingham's intentional procurement of the termination of Dr. Goswami's contract with DePaul.*

**ANSWER:**

175.    Defendants deny the allegations in Paragraph 175.

*176.    Dr. Birmingham's actions were taken in bad faith, were intentional, and directly and proximately caused, and continue to cause, Dr. Goswami a loss of income and other financial benefits, emotional distress, embarrassment, humiliation, indignity, and damage to her professional reputation, the exact amount to be proven at trial, plus interest thereon.*

**ANSWER:**

176.    Defendants deny the allegations in Paragraph 176.

**COUNT III – RACE AND COLOR DISCRIMINATION
IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981**

*177.    The foregoing paragraphs are incorporated by reference as if restated herein.*

**ANSWER:**

177.    Defendants' answers to the foregoing paragraphs are incorporated by reference as if restated herein.

*178.    The Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), prohibits discrimination on the basis of race or color in the making, enforcement, performance, modification, and termination of contracts, including employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.*

**ANSWER:**

178.    Paragraph 178 states a legal conclusion to which no response is required. Defendants deny any alleged violation of Plaintiff's rights under Section 1981.

*179.    Section 1981 prohibits an employer from engaging in harassment that creates a hostile or offensive working environment by subjecting an employee to intimidation, ridicule, or insult because of the employee's race.*

**ANSWER:**

179.    Paragraph 179 states a legal conclusion to which no response is required. Defendants deny any alleged violation of Plaintiff's rights under Section 1981.

*180.    Dr. Goswami's qualifications and work performance were excellent, and but for her race and color, defendants would have continued to employ her.*

**ANSWER:**

180.    Defendants deny the allegations in Paragraph 180.

*181.    Defendants DePaul University and Peg Birmingham discriminated against Dr. Goswami on the basis of her race (Indian) and her color (brown), by downgrading her evaluations, criticizing her teaching and research in critical race studies, criticizing her involvement with diversity issues, and by terminating her employment, unfairly criticizing her teaching and research, attempting to terminate her employment early to deny her the opportunity to come up for tenure, denying her tenure, denying her appeal, refusing to grant her a hearing as required by findings of academic freedom violations by the appeal board, and refusing to grant her appeal.*

**ANSWER:**

181.    Defendants deny the allegations in Paragraph 181.

182. *Defendants DePaul University and Peg Birmingham discriminated against Dr. Goswami based on her race and color by suggesting that Dr. Goswami teach "our tradition," meaning white, European philosophers; by criticizing Dr. Goswami for not contributing to the philosophy department's "heritage" in European philosophy; by asserting that Dr. Goswami had a "thinking problem;" by stating that Dr. Goswami was "needlessly confrontational" because she discussed race and class when those issues were relevant; by stating that the essay that Dr. Goswami had co-authored with her husband was the strongest of her published work, implying that Dr. Goswami could only produce quality scholarship with the assistance of a white man; by criticizing Dr. Goswami for making a white, male colleague feel like a "passé old white guy" after she raised issues of diversity during a meeting; by repeatedly stating that Dr. Goswami had a "problem" with white men and was uncollegial toward her white male colleagues because she "already had a white man to take care of her;" and by using a Nazi salute to honor European philosopher Martin Heidegger.*

**ANSWER:**

182. Defendants deny the allegations in Paragraph 182.

183. *Defendants DePaul University and Peg Birmingham did not subject similarly situated white male professors such as Dr. Goldman to discriminatory conduct.*

**ANSWER:**

183. Defendants admit that they have not subjected Dr. Goldman or any other purported similarly situated white male professors (who are unnamed in the Complaint) to discriminatory conduct. Defendants deny that they subjected Plaintiff to discriminatory conduct as compared to Dr. Goldman, "similarly situated white professors," or anyone else.

*184.    Defendants DePaul University and Peg Birmingham granted tenure to similarly situated white male professors such as Dr. Goldman despite the fact that their qualifications are equivalent or inferior to those of Dr. Goswami.*

**ANSWER:**

184.    Defendants deny the allegations in Paragraph 184.

*185.    Defendants' actions toward Dr. Goswami described above constitute race and color discrimination, including the creation of a racially hostile work environment, in violation of 42 U.S.C. § 1981.*

185.    Defendants deny the allegations in Paragraph 185.

*186.    Defendants DePaul University and Peg Birmingham exhibited a pattern and practice of race and color discrimination by denying tenure to a disproportionate number of qualified minority tenure candidates while granting tenure to a disproportionate number of equally qualified or less qualified white tenure candidates.*

186.    Defendants deny the allegations in Paragraph 186.

*187.    Defendants engaged in their discriminatory actions intentionally, willfully, maliciously, with reckless indifference to Dr. Goswami's federally protected rights, and with intent to harm her.*

**ANSWER:**

187.    Defendants deny the allegations in Paragraph 187.

*188.    Defendants' actions described above directly and proximately have caused, and continue to cause, Dr. Goswami to suffer severe emotional distress, anguish, pain and suffering, humiliation, indignity, personal embarrassment, damage to her reputation and loss of past income and benefits, and future income and benefits.*

**ANSWER:**

188.    Defendants deny the allegations in Paragraph 188.

## COUNT IV – RETALIATION IN VIOLATION OF THE
## CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981

*189.    The foregoing paragraphs are incorporated by reference as if restated herein.*

**ANSWER:**

189.    Defendants' answers to the foregoing paragraphs are incorporated by reference as if restated herein.

*190.    Dr. Goswami engaged in statutorily protected activities when she complained to Defendant that she had been subjected to a hostile work environment and unlawful discrimination in March 2009.*

**ANSWER:**

190.    Defendants deny the allegations in Paragraph 190.

*191.    On May 21, 2009, the ad hoc Personnel Committee of the Department of Philosophy recommended to Dean Suchar that Dr. Goswami's contract be terminated.*

**ANSWER:**

191.    Defendants admit that on May 21, 2009, the Personnel Committee of the Department of Philosophy recommended to Dean Suchar that Plaintiff's contract be terminated, *i.e.*, not renewed.  Defendants deny the remaining allegations in Paragraphs 191.

*192.    Defendant DePaul University denied Dr. Goswami tenure in retaliation for Dr. Goswami's complaints of discrimination.*

**ANSWER:**

192.    Defendants deny the allegations in Paragraph 192.

## COUNT V – DISCRIMINATION ON THE BASIS OF

RACE, COLOR, NATIONAL ORIGIN, AND GENDER IN VIOLATION OF TITLE VII

*193.    The foregoing paragraphs are incorporated by reference as if restated herein.*

**ANSWER:**

193.    Defendants' answers to the foregoing paragraphs are incorporated by reference as if restated herein.

*194.    Defendant DePaul University denied Plaintiff tenure because of her race, color, national origin, and gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.*

**ANSWER:**

194.    Defendants deny the allegations in Paragraph 194.

*195.    Throughout her probationary period Plaintiff met or exceeded DePaul's tenure expectations.*

**ANSWER:**

195.    Defendants deny the allegations in Paragraph 195.

*196.    Defendant DePaul University denied Plaintiff tenure because of her race, color, national origin, and gender by suggesting that Dr. Goswami teach "our tradition," meaning white, European philosophers; by criticizing Dr. Goswami for not contributing to the philosophy department's "heritage" in European philosophy; by criticizing her background in women's studies and her scholarship in feminist theory; by asserting that Dr. Goswami had a "thinking problem;" by stating that Dr. Goswami was "needlessly confrontational" because she discussed race and class when those issues were relevant; by stating that the essay that Dr. Goswami had co-authored with her husband was the strongest of her published work, implying that Dr. Goswami could only produce quality scholarship with the assistance of a white man; by*

*criticizing Dr. Goswami for making a white, male colleague feel like a "passé old white guy" after she raised issues of diversity during a meeting; by repeatedly stating that Dr. Goswami had a "problem" with white men and was uncollegial toward her white male colleagues because she "already had a white man to take care of her;" and by using a Nazi salute to honor European philosopher Martin Heidegger; by unfairly criticizing her teaching and research; by attempting to terminate her employment early to deny her the opportunity to come up for tenure; by denying her tenure; by denying her appeal; by refusing to grant her a hearing as required by findings of academic freedom violations by the appeal board; by refusing to grant her appeal; by denying tenure to a disproportionate number of women; and by denying the appeals of all female candidates after findings in their favor by appeal boards and granted the appeal of at least one man.*

**ANSWER:**

196. Defendants deny the allegations in Paragraph 196.

197. *Defendant DePaul University's actions were taken in bad faith, were intentional, and directly and proximately caused, and continue to cause, Dr. Goswami a loss of income and other financial benefits, emotional distress, embarrassment, humiliation, indignity, and damage to her professional reputation, the exact amount to be proven at trial, plus interest thereon.*

**ANSWER:**

197. Defendants deny the allegations in Paragraph 197.

**COUNT VI – RETALIATION IN VIOLATION OF TITLE VII**

198. *The foregoing paragraphs are incorporated by reference as if restated herein.*

**ANSWER:**

198.    Defendants' answers to the foregoing paragraphs are incorporated by reference as if restated herein.

199.    *Dr. Goswami engaged in statutorily protected activity when she complained to Defendant that she had been subjected to harassment and discrimination on the basis of her race, color, national origin, and gender.*

**ANSWER:**

199.    Defendants lack knowledge or information sufficient to form a belief as to the complaint referenced in Paragraph 199, which identifies neither the date nor the recipient of the alleged complaint, and therefore deny the allegations regarding the same.  This Paragraph also sets forth a legal conclusion, to which no response is required.  To the extent that a response is required, Defendants deny the remaining allegations in Paragraph 199.

200.    *Defendant DePaul University denied Dr. Goswami tenure in retaliation for her complaints of discrimination and harassment.*

**ANSWER:**

200.    Defendants deny the allegations in Paragraph 200.

201.    *Defendant DePaul University denied tenure to a disproportionate number of women, denied the appeals of all female candidates after findings in their favor by appeal boards, and granted the appeal of at least one man after Dr. Goswami publicly protested the discrimination in her tenure denial, including in several newspaper articles.*

**ANSWER:**

201.    Defendants deny the allegations in Paragraph 201.

202.    *Defendant DePaul University's actions were taken in bad faith, were intentional, and directly and proximately caused, and continue to cause, Dr. Goswami a loss of income and*

*other financial benefits, emotional distress, embarrassment, humiliation, indignity, and damage*

*to her professional reputation, the exact amount to be proven at trial, plus interest thereon.*

**ANSWER:**

    202.    Defendants deny the allegations in Paragraph 202.

    *WHEREFORE, Plaintiff respectfully requests:*

    *A.    Reinstatement at the rank of Associate Professor with Tenure at DePaul;*

    *B.    Compensation for lost wages and benefits;*

    *C.    Compensation for future lost wages if Plaintiff is not reinstated;*

    *D.    Emotional distress damages;*

    *E.    Other compensatory damages;*

    *F.    Punitive damages;*

    *G.    Attorney's fees and costs;*

    *H.    Pre- and post-judgment interest; and*

    *I.    Such other relief as law and justice allow.*

**ANSWER:**

Defendants deny that Plaintiff is entitled to any of the relief requested in the Complaint.

Defendants further deny any and all remaining allegations in the Complaint.


**AFFIRMATIVE DEFENSES**

As and for their Affirmative Defenses to the Plaintiff's Complaint, Defendants state as

follows:

1.    Plaintiff's Complaint, in whole or in part, fails to state a claim upon which relief can be

granted.

2.      Plaintiff's Title VII claims are barred to the extent they were not raised in the administrative charge or otherwise exceed the scope of the administrative charge.

3.      Plaintiff's Title VII claims are barred to the extent Plaintiff failed to exhaust her administrative remedies and statutory prerequisites in a complete and timely manner under applicable law.

4.      Title VII does not provide for individual liability.  Accordingly, to the extent that the Complaint purports to assert Title VII claims against Dr. Birmingham, those claims fail.

5.      Plaintiff's claims are barred to the extent Plaintiff failed to exhaust internal remedies.

6.      Plaintiff's claims are barred to the extent they rely upon or relate to events that took place outside the applicable statute of limitations or are otherwise untimely.

7.      Plaintiff's claims are barred in whole or in part by the equitable doctrines of estoppel, waiver, unclean hands, and laches.

8.      DePaul has and has had, at all relevant times, internal policies and procedures to be followed if an employee believes she has been discriminated or harassed or retaliated against and DePaul provides other opportunities to prevent and correct such conduct. To the extent Plaintiff failed to utilize such procedures, Plaintiff's claims are barred.

9.      All actions taken with regard to Plaintiff were taken for legitimate, lawful, and nondiscriminatory and non-retaliatory reasons.

10.     Defendants acted in good faith at all times relevant to this action and had reasonable grounds to believe that its acts and omissions, if any, were not a violation of any applicable law.

11.     Plaintiff's claims are barred because DePaul exercised reasonable care to prevent and correct promptly any discriminatory behavior, and to the extent Plaintiff was obligated to do so,

Plaintiff unreasonably failed to take advantage of preventative or corrective opportunities to avoid harm otherwise.

12.     To the extent Plaintiff complained of the alleged conduct giving rise to this action, and to the extent Defendant was obligated to do so, DePaul promptly and thoroughly investigated Plaintiff's complaints and promptly took appropriate corrective action.

13.     Any finding in Plaintiff's favor or remedy in the form of an award of tenure would infringe upon DePaul's right to institutional autonomy, including the prerogative to determine for itself on academic grounds who may teach, as grounded in the First Amendment.

14.     To the extent Plaintiff is entitled to damages, Plaintiff has failed to mitigate her damages.

15.     To the extent Plaintiff seeks punitive damages, any such claim is barred on the grounds that Defendants' action were not undertaken with malice or reckless indifference to the federally protected rights of Plaintiff.

16.     To the extent Plaintiff seeks punitive damages, any such claim is barred on the grounds that Defendants at all times acted in good faith and with the honest belief that their conduct was in compliance with applicable law.

17.     To the extent Plaintiff seeks punitive damages, any such claim is barred on the grounds that such damages are not available for some or all of Plaintiff's claims.

18.     To the extent Defendants are found to have been motivated by impermissible criteria, Defendants assert that all employment decisions in this action would have occurred even in the absence of such impermissible criteria.

19.     DePaul is not liable for the acts or omissions committed by its employees or agents who were not acting within the scope of their employment.

20.     Plaintiff did not sustain damages as a result of any alleged breach of contract.

21.     Defendants acted in accordance with all applicable policies and procedures in the handling of Plaintiff's application for promotion and tenure.

22.     Plaintiff's tortious interference with contract claim is barred by the exclusive remedy set forth in the Illinois Workers' Compensation Act.

Wherefore, Defendants deny that Plaintiff is entitled to judgment against them in any amount whatsoever, and asks that Plaintiff's Complaint be dismissed and that costs be assessed against Plaintiff.

Dated: October 17, 2012


                                                            Amy Schmidt Jones
                                                            One of the Attorneys for Defendants
                                                            DePaul University and Peg Birmingham

MICHAEL BEST & FRIEDRICH LLP
Kerryann Haase
Amy Schmidt Jones
Sarah Elizabeth Flotte
Two Prudential Plaza
180 N. Stetson Ave., Suite 2000
Chicago, Illinois 60601
Telephone: (312) 222-0800
Facsimile:  (312) 222-0818
Firm No.:  16519

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2012, I electronically filed the foregoing ***Answer and Affirmative Defenses of Defendants DePaul University and Peg Birmingham*** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Marc J. Siegel
Caffarelli & Siegel Ltd.
180 N. Stetson, Suite 3150
Chicago, IL 60601

Lynne Bernabei
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124

/s/ Amy Schmidt Jones
Attorney for Defendants, DePaul University and
Peg Birmingham
Amy Schmidt Jones, ID No. 1032274
Michael Best & Friedrich LLP
100 East Wisconsin Avenue, Suite 3300
Milwaukee, Wisconsin 53202
Phone: (414) 225-2771
E-mail: asjones@michaelbest.com