**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NAMITA GOSWAMI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12 C 7167** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **DEPAUL UNIVERSITY,** | ) | |
| **PEG BIRMINGHAM, and** | ) | |
| **ELIZABETH ROTTENBERG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

The plaintiff applied for tenure as a professor in the Philosophy Department at DePaul University and was turned down. Dr. Mary Jean Larrabee, an ardent supporter of Dr. Goswami, was one of several professors who voted to award her tenure. Not surprisingly, the plaintiff's attorneys viewed Dr. Larrabee as a favorable witness and wanted to speak with her outside the presence of DePaul's lawyers. And so, they did. The first of two, lengthy, ex-parte meetings was in December, 2012, the second in October, 2013, five days before she was to be deposed by DePaul's lawyers. It is DePaul's contention that by virtue of Dr. Larrabee's role in the tenure process, she was a "person" "represented" by DePaul's lawyers within the meaning of Rule 4.2 of the ABA Model Rules of Professional Conduct, and that the plaintiff's counsel's *ex parte* meetings with her were prohibited.

The cynosure of the motion for sanctions is the claim that the lawyers attempted to influence Dr. Larrabee's testimony at the three-hour meeting on October 25th by showing Dr. Larrabee numerous emails from colleagues belittling and insulting her. DePaul contends this was "an

obvious ploy to stoke Dr. Larrabee's animosity towards the [Philosophy] Department majority on the eve of her deposition." (*Def. Br.* 15). As we shall see, this is an argument that cannot be casually brushed aside by calling it "tactical" and "frivolous," (*Pl. Br.* 1). Attempts to influence a witness's testimony can be a basis for the ultimate sanction of dismissal, *Weibrecht v. Southern Illinois Transfer, Inc.*, 241 F.3d 875 (7th Cir. 2001*), or the* lesser sanction of disqualification of counsel, or exclusion of evidence obtained from the compromised witness. But any sanction must have due regard for the doctrine of proportionality. *See* discussion *infra* at 15.

## A.

The threshold question is whether the two *ex parte* meetings with Dr. Larrabee violated Rule 4.2, which provides:

> in representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

ABA-AMRPC §4.2. The Rule is often justified as an effort to prevent skilled counsel from taking advantage of a represented person through use of "artfully crafted questions." *Totherow v. College,* 2007 WL 5968762 (N.H.Super. 2007).[1]

It is undisputed that plaintiff's counsel had neither consent from DePaul nor a court order allowing them to contact Dr. Larrabee. But that is beside the point if Dr. Larrabee was not a person "represented" by DePaul's lawyers. The text of Rule 4.2 does not answer that question. Comment 7 to the Rule does. It provides:

> In the case of a represented organization, this Rule prohibits communications with

---

[1]The Rule is part of the disciplinary rules in this District. *See* Local Rule 83.50.

a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

DePaul argues that Dr. Larrabee "supervises, directs or regularly consults with the organization's lawyer" and "has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization . . . ." (*Pl. Br.* at 8)(Dkt. 100—1). DePaul does not cite any evidence that so much as suggests that Dr. Larrabee supervised, directed, or regularly consulted with DePaul's lawyers concerning tenure decisions. (*Pl. Br.* at 8-9). Indeed, its analysis, while acknowledging the qualifying phrase, "regularly consults with the organization's lawyers on the matter," essentially ignores it. But the explanatory Comment makes a clear distinction between directing or supervising lawyers and directing or supervising employees. It is only the former that counts.[2] Consequently, DePaul must show that Dr. Larrabee had authority to obligate it in tenure decisions or that her acts in connection with tenure decisions can be imputed to DePaul for purposes of civil liability.

---

[2] DePaul reads the provision as forbidding *ex parte* contact if a constituent "supervises" or "directs" *anyone* in the represented organization or "regularly consults with the organization's lawyer." (*Defs. Reply*, at 2-3). This is an overly expansive reading of the Comment that is contrary to its text and is unsupported by any caselaw. *See E.E.O.C. v. Hora, Inc.*, 239 Fed.Appx. 728, 730 (3rd Cir. 2007); *Roe v. Karval School Dist. RE23*, 2013 WL 1509126, 2 (D.Colo. 2013). It would bring within the ambit of Comment 7 every individual who had any degree of supervisory control over another and thus would include the shift foreman on the janitorial or cafeteria staff. Moreover, the former version of Comment 7, which did encompass those with "managerial responsibility," was changed to the present language in 2000. http://www.americanbar.org/groups/professional_responsibility/policy/ethics_2000_commission/e2k_rule 42.html. Had the meaning DePaul espouses been intended, no change would have been necessary.

**B**.

At DePaul, tenured professors like Dr. Larrabee have a key role in decisions regarding tenure. DePaul's Faculty Handbook vests the faculty with "primary governance responsibility" for scholarly activities and faculty personnel matters. That includes the matter at issue in this case, DePaul's tenure process, which involves a multi-tiered, faculty-driven review. *(Def. Br.,* Ex. A, Ch. 3; *Def.B*r. at 9). As part of that process, tenured professors like Dr. Larrabee evaluate candidates for tenure in their home department or unit. Candidates are also evaluated by the College Personnel Committee – comprised of faculty – and the University Board on Promotion and Tenure – also comprised of faculty and appointed by the faculty council. (Ex. A, §§ 3.2.3, 3.6, et seq.).

Tenured faculty of a candidate's home unit are "expected to vote" on a candidate's application for tenure. (*Def.Br.* Ex. A, § 3.6.1). In DePaul's view, as expressed in the faculty handbook, the peers in the home department are "assumed to represent the institution's best expertise in the relevant academic field," and their assessment on scholarship should not to be disturbed by higher levels of review absent a finding of significant deficiencies. (Ex. A. § 3.2.3). DePaul's President makes the final decision on tenure, but can reject the recommendation of the UBPT "only in rare instances and for compelling reasons." (Ex. A. § § 3.6.1).

DePaul argues that Dr. Larrabee falls "squarely within . . . the third category of constituents" covered by Rule 4.2. As just one person of many voting on tenure decisions, and with the final say going to DePaul's President, albeit under the conditions specified in the handbook, it's uncertain whether Dr. Larrabee (along with her colleagues on the tenure committee) has the "authority to obligate" DePaul on tenure decisions within the meaning of Comment 7. Comment 7 simply uses the term without explanation or example.

On the other hand, it is quite easy to say that Dr. Larrabee's act – her vote – in connection with the tenure decision may be imputed to DePaul. It is just one vote, and Dr. Larrabee was in the minority, but she is a key part of the process that decides who gets tenure.[3] More importantly, the focus of analysis for purposes of determining whether contact with a supposedly represented person is prohibited cannot be *ex post*, as Dr. Goswami's argument assumes it must. (*Pl.Br.* 13). *See* discussion below and *infra* at 8.

DePaul relies on the handbook provisions discussed above, *Kole v. Loyola University of Chicago*, 1997 WL 47454, 1 (N.D.Ill. 1997) and *Totherow*, 2007 WL 5968762. In *Kole,* which involved a claim for discriminatory denial of tenure, Judge Leinenweber determined that tenured faculty members who voted on the tenure application were within the scope of Rule 4.2. The Comment to Rule 4.2, as it previously provided, prohibited communications with persons having a "managerial responsibility" on behalf of the organization as well as those whose acts or omissions in connection with the matter may be imputed to the organization or whose statements may constitute an admission on behalf of the organization. Judge Leinenweber found the complained of contacts with those faculty members who participated in the tenure process were improper because they were capable of making admissions that would be binding on the university. 1997 WL 47454, *3.

---

[3] The Seventh Circuit in *Weibrecht*, 241 F.3d at 881 said that the question under the test as understood in the Southern District of Illinois under its Rule, which looked to the ABA test which included whether the allegedly represented person has "managerial responsibility" in the defendant's organization, as well as whether her acts or omissions can be imputed to the organization for purposes of civil or criminal liability, or her statements constitute admissions by the organization. 241 F.3d at 881. The first option, at least, may no longer be valid given the change in the Comment's language. *See* fn. 1, *supra*. Neither party discusses this aspect of *Weibrecht,* and thus it is not a concern here.

The plaintiff's brief makes much of the fact that there was no personal attorney-client relationship between Dr. Larrabee and DePaul's attorneys and that Dr. Larrabee "did not consider herself to be represented by DePaul's counsel." (*Pl.Br.* 6). As Judge Easterbrook said in another context,"So What?...Who cares?...True, but irrelevant." *Israel Travel Advis. Serv. v. Israel Iden. Tours*, 61 F.3d 1250, 1259 (7th Cir. 1995). The attorney-client privilege in an organizational setting is the organization's, not the employee's, and it is inconsequential that the attorney does not "personally" represent the employee. *Sandra T.E. v. South Berwyn School Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010).

By its plain terms, Rule 4.2 is not dependent on the wishes of the "constituent of the organization," but on whether that person fits within one or more of the categories specified by the Rule. If she does, that is the end of the matter, and the individual/constituent is powerless to waive the Rule's explicit prohibition as the run to the attorney. As Comment 3 to the Rule provides, *ex parte* contact is prohibited "even though the represented person initiates or consents to the communication." ABA-AMRPC §4.2.[4] Finally, in *Kole*, none of the contacted, tenured professors had a personal attorney/client relationship with Loyola's counsel. That fact was of no consequence

---

[4] The pages of the deposition transcript plaintiff cites do not exactly say what plaintiff claims regarding Dr. Larrabee's position on her relationship with DePaul's lawyers. Pages 5 and 6 are an exchange between Dr. Larrabee and DePaul's counsel as to whether counsel was from the University's general counsel office or from an outside firm. At page 17, Dr. Larrabee testified that she was not aware that DePaul had taken the position that plaintiff's counsel should not be contacting her. (*Defendant's Motion*, Ex. B, at 5-6, 17). In any event, Dr. Larrabee's opinion adds nothing to the calculus here.

The plaintiff's brief also claims that DePaul's attorneys stated "that they did not represent Dr. Larrabee but only DePaul University." (*Plaintiff's Response*, at 5). What DePaul's counsel actually said in the letter plaintiff cites is that they do not represent professors "in an individual capacity," but that their representation of the university, "[a]s an organizational client, [that] representation encompasses certain constituents of the organization with respect to *ex parte* contact, as outlined in Rule 4.2." (*Defendant's Motion*, Ex. G). That is an accurate statement, and it is a feckless argument that DePaul's letter which is clear to any neutral reader meant plaintiff had *cart blanche* to contact professors involved in the tenure decision.

to Judge Leinenweber's analysis. So too here, notwithstanding the plaintiff's argument to the contrary.

Judge Leinenweber's opinion in *Kole* is also helpful in assessing the plaintiff's insistence that contact by plaintiff's counsel with Professor Larrabee was not prohibited since she voted *for* tenure. Judge Leinenweber noted that Professor Kole had supporters and detractors among the tenured law school faculty. Information received under procedures for evaluating faculty members by their academic peers is zealously guarded. 1997 WL 47454. The supporters of a candidate rejected for tenure, he concluded, "might be delighted to share privileged information that they thought might help [the applicant's] cases and harm [the University]. Therefore, one of the purposes of Rule 4.2 was to protect the party from just the kind of contacts that [plaintiff's counsel] had with the tenured professors ...." *See also Hill v. St. Louis University,* 123 F.3d 1114, 1121 (8th Cir.1997)("Rule 4.2 is 'meant 'to prevent lawyers from taking advantage of uncounselled lay persons);*Roe v. Karval School Dist. RE23*, 2013 WL 1509126, 2 (D.Colo.2013)("Rule 4.2 is designed to prevent undue influence from being exerted by opposing counsel).

The fact that the prohibited contacts occurred after the tenure vote was not significant to the outcome of *Kole*. Nor was the fact that some of those contacted had voted in favor of tenure. Significantly, Dr. Goswami's response brief ignores *Kole* completely. This " is a risky tactic, and sometimes fatal."*Law v. Medco Research, Inc*., 113 F.3d 781, 787 (7th Cir.1997).

In *Totherow*, the court held that plaintiff's counsel could not conduct *ex parte* interviews with members of the defendant college's rank and tenure committee, even though they lacked authority to make final personnel decisions. It was enough that they played a significant advisory role to the college's top-level management in its decision-making on the matter at issue.

(*Defendant's Motion*, Ex. I, at 4). So too here. Indeed, throughout the United States tenure committees do not have the final voice on tenure decisions, although they play a critical role in the decision-making process. *See also Simonetta v. Wesleyan University*, 2010 WL 5030803, 2 (Conn.Super. 2010)(while university president had the final say, the tenured faculty who voted on tenure application were also decision-makers and within the purview of state's Rule 4.2 and explanatory Comment, which are identical to the Rule and Comment here). As in *Kole*, the application of New Hampshire Rule 4.2 was not dependent upon how a particular committee member voted.

Quoting (selectively) from *Consolidation Coal Co. v. Bucyrus-Eric Co.*, 89 Ill.2d 103, 432 N.E.2d 250 (1982), the plaintiff contends that since Dr. Larrabee's views did not "'in fact form the basis of the final decision by those in actual authority,'" there could not be an infraction of Rule 4.2. (*Pl. Br.* 13). Unfortunately, the quotation was taken out of context and thus is "quite misleading." *Walters v. National Association of Radiation Survivors*, 473 U.S. 305, 322 (1985). Here is what the Court actually said:

> We believe that an employee whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority, is properly within the control group. *Thus, if an employee of the status described is consulted for the purpose of determining what legal action the corporation will pursue, his communication is protected from disclosure.* This approach, we think, better accommodates modern corporate realities and recognizes that decisionmaking within a corporation is a process rather than a final act.

*Consolidation Coal Co.,* 89 Ill.2d 103 at 120, 432 N.E.2d at 258. (Emphasis supplied).

Fairly read, *Consolidation Coal Co.* does not remotely support the plaintiff's interpretation. The Court was not advocating an *ex post* analysis, under which the application of the privilege is determined by whether "top management" actually relied in the particular situation on the advice

8

of those whose function it is to give it. Rather, the proper inquiry is whether the views of a particular advisor or group of advisors are usually factored into management's decisions. The Court stressed that this approach is in accord with modern corporate realities and recognizes that decision-making within a corporation is a process rather than a final act.

Tenure decisions are fairly (and can only be) described as a process, and the opinions of those who are involved in that process are indispensable to the ultimate tenure decision. They are "in fact" relied on. Whether they are ultimately accepted is of no moment for purposes of determining privilege. If Dr. Goswami is right, there is no attorney/client privilege for anyone who expresses a view contrary to the ultimate decision made by "top management." Neither precedent nor principle supports the approach advocated by Dr. Goswami.[5]

Nor does the text of Comment 7 to the Rule. In relevant part, the Comment prohibits communications with a constituent of an organization who has "*authority* to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability." (Emphasis supplied). The plain text of the Comment looks to the existence of authority, not on how that authority was actually exercised in a particular case.

Large organizations – universities included – are seldom, if ever, monolithic in their approach to the increasingly complex and sensitive issues that confront them and which often result

_____

[5] *Consolidation Coal Co.* was decided under Illinois law which employs the "control group" test, which has been abandoned in the context of federal privilege law. *Upjohn v. United States*, 449 U.S. 383, 396 (1981). That test is one of several that are employed in cases implicating the various state versions of Rule 4.2. *See Totherow*, 2007 WL 5968762. Illinois's Rule 4.2 of its Rules of Professional Conduct, and its Comment 7, are identical to ABA Model Rule 4.2 applied in the Northern District of Illinois. ILCS S.Ct. Rules of Prof. Conduct 4.2. Plaintiff submits that even so, Illinois would apply the "control group " test that predated the Rule and Comment. That may or may not be the case. *See Weibrecht*, 241 F.3d at 879-81. But as the discussion above shows, application of the control group test would not change the result of this case.

in strident and bitter divisions of opinion on particular questions. This is especially true in the setting of university tenure committees, as the numerous cases involving claims of discrimination in the tenure process reveal. "'Tenure decisions are a source of unusually great disagreement.... [T]he stakes are high, the number of relevant variables is great and there is no common unit of measure by which to judge scholarship.'"*Blasdel v. Northwestern University,* 687 F.3d 813, 815-816 (7th Cir.2012). See also *Donnelly v. Greenburgh Cent. School Dist. No. 7,* 691 F.3d 134, 148 (2d Cir.2012); *Tanik v. Southern Methodist University,* 116 F.3d 775, 776 (5th Cir.1997). Not surprisingly, the DePaul Faculty Handbook "contemplates differences of opinion as an inevitable attribute of group deliberations that comprise the tenure process." (*Def.Br.* 9).

It cannot be the case that a "constituent" of an organization wanders in and out of the purview of Rule 4.2 depending on the outcome of the vote on a particular issue. That would make the prohibitions (and protections) of Rule 4.2 depend not on the place of an employee in the corporate hierarchy but on the outcome of each vote on each matter rather than their place in the organizational structure.[6] Nothing in the text or purpose of Rule 4.2 or Comment 7 supports so uncertain, unpredictable and random a result.

Finally, although the plaintiff does not elaborate on what facts she believes distinguish this case from others, she argues that the *facts of this case* tip the balance in favor of her being able to conduct *ex parte* interviews with the professors involved in the tenure decision who voted for her. Reliance is placed on *Morrison v. Brandeis University*, 125 F.R.D. 14 (D.Mass. 1989), which

---

[6] Conversely, plaintiff maintains that only the president is the represented constituent because if the voting tenured professors fell within Rule 4.2, "there would be hundreds of decision makers at DePaul, a result Rule 4.2 and applicable case law attempt to avoid." (*Plaintiff's Response*, at 13). Plaintiff offers no support for this conclusion. Moreover the vote on tenure was 11-7 with one abstention. So in this case, there are not hundreds of decision makers, only 19.

rejected Comment 7 to Rule 4.2 as inadequate and instead applied a balancing test that weighed plaintiff's need to gather information on an informal basis against the defendant's need for effective representation.

*In Morrison*, a magistrate judge concluded that the "managing-speaking" test, the "control group" test, and the test embodied in the comment to the then new Rule 4.2 of the ABA's Model Rules of Professional Conduct were "inadequate" to deal with the question of when and who could be interviewed by an adversary in litigation. The court concluded the tests heretofore used were either too restrictive in view of the extent to which employees' statements may be admissible against the corporation under Massachusetts' evidence rules or they were too broad in defining a "party" to be any employee whose statement *may* be admissible against the corporation under that rule.

The court concluded that "[a] plaintiff's need to gather information on an informal basis on the one hand and the defendant's need for effective representation on the other can, in most cases, only be balanced with reference to the facts and circumstances which appertain to the particular case at hand. Those tests which purport to strike a universal balance in all cases do not, [the court concluded] adequately meet the needs of either party." 125 F.R.D. at 18. *Siguel v. Trustees of Tufts University*, 1990 WL 29199 (D.Mass. 1990) followed *Morrison's* lead despite its candid acknowledgment that a balancing test lacks concrete guidelines, which the court conceded were critical to insure ethical behavior by attorneys. 1990 WL 29199, 4-5. Nonetheless, the court concluded it was permissible to sacrifice that certainty and to use a balancing test because of what it perceived to be the very confused state of the boundaries of DR 7- 104(A)(1) in Massachusetts. 1990 WL 29199, 5.

*Siguel's* recognition of the salutary function predictability and certainty serve in the law is

consistent with a long line of judicial authority. *See e.g. First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983*); Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 313 (1970); *Curran v. Kwon,* 153 F.3d 481, 488 (7ᵗʰ Cir.1998). It is that predictability and certainty that enables lawyers to be more effective in fulfilling their "main function," which "is to predict legal consequences," *Jagers v. Royal Indem. Co.* 276 So.2d 309, 315 (La. 1973), and thereby provide effective representation to their clients – and to regulate their own conduct in conformity with various ethical rules. And that, in turn, serves "broader public interests in the observance of law and administration of justice." *Upjohn Co.,* 449 U.S. at 389.

*Morrison* and *Siguel*'s approach to the prohibition on lawyer contact with "represented parties" is one that need not be employed here since the interpretative problems that prompted judicial improvisation in those cases are not present under Rule 4.2 and Comment 7. And, in any event, the Rule does not empower judges to fashion alternative approaches because of a perceived need for a party – in *Morrison* and *Siguel* it was the plaintiff – to be able to contact informally those potential witnesses deemed necessary to present the case.

Dr. Goswami's brief tacitly assumes that some unexplained balancing of undiscussed factors will inevitably favor her. And so, her brief sums it up by saying that her need to prepare her case by interviewing fact witnesses predominates over DePaul's "'desire to shield its employees from access in order to insure its effective representation.'" (*Pl.Br.* at 15 (quoting *Siguel*)). But this one-sided formulation begs the question and ignores the reality of our adversary system: in litigation, each side has an equal need to prepare its case, and each (if both are corporations) has an equal desire to shield its otherwise protected employees from access by the other side to insure its own effective representation.

In any event, beyond merely saying so, Dr. Goswami has not shown how she would have been thwarted in preparing her case if she were denied *ex parte* access to the professors who voted for her on the tenure decision, including Dr. Larrabee.  She certainly does not elaborate on that question in her brief, and "saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010).  Beyond this, the argument *ex necessitate* ignores the experience of lawyers since 1938 under the Federal Rules of Civil Procedure.

The Rules sought to end  what Wigmore called "trial by ambush," and to established a regime of openness and access to information so that trials can, so far as possible, arrive at the truth of the matter. Notwithstanding the existence of the attorney-client (and other) privileges that place restrictions on lawyers' ability to freely contact witnesses and gather evidence, the system has worked more than tolerably well for a very long time without adversely affecting lawyers' ability to effectively represent their clients.  Thus, Dr. Goswami's contention that unless her lawyers had untrammeled access to Dr. Larrabee  they could not "effective[ly] represent[ ]" their client is belied by three-quarters of a century of experience, and experience is "of all teachers the most dependable...."*Funk v. United States,* 290 U.S. 371, 381 (1933).  *See also Sinclair Refining Co. v. Jenkins Pet. Proc. Co.*, 289 U.S. 689, 698 (1933)(Cardozo, J.)("Experience is...available to correct uncertain prophecy.  Here is a book of wisdom that courts may not neglect.").

## C.

Certain other facts of this case tend to tip the balance against plaintiff rather than in her favor. At a hearing on this matter on June 11, 2013, plaintiff's counsel said, "[i]f we can't work out something [regarding informal interviews], we'll bring it to the court's attention.  I can assure you that we will not contact anybody, um, unless and until, uh, there's if necessary a ruling by the court."

Then a few minutes later, he reiterated this, saying, "[t]hat's the issue. We're working on it, and we'll bring it to the court's attention and before we contact anybody, we will either resolve it with them or let you know and wait for a ruling." [7]  A little later, I told DePaul's counsel that she was "being told that nothing will happen." I explained that I did not take Mr. Gordon's offer as a promise to me, but as a promise to her. (About 10:36:50a.m.).[8]

During the course of the discussions, Mr. Gordon said he was "disappointed that his word was not good enough"for DePaul's counsel. (About 10:35:23 a.m.). DePaul's counsel expressed her hope that Mr. Gordon's offer would be made a part of an order. I told DePaul's counsel that "not everything in the world has to be memorialized in an order," implying that she should take Mr. Gordon at his word. Following the hearing, plaintiff's counsel in an email repeated his promise not to contact anyone named in a June 7 letter – one whom was Dr. Larrabee – "until we have reached an agreement . . . or until Judge Cole rules that such contact is prohibited." (*Def.Br.* Ex. E). Mr. Gordon expressed dismay that DePaul's counsel would not take him at his word and suggested she "might try ro be a bit more trusting."*Id.* As it turns out, plaintiff's counsel had *already* interviewed Dr. Larrabee, *ex parte*, six months earlier in December of 2012, but did not disclose at the hearing

---

[7] I did not accept Mr. Gordon's offer, but instead told him, essentially, he should do what he felt was appropriate and that there may, of course, be consequences. In hindsight, that was an unhelpful response.

[8] Although I had rejected Mr. Gordon's offer as unnecessary, this later exchange understandably confused DePaul's counsel a bit, and she has couched her motion in terms that reflect her understanding that Mr. Gordon's statement, in open court, was binding on him in a legal sense. *See Tamari v. Bache & Co. (Lebanon) S.A.L.*, 729 F.2d 469, 472 (7th Cir.1984)(an attorney's promise in open court to produce certain documents "could be treated as the equivalent of an order" for Rule 37(b) purposes); *See Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.*, 234 F.R.D. 175, 185 (N.D.Ill. 2006)(collecting cases).

For this same reason, I cannot accept that DePaul's failure to act when plaintiff's counsel informed them, a week after the hearing, that they would be contacting witnesses constitutes a waiver. The exchange at the hearing put DePaul's counsel in the position of having to wait for the fallout or consequences, rather than be proactive as they had attempted. The fallout occurred shortly before Ms. Larrabee's deposition, and DePaul acted promptly thereafter.

or in the email after the hearing that he had done so.

Plaintiff's response brief represents that DePaul's counsel was informed that plaintiff's counsel would be interviewing Dr. Larrabee contemporaneously with the December 2012 interview. (*Pl.Br.* at 1-2). There is no evidence of any such disclosure. The only evidence is a letter to DePaul's dated June 18, 2013, a week after the June 11 hearing, stating: "Although we do not believe we have done anything improper, in order to avoid the appearance of impropriety, we are disclosing that [we] interviewed Mary Jeanne Larrabee on December 14, 2012." (*Defendants Br.*, Ex. F). While the June 18th letter stated that the plaintiffs' counsel intended to begin contacting witnesses on June 25th, it did not even hint that the plaintiff's lawyers planned on a second meeting with Dr. Larrabee on the eve of her deposition. Given all these facts, the contention that DePaul did not act promptly upon learning of the earlier Larrabee interview is unacceptable.

### D.

That brings us to what is to be done about the violations of Rule 4.2. DePaul favors the nuclear option of dismissal with prejudice. *(Pl.Br.* at 14). While in appropriate circumstances that can be an available sanction for a violation of Rule 4.2, *Weibrecht*, 241 F.3d at 874, it is not an exception to the doctrine of proportionality, which requires that any sanction be "'proportionate to the circumstances,'" *Holt v. Loyola University of Chicago*, 497 Fed.Appx. 662 (7th Cir. 2012), and "proportioned to the gravity of the violation's consequences." *In re IFC Credit Corp.*, 663 F.3d 315, 321 (7th Cir. 2011). As the Seventh Circuit stressed in the very case on which DePaul relies, the sanction of dismissal with prejudice "'should usually be employed only in extreme situations, when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailing.'" *Weibrecht*, 241 F.3d at 883.

At bottom, DePaul's motion to dismiss is based not on a violation of Rule 4.2, *simpliciter*, but on what it contends was plaintiff's counsel's attempt to influence Dr. Larrabee's upcoming deposition testimony. (*Def.Br.* at 14-15). Dr. Larrabee's deposition testimony makes clear that this was not an interview like the one ten months earlier in December. In that meeting, Dr. Larrabee claimed the discussion centered largely on the tenure process and DePaul's policies and procedures. (*Def. Br., Ex B* Tr. 28-30). The second meeting, which occurred five days before her deposition by DePaul, lasted almost three hours, even though Dr. Larrabee said her time was "very valuable." (*Def.Br.*, Ex. B at Tr. 15). Since the plaintiff's lawyers had gathered a wealth of information about the tenure process at the first meeting, she claimed at the second meeting, they "really didn't much discuss anything." (Tr.17 - 18). But what they did discuss was incendiary.

The lawyers showed her "a whole series of emails" that were quite critical of her personally and her role in the tenure process. (Tr. 18). Dr. Larrabee testified that she could not remember all the emails she saw in the three-hour session, but she did remember one that said she was "dense" and expressed dislike of her power within the University. As she put it, most of the emails were about her or her supposed influence on the case. (Tr. 19). She recalled another email that referred to Dr. Goswami's alleged decision to have a baby in order to overly influence the other levels of review for her tenure decision. (Tr. 20). When asked if she could remember others, she said "I probably would but not right now." (Tr. 19).

Given the fact that the meeting occurred only five days before the deposition, her claimed general lack of recall about what she was shown and what was said to her is odd to say the least. She did recall being asked about the accuracy of one particular email, but "in most cases there was no discussion because I didn't know about, I just said – excuse me, I said nothing because I had nothing

to say." (Tr. 21). "I really didn't much discuss anything. (Tr. 18). She later recalled a series of emails between "various members of what has been termed the majority against [Dr. Goswami's] reappointment." (Tr. 18). Other emails she recalled, were all critical of her. (Tr. 22).

Dr. Goswami's counsel gave her copies of the emails to take with her. But she claimed she "already had copies of all of them." She only had time to print out one or two before the meeting and so this saved her printing time, as she put it. (Tr. 22). Whether she actually had copies and where she got them was not explored by DePaul at the deposition.

During the course of the deposition, there occurred an exchange that spoke volumes about Dr. Larrabee's enmity towards DePaul and its counsel. Counsel for DePaul, interposed an objection on attorney/client privilege grounds to Mr. Gordon's question whether anyone had ever told her that she was restricted from speaking to Dr. Goswami's counsel. Mr. Gordon told her to go ahead and answer and Ms. Jones again instructed her not to. And that was followed by Mr. Gordon's assurance to her that she "can answer whatever you want." (Tr. 286-87). Dr. Larrabee then suggested that they get "the judge on the phone," because "I want to answer this question"u "because I believe it's a legal manipulation by [DePaul's] counsel." (Tr. 287).

In light of its timing and what occurred at the October 2013 meeting, DePaul insists that the meeting with Dr. Larrabee was "an obvious ploy to stoke Dr. Larrabee's animosity towards the Department majority on the eve of her deposition." (*Def.Br*. 15). This is an argument that cannot be casually dismissed as "tactical" and "frivolous,"designed to punish Dr. Goswami and her counsel. (*Pl.B*r. at 1). The plaintiff's explanation for showing Dr. Larrabee the "whole series" of denunciatory emails is that they had "significant probative effect," and that they had to explore them with her. (*Pl.'s Br*. at 18). But that plainly is an unsatisfactory answer. The "probative value" and factual

accuracy of the emails could easily have been explored without disclosing to Dr. Larrabee what her colleagues thought of her.

For example, Dr. Goswami's lawyers could have simply asked why she refused to sign a particular report discussed in an email without showing her the castigating email. (*Pl. Br.* 18). The same is true of other aspects of the emails shown to her by the plaintiff's lawyers. Or they could have redacted the emails to remove the offensive comments. While the insults did not approach those of the Earl of Kent in King Lear,[9] under "a realistic appraisal of psychological tendencies and human weakness," *Withrow v. Larkin,* 421 U.S. 35, 47 (1975), it is idle to say that plaintiff's experienced and skillful counsel did not know the derisive emails contained the kind of personal insults that are not easily laughed off and brushed aside. After all, even "[h]onest criticism is hard to take, particularly from a relative, a friend, an acquaintance or a stranger." Franklin P. Jones.

Common sense and human experience—which always have a role to play, *United States v. Montoya De Hernandez,* 473 U.S. 531, 542 (1985); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir.1992) (Breyer, C.J.); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir.2009); Posner, How Judges Think at 116 (Harv. Univ. Press 2008) – support DePaul's assessment of counsels' motivation for having shown Dr. Larrabee the denunciatory communications.

The plaintiff argues that defendants' counsel was "hostile, argumentative, and condescending" to Dr. Larrabee at the deposition. (*Pl.Br.* at 5). Nothing in the record supports the charge. The transcript shows that DePaul's counsel acted at all times with dignity, restraint, and professionalism. However, the plaintiff's description fairly describes Dr. Larrabee. (*See, e.g., Def.Br.* Ex. B, Tr. 8-11, 25-26, 287). And it cannot be concluded at this juncture and on this record that exposing

---

[9] Second Act, Scene 2, The Yale Shakespeare (Barnes & Noble, 2006 ed. at 1085).

her to the emails was not designed to affect her testimony. But that is the beginning and not the end of the analysis.

Since any sanction must take account of the circumstances of the case and the gravity of the consequences of the claimed infraction, the immediate question is whether Dr. Larrabee's claimed hostility towards DePaul at the deposition – and that is all that DePaul alleges to be the product of the violation (there is no claim of subornation of perjury, for example) -- was caused by the plaintiff's lawyers.[10] And if it was, is dismissal of the case or exclusion of Dr. Goswami as a witness an appropriate sanction?

While the record can support the argument that plaintiff's lawyers sought to "stoke" Dr. Larrabee's animosities on the eve of her deposition, there is no doubt that Dr. Larrabee's fires needed no fanning. Her attitudes towards DePaul, its counsel, and the members of the tenure committee with whom she disagreed did not stem from what occurred at October meeting. Those attitudes were fixed long before and could not possibly have come as a surprise to DePaul.

For example, Dr. Larrabee had not only voted in favor of plaintiff's tenure application, she had openly, vociferously, and repeatedly attacked those who did not agree with her views about tenure for Dr. Goswami before the first meeting Dr. Goswami's lawyers. Indeed, her minority report of October 1, 2010 supporting Dr. Goswami's application for tenure accused those who opposed tenure of being "complicit in the racism that informed some of the majority's position in regard to Dr. Goswami's qualifications." (*Pl.Br.*, Ex. 7 at 2; 3, *et. seq.*). When interviewed in May 2011 by DePaul's Office of Institutional Diversity and Equity, Dr. Larrabee refused to give the interviewers more than a half hour even though she had scheduled a full hour. The Report noted that Dr. Larrabee

---

[10] The motion for sanctions asks, *inter alia*, that Dr. Larrabee be prohibited from testifying.

responded to many of their questions "in an argumentative and/or rhetorical manner." She made clear her views about the racial motivation of those who were opposed to tenure for Dr. Goswami.(*Pl. Br.,* Ex. 8 at 28-29).

In various lengthy and exceedingly detailed emails in which she sought to state the case for Dr. Goswami, Dr. Larrabee, made her views about those who voted against tenure luminously clear: those who disagreed with her assessment of things were racially motivated. The notion that there could be a reasonable difference of opinion over plaintiff's qualifications, was for Dr. Larrabee, unthinkable. She invariably ascribed a nefarious motive to any view or decision that was not favorable to Dr. Goswami. Whether this was all a function of confirmation bias or whether Dr. Larrabee's insight was right will be for the jury.[11]

The point to be made now is that while Dr. Goswami's lawyers may well have sought to "stoke" the fires of Dr. Larrabee's enmity towards DePaul and Dr. Goswami's antagonists, the fact remains that her views were set in amber, and their efforts cannot be said to have influenced Dr. Larrabee's testimony or played a role either in forming or firming up her attitudes towards DePaul. And, she already had copies of all the emails critical of her. (*Def.Br.* Ex. B, Tr. 22).

This is not to say that what occurred at the two meetings has no role to play in this case. Dr. Larrabee's willingness to spend six hours with the plaintiff's lawyers despite her incredibly "valuable" and scarce time, (*Def.Br.* Ex. B Tr. 14, 15, 22), is certainly a matter that can be explored

---

[11] Confirmation bias is "the well-documented tendency, once one has made up one's mind, to search harder for evidence that confirms rather than contradicts one's initial judgment." Richard Posner, How Judges Think, 111 (2008). *See also* Raymond S. Nickerson, *Confirmation Bias: A Ubiquitous Phenomenon in Many Guises*, 2 Review of General Psychology 175 (1998). Francis Bacon recognized the phenomenon hundreds of years ago:" And though there be a greater number and weight of instances to be found on the other side, yet these it either neglects and despises, or else by some distinction sets aside and rejects; in order that by this great and pernicious predetermination the authority of its former conclusions may remain inviolate.. . . " Nickerson, at 176.

on cross-examination if DePaul chooses, since it goes to the question of possible bias. And bias is always a matter for cross-examination. *United States v. Meachum* 1999 WL 511431, 4 (7th Cir.1999).[12]  It is only to say that given the circumstances of this case and the lack of any causal connection between Dr. Larrabee's attitudes about the case and the *ex parte* meeting five days before the deposition, dismissal of the case would not be either a proportionate or proper remedy. And while exclusion of evidence obtained in violation of Rule 4.2 is an available sanction, as is exclusion of Dr. Larrabee at trial, neither would be proportionate or proper remedies.

Finally, it is suggested that Dr. Goswami's counsel be disqualified for their violations of Rule 4.2. That too is a drastic sanction and obviously would impinge on Dr. Goswami's right to counsel, as well as affecting the progress of this case. If Dr. Larrabee is to be believed, all she talked about at the December 2012 meeting was University policies and procedures. (*Def. Br. Ex. B,* Tr. 17, 27-30). But all that information was readily available and known to Dr. Goswami's lawyers, and thus there is no evidence to be excluded at trial.[13] The December 2013 meeting likewise produced no evidence for the plaintiff and did not give rise to attitudes that did not already exist. Consequently, considering the circumstances of the case and the absence of consequences resulting from the violation,  disqualification of counsel would not be a proportionate remedy.

### E.

---

[12] Bias is a term used in the common law of evidence to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is always relevant because the jury, as finder of fact and weigher of credibility, is entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony. *United States v. Abel*, 469 U.S. 45, 52 (1984).

[13] DePaul points to no specific evidence that it contends should be excluded as having been derived from the violation of Rule 4.2. And there does not appear to be any.

What we have said is necessarily based on the record as it exists. DePaul has not asked to expand that record through further depositions of Dr. Larrabee; nor has it asked to take any discovery from Goswami's lawyers. It has been content to rely on the record as it exists, and so that is the record that governs disposition of the motion for sanctions.

Still, there are issues implicated by the case that transcend the immediate interest of the parties and their lawyers and could affect the trial, itself. Accordingly, I think it appropriate, as DePaul has requested, that Dr. Goswami's lawyers submit immediately to DePaul whatever materials they shared with Dr. Larrabee or she shared with them at any meeting or in any phone conversation, email, or otherwise. They must also produce immediately any notes or memoranda or recordings relating to any conversations or meetings with Dr. Larrabee. (*Def.Br.* 18-19).

For the foregoing reasons, the defendant's motion for sanctions for *ex parte* contact is GRANTED to the extent that Dr. Goswami's counsel will be responsible for the costs and legal fees incurred by DePaul in bringing this motion. Counsel for the plaintiff cannot have any further ex parte contacts with any person on the tenure committee or any other person who had any role to play in its determinations regarding the plaintiff. In all other respects, the Motion is denied.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE: 3/24/14**

22