# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NAMITA GOSWAMI, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 7167 |
| | ) | |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| DEPAUL UNIVERSITY, | ) | |
| PEG BIRMINGHAM, and | ) | |
| ELIZABETH ROTTENBERG, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

## INTRODUCTION

In 2010, Dr. Namita Goswami, applied for tenure in DePaul University's Philosophy Department. Her application was rejected by a majority of the tenured faculty in the Department by a vote of eleven to seven, with one abstention. The majority's rejection "rest[ed] largely on the quality of [Dr. Goswami's] research and what this says about her ability to train doctoral students in philosophy. The view of the majority [was] that the research is weak, incoherent, and lacks a conceptual framework." (*Pl.Br., Ex 4* at 18).[1]

As part of DePaul's multi-level tenure process, the University Board on Promotion and Tenure then considered the matter, ultimately recommending against tenure. The Board agreed that Dr. Goswami's scholarship was deficient. (*Defs.Br.* Ex. 5). That recommendation then went to DePaul's President, who had the ultimate decision-making authority. He accepted the Board's

---

[1] "On the basis of the inadequate quality of her research, the majority of the department concluded that Prof. Goswami is not someone who is able to train a new generation of postcolonial theorists in a philosophy doctoral program." *Id.*

recommendation regarding "the quality of [Dr. Goswami's] philosophical work."[2]  He concluded that neither Dr. Goswami's response nor the minority opinion of the tenured faculty in the Department of Philosophy, nor the College Committee's response "adequately answers the substantive judgments made in the Department's majority analysis." (*Pl.Br.* at 5, Ex. 6).[3]

Not surprisingly, Dr. Goswami has a very different view of her capabilities and what underlay her rejection by DePaul. It is her contention that she deserved to be awarded tenure and that DePaul's action was motivated by an assortment of discriminatory motives: gender, race, color, and national origin.  (*Amended Complaint*, ¶ 1).  In support of her claims, she plans to introduce the testimony of six professors – four philosophy professors, one literature professor, and one women's study's professor – from other universities.

In their Rule 26(a)(2) reports, they have discussed Dr. Goswami's published articles, and have praised her work and her potential importance as a scholar in the recondite field of postcolonial feminist theory. As often occurs in cases like this, they have done so in largely conclusory terms, which lend themselves to "exaggeration," and "extravagan[ce]" of expression. *Zahorik v. Cornell Univ.,* 729 F.2d 85, 93 (2d Cir.1984). They have variously described her work in such undeniably subjective terms as: careful, innovative, vital, thought provoking, outstanding, wide-ranging,

_____

[2] Since DePaul's President made the ultimate tenure decision, the plaintiff must show either that his decision was knowingly animated by a prohibited consideration or that it was decisively influenced by someone who was prejudiced. *Sun v. Board of Trustees of Illinois*, 473 F.3d 799, 812-13 (7th Cir. 2007).

[3] DePaul's brief contains some rather serious allegations regarding Dr. Goswami's lack of good faith in  the way she handled her tenure application. (*Pl.Br.* at 7). Dr. Goswami vigorously denies any claims of impropriety. That debate plays no role in the analysis of DePaul's motion to bar.

imaginative, courageous, solid, careful, excellent, original, high quality, strong, bold, ambitious, sophisticated, top-notch, lucid, eloquent and breathtakingly brave.

As we shall see, all the cases hold that assessments of "scholarship" by universities are inherently subjective and not measurable by objective criteria. *See infra* at 17-19. Nonetheless, the plaintiff insists that DePaul's assessment of her scholarship is based on objective and thus measurable criteria, (*Pl.Br. at* 10-11, *Ex 4* at 18), and therefore her witnesses' opinions being themselves "objective" are admissible to show that the criticisms of her scholarship were not merely inaccurate, but were "false" (*Pl.Br.* at 2, 10, 13, 18, 19), and "so plainly wrong" that they could not have been the real reasons for her rejection. (*Pl.Br.*. at 11). DePaul's rejoinder is quite simple: since tenure decisions are inherently subjective, admitting the subjective opinions of other academics will prove nothing: they will merely deflect the jury's attention from the real issue in the case, which is not whether the majority members of the tenure committee were "wrong" about the plaintiff's "scholarship," but whether DePaul's assessment was pretextual.

Perhaps the plaintiff's six witnesses are wiser than the eleven scholars at DePaul, who thought the plaintiff's scholarship deficient. After all, original genius is often "proved by the fact that we, working at our poor half thing, will impose him might and main...."Albert Schweitzer, The Quest of the Historical Jesus 2 (The MacMillan Co. 1940). Or perhaps their measure of her is not nearly as accurate as DePaul's. It matters not. The question of right and wrong plays no role in this and like cases. *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 338 (7th Cir. 2012); *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir.2011)("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge."); *Gupta v. Board of Regents of University of Wisconsin System*, 63 Fed.Appx. 925, 928 (7th Cir. 2003)("To prove discrimination, Gupta must

show more than that he was a qualified tenure candidate or even that the defendants' reason for denying him tenure was 'mistaken, ill-considered, or foolish.' He must show that the defendants' reason was a lie.").

Indeed, the law gives institutions of higher learning, like other employers, the right to be wrong, and grievously so. And more than that, it permits them to be insensitive, misguided, foolish, or even self-defeating in their employment decisions. "[I]t is not the function of the courts to sit as 'super-tenure' committees." *Thrash v. Miami University*, 2014 WL 929152, 8-9 (6th Cir. 2014).

Thus, in case after case, the Seventh Circuit and the other Courts of Appeals have refused "'to review the merits of tenure decisions and other academic honors in the absence of clear discrimination. [They] have... recognized that scholars are in the best position to make the highly subjective judgments related with the review of scholarship and university service.'" *Adelman–Reyes v. Saint Xavier Univ.,* 500 F.3d 662, 667 (7th Cir.2007). *Accord, Thrash,* 2014 WL 929152, 8-9; *Farrell v. Butler University*, 421 F.3d 609, 616 (7th Cir.2005); *Colburn v. Trustees of Indiana University,* 973 F.2d 581, 589 (7th Cir.1992); *Jiminez v. Mary Washington College,* 57 F.3d 369 (4th Cir.1995); *Zahorik,* 729 F.2d at 93; *Kunda v. Muhlenberg College,* 621 F.2d 532, 548 (3d Cir.1980); *McNaught v. Virginia Community College System,* 933 F.Supp.2d 804, 823-24 (E.D.Va.2013); *Leach v. Baylor College of Medicine,* 2009 WL 385450, 23-24 (S.D.Tex.2009).

That being the case, DePaul argues, Dr. Goswami's evidence is irrelevant and will not be helpful to the jury and thus is inadmissible. DePaul has filed a motion to bar what it calls the "scholarship experts" pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

# DR. GOSWAMI'S PROPOSED EXPERTS

We begin with Henry Schwarz, who is not a professional philosopher, but is a professor in the Department of English at Georgetown University, specializing in post-colonial studies, critical theory and cultural studies. He holds a Ph.D. in Literature from Duke University. Expressing "admiration for this gifted colleague," Dr. Schwarz noted that his "first impressions of Dr. Goswami's work were overwhelmingly positive." (*Pl.Br.* Ex. 11 at 2). He felt the quantity of Dr. Goswami's publications was high and would be sufficient for tenure at his university.

Dr. Schwarz said the quality of the journals in which she published was extremely high and their reputations "highly appropriate for the various fields engaged by Dr. Goswami." (Defendants. *Br.Ex.* 11 at 1). Dr. Goswami had published four articles in double-blind peer-reviewed journals – a large number, he said, for a junior scholar. (*Defs.Br.* Ex. 11, at 1,3). In commenting on one of Dr. Goswami's articles – "The Second Sex: Philosophy, Postcolonialism, African-American Feminism and the Race for Theory," which he assigned as an optional reading in one of his courses – he noted that, while the "academy" has come to value difference in departments of literature and culture (the argument Dr. Goswami made in her article), those "same departments have been extremely resistant to hiring people of color to teach about difference . . . ."[4] He accepted uncritically Dr. Goswami's opinion in the article that marginalization of African-American women in the departments despite the embrace of difference was a new form of segregation. *(Defs.Br.* Ex. 11, at 2).

---

[4] This is not an assessment of Dr. Goswami's scholarship. The reason for its inclusion in the report is as obvious as it is irrelevant. Moreover, no basis is given for this conclusion. There is only Dr. Schwarz's *ipse dixit*, and that is not enough. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *United States v. Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010).

In another article that Dr. Schwarz lauded, Dr. Goswami analyzed a 1955 short story by an Urdu writer, Prem Chand. Dr. Goswami posited that India could never be truly post-colonial because of the violence of its birth – partitioning of Hindu and Muslim states – and racial mixing between Indian and English. Dr. Schwarz said that Dr. Goswami "does masterful service to the texture of the short story and is as comfortable a critic of literature as she is a high-flown philosopher of epistemology and ontology." (*Defs.Br. Ex.* 11, at 3). Dr. Schwarz complimented what he perceived to be Dr. Goswami's "commitment to stylistic clarity" and her ability to express "very complex thinking in very straightforward language." He closed by complimenting what he perceived as the "unflinching critical courage" she brought to each of her "ambitious projects" and reiterated that there was no question she would receive tenure and promotion at Georgetown. (*Defendants.* Ex. 11, at 3)

Chandra Mohanty, professor of Women's and Gender Studies at Syracuse University, defines her area of expertise as situated at the  intersection of critical race, post-colonial, and transitional feminist studies. Dr. Mohanty began by calling Dr. Goswami the very best candidate for tenure of the 30 plus candidates she had reviewed as an outside reviewer. She found "Dr. Goswami's work to be of excellent quality."(*Defendants.* Ex. 12, at 1). She thought the most useful aspect of Dr. Goswami's scholarship was her analysis of post-colonial and African American literary texts. Dr. Mohanty was impressed that in two of her essays – "Shifting Grounds" and "Autophagia and Queer Transnationality" –  Dr. Goswami drew attention to the completely neglected mixed-race figure of the Anglo-Indian. Dr. Goswami's "interventions [were] deeply philosophical, posing ontological and metaphysical questions of identity and difference." (*Defendants. Ex.*  12, at 2).

Dr. Goswami's reading of Theodor Adorno illustrated, for Dr. Mohanty, "the boldness and originality of her scholarship." (*Defendant. Ex.* 12 at 2). She was attempting to bring the fields of

continental philosophy, postcolonial criticism, and critical race feminism together through their continuities in analytical approaches. According to Dr. Mohanty, "[s]he thus challenges postcolonial feminists to rethink their dismissal of continental philosophy as 'western' and therefore irrelevant, simultaneously challenging philosophers to look for the productive ontological and metaphysical implications of the theorization of difference in postcolonial and critical race feminism." (*Defs.Br. Ex.* 12 at 3).

Her report goes on to further analyze Dr. Goswami's "larger metaphysical vision," which "brings philosophy, feminism and postcolonial theory" "back together as these disciplines attempt to understand the subject that matters: the ground beneath our feet." She finds in one of Dr. Goswami's articles "a lucid, and eloquent statement of a project that is ambitious, bold, and original." (*Ex.* 12 at 3).

Dr. Mohanty then quoted Dr. Goswami's thesis for her proposed book on philosophy, feminism, and postcolonial theory and called it a lucid statement of an ambitious and original project. Dr. Goswami wanted to argue for the "conceptually postcolonial" in Adorno's framework, thereby responding to Adorno critics who dismissed his work as "Western" and of no import to critics of colonialism. Dr. Mohanty had no doubt the project would "have a significant impact on postcolonial and critical race feminist studies, as well as on interdisciplinary continental philosophy." (*Defendants. Ex.* 12, at 3).

Dr. Mohanty characterizes Dr. Goswami as a "bold, ambitious, careful and original thinker" (*Defendants. Ex.* 12, at 3-4).[5] She says that Dr. Goswami's scholarship is "wide ranging" and

---

[5] "Bold" is a word that she uses four times in her report to describe Dr. Goswami. That term is not by any definition "objective."

"showcases a bold, ambitious, and careful philosophical thinker, committed to an intellectual project that is unusual" in all the three "disciplines" she traverses – continental philosophy, postcolonial cultural/literary criticism and interdisciplinary feminist studies."(*Ex.* 12 at 4).

Alison Bailey is a tenured professor in the Philosophy Department at Illinois State University and director of that institution's women's and gender studies program. She points out in her report that she is not trained in continental philosophy. Perhaps that is why she explicitly refrains from assessing the quality of Dr. Goswami's writing. She has no qualms, however about voicing her opinions regarding Dr. Goswami's contributions to feminist philosophy. Significantly, she does state that philosophical writing is necessarily "clunky and jargon-laden." (*Defs.Br.* Ex. 13, at 1). "This is just the nature of our profession. . . . ordinary language is too inexact for philosophical purposes. To remedy this we regularly develop highly specialized vocabularies to help us engage philosophical puzzles in a more exacting ways[sic]." (*Defs.Br.* Ex. 13, at 1-2). This echoed Dr. Schwarz who noted that "highly specialized vocabularies of continental thought" are "required to comprehend" much of the fields in which Dr. Goswami works. (*Defs.Br.* Ex 11 at 2).

But the DePaul majority obviously had a different view and found Dr. Goswami's use of jargon objectionable. Dr. Goswami's brief has made no attempt to explain how, given the specialized vocabulary known only to philosophers, the jury could possibly make heads or tails out of the competing positions of DePaul and Dr. Goswami's witnesses. And if they cannot do so, it is a contradiction in terms to say that her six witnesses will assist the jury.

Dr. Bailey called Dr. Goswami's article, "Autophagia and Queer Transnationality," an extraordinary accomplishment, apparently because it appeared in "the top journal in Women's and Gender Studies." She did not discuss it any further than that. Dr. Bailey said that Dr. Goswami's essay "De-Liberating Traditions: The Female Bodies of Sati and Slavery," was poised to make a

significant contribution to the emerging literature in comparative feminist philosophy and postcolonial studies. (*Defs.Br.* Ex. 13 at 3). Dr. Goswami's brief makes no attempt to explain how this attempt to anticipate events still in the womb of time – to borrow one of Justice Frankfurter's famous phrases – can be classified as an objective assessment.

According to Dr. Bailey, Dr. Goswami's approach – using Adorno as the "philosophical lens through which she examines both postcolonial and African-American feminist frameworks with an eye toward explaining how, despite their liberatory roots these movements operate under the same understandings of culture as the `western' philosophical paradigms they critique" – allowed Dr. Goswami to show the postcolonial leanings in Adorno's work. (Defendants. Ex. 13, at 3). Dr. Goswami's "On the Limits of Postcolonial Identity Politics," discusses the Indian American as "model minority" and how the image is used to bolster the Anglocentrism of the U.S. academy. Dr. Bailey closed by saying she found Dr. Goswami's "scholarship to be innovative, imaginative, clear, well-written, "top-notch," and "breathtakingly brave." Hers was "the kind of voice our discipline needs if we are to answer Dr. Linda Martin Alcoff's call for philosophical pluralism." (*Defs.Br.* Ex. 13, at 4).[6] Dr. Goswami's brief makes no attempt to explain how these assertions are anything but subjective opinions.

Sarah Lucia Hoagland is a professor of Philosophy, Women's Studies, and Latin American Studies at Northeastern Illinois University, which she points out in her report is the most diverse campus in the Midwest. Why that is relevant, she does not say. She has known Dr. Goswami since 2004, but has not kept in close contact with her. She was "struck by a number of qualities of her research including its vitality, its solid scholarship, its original and thought-provoking content and

---

[6] Dr. Alcoff, is the President of the American Philosophical Association. Like Dr. Bailey, Dr. Mohanty, and Dr. Goswami, Dr. Alcoff focuses on race and gender issues. http://www.alcoff.com/.

its interdisciplinary value." (*Defs.Br.* Ex. 14 at 1).  She went on to call Dr. Goswami's body of work "original and innovative as it raises significant questions of ontology, epistemology and metaphysics."  Dr. Hoagland thought it addressed multiple audiences and brought to bear "philosophical practice to many areas of significance, particularly feminist and postcolonial research."  (*Defs.Br.* Ex. 14, at 1-2).  Like the others, Dr. Hoagland's report discusses at length the content and meaning and what she perceives to be the significance of Dr. Goswami's published works. She concludes by saying that "[o]verall I find that Dr. Goswami's work exhibits original and solid scholarship...." (*Defs.Br.* Ex. 14 at 7).

Here is a sample of Dr. Hoagland's substantive explanations of Dr. Goswami's work.  She begins by launching into a brief critique of Western culture and its view of any other system of thought as derivative.  As a result, Western culture "promote[d] an epistemology of ignorance."  Dr. Goswami work "interrupt[ed] the seminally smooth devaluation of non-Eurocentered scholarship" and "focused on subjects that matter."  In "Shifting Grounds," Dr. Goswami drew on the work of Theodor Adorno to examine the principles of identity that shaped the borders and boundaries during the Partition of "British India" into the nation-states of India and Pakistan and challenge the transparency of the compulsory binary identities "Hindu" and "Muslim."  She asks what relation Adorno's  identity-principle has ethically, epistemologically and ontologically to Europe's self-identity as the bearer of the burdens of civilization and history and evinces a moral concern, as did Adorno, over a commitment to remaining answerable to human suffering.  *(Defs.Br. Ex.* 14, at 2).

Dr. Goswami addressed film and charged that if Indian film – Bollywood – was approached from a Hollywood aesthetic perspective it would be seen, "not as a distinct cultural production but as a mere naive and inferior copy, rendering it a subject that does not matter."  Dr. Hoagland calls the critique a "carefully detailed expose of Eurocentric reading of a former colony's cultural

production." Dr. Goswami discusses Bollywood again in "The Empire Sings Back", where she develops the concept of postcolonial whimsy to "challeng[e] the Eurocentric approach to aesthetics, in particular the practice of considering Hollywood as the paradigm." "Most interesting," for Dr. Hoagland, is that Dr. Goswami "develops the concept of Postcolonial Whimsy as an aesthetic that does not foreground authenticity and manages to speak 'truths' through 'lies.'"

Dr. Hoagland discussed a number of other of Dr. Goswami's publications, congratulating her for her analysis of the film "Slumdog Millionaire," arguing that "feminist theory that analyzes other people's experiences often winds up reinstating the hierarchies of the status quo," and proposing that feminist postcolonials face the double bind of being considered terrorists yet seeking advancement in the U.S. hierarchy "head on by exposing the way they are being used to support U.S. imperialism and render as lesser or dismiss altogether U.S. feminists of color, being positioned institutionally as the model minority." (*Defs.Br.* Ex. 14, at 4-5). Dr. Hoagland closed by opining that, overall, Dr. Goswami's work was original and solid scholarship, offering "deeply thoughtful philosophical engagement with critical questions that impact feminist philosophy, postcolonial theory, and philosophy in general." (*Defs.Br.* Ex. 14, at 7).

Charles Mills is a professor of philosophy at Northwestern University, focused in critical race theory. He was one of the external evaluators DePaul engaged to review Dr. Goswami's tenure dossier during deliberations on her application. He reiterated and clarified his comments he had made in his external review, and felt that some of his opinions had been mischaracterized in the Majority Report. He said that he wrote that Dr. Goswami's work was "'of very high quality' and that her tenuring had [his] enthusiastic endorsement,'" as opposed to having said her work was "strong" or "promising." He questioned how someone with a thinking problem – as one of the professors charged in the Majority Report – could obtain a Ph.D. or have an article published in a

leading feminist journal.  (*Defs.Br.* Ex. 15, at 1).

He agreed with Dr. Goswami's point that "though postcolonial theory is well-established as an overall theoretical orientation, its implications for the discipline of philosophy in particular (as against literature, anthropology, cultural studies, etc.) are still being worked out and debated. So there is a dichotomy in the sense that a consensus on the appropriate philosophical framework, or range of frameworks, has yet to be established."  He explained postcolonialism's place outside philosophy by saying that "Philosophy traditionally seeks answers to deep questions about meaning, the good life, justice, knowledge, and so forth, and what we want to know is how these questions and answers would be reshaped by bringing a postcolonial perspective to bear on them, given that the questioning of philosophy is itself philosophical."

Dr. Mills noted that some in the DePaul Philosophy Department complained that they did not recognize the journals Dr. Goswami had published in.  He explained that there was no postcolonial journal and that Dr. Goswami had to go to journals outside of philosophy in order to be published.  He did not find jargon in Dr. Goswami's work, but well-developed arguments using neologisms – the vocabulary of her field.  (*Defs.Br.* Ex. 15, at 2).  He criticized those who were skeptical about whether  interventions into the debate between black American feminism and postcolonial feminism was philosophy. He then offered his opinion that he found it "hard to understand how anyone reading this work can deny its intellectual and philosophical merit." (*Defs.Br.* Ex. 15, at 3).

Finally, there is Jose Medina, a  professor of philosophy at Vanderbilt University, where he is "an expert in feminist philosophy and the philosophy of race and ethnicity...." (*Defs.Br. Ex.* 16 at 1). He met Dr. Goswami once at a critical philosophy of race conference where she gave one of the most provocative and sophisticated talks of the event. He felt there were only a handful of people

in the country who could claim expertise in feminist philosophy, race theory, and postcolonial theory at the level of sophistication of Dr. Goswami. He noted that, in many of her articles, Dr. Goswami staged enriching conversations between African-American feminism and Third World feminism. (*Defendants*. Ex. 16, at 1).

In an attempt to explain what he characterized as "the high quality of the philosophical contributions made [by Dr. Goswami's] articles" (Ex. 16 at 1), Dr. Medina went on to explain that Dr. Goswami "argues convincingly and with great theoretical sophistication that the reason why minority philosophical traditions remain secondary and conceived as minor traditions is because they are forced to validate themselves in relation to the established Western canon and to adopt the language of that canon. Because these alternative philosophical traditions have been ignored, they remain completely unfamiliar to those trained only in Western philosophy and, therefore, these scholars cannot even understand these intellectual traditions as philosophical traditions at all unless they are translated into the vocabularies of British, French, and German philosophy." [7]

---

[7] This was no doubt a slap at those members of the tenure committee who were trained in Western philosophy and are insidiously being accused of lack of competency to judge Dr. Goswami's work. Of course, if they were not, how is the jury to make the determination of whether they were "plainly wrong" (*Pl. Br.* at 11). The problem is exacerbated by the insistence of Dr. Bailey and Dr. Schwarz, that there are unique vocabularies used in postcolonial and critical feminist theory. (*Defs.Br.* Ex. 13 at 1). Indeed, Dr. Schwarz noted that "highly specialized vocabularies of continental thought" are "required to comprehend" much of the fields in which Dr. Goswami works. (*Defs.Br.* Ex. 11 at 2). How then is the jury to assess whether the majority was "plainly wrong" when they will not even understand the vocabulary employed?

Even without the barriers to understanding adverted to by the plaintiff's witnesses, courts have held that "[w]here the tenure file contains the conflicting views of specialized scholars, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion."*Zahorik v. Cornell University,* 729 F.2d 85, 92 -94 (2d Cir.1984. *Accord Jiminez,* 57 F.3d at 377 (tenure decisions " often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges." ); *Thrash,* 2014 WL 929152 at 8 -9 ("We are neither engineers nor scientists, and as such are ill-suited to evaluate the quality of Dr. Thrash's work ourselves.").

Dr. Goswami was aligned, he thought, with "cutting edge" philosophical theorists like Charles Mills. Dr. Goswami argues that colonized and enslaved populations developed their own philosophical language and because of this were marginalized by Western thought. (*Defendants*. Ex. 16, at 2). She claimed that minority feminists have had their insights appropriated in such a way that they cannot form their own philosophical tradition. She also performs an internal critique of postcolonialism, arguing that postcolonial theorists had been recruited as model minorities and had to fight not to become complicit with Eurocentric privilege and the marginalization of non-Western thought.

Dr. Medina called Dr. Goswami's book manuscript, "Subjects That Matter," "original, sophisticated, and full of rich implications for future research in critical theory, feminism, post-colonial theory, and race theory." It involved a new interpretation of Adorno's critical theory and showed how this interpretation can be used to make post-colonial theory more philosophical. (*Defendants. Ex.* 16, at 3). For Dr. Goswami, post-colonial theory cannot be reduced to mere cultural critique but must be understood philosophically as playing a critical role in our ideas of identity, agency, and citizenship. Her "critical post-colonial theory offers a nuanced account of the complex intersections of race and gender in different cultural contexts, and it offers a metaphysical elucidation of race, ethnicity, and sexuality."

Dr. Medina said Dr. Goswami's manuscript culminates with a superb, thought-provoking discussion that brings Adorno to bear on African-American and post-colonial feminist reflections on the female body, specifically on the female bodies of slavery and sati. He recommended Dr. Goswami for tenure "enthusiastically and without reservation" on the basis of her "outstanding scholarship." He warned against what he perceived would be the "tremendous injustice" of denying tenure to Dr. Goswami – an injustice that in his view would be "precisely the repetition of the very

same kind of epistemic injustice committed against African-American and Third-World scholars that

Dr. Goswami has analyzed so brilliantly in many of her essays." (*Defs.Br.* Ex. 16, at 4).[8]

## ANALYSIS
### A.

Under Rule 702, which governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule requires that the trial judge act as a "gatekeeper" to ensure that expert testimony

or evidence sought to be admitted "is not only relevant, but reliable." *Daubert,* 509 U.S. at 589. The

trial court's "special obligation" to determine the relevance and reliability of an expert's testimony,

is vital to ensure accurate and unbiased decision-making by the trier of fact. *Kumho Tire,* 526 U.S.

at 147. Although the principles in *Daubert* addressed scientific testimony, they apply equally to non-

scientific fields with the proviso that they must be geared toward the type of testimony at issue.

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49 (1999); *Lees v. Carthage College* ,714

F.3d 516, 521 (7th Cir. 2013).[9]  No matter the nature of the witness's expertise, Rule 702 establishes

not only a standard of evidentiary reliability, it requires a valid connection to the pertinent inquiry

---

[8] The reason Dr. Medina included this subjective opinion in his report would seem as obvious as it is irrelevant to the question raised by the motion to bar. Its motivation would appear to be the same as that underlying Dr. Schwarz's comment referred to in note 4, *supra*.

[9] Although *Daubert* interpreted an earlier version of the present Rule702, it "remains the gold standard for evaluating the reliability of expert testimony and is essentially codified in the current version of Rule 702." *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 805-06 (7th Cir. 2013).

as a precondition to admissibility.  *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 805-06 (7th Cir. 2013).

Rule 702 requires that the evidence or testimony help the trier of fact to understand the evidence or determine a fact in issue. This condition goes primarily to relevance. *Daubert,* 509 U.S. at 591. Judge Kozinski, in his opinion in *Daubert* following the Supreme Court's remand, put it this way: "[W]e must ensure that the proposed expert testimony...logically advances a material aspect of the proposing party's case. The Supreme Court referred to this second prong of the analysis as the 'fit' requirement." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995).   This is how the Supreme Court put it in *Daubert*:

> Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. " Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  The consideration has been aptly described by Judge Becker as one of "fit." ... "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. See Starrs, *Frye v. United States* Restructured and Revitalized: A Proposal to Amend Federal Evidence Rule 702, 26 Jurimetrics J. 249, 258 (1986). The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

*Daubert*, 509 U.S. at  591-592. Thus, Stephen Hawking would be a stunning witness in a case involving theoretical physics, but would never see the light of day in an accounting malpractice case.

*See* Rule 401.[10]

As the proponent of the expert testimony at issue, Dr. Goswami has the burden of demonstrating its admissibility by a preponderance of evidence. *Lewis v. CITGO Petroleum Corp*., 561 F.3d 698, 705 (7th Cir. 2009). Here, we must find that Dr. Goswami has failed to meet that burden; specifically, she has failed to demonstrate that the proffered opinion testimony is relevant – that is, that it will help the jury in determining whether one or more members of the tenure committee lied when they concluded that there were various deficiencies in Dr. Goswami's scholarship that prevented her from being granted tenure in the Department of Philosophy. And that, not whether Dr. Goswami's experts' views of her scholarship trump those of the committee members, is the question to be decided. *Cf., Medina v. Ramsey Steel Co., Inc*., 238 F.3d 674, 682 (5th Cir.2001)("'Beauty is in the eye of the beholder and the beholder in this case' is the employer... In short, 'the trier-of fact will evaluate truthfulness, not beauty.'").[11]

---

[10] Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) that fact is of consequence in determining the action." Relevance does not exist in a vacuum; it is not inherent in any item of evidence, but exists only as a relation between an item of evidence and the matter sought to be proved. *See* 2 *Weinstein's Federal Evidence*, §401.04[2][a] (Joseph M. McLaughlin ed., 2d ed. 2007). Decisions on relevancy are made on a case-by-case basis, and each is dependent on surrounding facts, circumstances, and issues. *See* 1 C. Mueller and L. Kirkpatrick, *Federal Evidence,* § 4:3 at 568 (3d ed. 2003).

[11] The parties are also at odds over whether plaintiff's proposed witnesses are qualified to testify as to the quality of Dr. Goswami's scholarship. Essentially, DePaul complains that these professors are outsiders to Depaul's philosophy department and unfamiliar with DePaul's tenure standards and either do not hold philosophy degrees, do not come from universities with philosophy doctorate programs – DePaul has such a program – or have different areas of specialization than Dr. Goswami. (Defendants. Br at 5-6). DePaul's first two arguments are odd ones to make, as its tenure review procedures specifically recommend that outside scholars' assessments are considered. DePaul University Handbook, Pl. Ex. 22, at §3.3.2. The University President, in his decision on tenure applications, called such outside scholars "experts in the field [employed] to render an opinion as to a candidate's qualifications." (Pl. Ex. 4, at 4). The third is a bit dicey as well, as all of the professors who voted against Dr. Goswami have different areas of specialization than she does. (Dkt. #132, at 3-4). But the questions need not be resolved because the experts, qualified or not, offer nothing that is relevant to the issue at hand.

The pretext inquiry focuses on whether the stated reason for the adverse employment action is *in fact* the reason for it—not on whether the stated reason is accurate or fair or even rational. *Perez v. Thorntons, Inc*., 731 F.3d 699, 708 (7th Cir. 2013)*; Zayas v. Rockford Memorial Hosp*., 740 F.3d 1154, 1158-59 (7th Cir. 2014). "It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 627 F.3d 596, 601 (7th Cir.2010). The testimony Dr. Goswami offers here is not relevant to the issue of "pretext" and thus does not "fit" the case and cannot therefore assist the trier of fact in understanding the issues. *Daubert,* 509 U.S. at 590–91.

In case after case, the Federal Courts of Appeals have recognized "the absence of fixed, objective criteria for tenure [decisions]." *Blasdel v. Northwestern University*, 687 F.3d 813, 815-16 (7th Cir. 2012). *Accord Zahorik,* 729 F.2d at 92–93 ("[T]here is no common unit of measure by which to judge scholarship"); *Tanik v. Southern Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997). Not surprisingly, the authorities are uniform in holding that tenure decisions about scholarship are necessarily and inherently "subjective." *See also Thrash,* 2014 WL 929152 at 8 -9; *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007); *Sun v. Board of Trustees of University of Illinois*, 473 F.3d 799, 815 (7th Cir. 2007); *Farrell*, 421 F.3d at 616; *Vanasco v. National–Louis University,* 137 F.3d 962, 968 (7th Cir.1998); *Jiminez,* 57 F.3d at 377; *Fisher v. Vassar College*, 70 F..3d 1420, 1435 (2nd Cir. 1995)("it is difficult to conceive of tenure standards that would be objective and quantifiable"),*abrogated on other grounds*, *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147–48 (2000); *Colburn v. Trustees of Indiana University,* 973 F.2d 581, 589 (7th Cir.1992); *Gottlieb v. Tulane Univ. of Louisiana,* 809 F.2d 278, 283 n. 6 (5th Cir.1987); *Lovelace v. Southeastern Massachusetts University,* 793 F.2d 419, 422 (1st Cir.1986); *Namenwirth*

*v. Board of Regents of University of Wisconsin System,* 769 F.2d 1235, 1243 (7th Cir.1985); *Clark*

*v. Whiting*, 607 F.2d 634, 639-40 (4th Cir. 1979).

Judge Posner's opinion in *Blasdel* has so comprehensively explored the factors in cases like

Dr. Goswami's that it is helpful to quote it at length:

> . . . although the legal standard is the same whether the plaintiff in an employment discrimination case is a salesman or a scientist, practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight—notably the absence of fixed, objective criteria for tenure at that level . . . . And we must not ignore the interest of colleges and universities in institutional autonomy. Although the Supreme Court in University of Pennsylvania v. EEOC, ... was emphatic that academic freedom does not justify immunizing materials submitted in the tenure process from the EEOC's subpoena power, courts tread cautiously when asked to intervene in the tenure determination itself. They must be mindful that, as Judge Friendly said in *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir.1980), "to infer discrimination from a comparison among candidates is to risk a serious infringement of first amendment values. A university's prerogative 'to determine for itself on academic grounds who may teach' is an important part of our long tradition of academic freedom. *Sweezy v. New Hampshire,* 354 U.S. 234, 263 (1957) (Frankfurter, J., joined by Harlan, J., concurring in the result)

> A disappointed candidate for tenure at a college or university may well be the best possible candidate along one dimension but not others. ... Then too, office politics frequently plays a role in the award or denial of tenure; friendships and enmities, envy and rivalry ... can figure in tenure recommendations by the candidate's colleagues, along with disagreements on what are the most promising areas of research. In addition, many academics are hypersensitive to criticism, especially by younger academics, whom they suspect, often rightly, of wanting to supplant them. Although office politics and professional jealousy are bad reasons for denying tenure, an erroneous denial of tenure, as such, does not violate Title VII.

> The decisionmaking process in an academic hierarchy creates further complication. Granting tenure, like appointing a federal judge, is a big commitment. The final decision may be made by a committee, or an official such as a university provost or president, remote from the chairman and the other members of a candidate's department. Even if invidious considerations play a role in the department's recommendation for or against tenure, they may play no role in the actual tenure decision, made at a higher level. . . . .

> And finally, because so many factors influence the tenure process and because statistical inferences of discrimination are difficult to draw when there is only a small

number of observations (tenure appointments in a particular department may be few and far between), it can be difficult to infer the presence of an invidious influence such as the sex of the candidate merely by comparing successful and unsuccessful tenure applicants.

687 F.3d at 815-17.[12]

## B.

Dr. Goswami's brief submits that she is offering her experts' testimony to refute specific, "objective" criticisms of her scholarship. (*Pl.Br.* at 9, 10, 11, 12, 17, 18). But that argument is simply an attempt to avoid, through a turn of a phrase, the uniform line of authority explicitly holding that evaluations of "scholarship" are inherently "subjective." *See supra* at 19. But "[u]nlike Humpty Dumpty...a litigant cannot use words any way [she] pleases." *Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Insurance. Co.,* 671 F.3d 635, 637 (7th Cir. 2011). Or as Justice Holmes more lambently phrased it: "We must think things, not words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true." Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 460 (1889).

Even the briefest review of the encomia lavished on Dr. Goswami by her experts shows their highly subjective quality. The same is true of the following criticisms Dr. Goswami has plucked from the Majority Report :

---

[12] DePaul oversteps, however, when it submits that "[b]y virtue of their topic alone, tenure evaluations are not capable of being tested." (Dkt. # 119, at 17). When Title VII was enacted in 1964, it included an exemption for "educational institutions with respect to the employment of individuals to perform work connected with the educational activities of such institution." The exemption was eliminated eight years later when Congress enacted § 3 of the Equal Employment Opportunity Act of 1972. *University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990). The elimination of the exemption exposed tenure determinations to the same enforcement procedures applicable to other employment decisions. 493 U.S. at 190.

DePaul's tenure evaluation can most certainly be tested in a number of ways, not the least of which being the jury's observation and consideration of the testimony, cross-examination, and demeanor of the professors who voted on the matter. *Tanik*, 116 F.3d at 776; *Zahorik*, 729 F.2d at 93; *Mukhtar v. California State University, Hayward*, 299 F.3d 1073, 1074 (9th Cir. 2002).

Lacking and insufficient in terms of its conceptual development and does not show sufficient ability to make a coherent argument;

[W]hen the philosophical issues get hard [the work] either goes rhetorical or it becomes trite; [I]nability to use citations, to clearly state a thesis, to follow through on an argument;

Prof. Goswami lifts terms out of their context, has a tendency to string together quoted phrases without ever pausing to consider either how they worked in the original text or their implications for the argument she was attempting to make;

[A]t the moment the reader would expect a well developed argument, one finds instead a lapse into jargon;

Problem of conceptualization – her work lacks entirely a conceptual framework ... her grasp of basic philosophical concepts was shallow and trite;

Prof. Goswami was creating a false dichotomy between postcolonial theory and philosophy . . . there is no dichotomy;

Professor Goswami is unable to articulate how her project brings philosophy to postcolonial theory;

The writing problem, as another faculty member described it, is "irremediable;"

[I]t is not a "writing problem," it's a "thinking problem."

(*Pl.Br.* at 10).

Dr. Goswami's brief takes no note of the undeviating line of cases holding that scholarship assessments are necessarily subjective. *See supra* at 19. And it overlooks Judge Posner's statement in *Blasdel*, decided long before the brief was filed, regarding the absence of fixed, objective criteria for tenure decisions. 687 F.3d at 815-16 .The brief offers no insight as to how one might quantify or objectify the factors relied on by DePaul in denying tenure. It does not even cite to any particular part of her expert's reports to offer some inkling as to how the points of criticism were objectively wrong and her experts objectively right. What it does is to point to the superlatives the experts so freely used to give their positive assessments of her work. That deficiency is telling. More

importantly, it leaves her argument that her proffered expert testimony is relevant and admissible nothing more than an unadorned, conclusory assertion, and thus not persuasive. *Roger Whitmore's Automotive Svcs, Inc. v. Lake County*, 424 F.3d 659, 674 (7th Cir. 2005).

Reviewing some examples of the purportedly objective criticisms of the majority on the tenure committee will help shed light on the "objectivity" question. One example that Dr. Goswami focuses on is the excessive use of "jargon" objected to by the majority on the committee: "[A]t the moment the reader would expect a well developed argument, one finds instead a lapse into jargon . . . ." Dr. Schwarz wrote simply that "[t]here is no obfuscating jargon in Goswami's writing, She expresses very complex thinking in very straightforward language." (*Defs.Br.* Ex. 11 at 3).[13] By contrast Alison Bailey, professor of Women's and Gender Studies at Illinois State University, does not deny Dr. Goswami's use of jargon, but finds it necessary: "Academic philosophy [she says] is a clunky and jargon-laden discipline by necessity.[14] This is just the nature of our profession. . . . ordinary language is too inexact for philosophical purposes. To remedy this we regularly develop highly specialized vocabularies to help us engage philosophical puzzles in a more exacting ways[sic]." (*Defs.Br.* Ex. 13, at 1-2). Charles Mills was somewhat in the middle: "I do not find jargon but well-developed arguments using the vocabulary of the field." (*Defs.Br.* Ex. 15, at 2).

And so, there is a difference of opinion among Dr. Goswami's own experts as whether her writing is jargon-laden, contains jargon at all, contains jargon as a matter of necessity, or contains jargon that is not "obfuscatory." In light of this diversity of opinion among Dr. Goswami's own

---

[13] It is not entirely clear whether he is saying that jargon is obfuscating by its nature and Dr. Goswami does not use jargon or whether the jargon she uses is not of that type.

[14] Certainly, the report from Dr. Hoaglund is a prime example of this. It is a thicket of jargon that no jury could be expected to hack through.

experts, how the Majority Report's criticism on this point can be called "objective" and can be shown to be categorically false is unfathomable.

Another example is the criticism that Dr. Goswami's inability to read German affected that part of her scholarly agenda that relies so heavily on Theodor Adorno, who wrote in that language. (*Pl.Br.* Ex. 2, at 10-11; Dkt. #132, at 11, citing *Pl.B*r. Ex. 3). The accuracy of the English translations of Adorno had been questioned. That, of course, would call into question Dr. Goswami's reliance on them. But Dr. Schwarz claimed that "[i]t has been said of . . . Adorno, that his writing is much clearer in English than in his native German because the translator must perform the double task of translating the language as well as untangling the thought." (*Defs.Br.* Ex. 11, at 3). Not only is this not an objective assessment, its "only footing is George Orwell's Newspeak." *In Re TCI, Ltd.*, 769 F.2d 441, 447 (7th Cir. 1985)(Easterbrook, J.).

First, the only way to know whether the writing is "clearer" in English than in German is to understand German; otherwise, there is no basis for comparison. And even that would be a subjective judgment. Second, lauding a process that involves an *untangling* of Adorno's thoughts overlooks the reality that the original thought is transformed as it passes through the alembic of translation. Beyond this, it cannot even be said that this is Dr. Schwarz's own opinion. In fact, saying, as Dr. Schwarz does, that "it is said" means it is not attributed to anyone, and it is impossible, therefore, to make any determination about the merit of the assertion or whether Schwarz shares this view. This is hardly an appropriate approach to be taken by a scholar. In the end, this is another difference of opinion that cannot be resolved objectively.

Both Dr. Goswami and DePaul submit that the Seventh Circuit has not spoken on the subject. But that overlooks the significance of Judge Posner's decision in *Blasdel,* which, while not answering the specific question raised here, explicates issues that necessarily inform the analysis

in this case. Moreover, *Gupta v. Board of Regents of University of Wisconsin System*, 63 Fed.Appx. 925 (7th Cir. 2003) did deal with the issue in this case. There, the plaintiff, who was a Native American, brought a Title VII action against the University of Wisconsin, alleging that he had been denied tenure due to his national origin and race. He hoped to bolster his case with the testimony of a former colleague, who was a professor and faculty supervisor at the University of Tennessee who would testify as to the quality of the plaintiff's academic accomplishments and abilities. The district court found the testimony was inadmissible because it was irrelevant. 63 Fed.Appx. at 927-28. The Seventh Circuit upheld the district court's ruling, explaining that:

> [t]o prove discrimination, [plaintiff] must show more than that he was a qualified tenure candidate or even that the defendants' reason for denying him tenure was "mistaken, ill-considered, or foolish." He must show that the defendants' reason was a lie. For [the witness's] testimony to be relevant, therefore, it must advance the inquiry into whether the defendants'[sic] lied when they said that they denied [plaintiff's] tenure clock extension (and correspondingly, tenure) because he was not a qualified tenure candidate. [The witness's] testimony, however, discusses only [plaintiff's] qualifications and does not provide any information about the motivations of the department and executive committees. [The district court judge] thus did not abuse his discretion in excluding it as irrelevant.

63 Fed.Appx. at 928-29 (citations omitted).

Similarly, here, the testimony Dr. Goswami proffers does not provide any information regarding the motivations of those who made the tenure decision. It is simply the witnesses' subjective assessments of Dr. Goswami's scholarship, expressed in extravagant language, as these assessments often are. Thus, as in *Gupta*, those opinions are irrelevant to the issue at hand. While *Gupta* is a nonprecedential decision, it nonetheless ought not be overlooked as unpublished decisions can "offer helpful guidance." *United States v. Ramirez,* 675 F.3d 634, 636 (7th Cir.2011).

## C.

None of this is to say that expert testimony can never have a role to play in cases involving tenure discrimination.  In other contexts, it may well be relevant. These include where the issue relates to deviations from university procedures, *Siring v. Oregon State Bd. of Higher Educ. ex rel. Eastern Oregon University*, 927 F.Supp.2d 1069 (D.Or. 2013), or statistical evidence on a school's treatment of a particular minority group, *Fisher v. Vassar College*, 70 F.3d 1420 (2nd Cir. 1995); *Rosado v. Virginia Commonwealth University*, 927 F.Supp. 917, 935 (E.D.Va. 1996).  But where the expert testimony sought to be introduced deals with the quality of the plaintiff's abilities and qualifications for tenure, the testimony is found to be irrelevant.  *See, e.g.,Babbar v. Ebadi*, 36 F.Supp.2d 1269, 1279 (D.Kan. 1998), *aff'd* 216 F.3d 1086 (10th Cir. 2000)(finding "an expert report stating that plaintiff, in light of his superior research program, was 'eminently qualified and should not have been denied tenure'" inadmissible because "plaintiff's own perceptions (or the perceptions of his expert) with respect to his qualifications for tenure are irrelevant; it is the perception of the decisionmaker which is relevant."); *Goodship v. University of Richmond*, 860 F.Supp. 1110, 1112-13 (E.D.Va. 1994)("The Court notes that unanimity of opinion is rarely encountered in university-level scholarship. The opinions of [plaintiff] and her expert are undoubtedly genuine, but they simply have no bearing on whether the different opinions expressed by numerous University faculty members were *not* genuine."); *Kossow v. St. Thomas University, Inc*., 42 F.Supp.2d 1312, 1317 (S.D.Fla. 1999)(". . . neither the Court, nor the jury need evaluate the degree of scholarship in the law review articles. The Plaintiff has failed to provide sufficient evidence supporting its argument that the lack of track tenure renewal was a pretext for age discrimination."); *El-Ghori v. Grimes*, 23 F.Supp.2d 1259, 1268-69 (D.Kan. 1998)(both sides submitted expert opinions as to the quality of plaintiff's scholarship, but the question was not whether one view was better supported, the point

was that "these matters were certainly debatable; they called for the exercise of professional judgment, and a reasonable jury could not find that the University officials failed to exercise that judgment or ventured 'beyond the pale of reasoned academic decision-making.' ").

Dr. Goswami contends that in cases like *Goodship, Kossow,* and *El-Ghori*, the expert evidence was *permitted.* But there is no indication that, in any of those cases, the evidence was challenged with a *Daubert* motion or comparable objection. Hence, those cases cannot be the basis for Dr. Goswami's argument for admissibility. The principle is as old as the republic: a point not in dispute in one action cannot be received as conclusively settled in any subsequent action. *Sub silentio* resolution is not sufficient. *See Cohens v. Virginia*, 19 U.S. 264, 399 (1821)(Marshall, C.J.); *United States v. Acox,* 595 F.3d 729, 731-732 (7th Cir. 2010)("the briefs in those cases did not join issue on the [question raised here], and the opinions do not discuss this subject... so they do not establish holdings."). And, more importantly, in each case – all of which were summary judgment cases – the evidence was deemed irrelevant. Rule 402, Federal Rules of Evidence, mandates that irrelevant evidence be excluded.

Dr. Goswami also attempts to distinguish *Babbar*, submitting that the plaintiff raised the issue, not of his scholarship, but of the panel considering his application deviating from proper procedures. (Dkt. #132, at 12). And she reintroduces her position – the flaws of which have already lead to its being disposed of – that she can use her expert testimony to specifically rebut the purportedly "objective" reasons DePaul gave for denying her tenure. But, Dr. Goswami ignores the fact that the plaintiff in *Babbar* also "devote[d] a significant portion of his papers to a multitude of evidence about his qualifications for tenure." 36 F.Supp.2d at 1279. It was in that context – not in the context of the panel procedure argument – that the court determined the expert testimony on the quality of the plaintiff's "research" (i.e. scholarship) was irrelevant. 36 F.Supp.2d at 1279.

Dr. Goswami has not cited a tenure case where a court has found expert testimony relating to scholarship deficiencies relevant and admissible. Perhaps that is because all of the cases stress that differences of opinions as to the quality of a candidate's scholarship will not raise an inference of discrimination. *See, e.g., Zahorik*, 729 F.2d at 94; *Lieberman,* 630 F.2d 60 at 67–68 (2d Cir.1980); *Villanueva v. Wellesley College,* 930 F.2d 124, 131 (1st Cir.1991). Our independent research however, has found three cases that to one degree or another have touched on the admissibility of expert testimony regarding the scholarship of a disappointed tenure candidate.

In *Torres v. City University of New York*, 1994 WL 502621 (S.D.N.Y. 1994), the plaintiff was denied tenure because his publications contained no analysis, but were merely compilations of information for lawyers. While ruling on a privilege question regarding discovery, the magistrate judge mused that the plaintiff might "through expert testimony or otherwise, attempt to demonstrate that Defendants' evaluation of his work is manifestly wrong and pretextual." But then came the following:

> Further, *to the extent that it is relevant*, Plaintiff may attempt to compare the quality of his own publications to the quality of publications by colleagues who were reappointed or granted tenure, in an effort to show that he was subjected to a higher standard than that applied to individuals in unprotected groups.

1994 WL 502621, 3 (emphasis supplied). But then, the court stressed "that courts are reluctant to make themselves the judges of the scholarly merits of a plaintiff's work and those mere differences of opinion as to the merits of such work will not raise an inference of discrimination." 1994 WL 502621, 3, n.3.

In *Carton v. Trustees of Tufts College*, 1981 WL 128 (D.Mass. 1981), the plaintiff alleged various forms of discrimination when she was denied tenure based on perceived deficiencies in scholarship. The district court simply noted that he accepted the testimony of Dr. Davies, "an expert

witness," to the effect that plaintiff was an excellent teacher and perhaps the best of the four candidates. As in *Torres v*, no case was cited, and there was no discussion of the issue at all. These cases are thus not helpful or persuasive. *See Sandifer v. U.S. Steel Corp*., 687 F.3d 590, 598-99 (7th Cir. 2012); *Szmaj v. AT&T*, 291 F.3d 955, 956 (7th Cir. 2002); *Committee on Judiciary, U.S. House of Representatives v. Miers* , 558 F.Supp.2d 53, 104 (D.D.C.2008).

In *Figal v. Vanderbilt University*, 2013 WL 5459021 (Tenn.Ct.App. 2013), the plaintiff sought to introduce evidence that his scholarship met Vanderbilt's standards of excellence. The court held that even if it were to accept the expert' opinion, it did not create a disputed issue of material fact in the case. "Absent evidence of discrimination or a substantial departure from academic norms, a university's assessment of a candidate's scholarly excellence is a matter within the professional judgment of the university." 2013 WL 5459021, 13.

In *Mukhtar v. California State University, Hayward*, 299 F.3d 1053 (9th Cir. 2002), the plaintiff was denied tenure "because of lack of scholarly achievement." *Id*. at 1067. At trial, both sides presented witnesses who testified as to whether the plaintiff was qualified for a tenured appointment. Dr. David Wellman, an expert witness who devoted much of his career to investigating how racism persists without open bigotry, testified that race was a factor in defendant's decision to deny plaintiff tenure. After a nine-day trial, the jury found for plaintiff and awarded him $637,000 in economic, emotional distress, and punitive damages *Id*. at 1061.

On appeal, the defendant challenged the admission of Dr. Wellman's testimony, which focused on eight separate issues: The University's justification for denying tenure lacked "credence;" tenure criteria were applied inconsistently; inconsistent tenure criteria advantaged whites and disadvantaged blacks; tenure criteria shifted when challenged; statistical evidence showed disparate treatment; procedural violations occurred in the tenure process; university officials trivialized and

dismissed plaintiff's qualifications and accomplishments; and university officials failed to follow procedures for reducing racial inequality.

The question on appeal was whether the district court fulfilled its obligation to ensure that the testimony of an expert witness was sufficiently reliable before it was presented to the jury. *Id*. at 1056. The court of appeals expressed substantial discomfort with the district court's handling of Wellman's testimony. Among its concerns was the court's failure to have determined whether that testimony would be helpful to the jury. The Court of Appeals expressed no opinion on that issue, noting that the defendant had conceded at oral argument that Dr. Wellman's testimony was relevant. *Id*. at 1063 n. 7. It did conclude the district court abdicated its gatekeeping role by failing to make *any* determination that Dr. Wellman's testimony was reliable and, thus, did not fulfill its obligation under *Daubert* and its progeny. *Id*. at 1066.

The court then examined the evidence without considering Wellman's opinions: "Once Dr. Wellman's testimony is excluded, the remaining evidence seems to indicate, at most, a mere difference of academic opinion—not discrimination—and does not undermine the University's nondiscriminatory reason for denying [plaintiff] tenure. Indeed, academic tenure decisions involve *subjective judgments* on scholarship that neither courts nor juries are well qualified to make." *Id*. at 1067 (Emphasis supplied). The court held that it was error to have admitted Wellman's testimony without compliance with *Daubert* and that error was not harmless.[15]

None of these cases then is of help to the plaintiff. or alters the result reached in this Opinion.

_____

[15]Later, the Ninth Circuit overruled *Mukhtar* to the extent that it had held that it required that *Daubert* findings always be made by the district *court. Estate of Barabin v. AstenJohnson, Inc*,. 740 F.3d 457, 467 (9th Cir.2014).

In the end, the testimony Dr. Goswami proffers from the six proposed experts is merely their subjective opinions about the quality of Dr. Goswami's scholarship and the prospective value of her work to postcolonial feminism. Their opinions are essentially the same as those of the DePaul professors who voted for her and add nothing new to the calculus. Their opinions are no more "objective" than the opinions of her detractors. Judge Friendly, it may be noted, thought that clarity, like beauty, is in the eye of the beholder, *see NLRB v. Southland Paint Co.*, 394 F.2d 717, 727 (5th Cir. 1968), and at least one court has concluded that so is succinctness. *Myers v. Gulf Oil Corp.*, 731 F.2d 281 (5th Cir. 1984). Dr. Goswami's admirers have these and other subjective views about her work. Those opinions do not, because they cannot, point to fixed, objective criteria against which they or DePaul's contrary opinions can be measured..

Suppose Dr. Goswami submitted a manuscript to a publisher and the publisher rejected it. What she is trying to do here is akin to finding another publisher who liked the material and saying that this proves the first publisher was "wrong." The publisher may have made a poor judgment– depending on ultimate sales – but it was not "wrong." It simply would have had a different opinion of her work, in much the same way as the various professors do here. Accordingly, we must conclude that Dr. Goswami has not met her burden of demonstrating her proffered expert opinions are admissible under *Daubert* and Fed.R.Evid. 702.

## CONCLUSION

Learned Hand once observed that "values are incommensurables...." *Posusta v. United States*, 285 F.2d 533, 535 (2nd Cir. 1961). And so it is usually idle to talk about the objective nature of philosophers' critiques of the quality of the "scholarship" of other philosophers. Indeed, the very nature of the enterprise necessarily involves subjective assessments, for "there is no common unit of measure by which to judge scholarship." *Zahorik,* 729 F.2d at 92–93. There certainly are

none in this case, where the units of measure employed by the plaintiff's own witnesses are: careful, innovative, vital, thought provoking, outstanding, wide-ranging, theoretically sophisticated, imaginative, courageous, solid, careful, excellent, original, high quality, strong, bold, ambitious, nuanced, top-notch, lucid, eloquent, full of rich implications for future research in critical theory, feminism, post-colonial theory, and race theory, and breathtakingly brave.

DePaul's Motion to Bar [119] is granted.

_____
United States Magistrate Judge

April 4, 2014