**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Namita Goswami, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12 CV 7167 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| DePaul University and Peg Birmingham, | ) | Jury Trial Demanded |
| Elizabeth Rottenberg, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS DEPAUL UNIVERSITY**
**AND PEG BIRMINGHAM, PH.D.'S MOTION FOR SUMMARY JUDGMENT**

Kerryann M. Haase
Amy Schmidt Jones
Sarah E. Flotte

Michael Best & Friedrich LLP
180 North Stetson Avenue, Suite 2000
Chicago, Illinois 60601
312-222-0800

100 East Wisconsin Avenue, Suite 3300
Milwaukee, Wisconsin 53202
414-271-6560

June 6, 2014

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD ........................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

I.   Plaintiff's Discrimination Claims As To Her Tenure Denial Cannot Survive Summary Judgment (Counts I And V). ................................................................................................. 4

  A.   Under Controlling Seventh Circuit Authority, Plaintiff Faces An Uphill Battle In Proving Discrimination With Respect To Her Tenure Denial. ............................................... 4

  B.   Plaintiff Must Produce "Clear Evidence" Of Discrimination Through The Direct Or Indirect Method Of Proof. ................................................................................................... 6

  C.   Plaintiff's Claims Also Are Subject To The "Cat's Paw" Standard Of Proof. .............. 7

  D.   The Undisputed Material Facts Refute Plaintiff's Claim That DePaul Denied Her Tenure Because Of Her Sex, Race, Color, or National Origin. ............................................... 9

    1.   Plaintiff Has No Direct Case Of Discrimination By Any Individual Member Of The Department Majority Or The Majority As A Whole. ......................................................... 9

    2.   The Undisputed Facts Preclude An Indirect Case Of Discrimination. ..................... 11

      a.   Defendant Has Proffered A Legitimate, Non-Discriminatory Reason For Denying Plaintiff Tenure:  Inadequate Scholarship. .................................................................... 12

      b.   Plaintiff Cannot Establish That The Department Majority's Negative Opinion Of Her Scholarship Was Pretextual. ................................................................................... 16

        (1)   Plaintiff's Admissions Doom Her Claim Of Pretext. .................................. 16

        (2)   Plaintiff Cannot Establish Pretext By Showing Disparate Treatment of a Similarly Situated Tenure Candidate. ...................................................................... 17

        (3)   Differences of Opinion Cannot Establish Pretext. ....................................... 20

    3.   The Record Contains No Evidence That Any Discriminatory Actor "Decisively Influenced" The Department Majority Opinion or Father Holtschneider's Ultimate Decision On Tenure. ................................................................................................... 21

    4.   The Claim For Race And Color Discrimination Against Birmingham In The Tenure Denial Cannot Survive Any Reading Of The Record. .................................................... 23

II.    Plaintiff Has No Viable Claim For Retaliation In The Denial Of Her Tenure Application.................................................................................................................. 24

    A.    Plaintiff's Retaliation Claims Fail Under The Direct Method Of Proof...................... 25

        1.    Plaintiff Did Not Engage In Protected Activity Before The Tenure Denial............. 25

        2.    The Undisputed Facts Negate Any Causal Link Between Plaintiff's Complaint to the Dean And The Tenure Denial. .......................................................................................... 26

    B.    Plaintiff's Claims Fail Under The Indirect Method Of Proof...................................... 27

    C.    Birmingham Cannot Be Individually Liable For Retaliation Under Section 1981 Because She Is Not Responsible For Plaintiff's Tenure Denial. ........................................... 27

III.    Plaintiff's Section 1981 Claims Of Race And Color Discrimination In The Terms And Conditions Of Employment Also Cannot Survive Summary Judgment. ................................. 27

    A.    Plaintiff Did Not Experience Severe Or Pervasive Harassment................................... 28

    B.    The Alleged Harassment Lacks Any Connection To Race Or Color. .......................... 30

IV.    The Undisputed Facts Refute Any Claimed Breach Of Depaul's Contractual Obligations To Plaintiff. ...................................................................................................... 31

    A.    Plaintiff's Contract With DePaul Did Not Promise Tenure.......................................... 31

    B.    DePaul Met All Of Its Contractual Obligations With Respect To Plaintiff's Tenure Consideration. ...................................................................................................................... 32

        1.    DePaul Afforded Plaintiff A Full And Fair Review Of Her Tenure Application Consistent With The Faculty Handbook............................................................................ 32

        2.    DePaul Offered Plaintiff Process With Respect To Her Tenure Review Beyond That Required By Contract. ..................................................................................................... 34

        3.    Plaintiff's Pre-Tenure Reviews Conformed To The Requirements Of The Faculty Handbook........................................................................................................................... 36

        4.    DePaul's Denial Of Plaintiff's Tenure Application Did Not Violate Her Academic Freedom. ........................................................................................................................... 38

    C.    None Of The Alleged "Breaches" Damaged Plaintiff. .................................................. 39

CONCLUSION........................................................................................................................ 40

## **TABLE OF AUTHORITIES**

**Page(s)**

**C**ASES

*A.V. Consultants, Inc. v. Barnes*,
  978 F.2d 996 (7th Cir. 1992) ..............................................................................39

*Abuelyaman v. Illinois State Univ.*,
  667 F.3d 800 (7th Cir. 2011) .............................................................................25

*Adams v. Wal-Mart Stores, Inc.*,
  324 F.3d 935 (7th Cir. 2003) ............................................................................6, 7

*Adelman-Reyes v. St. Xavier Univ.*,
  500 F.3d 662 (7th Cir. 2007) ...........................................................................6, 20

*Adelman-Reyes v. St. Xavier Univ.*,
  500 F.3d 665 (7th Cir. 2007) ..............................................................................12

*Adelman-Reyes v. St. Xavier Univ.*,
  500 F.3d 666 (7th Cir. 2007) ..............................................................................16

*Adelman-Reyes v. St. Xavier Univ.*,
  500 F.3d 667 (7th Cir. 2007) ...................................................................4, 5, 17, 23

*Adelman-Reyes v. St. Xavier Univ.*,
  500 F3d 668 (7th Cir. 2007) ...............................................................................20

*Adelman-Reyes v. St. Xavier Univ.*,
  No. 05 C 3269, 2006 U.S. Dist. LEXIS 24558 (N.D. Ill. Apr. 28, 2006).............11, 36, 39, 40

*Andonissamy v. Hewlett-Packard Co.*,
  547 F.3d 841 (7th Cir. 2008) ..............................................................................26

*Beamon v Marshall & Ilsley Trust Co.*,
  411 F.3d 854 (7th Cir. 2005) ...........................................................................28, 30

*Blasdel v. Northwestern Univ.*,
  687 F.3d 813 (7th Cir. 2012) ...........................................................................4, 20

*Blasdel v. Northwestern Univ.*,
  687 F.3d 816 (7th Cir. 2012) ...........................................................................5,18

*Blasdel v. Northwestern Univ.*,
  687 F.3d 817 (7th Cir. 2012) ..........................................................................5, 6, 8

*Blasdel v. Northwestern Univ.*,
    687 F.3d 820 (7th Cir. 2012) .................................................................................11, 16, 17

*Blasdel v. Northwestern Univ.*,
    687 F.3d 823 (7th Cir. 2012) ...............................................................................................8

*Brewer v. Bd. of Trs.*,
    479 F.3d 908 (7th Cir. 2007) ...............................................................................................8

*Brown v. Advocate S. Suburban Hosp.*,
    700 F.3d 1101 (7th Cir. 2012) .............................................................................................6

*Brown v. Advocate S. Suburban Hosp.*,
    700 F.3d 1104 (7th Cir. 2012) ...........................................................................................18

*Brown v. Advocate S. Suburban Hosp.*,
    700 F.3d 1106 (7th Cir. 2012) ....................................................................................25, 30

*Burrell v. City of Mattoon*,
    378 F.3d 642 (7th Cir. 2004) .............................................................................................31

*Carlile v. South Routt Sch. Dist. RE-3J*,
    739 F.2d 1496 (10th Cir. 1984) ...........................................................................................5

*Cerros v. Steel Techs., Inc.*,
    288 F.3d 1040 (7th Cir. 2002) ...........................................................................................29

*Cerutti v. BASF Corp.*,
    349 F.3d 1055 (7th Cir. 2003) ....................................................................................6, 7, 8

*Dass v. Chicago Bd. of Educ.*,
    675 F.3d 1060 (7th Cir. 2012) .............................................................................................6

*Davidson v. Midelfort Clinic, Ltd*.,
    133 F.3d 499 (7th Cir. 1998) .............................................................................................26

*Davis v. Time Warner Cable of Se. Wis., L.P.*,
    651 F.3d 664 (7th Cir. 2011) .............................................................................................26

*Dobbs-Weinstein v. Vanderbilt Univ.*,
    185 F.3d 542 (6th Cir. 1999) ...............................................................................................5

*EEOC v. WC&M Enters., Inc.*,
    496 F.3d 393 (5th Cir. 2007) .............................................................................................28

*EEOC v. Yellow Freight Sys., Inc.*,
    253 F.3d 943 (7th Cir. 2001) .............................................................................................26

*Ellis v. CCA of Tennessee LLC*,
    650 F.3d 640 (7th Cir. 2011) ..................................................................28

*Farrell v. Butler Univ.*,
    421 F.3d 609 (7th Cir. 2005) ..............................................................5, 18

*Fields v. Clark Univ.*,
    966 F.2d 49 (1st Cir. 1992) .....................................................................4

*Filipovic v. K & R Express Sys., Inc.*,
    176 F.3d 390 (7th Cir. 1999) ..................................................................26

*Frederick v. Metro. State Univ. of Denver Bd. of Trs.*,
    535 Fed. Appx. 713 (10th Cir. 2013) ......................................................23

*Goswami v. DePaul Univ.*,
    No. 12 C 7167, 2014 U.S. Dist. LEXIS 46509 (N.D. Ill. Apr. 7, 2014) (Cole, J) ...................8

*Herrnreiter v. Chicago Housing Auth.*,
    315 F.3d 742 (7th Cir. 2002) ..................................................................10

*Hrobowski v. Worthington Steel Co.*,
    358 F.3d 473 (7th Cir. 2004) ..................................................................29

*Jiminez v. Mary Washington College*,
    57 F.3d 369 (4th Cir. 1995) .....................................................................4

*Kuhn v. Ball State Univ.*,
    78 F.3d 330 (7th Cir. 1996) .....................................................................6

*Kunda v. Muhlenberg College*,
    621 F.2d 532 (3d Cir. 1980) .....................................................................4

*Lim v. Trs. of Ind. Univ.*,
    297 F.3d 575 (7th Cir. 2002) .....................................................................6

*Logan v. Kautex Textron N. Am.*,
    259 F.3d 635 (7th Cir. 2001) ..................................................................28

*Lynn v. Regents of Univ. of Cal.*,
    656 F.2d 1337 (9th Cir, 1981) .................................................................5

*Maarouf v. Walker Mfg. Co.*,
    210 F.3d 750 (7th Cir. 2000) .....................................................................8

*Maestas v. Segura*,
    416 F.3d 1182 (10th Cir. 2005) ..............................................................24

v

*Megill v. Bd. of Regents*,
   541 F.2d 1073 (5th Cir. 1976) ...............................................................................5

*Millbrook v. IBP, Inc.*,
   280 F.3d 1169 (7th Cir. 2002) .............................................................................18

*Miller v. Borden, Inc.*,
   168 F.3d 308 (7th Cir. 1999) .................................................................................6

*Miller v. Trs. of Univ. of Pa.*,
   No. 91-7358,1993 U.S. Dist. LEXIS 13141 (E.D. Pa. July 30, 1993)...................33

*Namenwirth v. Bd. of Regents*,
   769 F.2d 1235 (7th Cir. 1985) .................................................................4, 6, 16, 20

*Nat'l R.R. Passenger Corp.* v. *Morgan*,
   536 U.S. 101 (2002).............................................................................................27

*Negussey v. Syracuse Univ.*,
   No. 95-CV-1827, 1997 U.S. Dist. LEXIS 3853 (N.D.N.Y Mar. 24, 1997) ...........40

*Northington v. H & M Int'l*,
   712 F.3d 1062 (7th Cir. 2013) .............................................................................26

*Ogle v. Wal-Mart Stores East, LP*,
   No. 2:09-CV-317, 2011 U.S. Dist. LEXIS 116212 (N.D. Ind. Sept. 23, 2011) .....26

*Ollman v. Evans*,
   750 F.2d 970 (D.C. Cir. 1984)................................................................................5

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998)...............................................................................................28

*Pourki v. Drexel Univ.*,
   No. 98-4231, 1999 U.S. Dist. LEXIS 4519 (E.D. Pa. Mar. 24, 1999)...................35

*Qamhiyah v. Iowa State Univ. of Sci. & Tech.*,
   566 F.3d 733 (8th Cir. 2009) .................................................................................5

*Qamhiyah v. Iowa State Univ. of Sci. & Tech.*,
   566 F.3d 745 (8th Cir. 2009) ...............................................................................23

*Regents of Univ. of Mich. v. Ewing*,
   474 U.S. 214 (1985)...............................................................................................5

*Rehor v. Case Western Reserve Univ.*,
   331 N.E.2d 416 (Ohio 1975) ...............................................................................36

*Rickher v. Home Depot, Inc.*,
535 F.3d 661 (7th Cir. 2008) ...................................................................................31

*Rozskowiak v. Village of Arlington Heights*,
415 F.3d 608 (7th Cir. 2005) .....................................................................................8

*Russell v. Univ. of Texas*,
234 Fed. Appx. 195 (5th Cir. 2007) ............................................................................8

*Smith v. Bray*,
681 F.3d 888 (7th Cir. 2012) ...................................................................................24

*Smith v. Bray*,
681 F.3d 898 (7th Cir. 2012) ...................................................................................24

*Smith v. Bray*,
681 F.3d 899 (7th Cir. 2012) ...................................................................................27

*Smith v. Bray*,
681 F.3d 900 (7th Cir. 2012) ...................................................................................27

*Smith v. Lafayette Bank & Trust Co.*,
674 F.3d 655 (7th Cir. 2012) ...................................................................................25

*Stephens v. Erickson*,
569 F.3d 779 (7th Cir. 2009) .............................................................................25, 26

*Strahan v. Kirkland*,
287 F.3d 821 (9th Cir. 2002) ...................................................................................24

*Sun v. Bd. of Trustees*,
473 F.3d 799 (7th Cir. 2007) .....................................................................5, 6, 7, 17

*Thompson v. Gordon*,
241 Ill. 2d 428 (2011) ..............................................................................................35

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
133 S. Ct. 2517 (2013) .............................................................................................24

*Vanasco v. Nat'l-Louis Univ.*,
137 F.3d 962 (7th Cir. 1998) .........................................................................6, 16, 17

*Vanasco v. Nat'l-Louis Univ.*,
137 F.3d 968 (7th Cir. 1998) ...................................................................................20

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 1999) .........................................................................................4

*Whittaker v. N. Ill. Univ.*,
    424 F.3d 640 (7th Cir. 2005) ................................................................................28

*Zayas v. Rockford Mem. Hosp.*,
    740 F.3d 1154 (7th Cir. 2014) ...........................................................................16

## INTRODUCTION

*You can fool some of the people all of the time, and all of the people some of the time, but you cannot fool all of the people all of the time.*

Attributed to Abraham Lincoln

Such was the case with Plaintiff Namita Goswami's ("Plaintiff's") quest for tenure at Defendant DePaul University ("DePaul"). DePaul enthusiastically hired Plaintiff into a tenure-track position in 2003, with full knowledge of her sex, race, color, national origin, and areas of academic specialization. (SOF ¶¶ 15-21). Plaintiff had convinced DePaul and more specifically, the tenured faculty in the Ph.D.-granting Department of Philosophy (the "Department"), that even without a Ph.D. in Philosophy, she nonetheless had the chops to produce scholarship of the highest order by building bridges between continental philosophy and postcolonial, feminist, and critical race theories. DePaul took a bet on Plaintiff and gave her the opportunity to earn tenure.

As she moved through her probationary period toward her tenure review, Plaintiff kept up a masquerade that she could meet the Department's high standard for quality scholarship in philosophy. After failing to turn her dissertation into a publishable book, Plaintiff strung her Department along with assurances of substantial progress on and near readiness for publication of her next book project, one that would draw out "conceptual continuities" between post-colonial theory and the work of Theodor Adorno ("Adorno"), a 20th Century continental philosopher well-familiar to her tenured colleagues. (SOF ¶¶ 28, 29, 33-34, 45, 47, 49, 53, 62-65, 79, 81, 85-86, 89, 123). Plaintiff chose to make this manuscript-in-the-works the centerpiece of her purported ongoing research agenda, the existence of which was required for tenure. (*Id.*).

The blindfold was stripped off the eyes of the majority of her Department peers in May 2009, when Plaintiff underwent her final formal probationary review. At that point, mere months from her tenure review, she presented only a rough, typo-ridden, "messy and fraught,"

1

draft book prospectus as evidence of the most substantial research project of her probationary period. (SOF ¶¶ 62-64). Plaintiff was "horrified" when she submitted her prospectus to her colleagues. (SOF 65). The majority of her tenured colleagues in the Department shared her horror when they read what she submitted. (SOF ¶¶ 66-73, 76). They could be fooled no more.

Despite her last minute scramble to cobble together a manuscript, she failed to complete it by the time she submitted her tenure application. (SOF ¶¶ 79-81). The published and unpublished materials that she did submit for tenure only confirmed for the eleven (11)-person majority of tenured faculty in the Department (the "Department Majority") that the quality of her work fell far short of meeting the "most exacting national and international standards" in her field, as required. (SOF ¶¶ 14, 93-96). The Department Majority instead found her work "weak, incoherent, and lack[ing] a conceptual framework." (SOF ¶¶ 94-96). The assessment of deficient quality in Plaintiff's scholarship carried the day through the robust debates that occurred in and were anticipated by DePaul's multi-level tenure review process, which ended with a decision by DePaul's President to deny tenure based on inadequate scholarship. (SOF ¶ SOF ¶¶ 93-114, 125-142).

Plaintiff's current claims of discrimination, retaliation, and breach of contract represent her last-ditch, futile effort to cover-up her inability to produce quality scholarship sufficient to earn her tenure in the Department. With respect to the alleged discrimination and retaliation, Plaintiff admits that she cannot refute the honest, good faith belief of DePaul's President, Father Dennis Holtschneider ("Father Holtschneider"), that her scholarship did not meet the standard required to obtain a lifetime appointment to DePaul's faculty. (SOF ¶¶ 10-14, 140). She cannot say what was "in his heart." (SOF ¶ 139). She also cannot establish the predicate for "cat's paw" liability based upon alleged bias at the Department level; namely, that the Department

Majority provided false information motivated by unlawful discriminatory or retaliatory bias, which then decisively tainted the process up through Father Holtschneider's final decision.

Plaintiff has no direct or indirect evidence that the opinion of the eleven (11) members of the Department Majority regarding the quality of her work resulted from bias based upon her gender, race, color, national origin (Counts III, V). Plaintiff's retaliation claims (Counts IV, VI), in turn, fail for lack of any protected activity on Plaintiff's part prior to the tenure denial, and the absence of any causal link between any purported protected activity and the tenure decision. As to her contract claims (Count I),[1] Plaintiff admittedly had no contractual right to tenure, and she cannot prove up the collateral violations that she claims, none of which can provide her with the remedy she seeks (tenure). Plaintiff's claims amount to nothing more than a defense mechanism to divert blame for her own failure to come up with the goods to earn tenure, a privilege to which she had no entitlement.[2]

## LEGAL STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). "To avoid summary judgment, the nonmovant bears the burden of setting forth specific facts showing that there is a genuine issue for trial." *Id.*

---

[1] On January 14, 2014, the Court dismissed Counts II and VII of Plaintiff's First Amended Complaint, ruling that Plaintiff's claims for tortious interference with prospective economic advantage against Peg Birmingham, Ph.D. (Count II) and Elizabeth Rottenberg, Ph.D. (Count VII) failed to state a claim upon which relief could be granted. *See* Dkt. Nos. 125 and 126.

[2] A complete statement of the material undisputed facts is set forth in Defendant's Local Rule 56.1(A)(3) Statement of Undisputed Material Facts.

**ARGUMENT**

The voluminous record generated in discovery yields nothing that would forestall summary judgment on all remaining claims in the First Amended Complaint. Plaintiff's claims of discrimination with respect to the tenure denial (Counts III and V), retaliation as to the tenure denial (Counts IV and VI), harassment based upon race and color (Count III), and breach of contract (Count I), all fail under the applicable standards of proof, as set forth below.

I.  **PLAINTIFF'S DISCRIMINATION CLAIMS AS TO HER TENURE DENIAL CANNOT SURVIVE SUMMARY JUDGMENT (COUNTS III AND V).**

   A.  **Under Controlling Seventh Circuit Authority, Plaintiff Faces An Uphill Battle In Proving Discrimination With Respect To Her Tenure Denial.**

With respect to Plaintiff's marquee claim – that she was denied tenure because of her gender, race, color, and national origin – Seventh Circuit tenure decisions set a high bar. The Seventh Circuit has recognized the difficulty in proving discrimination in a subjective academic judgment, such as the assessment of the quality of a faculty member's scholarship. *See Blasdel v. Northwestern Univ.*, 687 F.3d 813, 815 (7th Cir. 2012) ("[P]ractical considerations make a challenge to the denial of tenure at the college or university level an uphill fight – notably the absence of fixed, objective criteria for tenure at that level."); *Namenwirth v. Bd. of Regents*, 769 F.2d 1235, 1243 (7th Cir. 1985) ("Tenure decisions have always relied primarily on judgments about academic potential, and there is no algorithm for producing those judgments."). The Seventh Circuit has explained that "scholars are in the best position to make the highly subjective judgments related to the review of scholarship…." *Adelman-Reyes*, 500 F.3d at 667. In this respect, the Seventh Circuit falls in line with circuit courts across the country that have shown deference to universities' subjective judgments regarding qualifications for tenure.[3]

---

[3] *See Fields v. Clark Univ.*, 966 F.2d 49, 54 (1st Cir. 1992); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 43 (2d Cir. 1999); *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir. 1980); *Jiminez v. Mary*

This deference stems not from any immunity to the anti-discrimination statutes – which DePaul does not claim to have – but the First Amendment.  Courts "must not ignore the interest of colleges and universities in institutional autonomy," as guaranteed by the First Amendment. *Blasdel*, 687 F.3d at 816. "[A]cademic freedom includes the authority of the university to manage an academic community and evaluate teaching and scholarship free from interference by other units of government, including the courts." *Id*. (*quoting Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005) (en banc)). Thus, "courts tread cautiously when asked to intervene in the tenure determination itself." *Id*.  As the U.S. Supreme Court has made clear: "When judges are asked to review the substance of a genuinely academic decision, ... they should show great respect for the faculty's professional judgment."  *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225 (1985).

Even more, "[t]he decisionmaking process in an academic hierarchy creates further complication" for a plaintiff seeking to prove discrimination in a tenure decision.  *Blasdel*, 687 F.3d at 817.  Where, as here, a tenure process involves multiple levels of review, absent evidence that the ultimate decisionmaker made a decision motivated by bias, or was "decisively influenced" by false information provided by someone who was so motivated, any inference of discrimination crumbles.  *Blasdel,* 687 F.3d at 817, 823*; see also Sun v. Bd. of Trustees*, 473 F.3d 799, 814-15 (7th Cir. 2007) (holding that proving pretext in tenure decision is "extremely difficult burden to carry due to the layered and subjective nature of the tenure process").

Distilling these considerations, the Seventh Circuit and this Court have directed that a tenure assessment must not be disturbed "in the absence of clear discrimination."  *Adelman-Reyes*, 500 F.3d at 667 (*quoting Farrell v. Butler Univ*., 421 F.3d 609, 616 (7th Cir. 2005)); *see*

---

*Washington College*, 57 F.3d 369, 376-77 (4th Cir. 1995); *Megill v. Bd. of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976); *Dobbs-Weinstein v. Vanderbilt Univ*., 185 F.3d 542, 545 (6th Cir. 1999); *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 741-42 (8th Cir. 2009); *Lynn v. Regents of Univ. of Cal*., 656 F.2d 1337, 1342-44 (9th Cir. 1981); *Carlile v. South Routt Sch. Dist. RE-3J*, 739 F.2d 1496, 1500 (10th Cir. 1984); *Ollman v. Evans*, 750 F.2d 970, 1008 (D.C. Cir. 1984).

*also* (Dkt. 151 at p. 4). Consistent with this rigorous standard, the Seventh Circuit repeatedly has upheld summary judgment for university defendants. *See Blasdel*, 687 F.3d at 817; *see also Adelman-Reyes*, 500 F.3d 662; *Sun*, 473 F.3d at 814; *Lim v. Trs. of Ind. Univ.*, 297 F.3d 575 (7th Cir. 2002); *Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 966 (7th Cir. 1998); *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332-33 (7th Cir. 1996); *Namenwirth*, 769 F.2d at 1242.

### B. Plaintiff Must Produce "Clear Evidence" Of Discrimination Through The Direct Or Indirect Method Of Proof.

Plaintiff asserts her claims of gender, race, color, and national origin discrimination in the denial of her tenure application pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"). Plaintiff also asserts race and color discrimination claims as to the tenure denial pursuant to 42 U.S.C. § 1981.[4] As to all of these claims, Plaintiff cannot show "clear evidence" of discrimination in her tenure denial, as she must, absent competent record evidence that satisfies the direct or indirect method of proof. *See Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1068 (7th Cir. 2012).

"Under the direct method, the plaintiff must show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose…." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003). Direct evidence amounts to an admission of discriminatory intent, the classic example of which is a statement by a decisionmaker relating to the contested employment decision that reveals the decision was based on illegal criteria. *See Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *see also Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Circumstantial evidence can create a triable issue of fact under the direct method only if it

---

[4] Because "the elements and methods of proof for § 1981 claims are essentially identical to those under Title VII," "[the court] need not analyze [Plaintiff's claims] separately." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012).

"compos[es] a convincing mosaic of discrimination against the plaintiff." *Adams*, 324 F.3d at 939 (internal quotations omitted). This circumstantial evidence "must point directly to a discriminatory reason for the employer's action. Otherwise the plaintiff must proceed by way of the well-known indirect route." *Id.*

The indirect method of proof follows the familiar *McDonnell-Douglas* burden-shifting methodology, under which Plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. To establish a *prima facie* case of discrimination as to a tenure denial, Plaintiff must prove: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for tenure; (3) [s]he was denied tenure; and (4) a similarly situated applicant not in the protected class was granted tenure." *Sun*, 473 F.3d at 814. If a plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions; the plaintiff then has the ultimate burden to prove that the offered reason is a pretext for unlawful discrimination. *See Cerutti*, 349 F.3d at 1061.

### C.      <u>Plaintiff's Claims Also Are Subject To The "Cat's Paw" Standard Of Proof.</u>

Plaintiff carries an additional burden of proof on her tenure claims, which stems from the multi-level review process that yielded the contested decision. Plaintiff cannot dispute that Father Holtschneider, the ultimate decisionmaker on her tenure application, honestly and in good faith believed his stated reasons for denying plaintiff tenure: namely, the insufficient quality of her scholarship. (SOF ¶¶ 134-142). Plaintiff therefore has no competent evidence that Father Holtschneider intentionally acted out of a discriminatory motivation.

Plaintiff instead proceeds on a "cat's paw" theory of liability, contending that the Department Majority issued an allegedly biased recommendation, and that biased recommendation tainted subsequent decisionmaking up to and including the President. To make such a showing in the context of tenure, Plaintiff must show the President was "decisively

influenced by someone who was prejudiced." *See Goswami v. DePaul Univ.*, No. 12 C 7167, 2014 U.S. Dist. LEXIS 46509, at *2 n.2 (N.D. Ill. Apr. 7, 2014) (Cole, J.).; *see also Blasdel*, 687 F.3d at 817. Such would be the case if Father Holtschneider was "manipulated by an unscrupulous underling," and reached his decision based upon false information provided by the underling out of a discriminatory motivation. *See Blasdel*, 687 F.3d at 823 *citing Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 n.1 (2011) (holding that plaintiff could pursue "cat's paw" theory of liability under USERRA where supervisor based termination decision on false accusation provided by biased subordinate) *and Brewer v. Bd. of Trs.*, 479 F.3d 908, 917 (7th Cir. 2007) (actions of biased employee can be imputed to employer under Title VII where biased employee influences decisionmaker by supplying misinformation or incomplete information)).

Here, the contested and allegedly infectious Department Majority opinion was the consensus expression of eleven (11) tenured faculty members. (SOF ¶¶ 94-96). In this context, any evidence of discriminatory animus on the part of one faculty member in the Department Majority (none of which exists) will not forestall summary judgment absent proof of a causal link between that discriminatory opinion and the opinion of the group as a whole. *Cerutti,* 349 F.3d at 1063 (finding "plaintiffs' evidence of [two committee member's] alleged animus" irrelevant because plaintiffs presented no "evidence from which a reasonable jury could infer that their animus influenced the selection panels' deliberations to such a degree so as to result in the plaintiffs' terminations"); *see also Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 613 (7th Cir. 2005); *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 754-55 (7th Cir. 2000); *Russell v. Univ. of Texas*, 234 Fed. Appx. 195, 203 (5th Cir. 2007) ("Without any evidence that [the

alleged bad actor] influenced the committee, we cannot impute [his] allegedly discriminatory animus to the committee's selection.").[5]

Thus, to carry the heavy burden of proof to show discrimination as to her tenure denial, utilizing the "cat's paw" theory, Plaintiff must show that (a) the evaluation on the quality of her scholarship expressed by the Department Majority constituted a discriminatory act (using the direct or indirect method of proof) by one or more of the members of the Majority; (b) that this discriminatory act "decisively influenced" the Majority opinion (*i.e.*, was a proximate cause, without which the opinion would not have been rendered); and (c) that this discriminatory opinion then "decisively influenced" President Holtschneider's decision to deny tenure based on the quality of scholarship. Plaintiff comes nowhere close to meeting this burden of proof.

> **D.** **The Undisputed Material Facts Refute Plaintiff's Claim That DePaul Denied Her Tenure Because Of Her Sex, Race, Color, or National Origin.**

>> **1.** **Plaintiff Has No Direct Case Of Discrimination By Any Individual Member Of The Department Majority Or The Majority As A Whole.**

The Court will scour the voluminous record in this case in vain to find any competent evidence that supports a direct inference that any of the members of the Department Majority found the quality of Plaintiff's work inadequate because she is a woman, Southeast Asian, brown, or Indian. Plaintiff's admission that she cannot speak to what was in the hearts of her Departmental colleagues (or the UBPT or President Holtschneider, for that matter) cements the absence of any direct proof of discrimination. (SOF ¶¶ 139-140).

The competent proof only negates an inference of bias, as tenured faculty who voted against her tenure once stood among her supporters (when Plaintiff had them fooled that she

---

[5] The UBPT, like the Department, made a group recommendation. DePaul does not understand Plaintiff to be claiming that any individual UBPT member acted out of personal discriminatory motives in voting against her tenure case. To the extent that she does make such a claim, however, she would need to show either that all six (6) members of the UBPT who voted against her case did so with discriminatory intent, or that one or more of those UBPT members had such an intent and "decisively influenced" the group.

could produce future, quality scholarship), thereby establishing the basis for a "same-actor" inference of non-discrimination. This inference rests upon common-sense: "When the same person hires [or otherwise supports] and later fires the employee who claims that [her] firing was discriminatory, judges are skeptical, because why would someone who disliked whites, or Germans, or members of some other group to be working for him have hired such a person in the first place?" *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 747 (7th Cir. 2002).

Common sense speaks volumes in this case. With the exception of Michael Naas, Ph.D. ("Naas") (who Plaintiff never entirely fooled, because he carefully reviewed Plaintiff's writing before her hire and identified its weakness from the outset), the tenured faculty in the Department of Philosophy at the time of Plaintiff's recruitment to DePaul voted to hire her, knowing full well that she is a woman, Asian, brown, and Indian. (SOF ¶¶ 15-21). Indeed, Defendant Peg Birmingham, Ph.D. ("Birmingham") helped select Plaintiff from a group of over 100 candidates to interview at DePaul. (SOF ¶¶ 17-18). Birmingham – the alleged lead bad actor – overflowed with enthusiasm at the prospect of bringing Plaintiff on board, dubbing Plaintiff "the next Gyatri Spivak," in reference to a preeminent postcolonial scholar. (SOF ¶ 19). She appointed Plaintiff to a leadership role early on. (SOF ¶ 27). She then recommended contract renewal for Plaintiff in every informal review that she conducted as Chair, even when she had growing reservations about Plaintiff's performance. (SOF ¶¶ 23, 29, 41-42).

Richard Lee, Ph.D. ("Lee") similarly recommended a series of contract renewals for Plaintiff when serving as Chair, and he gave Plaintiff glowing annual merit reviews, putting faith in her representations of a substantial on-going research agenda, focused on her (non-existent and ill-fated) manuscript. (SOF ¶¶ 46-51; SOF ¶ 45 ("I know from our conversations that you also have a substantial, on-going research agenda that currently focuses on your book

manuscript."). Tenured faculty members David Pellauer, Ph.D. ("Pellauer"), Peter Steeves, Ph.D. ("Steeves"), William McNeill, Ph.D. ("McNeill"), Naas and Mollie Painter-Morland, Ph.D. "Painter-Morland") also recommended in favor of renewal for Plaintiff in early reviews, also betting on the promise of Plaintiff's proffered research plans. (SOF ¶¶ 29, 49-51).

These early supporters of Plaintiff later voted to recommend against tenure. (SOF ¶¶ 15, 21, 29, 49-51, 93-113). Something obviously changed along the road, but it was not Plaintiff's sex, race, color, or national origin. The tipping point was the realization (by those Plaintiff once had fooled) that she had not delivered the goods she had promised. (SOF ¶ 67 ("[W]e concluded that [the prospectus] does not demonstrate that in six years Professor Goswami has been able to grow into the role envisioned for her in the Department."); SOF ¶ 91 ("Many pointed to their own excitement with regard to the self-description of [Plaintiff's] work, to the excitement of the promise, yet are disappointed with the work she has produced. . . . The point is that it is with the work that [Plaintiff's] case stands or falls.")). No direct case of discrimination will lie on these facts. *See Adelman-Reyes v. St. Xavier Univ.*, No. 05 C 3269, 2006 U.S. Dist. LEXIS 24558, at *18-19 (N.D. Ill. Apr. 28, 2006) ("No reasonable trier of fact could conclude that, despite [the supervisor's] continual support of [plaintiff's] career goals, the one time when [the supervisor] did not recommend what [plaintiff] desired, [the supervisor] was secretly discriminating against [plaintiff]"); *see also Blasdel*, 687 F.3d at 820 (explaining that department head's enthusiastic support of plaintiff at hire undermines inference of gender discrimination).

2. The Undisputed Facts Preclude An Indirect Case Of Discrimination.

Turning to the indirect case, Plaintiff's *prima facie* case falls short on elements (2) (she was not qualified for tenure) and (4) (she has no evidence that a similarly situated male received tenure). "The *prima facie* case and pretext inquiries often overlap," and when that occurs, the Court can "skip the analysis of a plaintiff's *prima facie* case and proceed directly to the

11

evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." *Adelman-Reyes*, 500 F.3d at 665. As DePaul's proffered reason for its decision to deny tenure is Plaintiff's lack of qualification for tenure, DePaul will address the deficiencies in Plaintiff's *prima facie* case in the context of the pretext analysis.

> a.  Defendant Has Proffered A Legitimate, Non-Discriminatory Reason For Denying Plaintiff Tenure: Inadequate Scholarship.

Father Holtschneider told Plaintiff the legitimate, non-discriminatory reason for the denial of her tenure application: "[Y]our record of scholarship did not sufficiently meet the criteria for promotion and tenure." (SOF ¶ 142). Father Holtschneider accepted the Department Majority opinion on her scholarship, articulated in the Department Report as follows:

> [T]he majority vote to deny tenure and promotion to Professor Goswami's rests largely on the quality of her research and what this says about her ability to train doctoral students in philosophy. The view of the majority is that the research is weak, incoherent, and lacks a conceptual framework. On the basis of the low quality of Prof. Goswami's research, the majority of the department concluded that Prof. Goswami is not someone who is able to train a new generation of post-colonial theorists in a philosophy doctoral program.

(SOF ¶ 138).

The record evidence concerning the underpinnings of the Department Majority view is uncontroverted and devastating to Plaintiff's case. After years of talk about her excitement about her book project on Adorno and postcolonial theory, (SOF ¶¶ 45, 47, 49, 53, 62-65, 79, 81, 85-86, 89, 123; SOF ¶ 53 ("I am terribly excited about this project and I am eagerly anticipating this book coming to fruition.")), and repeated representations that her manuscript was ready for publishers, (SOF ¶ 47 ("I am making significant process on this manuscript and will submit it for publication consideration in June 2007."); SOF ¶ 53 ("I am making significant process on this manuscript and will submit a completed prospectus and 2 chapters for review to presses in early spring [2009].")), Plaintiff arrived at her May 2009 Formal Review, on the eve of her tenure

review, with only a very rough draft book prospectus to show for her labors on her most substantial and ambitious research project. (SOF ¶ 62-64). In *her* words, the prospectus was unproofread, not fit for public consumption, not ready for publisher review, and "messy and fraught." (SOF ¶ 64). She felt "horrified" to show it to her colleagues precisely because she knew it reflected poorly on her. (SOF ¶ 65). It did indeed, as shown in the recommendation of the personnel committee and then the Department not to renew her contract for the 2010-2011 calendar year. (SOF ¶ 67 ("The overall thesis is not well- or clearly stated; there is little evidence that the implications of what is proposed have been considered; and much of the writing is poor. . . . [M]embers of the Committee find that her efforts to extend her research to more than article length and thus meet the Department's expectations for a significant publication at all levels from articles to books and monographs has had a detrimental effect on the quality of her scholarship."). Plaintiff's Department supporters who authored the "Minority Report" could not even bring themselves to comment on the prospectus, much less speak positively of it. (SOF ¶ 74). Ignoring the elephant in the room, they focused instead on her shorter writings. (*Id.*).

Plaintiff worked in a Ph.D.-granting Department that expected scholarship at the most exacting national and international standards. (SOF ¶ 14). "Horrifying" was not that. (SOF ¶¶ 14, 65). After a full year of research leave, flexible scheduling during which she had no teaching duties, six years to demonstrate her ability to develop a substantial, on-going research agenda, and promises of a book well on its way to completion, Plaintiff arrived at her formal review on the eve of tenure and (undisputedly) laid an egg. (SOF ¶¶ 48, 63-65). A majority of the tenured faculty recognized finally, and with alarm, that they had been fooled. (SOF ¶ 66 ("[We] were sort of shocked with just how poor quality it all was."); SOF ¶¶ 72-73 ("[W]hen [one faculty member] read the Personnel Committee's report, he couldn't believe the writing could possibly

be as bad as the Committee made it out . . . . But after reading the prospectus twice and then all of the published writing, he was convinced that the written work was as bad as . . . indicated.")).

Plaintiff scrambled to cobble together a manuscript by the time her tenure application was due in November 2009, and secured a conditional "advance" contract with a press after her senior faculty supporter lied to the publisher about how "great" Plaintiff's non-existent manuscript was (yet another person fooled by persuasive assertions of Plaintiff's promise). (SOF ¶¶ 79-81). Unsurprisingly, Plaintiff could not accomplish in six months what she had been unable to do in six years. (SOF ¶ 125). Come time of tenure, Plaintiff had not completed her book on Adorno and postcolonial theory. (SOF ¶¶ 85-86, 91). Plaintiff had only drafted three chapters of the book, and those chapters merely were re-drafts of previously published articles, which did not focus on Adorno. (SOF ¶¶ 85, 91). As a result, Plaintiff's external reviewers were unable to opine on the quality of her projected book, which would hang greatly on the Adorno chapters. (SOF ¶¶ 89-90).

The examples of scholarship that she submitted at tenure did nothing to allay the previous concerns of the Department Majority -- that the submitted work, including published pieces and book excerpts, only confirmed the worst. (SOF ¶¶ 89, 93, 115-118). Those concerns rang clear in the testimony of the faculty members who voted with the Majority. *See* (SOF ¶ 98) (Krell: "The consensus for me of reading all of the published work and the proposed work was that there was a terrible problem with coherency of thought…I did not find the candidate able to construct an argument and make it coherent and to make it stick. And one of the things you do in teaching writing is to do precisely that. So I was worried about this, genuinely."); (SOF ¶ 101) (Painter-Morland: "the quality of the writing was really a problem."); (SOF ¶ 104) (Lee: "I felt that almost in its entirety I found it hard to find an argument to structure. I felt like there was an

14

awful lot of technical terms and what one might also call jargon that were doing work -- were thought to be doing work that they weren't doing. That there was a lack of clear presentation of the -- of anything like a thesis or position."); (SOF ¶ 102) (Werhane: "…I thought it was completely unclear[,] that it was muddled writing … you couldn't get a grip on what the thesis was, what the contribution to the thinking of Adorno and her work and that it was so poorly constructed that I couldn't understand what it was about."); (SOF ¶ 103) (McNeill: Plaintiff's written work was "weak and not particularly philosophical."); (SOF ¶ 100) (Pellauer: Plaintiff's prospectus was "not publishable"); (SOF ¶ 106) (Steeves: Plaintiff's writing "evidenced an inability to conceptualize ideas, lacked an overall thesis, and did not contain supported arguments."); (SOF ¶ 108) (Thompson: "I was stunned by how appallingly bad it was…I found them to be poorly written in the sense that they could not and did not express clearly a problemati[c] that was to be investigated, a thesis, a claim about that problemati[c], and did not lay out a clear trajectory about how that problemati[c] would be argued over the course of, in this case, a book or an article or whatever. That's what I meant by conceptual problemization…"); (SOF ¶ 107) (Naas: Plaintiff's writing showed "an inability to conceptualize or make transitions, used disconnected quotations, and contained poor grammar and excessive fragments."); (SOF ¶ 110) (Birmingham: "Having read almost everything that was in the box -- I thought that the written work was -- it lacked really any kind of coherent thesis that one could follow. The arguments were not developed well if at all. They were full of jargon, and the jargon was substituting for -- again for argument as to why these terms might be used and what connections they had to the overall framework...") (SOF ¶ 113) (Rottenberg: "I thought it was terrible… The writing was so bad it was impossible to figure out what the argument was. She didn't know how to use citations. She didn't know how to make transitions. She didn't know how to differentiate

her own voice from other voices; namely, the quotes. There could be nine quotes in a paragraph. It was unreadable.").  Plaintiff's colleagues determined that she was not qualified for tenure.

Poor scholarship constitutes a valid non-discriminatory reason for denying tenure. *See Blasdel*, 687 F.3d at 820; *Namenwirth*, 769 F.2d at 1241.  Thus, Plaintiff's discrimination claims fail absent proof of pretext, which is entirely absent from the record.

> b.    Plaintiff Cannot Establish That The Department Majority's Negative Opinion Of Her Scholarship Was Pretextual.

To show pretext, an unsuccessful tenure candidate "must establish by a preponderance of the evidence that the legitimate reasons offered by the University [] were not its true reasons, but were a pretext for discrimination."  *Adelman-Reyes*, 500 F.3d at 666.  "A pretext… is a deliberate falsehood."  *Id.*  As such, "[t]he pretext inquiry focuses on whether the stated reason for the adverse employment action is in fact the reason for it--not on whether the stated reason is accurate or fair."  *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1158-59 (7th Cir. 2014).

This Court has stated:  "the law gives institutions of higher learning, like other employers, the right to be wrong, and grievously so.  And more than that, it permits them to be insensitive, misguided, foolish, or even self-defeating in their employment decisions.  '[I]t is not the function of the courts to sit as 'super-tenure' committees.'"  (Dkt. 151 at p. 4, *citing Thrash v. Miami Univ.*, 2014 WL 929152, at  *8-9 (6th Cir. 2014)); *see also Vanasco*, 137 F.3d at 967 Those who voted against Plaintiff's application did so based upon their honest assessment of her scholarship.   Plaintiff has no means to show pretext as to the views of any individual member of the Department Majority, or the group as a whole.

> (1)    Plaintiff's Admissions Doom Her Claim Of Pretext.

Seventh Circuit authority is clear: where a tenure plaintiff expresses disagreement with her colleague's opinions, but admits she has no reason to doubt their honesty, "this admission is

fatal to [plaintiff's] contention that the University's proffered reasons for its decision were pretextual." *Vanasco*, 137 F.3d at 966. Plaintiff has testified under oath that she cannot speak to the motivations of anyone who voted against her tenure application. (SOF ¶¶ 139-140). Under binding authority, this testimony defeats any pretext argument. *Vacasco*, 137 F.3d at 966.

Even more damning, during the multi-level tenure review process, Plaintiff disclaimed any illicit motive on the part of the Department Majority. Plaintiff truthfully gushed in her written response to the Department Report about the diversity of the Department and the supportive environment for her work. (SOF ¶ 123). She then appeared in person before the UBPT. (SOF ¶ 126). Faced with a hyperbolically uncritical report from the College Personnel Committee ("CPC"), the UBPT asked Plaintiff whether the members of the Department Majority had personal issues with her or held biases against her. (*Id.*). She said "no," and that she could not speak to the motivation of others. (SOF ¶¶ 126, 139-140). Plaintiff cannot now attempt to claim pretext after the fact. *See Adelman-Reyes,* 500 F.3d at 667 (finding no pretext where plaintiff failed "to even mentioned [] discrimination in her formal grievance with the University, and also [conceded] that neither the President nor the University committee were motivated by [illegal] bias"); *Sun*, 473 F.3d at 815 ("Where … a plaintiff is afforded process sufficient to eliminate potentially discriminatory motives, summary judgment [for] defendants is proper.").

        (2)     **Plaintiff Cannot Establish Pretext By Showing Disparate Treatment of a Similarly Situated Tenure Candidate.**

Plaintiff also cannot establish pretext by arguing that DePaul tenured the only other candidate from the Philosophy Department in 2009-2010 – ███████ . As Plaintiff and ███████ were not competing for a single tenure slot, his success in the tenure process does not, in itself, suggest discrimination. (SOF ¶ 152); *see Blasdel*, 687 F.3d at 823-24 ("There is no indication that [plaintiff] and [the successful male applicant] were competing for a single tenure

slot and therefore that the grant of tenure to him was necessarily a rejection of tenure for her. It thus is not a case of a male-female face-off won by the male.").

No inference of discrimination arises from the comparative qualifications of Plaintiff and ██████ either. "[E]vidence of the applicants' competing qualifications does not constitute evidence of pretext 'unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.'" *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1180 (7th Cir. 2002); *see also Farrell v. Butler Univ.*, 421 F.3d 609, 615 (7th Cir. 2005). In conducting this analysis, the Court must not forget: "to infer discrimination from a comparison among candidates is to risk a serious infringement of first amendment values." *Blasdel*, 687 F.3d at 816 (citations omitted).

Academic freedom restraints aside, DePaul's award of tenure to ██████ cannot establish pretext, even under a side-by-side comparison of the candidates. ██████ is a Kant scholar, with a Ph.D. in philosophy (SOF ¶ 152), whereas Plaintiff self-identifies as a postcolonial, critical-race, feminist theorist, with a Ph.D. in Women's Studies. (SOF ¶¶ 15, 27, 123). On these facts alone, Plaintiff and ██████ are substantially dissimilar in education and qualification. *See Brown*, 700 F.3d at 1104 (a similarity situated employee "is someone who is directly comparable to [plaintiff] in all material respects").

██████ also had far better qualifications.[6] Unlike Plaintiff, ██████ earned the unanimous support of the Department and the UBPT. (SOF ¶ 153). Unlike Plaintiff, at the time he applied for tenure in November 2009, ██████ had a completed book manuscript. (SOF ¶ 154). Unlike Plaintiff, when he appeared before the UBPT in April 2010, ██████ had a final book contract from Indiana University. (*Id*). Plaintiff learned three days before her UBPT

---

[6] ██████ record of teaching and service also surpasses Plaintiff's record of the same. However, because the decision to deny Plaintiff's tenure application rested on scholarship, Defendants will not detail ██████ teaching and service achievements.

appearance that her book would not be sent to SUNY Press's editorial board because it was "unlikely the board would recommend publication." (SOF ¶ 125). ███████ book came out in 2010 and can be purchased from Amazon.[7]

███████ work also received superlative external reviews. The external reviewer from Penn State University sings the following praise: "Professor ██████ has clearly met and gone beyond [the] high standard for one writing on Kant…"; "… [he] writes with great clarity and lucidity…"; "[his] articles have appeared in highly respected journals. [They] are some of the most respected and widely read journals here and abroad. Articles in those journals get noticed and read…"; "I do not doubt that [his book manuscript] will be published (in fact, I would not hesitate to recommend that it be published in a book series I edit)…". (SOF ¶ 155). The second external review of ██████ work was equally laudatory: "I do not know if [Professor ██████ manuscript has been accepted for publication yet, but I have every reason to think that it will appear with a major university press…"; and "[a]s I hope I have sufficiently indicated, Dr. ██████ scholarly accomplishments are considerable. His work is deserving of high commendation. I have no reservations whatsoever about this assessment." (SOF ¶ 156).

Plaintiff's external reviews, in contrast, damn with faint praise. Shannon Sullivan ("Sullivan"), the reviewer selected at Plaintiff's suggestion, commented:

> I am not able to provide a comprehensive review of the book since only two of its five chapters are finished. These two chapters, chapters three and five, are modified versions of [prior] essays …. Those chapters currently do not include much material on Adorno, who will be the focus of chapters one, two and four. The quality of the Adorno chapters obviously will bear a great deal on the final quality of the book. It also will be very important to the quality of the finished product that Adorno's work be well woven into chapters three and five. Given the concerted engagement that Goswami seeks with Adorno and that the early chapters of the book will undertake, it will be important that his work be made explicitly and directly useful to understanding, e.g., sati and slavery, in

---

[7] http://www.amazon.com/Kant-Subject-Critique-Psychological-Continental-ebook/dp/B00866H2LU

subsequent chapters. Finally, it will be important that the detailed argumentation in the completed book be made as clear and compelling as possible.

(SOF ¶ 89). Sullivan also admits, "I am not familiar with most of the journals in which Professor Goswami's articles have been published." (*Id.*). Plaintiff's external review from Charles Mills ("Mills") also leaves room for doubt:

> You asked about impact or potential impact on the field… Apart from the jointly-authored 2001 piece, Goswami's publications are either still forthcoming or have only come out in the last two to three years (2006, 2006, 2008, 2008, 2009, 2009, 2009). So it is too early to talk about actual impact…You asked me also to comment on the journals and presses in which Goswami's work appeared or is scheduled to appear … I don't know *Angelaki*, *South Asian Review* and *Contemporary Aesthetics*, but then I don't work in those areas.

(SOF ¶ 90). On these facts, it is impossible to infer pretext by comparison.

(3)      Differences of Opinion Cannot Establish Pretext.

Plaintiff also cannot get to a jury by pointing out that faculty involved in the tenure process disagreed about the quality of her scholarship. As this Court recognized in barring Plaintiff's scholarship experts, "[a]ll of the cases stress that differences of opinions as to the quality of a candidates scholarship will not raise an inference of discrimination." (Dkt. 151, at p. 27 (citations omitted)). This is so because "[e]xperienced faculty members may well come to different conclusions when confronted with voluminous and nuanced information about a colleague's overall capacity to make a long-term institutional contribution." *Adelman-Reyes*, 500 F.3d at 668 (quoting *Vanasco*, 137 F.3d at 968 and citing *Namenwirth*, 769 F.2d at 1243). As such, the Seventh Circuit has consistently upheld summary judgment for university defendants where, as here, faculty disagreed about the candidate's tenure case. *See Blasdel*, 687 F.3d at 813; *Adelman-Reyes*, 500 F.3d 662; *Namenwirth*, 769 F.2d at 1235. The tenure process contemplates disagreement. That the process vigorously ran its course with respect to Plaintiff provides no basis to find pretext.

20

In sum, despite the record amassed by Plaintiff in this case, she lacks the evidence to show that any individual member of the Department Majority acted out of impermissible bias when he/she found the quality of Plaintiff's scholarship wanting. This requires dismissal of her discrimination claims.

3.    <u>The Record Contains No Evidence That Any Discriminatory Actor "Decisively Influenced" The Department Majority Opinion or Father Holtschneider's Ultimate Decision On Tenure.</u>

Even if Plaintiff could get past her initial burden of showing some discriminatory "taint" in the opinion of a member of the Department Majority, which she cannot, she also lacks evidentiary ammunition to carry that taint through to Father Holtschneider's final decision. Plaintiff has no proof of a grand conspiracy to make sure that the Department did not add (another) woman, person of color, or an Indian to its tenured ranks. She cannot show that any member of the Majority acted as a mere tool to a nefarious, biased colleague. The record instead shows only that each member evaluated Plaintiff's work (witness the extensive reading notes on Plaintiff's work by Pellauer) and her external reviews, participated in a lengthy (5-hour), robust debate, which included the voices of those who vehemently argued that Plaintiff deserved tenure, and then cast a vote based upon an individual, unbiased assessment. (SOF ¶¶ 92-118).

Plaintiff further cannot show the "decisive influence" of a discriminatory act on the ultimate decisionmaker, Father Holtschneider. Father Holtschneider's charge in making the decision on tenure was to determine whether "rare and compelling reasons" existed to overturn the recommendation of the UBPT. (SOF ¶ 136). The UBPT did not simply rubber stamp the Department Majority. The UBPT gave its recommendation after reviewing Plaintiff's complete dossier, which included passionate minority reports and a heated College recommendation, and then hearing directly from the Department Chair, the Dean, and, most significantly, Plaintiff. (SOF ¶¶ 125-133). In Plaintiff's presentation, as noted above, she disavowed any ill motives on

21

the part of the Department Majority, and she also expressed her intention to learn the source language (German) of the scholar she had identified as a focal point of her research (Adorno). (SOF ¶ 126). The language issue factored heavily in the analysis of the UBPT, as reflected in its report and the testimony of its members. (SOF ¶ 127 ("In addition, much of Dr. Goswami's scholarly agenda focuses on Theodor W. Adorno, who wrote in German. Nevertheless, Dr. Goswami does not read German. This led her to rely on English translations, the accuracy of which has been questioned.").

Father Holtschneider, in turn, considered all the materials before him, including: (a) Plaintiff's personal statement and CV; (b) the recommendations of the Department, the CPC, and UBPT; (c) the two minority reports submitted by Plaintiff's supporters; (c) the external reviews of Plaintiff's scholarship; and (d) Plaintiff's response to the Department recommendation. He listened to "all of the voices before him." (SOF ¶ 135). This open and broad evaluation is readily apparent in his explanatory comments, in which he specifically addresses the critiques set forth by Goswami's supporters. (SOF ¶ 138). Significantly, he independently found in those critiques corroboration for the lack of quality in Plaintiff's work. (SOF ¶ 138 ("I find the argument that 'Dr. G was hired to teach postcolonial philosophy and therefore need not be strong in philosophy' both appalling and revealing. It undercuts the minority argument for the quality of the candidate's knowledge of her field."; "[T]he argument is raised . . . that it is not a criterion for tenure that a professor be able to teach at the graduate level . . . . The philosophy department offers an internationally respected and known doctoral and masters program . . . . It's difficult for a university president to fathom how competence to teach at the graduate level would not be a "*sine qua non*" requirement for a graduate program.").

This multifaceted review, at the end of a multi-level review process that included multiple contributing (including dissenting) voices, precludes a finding that the Majority opinion on Plaintiff's scholarship "decisively influenced" Father Holtschneider's decision.[8]  *See Frederick v. Metro. State Univ. of Denver Bd. of Trs.*, 535 Fed. Appx. 713, 719 (10th Cir. 2013) (rejecting claim of cat's paw liability because President did not rely exclusively on bad actor's comments, but rather independently reviewed plaintiff's dossier and made his own assessment and decision on her application); *Qamhiyah v. Iowa State Univ. of Sci. & Tech.,* 566 F.3d 733,745 (8th Cir. 2009) ("Though we recognize that there is evidence that upper-level reviewers did consider lower-level recommendations when evaluating Qamhiyah's case, the evidence nonetheless shows that the upper-level reviews were independent and that many of the reviews took place after Qamhiyah had voiced her concerns regarding prior votes."); *see also Adelman-Reyes*, 500 F.3d at 667 (refusing to impute the invidious motives of plaintiff's department chair against the president reasoning that "[b]ecause tenure decisions typically involve numerous layers of review by independent and University-wide committees, the causal connection between any possible discriminatory motive of a subordinate participant in the tenure process and the ultimate tenure decision is weak or nonexistent").  Plaintiff's claims cannot survive.

    4.    <u>The Claim For Race And Color Discrimination Against Birmingham In The Tenure Denial Cannot Survive Any Reading Of The Record.</u>

The lack of any evidentiary support for Plaintiff's claims of race and color discrimination against Birmingham individually only underscores their vindictive nature.  As noted above, Birmingham was Goswami's biggest fan at the time of her hire, and she continued to support her well into her probationary period. (SOF ¶¶ 19, 23, 29, 41-42).  Come the time of

---

[8] Father Holtschneider similarly analyzed information other than the Department Report in considering Plaintiff's appeal.  (SOF ¶¶ 136-138).  He provided a lengthy explanation of his reasons for denying that appeal, and the record contains no evidence to rebut that his explanation constituted his honest, good faith assessment of the matter.  (SOF ¶ 138-139).

tenure, Birmingham was only one of 29 faculty members who voted on Plaintiff's tenure application before DePaul's President rendered the final decision. (SOF ¶¶ 93, 127, 138). Birmingham was not the Department Chair at the time of Plaintiff's tenure application. (SOF ¶¶ 4, 83). Rather, Birmingham participated in the Department's deliberations on Plaintiff's tenure case only as required under the Faculty Handbook. (SOF ¶ 11). She read Plaintiff's scholarship, judged it to be entirely "subpar," and voted consistent with that view. (SOF ¶ 110).

Plaintiff has no evidence that Birmingham did not honestly hold this view, or that her personal view of Plaintiff's scholarship swayed the evaluation of her colleagues, the UBPT, or Father Holtschneider. Indeed, the extensive discovery in this case has yielded zero support for Plaintiff's inflammatory accusations that Birmingham discussed Plaintiff's tenure case with any member of the UBPT or Father Holtschneider prior to the tenure decision. *Compare Smith v. Bray*, 681 F.3d 888, 899-900 (7th Cir. 2012) (finding individual liability under § 1981 because the subordinate "was substantially involved at every stage" of the events leading to plaintiff's termination) *with Maestas v. Segura*, 416 F.3d 1182, 1191 (10th Cir. 2005) (refusing to impose liability where subordinate "did not set in motion the chain of events that ultimately led to [the adverse actions]") (*cited with approval by Smith*, 681 F.3d at 898); *Strahan v. Kirkland*, 287 F.3d 821, 826 (9th Cir. 2002) (liability exists only where subordinate's "improper motive sets in motion the events that lead to termination that would not otherwise occur") (*cited with approval by Smith,* 681 F.3d at 898). The individual claims against Birmingham should be dismissed.

## II.    PLAINTIFF HAS NO VIABLE CLAIM FOR RETALIATION IN THE DENIAL OF HER TENURE APPLICATION.

With respect to her retaliation claims under Title VII and Section 1981, Plaintiff must establish that *but-for* her alleged protected activity, she would have been tenured. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) (holding that retaliation claims under Title VII

24

require but-for causation).[9]   Plaintiff again bears the burden of establishing retaliation under the direct or indirect method of proof, and then a basis for imposing "cat's paw" liability.   As with her discrimination claims, the voluminous factual record created in this case leaves Plaintiff without the evidence she needs to reach a jury.

**A.**       **Plaintiff's Retaliation Claims Fail Under The Direct Method Of Proof.**

The direct method of proof of retaliation mandates that Plaintiff demonstrate that: (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) a causal link exists. *Brown,* 700 F.3d at 1106.   Plaintiff is empty-handed on elements (1) and (3).

**1.**       Plaintiff Did Not Engage In Protected Activity Before The Tenure Denial.

The supposed protected activity upon which Plaintiff pins her retaliation claims is her March 2009 letter to Dean Charles Suchar, Ph.D. ("Dean Suchar") complaining about the Calendar Year 2008 Annual Merit Review from Birmingham.   (First. Am. Compl. ¶ 191).   This presents a simple, but insurmountable problem for Plaintiff.   The letter to Dean Suchar, like her earlier March 2005 letter to the prior Dean, Michael Mezey, Ph.D. ("Dean Mezey"), makes no reference to unlawful discrimination. (SOF ¶¶ 38, 57)   The letter threw out a reference to "harassment" and a "hostile work environment," but she did not attribute these terms to her sex, race, color, or national origin. (*Id.*).   "This is a serious deficiency; to be classified as a statutorily protected activity the complaint needs to at least say something to indicate [discrimination] is at issue." *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 814 (7th Cir. 2011) (citation omitted).   As the March 2009 letter did not complain of illegal discrimination, it did not amount to protected activity.   *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012) ("In order for [plaintiff's] complaints to constitute protected activity, they must include an objection

---

[9] The Seventh Circuit "appl[ies] the same elements to retaliation claims under Title VII and § 1981." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).

to discrimination on the basis of [the protected class]"); *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013) ("Vague and obscure 'complaints' do not constitute protected activity."); *Andonissamy v. Hewlett-Packard Co*., 547 F.3d 841, 851 (7th Cir. 2008); *Ogle v. Wal-Mart Stores East, LP*, No. 2:09-CV-317, 2011 U.S. Dist. LEXIS 116212, at *19 (N.D. Ind. Sept. 23, 2011) (finding complaints not protected because the plaintiff did not complain "about any specific instances of disparate treatment").

2.     <u>The Undisputed Facts Negate Any Causal Link Between Plaintiff's Complaint to the Dean And The Tenure Denial.</u>

On causation, Plaintiff cannot make the basic showing that members of the Department or the UBPT knew that she had made any complaint of employment discrimination based upon gender, race, color, or national origin prior to the tenure decision. (SOF ¶¶ 119, 133 ) The same holds true with respect to Father Holtschneider. Although he knew Plaintiff had complained to the Dean, he did not understand the complaint to be for employment discrimination. (SOF ¶ 141). "[A] superior cannot retaliate against an employee for a protected activity about which he has no knowledge." *Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009).

The timing of events also negates causation. The March 2009 letter predated Plaintiff's tenure denial by over a year. (SOF ¶¶ 57, 142). The Seventh Circuit has refused to infer causation when faced with much shorter lapses in time between the protected activity and adverse action. *See EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (six weeks); *Davidson v. Midelfort Clinic, Ltd*., 133 F.3d 499, 511 (7th Cir. 1998) (five months); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (four months). Even more, the tenure review process, and the evaluation of Plaintiff's work that took place as part of in that process, constitutes an intervening event that breaks any causal chain between her March 2009 letter to the Dean and the tenure denial. *See Davis v. Time Warner Cable of Se. Wis., L.P.*,

651 F.3d 664, 675 (7th Cir. 2011) (finding no direct even though termination followed complaint because plaintiff engaged in questionable transaction that led to termination after complaint).

### B.     Plaintiff's Claims Fail Under The Indirect Method Of Proof.

Plaintiff's retaliation claims also do not satisfy the indirect method of proof. Specifically, Plaintiff's claim is doomed because: (1) she cannot establish a *prima facie* case in that: (a) she was not qualified for tenure (*see* Section I.D.2.), (b) DePaul did not treat any similarly-situated candidate more favorably (*see* Section I.D.2.b.(2)); (2) DePaul had legitimate, non-retaliatory reasons for Plaintiff's tenure denial; and (3) no evidence of pretext exists (see Section I.D.2.a.-b.). *Smith*, 681 F.3d at 900 (describing indirect method for retaliation claims under Title VII and § 1981). These defects require dismissal of Plaintiff's retaliation claims.

### C.     Birmingham Cannot Be Individually Liable For Retaliation Under Section 1981 Because She Is Not Responsible For Plaintiff's Tenure Denial.

As detailed in Section I.D.4. above, Birmingham did not cause the tenure denial and therefore cannot be individually liable for retaliation under § 1981 based upon the tenure denial. *Smith*, 681 F.3d at 899 (deciding that "a subordinate with a retaliatory motive may be individually liable under § 1981 for causing the employer to retaliate against another employee" only when plaintiff can establish cat's paw liability). The individual retaliation claims against Birmingham, accordingly, must be dismissed.

### III.     PLAINTIFF'S SECTION 1981 CLAIMS OF RACE AND COLOR DISCRIMINATION IN THE TERMS AND CONDITIONS OF EMPLOYMENT ALSO CANNOT SURVIVE SUMMARY JUDGMENT.

The record evidence also defeats Count III of Plaintiff's First Amended Complaint, which appears to assert a claim for harassment based upon race and color under 42 U.S.C. § 1981. "Hostile environment claims are different in kind from discrete acts." *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 115 (2002). To establish a racially hostile

27

environment, a plaintiff must present evidence of a workplace "permeated with discriminatory intimidation, ridicule, and insult" sufficiently "severe or pervasive" to create an objectively hostile or abusive work environment. *Id.* at 116. The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position. *See EEOC v. WC&M Enters., Inc.*, 496 F.3d 393 (5th Cir. 2007). Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "[T]he workplace that is actionable is one that is 'hellish.'" *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (*citing Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)); *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 641 (7th Cir. 2001). "In addition to showing that the environment was sufficiently serious, the plaintiff must show that the harassment was based on membership in a protected class and also that there is a basis for imputing liability to the plaintiff's employer." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (citations omitted).

Thus, to survive summary judgment on this hostile work environment claim, Plaintiff must show that: (1) she was subjected to unwelcome harassment; (2) the harassment was based on her race or color; (3) the harassment was severe and pervasive enough to alter the conditions of her environment; and (4) there is a basis for employer liability. *Beamon v Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005). Plaintiff's evidence meets none of these elements.

### A. Plaintiff Did Not Experience Severe Or Pervasive Harassment.

Plaintiff can hardly claim that she experienced a "hellish" work environment based upon race and color. She truthfully attested in her personal statement to the "tremendous" opportunities she had been provided to pursue her work at DePaul. (SOF ¶ 86). To the UBPT, she espoused no knowledge of bias or personal animosity. (SOF ¶ 126). During her deposition,

moreover, she testified to her belief that she always did her job well and accomplished much while at DePaul. (SOF ¶ 160). These are not the statements of a person who had to work in hell.

The specific incidents of purported harassment, to the extent they have any competent support in the record, similarly fall far short of severe or pervasive racial harassment. Plaintiff relies on Birmingham's Calendar Year Annual Merit Reviews for 2004 and 2008, in which Birmingham raised valid concerns regarding Plaintiff's ideological agenda in class, abrasive approach to her colleagues, and lack of visibility in the Department on the eve of tenure. (SOF ¶¶ 30-39, 52-58). Plaintiff claims to have taken offense to a senior faculty member's lament in 2004 that she made him feel like a "passé old white guy," after she curtly dismissed one of his ideas, and a colleague's "Heil Zombie Heidegger" reference in a December 14, 2008 e-mail, apparently missing that the point of the reference was to call out Heidegger's Nazi sympathies, not to praise them.[10] (SOF ¶¶ 159). She also invokes the audacity of her colleagues to criticize her work when she finally presented it, after she led them on for years about her progress.

These incidents are isolated, sporadic, and benign. Entirely lacking in this record are type of racial slurs, insults, and threats sufficient to show "severe or pervasive" harassment under controlling authority. *See, e.g., Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (finding that plaintiff established objectively hostile work environment based upon evidence showing he frequently heard the word "nigger" and was even told to talk to another employee "nigger to nigger"); *Cerros v. Steel Techs., Inc.,* 288 F.3d 1040 (7th Cir. 2002) (holding that plaintiff had established a hostile work environment based upon allegations that plaintiff heard supervisors and co-workers endorse "if it ain't white it ain't right" philosophy use

---

[10] Plaintiff's colleague is not the only philosopher who has used the phrase "Heil Heidegger" as an ironic jab against the idealization of a known Nazi. *See* Carlin Romano, "Heil Heidegger!", The Chronicle of Higher Education (Oct. 18, 2009), available at http://chronicle.com/article/Heil-Heidegger-/48806/?sid=at&utm_source=at&utm_medium=en.

racial slurs such as "brown boy," "spic," "wetback," "Julio," and "Javier"; saw graffiti painted on bathroom walls that said "spic," "Go Back to Mexico, "[plaintiff] is a Spic," "KKK," and "White Power"; and suffered slashed tires on his car).

### B.      The Alleged Harassment Lacks Any Connection To Race Or Color.

The purported harassment, even on the most charitable reading of the record, also has no relationship to Plaintiff's race or color.  *See Beamon*, 411 F.3d at 863-64 (explaining that harassment must be "sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race").  Other than the "passé old white guy" comment, none of the episodes have any explicit or implicit racial component, and even that comment evidences no animosity toward Plaintiff's race or color, as much as a lament at being treated like an out-of-touch, uncool member of "the establishment."  *See Brown*, 700 F.3d at 1106 (finding alleged harassing criticisms of plaintiff did not "suggest a discriminatory motive" because "[a]ll of the criticisms used nonracial language, and nothing else about their context suggests that they were racially motivated").  Plaintiff apparently believes that because she is Southeast Asian and Brown, and because she works in the area of postcolonial studies and critical race theory, any criticism of her is *ipso facto* race and color discrimination.  (SOF ¶¶ 3, 123).  Courts have refused to take that leap in logic.  *See Beamon*, 411 F.3d at 863-64 ("[Plaintiff] asserts that racial hostility was the impetus underlying each of [the challenged] actions by [defendant], but his sole basis for doing so is the fact that he is African-American. The 'harassment of which [plaintiff] complains could just as readily have been perpetrated upon a white person without any alteration in its character or purpose. Accordingly, we cannot reasonably construe [defendant's] actions as being motivated by hostility to [plaintiff's] race."); *see also Brown,* 700 F.3d at 1106 ("Perhaps their supervisors' criticisms were unfair – clearly the plaintiffs feel that they were – but there is no evidence that they were unfair *because they were*

*motivated by race*.").  Lacking any link between the purported harassment and Plaintiff's race or color, her racial harassment claim necessarily fails.

## IV.  THE UNDISPUTED FACTS REFUTE ANY CLAIMED BREACH OF DEPAUL'S CONTRACTUAL OBLIGATIONS TO PLAINTIFF.

Plaintiff also cannot achieve a tenure do-over via her breach of contract claims.  "[T]he interpretation of a contract presents a question of law that is decided by the court."  *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008).  In Illinois, an actionable breach of contract claim requires proof of: (1) the existence of a contract; (2) plaintiff's performance under the contract; (3) the defendant's breach; and (4) resulting injury from the breach.  *Burrell v. City of Mattoon*, 378 F.3d 642, 651 (7th Cir. 2004).  Here, Plaintiff cannot establish any breach by DePaul or resulting damages.

### A.  Plaintiff's Contract With DePaul Did Not Promise Tenure.

In this case, the only contract that existed between Plaintiff and DePaul was Plaintiff's Contract of Faculty Employment (the "Contract").  The Contract provided DePaul would accord Plaintiff the "prerogatives and benefits" described in the Faculty Handbook, as it may be amended from time to time.  (SOF ¶ 21). The Contract made no promise of tenure, and neither did the Faculty Handbook. (SOF ¶¶ 5, 21-22).  As this Court has observed, the Faculty Handbook "simply detail[ed] the qualifications of various levels of instructors and professors and describe[d] some criteria upon which promotion and tenure are based. . . ."  (Dkt. 126 at p. 13, *citing Jacobs v. Mundelein College, Inc.*, 256 Ill. App. 3d 476, 628 N.E.2d 201 (1993)).  Plaintiff concedes: tenure is an earned privilege, not a right; faculty members spend multiple years during their probationary period before being eligible to be considered for tenure; the burden rests on the individual faculty member to earn tenure at DePaul; there was no guarantee she would receive tenure at DePaul; and no one ever promised her tenure. (SOF ¶¶ 10, 22).  Simply put,

Plaintiff's Contract gave her the opportunity to be considered for tenure in the final year of her probationary period and established a process for that consideration – nothing more. DePaul fulfilled all contractual obligations toward Plaintiff with respect to her tenure process and did not breach its Contract with Plaintiff in any way.

### B. DePaul Met All of its Contractual Obligations With Respect to Plaintiff's Tenure Consideration.

#### 1. DePaul Afforded Plaintiff A Full And Fair Review Of Her Tenure Application Consistent With The Faculty Handbook.

Far from showing that DePaul mishandled her tenure application, the undisputed facts show only that the tenure process afforded Plaintiff gave Plaintiff the full benefit of the robust, multi-level review set forth in the Faculty Handbook. Plaintiff had the unrestricted opportunity to prepare her tenure application, including her supporting personal statement. (SOF ¶¶ 82-87). Her Chair selected the external reviewer whom Plaintiff proposed. (SOF ¶¶ 88-89). Plaintiff presented to her Department colleagues, and her application then underwent five hours of vigorous debate, during which her supporters could and did advocate on her behalf. (SOF ¶ 92). After Plaintiff's application could not withstand the Department-level assessment of the quality of her work, the robust advocacy continued. (SOF ¶ 93). Plaintiff submitted a written response to the Department Report, and her supporters put into the record two minority reports, plus a copy of the May 2009 Minority Report. (SOF ¶ 84, 122-123, 135). Plaintiff then again presented her case to the College Personnel Committee, as did the Department. (SOF ¶ 124). The tide turned in Plaintiff's favor at the College level, with a venomous report and recommendation by the College Personnel Committee and a concurring recommendation by the Dean. (*Id.*).

At the University level, Plaintiff once again had the floor to make her case for tenure. (SOF ¶ 126). She also had the chance, in response to direct questions from the UBPT, to speak

to any personal animosity in the Department. (*Id*.). As required under the Faculty Handbook, the Department and the Dean similarly presented their respective positions. (SOF ¶ 128). In the full University evaluation, Plaintiff again fell short, with all but one of the members of the UBPT concluding that she had not met her burden of showing that her scholarship had sufficient quality for tenure. (SOF ¶ 127). Her case then went to the President, who reviewed her entire tenure dossier and listened to all of the voices before him, including those of her supporters. (SOF ¶¶ 135, 138). He found no rare and compelling reasons to reject the recommendation of the UBPT and thereby adhered to the requirements of the Faculty Handbook by accepting the recommendation to deny tenure. (SOF ¶ 136).

From there, Plaintiff received even more process. She requested and was granted an appeal under the Handbook. (SOF ¶ 143). The Appeal Board made a recommendation in her favor, which the President considered, but rejected, for carefully detailed and thoughtful reasons. (SOF ¶¶ 143-144). His decision, per the Handbook, was final. (SOF ¶ 11).

In Plaintiff's case, the tenure process operated exactly as dictated by the Faculty Handbook. Over thirty (30) participants weighed in on her application, the merits of which were hotly contested. (SOF ¶¶ 93, 127, 138). Plaintiff did not agree with the outcome, but as set forth above, she had no contractual right to an outcome; she had a right only to the process, which she received and more. Her failure to succeed in the process is not DePaul's breach. *See Miller v. Trs. of Univ. of Pa.*, No. 91-7358, 1993 U.S. Dist. LEXIS 13141, at *9-11 (E.D. Pa. July 30, 1993) ("[T]o the extent that the Handbook and Guide accorded a contractual right to Dr. Miller, it was the right to be evaluated for tenure during his appointment as an assistant professor. The handbooks, however, did not confer on Dr. Miller the right to receive tenure. …[T]he record demonstrates that the University duly considered Dr. Miller for tenure … that its procedures

33

were followed … Thus, as a matter of law, Dr. Miller's claim for breach of contract must fail.")

Plaintiff's bare assertion that DePaul applied "new" "extraneous," "ad hoc" and "discriminatory" criteria to her tenure application does not create a genuine issue of fact on her contract claims. (Comp. ¶¶ 163, 167). Rather, the supposed "extraneous" criteria relate directly to the contractual criteria for tenure: teaching, scholarship and service. (SOF ¶ 11). For example, Plaintiff alleges DePaul "alleged that most of [her] publications had not been peer reviewed." (Comp. ¶ 167). This concern relates to scholarship. (Comp. ¶ 167). Plaintiff also alleges DePaul "criticized [her] for having poor attendance at department events." (Comp. ¶ 167). This concern relates to service. Likewise, Plaintiff's allegation that DePaul claimed "[her] receipt of the Excellence in Teaching award was not indicative of her excellent teaching ability" is a concern related to teaching. (Comp. ¶ 167). Finally, Plaintiff's allegation that DePaul "criticized [her] for not being fluent in German," when the primary figure in her research agenda wrote only in German, again clearly relates to scholarship. (Comp. ¶ 167). DePaul applied no "ad hoc" or "impermissible" criteria applied to Plaintiff's tenure case. It provided the full debate and assessment contemplated by the Handbook, which is all it was contractually obligated to do.

2.  DePaul Offered Plaintiff Process With Respect To Her Tenure Review Beyond That Required By Contract.

After giving her the full benefit of the tenure review process under the Faculty Handbook, DePaul did still more, by offering an advisory hearing process, which Plaintiff foolishly rejected. (SOF ¶¶ 147). Instead, she adhered to the view (articulated in the Complaint) that she was entitled to a termination for cause proceeding, usually reserved for tenured faculty. This view is unsustainable and cannot serve as a vehicle for a breach of contract claim.

The Faculty Handbook includes language stating that when an appeal Review Board finds an academic freedom violation – as it did in Plaintiff's case – "the dean may recommend

34

that another contract be offered or that a review of the case be conducted in accord with these procedures ordinarily reserved for tenured faculty being dismissed for cause." (SOF ¶ 145). The operative phrase here is "may recommend." This language is permissive and, therefore, did not create any contractual right to such a hearing.

Even if the language was mandatory, which it is not, the language concerning actions the dean "may" take stands at odds with the subsequent statement that, "[t]he President's decision, as set forth in his or her response to the written report of the Review Board is final." (SOF ¶¶ 11, 145). This statement of final authority, unlike the dean reference, fully comports with the authority of the President as the final decisionmaker on faculty appointments and tenure decisions. (SOF ¶ 11). It is well settled that "[a] contract must be construed as a whole, viewing each provision in light of the other provisions… not…by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). Further, "[a] court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used." *Id.* at 442. A finding that the Handbook's discretionary language actually mandated a dean-directed hearing in Plaintiff's case would negate the Handbook's clear statements of final Presidential authority. (SOF ¶ 11). *See also Pourki v. Drexel Univ.*, No. 98-4231, 1999 U.S. Dist. LEXIS 4519, at *10-14 (E.D. Pa. Mar. 24, 1999) (finding that failure to return appeal to dean for *de novo* review did not violate contractual rights because President held final decisionmaking authority).

Even more, Plaintiff's Contract afforded her "the privileges and prerogatives" of the Faculty Handbook only "as it may be amended from time to time." (SOF ¶ 21). When confusion arose over the process required following Plaintiff's appeal Review Board finding, Father

35

Holtschneider authorized an advisory hearing for Plaintiff and negotiated the terms of that process with Faculty Council. (SOF ¶ 146).   This advisory hearing process became, as Father Holtschneider noted, a *de facto* amendment to the Faculty Handbook.  (SOF ¶¶ 146-147); *see also Rehor v. Case Western Reserve Univ.*, 331 N.E.2d 416, 422 (Ohio 1975) (finding amendment to faculty bylaws was valid where bylaws specifically reserved the right to amend "from time to time…").   DePaul offered the advisory hearing process to Plaintiff, and she refused to participate.  (SOF ¶ 147).  Plaintiff has no basis to cry breach on these facts, which only cement the conclusion that DePaul bent over backwards to benefit Plaintiff.

### 3.   Plaintiff's Pre-Tenure Reviews Conformed To The Requirements Of The Faculty Handbook.

Lacking an end-game (having received a full tenure process and rejected an opportunity for an additional advisory review process), Plaintiff attempts in her contract claim to shift blame for her failure to earn tenure on DePaul, claiming that "at no time did DePaul inform [her] of any significant deficiencies that she needed to cure in order to receive tenure." (Comp. ¶ 162).  This argument gets her nowhere.

First, by the terms of the Faculty Handbook, DePaul agreed to provide tenure-track faculty, like Plaintiff, with two types of annual reviews: merit reviews and probationary reviews. (SOF ¶ 6). As stated in the Faculty Handbook, the purpose of merit reviews is to "determine salary recommendations," and the purpose of probationary reviews is to "assess progress toward promotion and tenure." (SOF ¶¶ 7-9).  It is undisputed that DePaul provided Plaintiff with merit and probationary reviews on an annual basis. (SOF ¶¶ 23-24, 29-30, 41, 43, 45-46, 48-51, 52-54, 59-61).  Plaintiff cannot point to any contractual obligation by DePaul to do more than what it did and, thus, her contract claim fails.  *See Adelman-Reyes v. St. Xavier Univ.*, 2006 U.S. Dist. LEXIS 24558, at *19-21 (summary judgment on professor's claim that university breached its

36

contractual obligations to her by failing to properly evaluate her work before the tenure process began, finding professor received annual reviews and university had no obligation to do more).

Second, DePaul, through the review process, did warn Plaintiff of "significant deficiencies" in her scholarship as soon as she finally came clean that she had only "messy and fraught" work to show for the manuscript that she had promised for years. Plaintiff never put any work on her book before a personnel committee prior to 2009, and her publications were clustered at the end of her probationary period. (SOF ¶ 90) ("Apart from the jointly-authored 2041 piece, Goswami's publications are either still forthcoming or have only come out in the last two to three years (2006, 2006, 2008, 2008, 2009, 2009, 2009)."). Thus, it is not surprising DePaul did not "warn" Plaintiff about the "deficiencies" in her research early on. DePaul had little to go on – beyond her sales pitch regarding her project -- until the eve of tenure.

Once the sorry state of her scholarship was finally laid bare in May 2009, the Department emphatically sounded the alarm. A personnel committee, as well as the majority of the Department, recommended against renewal of her contract on the basis of her work. Although the Dean rejected the recommendation of non-renewal, the warning was unequivocal: "We believe that it is unlikely that Professor Goswami would eventually be granted tenure with the Department of Philosophy or, were she to gain such tenure from the University, that she would turn into the kind of productive teacher-scholar we need." (SOF ¶ 67).

Any suggestion that the May 2009 review itself constituted a breach is meritless. The Faculty Handbook provides that formal reviews should occur at least every two years, but does not prohibit them from occurring more frequently. (SOF ¶¶ 6-9). Further, nothing in DePaul's Faculty Handbook prohibits a full department vote on formal reviews. (SOF ¶¶ 5-9). To the contrary, the Handbook explicitly grants individual departments the authority to fashion the

manner and method of formal reviews. (SOF ¶ 12). If Plaintiff wanted notice that tenure might be a struggle, she got what she asked for in May 2009.

4.  DePaul's Denial Of Plaintiff's Tenure Application Did Not Violate Her Academic Freedom.

DePaul also fully afforded Plaintiff her contractual right to academic freedom, as established by the undisputed facts. (Comp. ¶¶ 159, 164-165). To be sure, DePaul hired Plaintiff because of – not in spite of – her interdisciplinary focus, with full knowledge that she lacked a Ph.D. in philosophy. (SOF ¶¶ 15-21). In advertising for Plaintiff's faculty position, DePaul clearly stated its desire for an interdisciplinary scholar. (SOF ¶ 15). Plaintiff openly pursued her interdisciplinary research agenda from the start, and DePaul renewed her contract year after year with full knowledge of that agenda. (SOF ¶ 29 ("The [] committee noted that her research adds an important dimension to the department and hopes that more can be done to integrate her scholarship into departmental course offerings.")). By Plaintiff's own admission, DePaul provided her with "tremendous opportunities" to pursue her interests. (SOF ¶ 86).

Things fell apart at the end, not because of any new-found aversion at DePaul to post-colonial, critical race, or feminist theory, but because Plaintiff could not make good on her promise to build bridges between continental philosophy and to critical theories through viable, quality research. As her colleagues eloquently stated during her critical fifth year review:

> …Professor Goswami was appointed … in the hope and with the expectation that she would help facilitate constructive conversations between Postcolonialism, the various discourses that inform Women's Studies, and the broad tradition of European philosophy to which the Department as whole is committed. . . . Professor Goswami not only understood and accepted what was expected of her, but that she has also made an effort to meet these expectations. However, after careful consideration of her efforts in this regard to date, the Committee is not convinced of her ability successfully to meet the challenges involved in fulfilling this challenging role within the Department…

(SOF ¶ 67). And come the time for tenure, Plaintiff's scholarship remained "incoherent, and

lacking a conceptual framework." (SOF ¶ 95). In making its tenure decision, DePaul took issue not with the subject of Plaintiff's work, but with the quality of that work.

Further, Plaintiff's critical admissions during the tenure review process render her academic freedom claim not only factually deplete, but patently disingenuous. During her tenure presentation, Plaintiff attested to DePaul's overall commitment to diverse academic endeavors, and to the diversity of the fields in which her Departmental colleagues worked. (SOF ¶ 123). She truthfully cited her good fortune to be a part of such a vibrant environment. (*Id.*).

As stated in its Faculty Handbook, DePaul faculty enjoy academic freedom in "[the classroom], research and publication … and other forms of creative expression." (SOF ¶ 5). DePaul is steadfast in this promise. Holding a faculty member to an expected standard of quality in scholarship, particularly in a Ph.D.-granting program, does not violate academic freedom. That is all DePaul did in this case, and doing so did not constitute a contractual breach.

### C. None Of The Alleged "Breaches" Damaged Plaintiff.

Even if Plaintiff could establish a single breach by DePaul, which she cannot, Plaintiff cannot prove resulting damages. In order to prevail on a breach of contract claim, a plaintiff must establish "that there was a wrongful act and that a loss or damages resulted directly from it." *Adelman-Reyes*, 2006 U.S. Dist. LEXIS 24558, at *19-21 (citing *Jackson v. Hammer*, 274 Ill. App. 3d 59, 64 (Ill. App. Ct. 1995) (stating that "[d]amages . . . to be recoverable, must not be merely speculative")); *see also A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996 (7th Cir. 1992) (upholding district court's entry of summary judgment for defendant where plaintiff could not prove damages resulted from the alleged contract breach).

Throughout her probationary period, Plaintiff worked under her Contract of Faculty Employment, without interruption or any loss of pay. (SOF ¶ 21). The May 2009 review could have resulted in the non-renewal of her contract as of June 2010, but the Dean intervened, and

Plaintiff received a full terminal year following the denial of her tenure application. (SOF ¶ 76). Thus, her purported procedural irregularities inflicted no compensable harm upon her. *Negussey v. Syracuse Univ.*, No. 95-CV-1827, 1997 U.S. Dist. LEXIS 3853, at *48-51 (N.D.N.Y Mar. 24, 1997) (granting summary judgment on tenure candidate's breach of contract based on his inability to provide contract damages given "that plaintiff never missed a paycheck or suffered any interruption of benefits during the pendency of his tenure decision").

Rather, the harm at the center of Plaintiff's contract claims, like this action, is the denial of her tenure application. Plaintiff has failed to demonstrate a contractual breach, much less adduce evidence establishing a causal link between any alleged breach of DePaul's contractual obligations and her denial of tenure. Rather, the evidence demonstrates DePaul denied Plaintiff tenure because of a body of work that was incoherent and unpromising. *Adelman-Reyes v. St. Xavier Univ.*, 2006 U.S. Dist. LEXIS 24558, at *21 ("Adelman-Reyes has failed to point to sufficient evidence that would show a causal link between any of the alleged breaches of St. Xavier's contractual obligations and her denial of tenure. Therefore, we grant Defendants' motion for summary judgment on the breach of contract claim"). Responsibility for this failure rests with Plaintiff, not with some non-existent contractual breach.

## CONCLUSION

DePaul University and Peg Birmingham Ph.D. respectfully request that the Court grant summary judgment in their favor, and dismiss Plaintiff Namita Goswami's First Amended Complaint in its entirety.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 6, 2014, I electronically filed the foregoing ***Defendants' Memorandum of Law in Support of Motion for Summary Judgment,*** with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have electronic mailed the document to the following:

Stuart David Gordon
Law Offices of Stuart D. Gordon
330 North Wabash, Suite 2100
Chicago, Illinois 60611

Carrie Alice Herschman
Richard M. Karr
Laura Elizabeth Fahey
Karr, Herschman & Eggert LLP
150 North Wacker Drive, Suite 940
Chicago, Illinois 60606

/s/ Amy Schmidt Jones
Attorney for Defendants, DePaul University, and Peg Birmingham
Amy Schmidt Jones, ID No. 1032274
Michael Best & Friedrich LLP
100 East Wisconsin Avenue, Suite 3300
Milwaukee, Wisconsin 53202
Phone: (414) 225-2771
E-mail: asjones@michaelbest.com