# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS,
### EASTERN DIVISION

NAMITA GOSWAMI,           )
                                )
           Plaintiff,     )
                                )
v.                             )
                                )    Case No. 12 CV 7167
DEPAUL UNIVERSITY, and    )
PEG BIRMINGHAM,        )    Magistrate Judge Jeffrey Cole
                                )
           Defendants.    )

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Stuart D. Gordon
Law Offices of Stuart D. Gordon
330 North Wabash
Suite 2100
Chicago, Illinois 60611
312-377-4455
(stuart@stuartgordonlaw.com)

Carrie A. Herschman
Richard M. Karr
Karr, Herschman & Eggert LLP
150 North Wacker Drive
Suite 940
Chicago, Illinois 60606
312-377-4450
(cherschman@khelaw.com)

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                  **Page**

*Adams v. Ameritech Services, Inc.*,
   231 F.3d 414 (7th Cir. 2000) ................................................................. 13

*Adelman-Reyes v. Saint Xavier University*,
   500 F.3d 662 (7th 2007)........................................................... 15, 18, 21

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...................................................................... 16

*Blasdel v. Northwestern University*,
   687 F.3d 813 (7th Cir. 2012) ............................................................ 21

*Bob-Maunuel v. Chipotle Mexican Grill, Inc.*,
   014 U.S.Dist. LEXIS 5447 (N.D.Ill. 2014) ...................................... 16, 30, 33, 38

*Brown v. Advocate S. Suburban Hosp.*,
   700 F.3d 1101 (7th Cir. 2012) ..................................................... 16, 29

*Casna v. City of Loves Park*,
   574 F.3d 420 (7th Cir. 2009) ............................................................ 29

*Cerutti v. BASF Corp.*,
   349 F.3d 1055 (7th Cir. 2003) ....................................................... 23, 24

*Coleman v. Donahoe*,
   667 Fd.3 835 (7th Cir. 2012) ........................................................... 16

*Davis v. Weidner*,
   596 F.2d 726 (7th Cir. 1979) .......................................................... 16

*Dickerson v. Bd. Of Trs. Of Cmty. Coll. Dist. No. 522*,
   657 F.3d 595 (7th Cir. 2011) ............................................................ 17

*Duldulao v. St. Mary of Nazareth Hosp. Ctr.*,
   115 Ill.2d 482, 505 N.E.2d 314 (1987)................................................... 36

*Evans v. Technologies Applications & Service Co.*,
   80 F.3d 954 (4th Cir. 1996) ............................................................ 12

*Frederick v. Metro State Univ. of Denver*,
   535 Fed. App'x. (10th Cir. 2013) ....................................................... 27

i

*Gilty v. Village of Oak Park,*
    919 F.2d 1247 (7th Cir. 1990) ................................................................ 13

*Krchnavy v. Limagrain Genetics Corp.,*
    294 F.3d 871 (7th Cir. 2002) ................................................................. 16

*Kuhn v. Ball State University,*
    78 F.3d 330 (7th Cir. 1996) ................................................................... 22

*Lim v. Trs. of Ind. Univ.,*
    297 F.3d 575 (2002)............................................................................... 22

*Malin v. Hospira,*
    Case No. 13-2433, at 11, 7th Cir., August 7, 2014 ............................... 33

*Mateo v. City Colleges of Chicago,*
    2013 U.S.Dist. LEXIS 133258 (N.D.Ill. 2013) ................................ 17, 18, 23, 26

*McDonnell Douglas Corp., v. Green,*
    411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973)........................... 15, 17

*Montgomery v. DePaul University,*
    2012 U.S.Dist. LEXIS 128206 (N.D.Ill. 2012) ................................ 29, 36

*Moss v. Martin,*
    473 F.3d 694 (7th Cir. 2007) ................................................................. 36

*Namenwirth v. Bd. of Regents,*
    769 F.2d 1235 (7th Cir. 1985) .............................................................. 16, 22

*Pat Mythes v. City of Janesville,*
    181 F.App'x 596 (7th Cir. 2006) ........................................................... 38

*Paluck v. Gooding Rubber Co.,*
    221 F.3d 1003 (7th Cir. 2000) .............................................................. 33

*Professional Ass'n of Coll. Educators v. El Paso Cmty. Coll. Dist.,*
    730 2d 257 (5th Cir. 1984)..................................................................... 24

*Qamhiyah v. Iowa State Univ. of Sci. & Tech.,*
    566 F.3d 733 (8th Cir. 2009) ................................................................ 27, 28

*Rogers v. City of Chicago,*
    320 F.3d 748 (7th Cir. 2003) ................................................................ 17

*Rudin v. Lincoln Land Community College,*
     420 F.3d 712 (7th Cir. 2005) ........................................................ 15, 38

*Sample v. Aldi, Inc.,*
     61 F.3d 544 (7th Cir. 1995) ......................................................... 15

*Shaw v. W. Elzie Danley, Sr.,*
     2000 U.S.App. LEXIS 545, (6th Cir. 2000) ................................ 11-12

*Sheehan v. Daily Racing Form, Inc.,*
     104 F.3d 940 (7th Cir. 1997) ....................................................... 15

*Silverman v. Bd. of Educ.,*
     637 F.3d 729 (7th Cir. 2011) ....................................................... 17

*Smith v. Bray,*
     681 F.3d 888 (7th Cir. 2012) ............................... 16, 17, 24, 29, 34, 35

*Smith v. Lafayette Bank & Trust Co.,*
     674 F.3d 655 (7th Cir. 2012) ....................................................... 29

*Stephens v. Erickson,*
     569 F.3d 779 (7th Cir. 2009) ....................................................... 32

*Sun v. Bd. Of Trs. Of Univ. of Ill.,*
     473 F.3d 799 (7th Cir. 2007) ....................................................... 17

*Vanasco v. National-Louis University,*
     137 F.3d 962 (7th Cir. 1998) .................................................. 22, 27

*Walker v. Bd. Of Regents of Univ. of Wis. Sys.,*
     4010 F.3d 387 (7th Cir. 2005) ..................................................... 17

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 2

ARGUMENT ........................................................................................................ 14

I     GENUINE ISSUES OF MATERIAL FACT PRELUDE THE
ENTRY OF SUMMARY JUDGMENT AGAINST PLAINTIFF
ON HER TITLE VII AND CIVIL RIGHTS ACT CLAIMS ........................... 14

     A  Overview.......................................................................................... 14

     B  DPU's Tenure Decisions Are Not Exempt
From Scrutiny .................................................................................. 15

     C  Plaintiff Can Prove Her Discrimination Claims
Under Both The Direct And Indirect Methods
Of Proof .......................................................................................... 16

     D  Plaintiff's Evidence, Under The Direct Method of
Proof, Requires A Denial Of DPU's Summary
Judgment Motion ............................................................................ 18

     E  Plaintiff's Evidence, Under The Indirect Method Of
Proof, Requests A Denial Of DPU's Motion For
Summary Judgment ......................................................................... 20

          1.  Convincing Evidence Demonstrates That
Plaintiff Was Qualified For Tenure ...................................... 20

          2.  Substantial Evidence Demonstrates, Under
The Cat's Paw Theory Of Liability, That
DPU's Motion For Summary Judgment Must
Be Denied.............................................................................. 23

          3.  Substantial Evidence Demonstrates That
Plaintiff Was Treated Less Favorably Than
A White Candidate For Tenure.............................................. 25

II    GENUINE ISSUES OF MATERIAL FACT REQUIRE
A DENIAL OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFF'S
RETALIATION CLAIM ............................................................................. 28

A    Applicable Law ..................................................................................... 29

B    Plaintiff Engaged In Protected Activity Before The
    Adverse Job Actions ........................................................................... 30

C    Plaintiff Can Demonstrate A Causal Link Between
    Her Complaints Of Discrimination And The Adverse Actions ..................................... 32

D    Plaintiff's Evidence Satisfies Their Burden Of Proof Of
    Retaliation Under The Indirect Method And Cat's Paw Theory ................................... 34

E    Birmingham Can Be Individually Liable For Retaliation ............................................. 35

III    PLAINTIFF HAS MADE NO CLAIM OF HOSTILE
    WORK ENVIRONMENT ........................................................................... 35

IV    DPU BREACHED ITS CONTRACT WITH PLAINTIFF .................................................. 35

A    The Faculty Handbook Is Part Of Plaintiff's Contract ................................................. 36

B    DPU Breached Its Contract With Plaintiff ........................................................... 36

C    The Process Was Not In Accord With
    DPU's Policies And Procedures ..................................................................... 39

D    Plaintiff's Damages ................................................................................. 39

CONCLUSION ........................................................................................... 40

# I
## INTRODUCTION

Plaintiff Namita Goswami is an Asian woman with a Ph.D. in Women's and Gender Studies from Emory University. During her 2003 through 2011 employment at DePaul University ("DPU"), Plaintiff's outstanding teaching, scholarship, and service was often recognized by members of DPU's Philosophy Department ("the department") and philosophers at other respected universities. But for the racism of Peg Birmingham, who believed that Plaintiff did not act the way Birmingham expected an Asian woman should (by showing sufficient gratitude for even being hired), and who retaliated when Plaintiff complained about discrimination, Plaintiff today would be a tenured professor at DPU.

After Plaintiff's complaints (to DPU administrators and investigators) about discrimination by Birmingham (while Birmingham was the Department's Chair and Acting Chair), a majority of the department,[1] led and orchestrated by Birmingham and her supporters, unsuccessfully attempted to have Plaintiff's contract with DPU "terminated" so as to prevent Plaintiff from even applying for tenure, and then recommended (in an 11-7 vote) that tenure be denied. Ultimately, and despite a record of outstanding reviews of Plaintiff's teaching (she had received DPU's Excellence in Teaching Award), the recommendation was relied upon and accepted by DPU's President, Fr. Dennis Holtschneider, thereby ignoring the University Appeal Board decision that the denial of tenure violated DPU's tenure process and violated her academic freedom.

Plaintiff has challenged the decision denying her tenure because of what she believes was bias, prejudice and retaliation. In seeking summary judgment, Defendants attack Plaintiff's scholarship, knowing full well that every material disparagement of Plaintiff's academic career

---

[1] The Philosophy Department faculty members are listed in Defendants' Appendix of Rule 56 Statement, Tab 4.

at DePaul is untrue. Indeed, the record in this case demonstrates that the reckless and pejorative comments contained in the memorandum filed by DPU are as false as the criticisms of Plaintiff's scholarship concocted by defendant Birmingham and her followers in the Philosophy Department.

## II
## STATEMENT OF FACTS

Plaintiff was hired by DPU as an interdisciplinary scholar to conduct research in the areas of critical race theory and post-colonial theory, and to analyze the philosophical and historical origins and developments of the concept of race. (PSOF 2)[2]  While at DPU, her published scholarship was superb. Plaintiff authored ten articles that were accepted for publication in peer reviewed journals and edited volumes, and wrote a book under advance contract with the State University of New York (SUNY) Press.

DPU recognized Plaintiff's quality as a teacher, having awarded her the Excellence in Teaching Award in 2007. (PSOF 1)  Department Chair Richard Lee and the DPU College Personnel Committee believed Plaintiff's service to DPU to be outstanding for a probationary faculty member.  (PSOF 28) Plaintiff's performance was reviewed frequently by the department in the form of merit reviews, informal reviews and formal reviews. (PSOF 11)  In Plaintiff's first biennial formal review, the review committee noted that it was "pleased with the progress Namita is making as a teacher, a scholar, and a citizen of the department, college, and university."  (PSOF 14)

_____

[2] The following abbreviations are used in this Memorandum: "DSOF" and PSOF" are, respectively, the Defendants' and Plaintiff's statement of material facts; "Def. Exs." are the exhibits included in the Defendants' Appendix of Exhibits, and "DPU" is the designation of documents produced by Defendants with bates numbers following "DPU"; and "Memo" refers to the Defendants' Memorandum in support of their Summary Judgment Motion.

During Plaintiff's first two years on the faculty, Peg Birmingham was the Department Chair. Birmingham authored Plaintiff's second annual merit review (for calendar year 2004), where she criticized Plaintiff for an alleged lack of collegiality and a tendency to "confront needlessly," a charge which had previously been leveled against Jason Hill, a person of color who was the only other philosophy department faculty member who was not recommended for tenure. (PSOF 15) Plaintiff complained about discrimination by Birmingham and the review by meeting with the Dean of the College of Liberal Arts and Social Sciences ("College"), with Craig Muson, the University's Ombudsman, and with Elizabeth Ortiz, the Senior Executive for Institutional Diversity. (PSOF 15)

Birmingham was required to issue an "apology" (which she did by email) for basing her complaints regarding collegiality on hearsay "which ought not have been included" in the evaluation. (DSOF, ¶41) Rather than modify the inappropriate review, Birmingham suggested that her email be attached to the review, thus preserving content she conceded was inappropriate. (*Id.*) One week later, in an informal review of Plaintiff, Birmingham again complained about Plaintiff's collegiality. (DSOF, ¶41) As Plaintiff would later learn, Birmingham would never forget that Plaintiff reported the discrimination treatment.

Rick Lee then became the Department Chair, and Plaintiff's reviews improved substantially. For calendar year 2005, Lee ranked her teaching as "outstanding," and her scholarship and service as "very good," [3] and he noted that in teaching, she "found a way to make canonical philosophical texts speak about issues in conjunction with other literature and other forms of expression." (PSOF 26) Lee's 2006 annual review was even more laudatory, giving Plaintiff "outstanding minus" as an overall rating, with teaching and service rated as

---

[3] According to DPU's President, Pres. Dennis Holtschneider, the "University criteria for promotion and tenure call for good to excellent performance in at least two of the three areas of evaluation: teaching, scholarship and service." (PSOF 34)

"outstanding" and research "very good minus." (PSOF 27)  Plaintiff's 2007 annual merit review, also authored by Lee, was even better yet, rating Plaintiff as "outstanding"  (teaching, service and research.  (PSOF 28)  This trajectory certainly shows positive professional development.

In May, 2008, Lee convened an *ad hoc* Personnel Committee to conduct a "formal" probationary review. (PSOF 29)[4]  In addition to Lee, William McNeil, Elizabeth Millan-Zaibert, it included Mollie Painter-Morland and David Pellauer, both of whom, one year later, voted to "terminate" Plaintiff's contract. (PSOF 30)  Dean Charles Suchar recalls Lee telling him that Plaintiff was rated "outstanding" in all three categories. (PSOF 31-32)  Lee then left for Rome in the fall of 2008, and Birmingham became the Interim Chair of the department. (PSOF 35)

In early 2009, Birmingham, who was Interim Chair for only three months of the period (September through November, 2008) wrote Plaintiff's 2008 annual review. Birmingham downgraded Plaintiff's evaluation in all three categories, ranking Plaintiff as "very good plus" in teaching,[5] "very good" in research and "good" in service. (PSOF 37-39)  Plaintiff received an overall rating of "very good minus" – the lowest overall rating she had ever received. (*Id.*)[6] Because of her discriminatory animus, Birmingham's review falsely stated that Plaintiff had published only one article (PSOF 40), when, in fact, she had published three articles as of the date of the review. (DSOF 55) DPU has never offered a meaningful justification for the significant downgrade.

Plaintiff complained to Dean Suchar about the distortions and misrepresentations of her record by Birmingham. (PSOF 41)  Plaintiff also met with Dean Suchar and with DPU's Vice

---

[4] Plaintiff's work on Theodore Adorno was submitted to the May 2008 personnel committee, which rated Plaintiff as "outstanding" in research. (PSOF 33)
[5] Significantly, during the 2008 fall semester, Plaintiff was not teaching – she was participating in DePaul's "flexible scheduling" program, during which she was not teaching, but was fulfilling all her department, college and university obligations.
[6] Overall ratings in annual merit reviews are important as salary increases based upon ratings. (PSOF 152)

President for Institutional Diversity, during which she complained about discrimination, harassment and a hostile work environment. (PSOF 42) After considering Plaintiff's records, Dean Suchar raised Plaintiff's overall rating for 2008. (PSOF 43). Foiled in her initial efforts to destroy Plaintiff's career, Birmingham concocted a new idea - hand-picking and appointing an "*ad hoc* Personnel Committee" to conduct a "formal" review of Plaintiff and two white male professors, ███████████████████████, although Birmingham concedes that Plaintiff was only due for an informal, not formal, review. (PSOF 44)[7]  Two members of the committee, Peter Steeves and David Pellauer (both white males), were considered to be hostile to Plaintiff. (PSOF 45)  To be certain that Steeves would support Birmingham's plot against Plaintiff, in Birmingham's email appointing Steeves to the Committee, she advised him that she was offering his companion (Danielle) a teaching job. (PSOF 46)

　　　　While the role of the committee was to recommend (or not recommend) a renewal of Plaintiff's contract,[8] it instead went a step further voting 3 to 1[9] to recommend "that Plaintiff's contract be terminated."[10] ( PSOF 50) The committee further voted unanimously to recommend the renewal of the contracts of the two white male department professors. (PSOF 50) Dean Suchar testified that in his nine years as Dean, he had never seen a recommendation to

---

[7] According to Suchar, Birmingham suggested the names of the members. (PSOF 44)

[8] As of May, 2009, Plaintiff's contract ran through June 30, 2010. (PSOF 49)

[9] Professor ███████, the dissenter, had previously contended that he too had been a victim of discrimination, when the Philosophy Department failed to recommend tenure for him. The University President ultimately granted tenure; and after ███ failed to support Plaintiff's tenure application, his colleagues voted to promote him to full professor. (PSOF 52, 117)

[10] A significant minority of the Department's faculty chose to submit a "minority" report favoring a renewal of Plaintiff's contract. (PSOF 54) The *ad hoc* Personnel Committee report does not suggest that any member of the Personnel Committee read any of Plaintiff's published and peer reviewed scholarship. Instead, they commented only about the quality of a possible book prospectus. Also, much like complaints leveled at ███, the *ad hoc* Committee commented on "reports" concerning Plaintiff's collegiality (*e.g.* her tone, attitude and dismissal of advice). (DSOF 55,114)

"terminate" a contract. (PSOF 67)  Birmingham had told all department faculty members that if Plaintiff's contract was not renewed, she could not apply for tenure.  (PSOF 64)

According to Philosophy Professor Tina Chanter, the formation of the Committee (with members selected by Birmingham) to review Plaintiff was an "aberration."  (PSOF 61)  Her opinion is consistent with the Appeal Review Board decision which found that the evaluation of Plaintiff was not in accordance with required procedures and that Plaintiff's academic freedom had been violated. (PSOF 62)   Dean Suchar offered Plaintiff another contract because he felt that the action recommended by the Philosophy Department was, among other things, unfair and a violation of the Rules of the American Association of University Professors ("AAUP"). (PSOF 67)

The fact that Plaintiff would be allowed to apply for tenure in the fall of 2009, when Rick Lee would be back as Chair (and would be overseeing Plaintiff's tenure application), caused considerable consternation among Birmingham and her followers – chief among them, Elizabeth Rottenberg, considered by Birmingham to be a member of her "family."[11] (PSOF 68)  Between the meeting of the *ad hoc* committee and Plaintiff's submission of her tenure application (in September, 2009): Painter-Morland and Rottenberg met with Dean Suchar to complain that Lee had put poison in his ear about Plaintiff and the department (PSOF 70); Birmingham pressured Lee into resigning as Chair before his term was up and to recuse himself from overseeing Plaintiff's tenure application (PSOF 74); Birmingham and Rottenberg obtained commitments from Philosophy Department faculty to vote against Plaintiff's tenure application even *before* it

---

[11] The extremely close relationship between Birmingham and Rottenberg is striking and significant. When Rottenberg has dinner with Birmingham and her daughter, they call it" family night."  They had one such dinner the night before the departmental faculty met on May 29, 2009, to consider the Personnel Committee's recommendations. (PSOF 68)  In her emails to Birmingham (which end with such salutation as "hugs" and "much love") Rottenberg has written such things as "I love you. Thank God you're in the world" and that she is "anxious without [Birmingham]" because I "miss you so much." (PSOF 68)

was submitted (PSOF 71); and Birmingham and Rottenberg encouraged David Krell to write a negative summary of Plaintiff's scholarship before she even applied for tenure. [12] (PSOF 72)[13]

After learning that Rick Lee had interceded with Dean Suchar on Plaintiff's behalf, Birmingham and Rottenberg threatened to investigate him for "financial" irregularities. (PSOF 73) As a result, Lee attempted to avoid representing the department in connection with Plaintiff's tenure application and to resign as Chair. (PSOF 76, 79)  However, Dean Suchar refused to allow Lee to abandon his responsibility to oversee the tenure application. (PSOF 76) Ultimately no investigation of finances ever took place and Lee voted against tenure.  (PSOF 153)

According to Birmingham, two of her colleagues (David Krell and Pat Werhane) believed that Lee ultimately voted against tenure because "he knew he would be dead in the water with us if he didn't."  (PSOF 78) Lee's vote was inexplicable since in September, 2008 Lee had reviewed Plaintiff's book prospectus, and on September 4, 2008 he wrote that her work shows how well she knows the "Adorno" material and that it was "all really excellent and I am so excited to see her final product." On September 10, 2008, Lee wrote that he was "very excited about your project" and offered "to write a letter of recommendation for you at any time."  (PSOF 75)

---

[12] Krell, who voted against tenure and who apparently claims to have opposed Plaintiff's initial hiring ultimately gloated when the department filled Plaintiff's "faculty slot" with a white male, and he identified only white faculty members as "serious" colleagues in the department. ( PSOF 152)  Krell claimed that in voting to terminate Plaintiff's contract in May, 2009, he had read two of Plaintiff's works: "Who is Roop Kanwar?" and "Shifting Grounds." However, Plaintiff had not submitted those for review. (PSOF 4, 21)

[13] Ultimately, Birmingham, Rottenberg, Painter-Morland, and Krell (together with Werhane, who admitted that she had merely "looked over," but had not "read" Plaintiff's published scholarship (PSOF 105) voted against tenure and had a hand in writing the department's recommendation.  The Court may note by comparing the 2010 tenure report (Def. Exs. Tab 51) to the May 29, 2009 department recommendation (Def. Exs. Tab 75), that substantial portions of the latter were cut and pasted into the former. Given the unanimous support for tenure by Dean Suchar and the College Personnel Committee, the importance of the recommendation cannot be overstated: (a) Not one member of the UBPT who voted against tenure claims to have read a word of Plaintiff's published scholarship; and (b) Pres. Holtschneider, who did not read any of Plaintiff's published scholarship, denied tenure, writing "I accept the majority opinion." (Def. Exs. Tab 85)

7

As part of the tenure process, the department had Plaintiff's written scholarship reviewed and evaluated by two outside experts. (PSOF 88) One reviewer - Professor Charles Mills – of Northwestern University was chosen by Department Chair Lee; the other, Professor Shannon Sullivan of Penn State University, was selected by Lee from a list submitted by Plaintiff. (PSOF 89)  Because they work in some of the same areas as Plaintiff, they were highly qualified to evaluate Plaintiff's written scholarship. (PSOF 90)

DPU's Memo uses Sullivan's comments about two not yet written chapters described in a draft book prospectus, and Mills' refusal to opine about the actual impact of a recently published work, to characterize overwhelmingly positive reviews as "damn[ing] with faint praise." (Memo, pp. 19-20). In reality, the outside experts were extremely complimentary of Plaintiff.

For instance, Mills, after describing Plaintiff's peer reviewed publications, noted the following:

1.      "One is struck by the thoroughness of Goswami's research. . ."

2.      "She writes with great intelligence, insight and theoretical sophistication."

3.      "I see her work as of a very high quality and directed towards an important goal."

4.      Plaintiff's work entitled "Autophagia" was published in "SIGNS" "one of the best known and oldest feminist journals" and "Existence Authoritarian" and "On The Limits," are chapters in two edited books published by the State University of New York (SUNY) Press.[14]

_____

[14] "SIGNS" is the most prestigious peer reviewed journal in Feminist Philosophy. Other works by Plaintiff were published in "ANGELKI, a journal edited by Moira Gatens, a prominent feminist theorist, and one was published in a book entitled "Rethinking Facticity," edited by two well respected continental philosophers. (PSOF 93)

5.      "In summary, then, I applaud not merely Goswami's enterprise . . . but her execution of it. She is doing important work that deserves to be recognized and I hope and believe eventually will be. She has, in short, my enthusiastic endorsement."  (PSOF 91)

Professor Sullivan's evaluation was equally positive. While she stressed the importance of, and shared suggestions for, chapters of Plaintiff's manuscript, <u>which had not yet been finished</u>, she noted that the Plaintiff's manuscript is "philosophically exciting and important," and "has the potential to be truly ground breaking." As for Plaintiff's peer reviewed and published work, Sullivan noted:

1.      "Goswami's explanation . . .is illuminating and should be extremely important to future developments in feminism and continental philosophy," and "should be important to colonial theory," and her arguments are "original and insightful."

2.      Plaintiff's work appeared in "SIGNS": <u>A journal of Women in Culture and Society</u>," which is the "top inter-disciplinary journal in women's studies," accepting only a small percentage of essays submitted to it, and SUNY Press, which had published two of Plaintiff's articles[15] (and had given Plaintiff an advance contract based up on a review of two chapters and her book prospectus) is a "well established university press that is highly regarded in continental and feminist philosophy circles." (PSOF 94)

When the department met to discuss Plaintiff's tenure application, the discussion about Plaintiff was, according to Philosophy Department faculty member Darrell Moore, "shocking" and "ugly," it did not proceed in a "normal way," and Plaintiff was treated differently in the process. (PSOF 95)

---

[15] SUNY published two of Plaintiff's articles and is currently proceeding with the process of publishing the book. (PSOF 92)

Philosophy Department faculty whose expertise were closest to that of Plaintiff's expertise (Darrell Moore, Mary Jeanne Larrabee, Elizabeth Millan and Tina Chanter), all voted in favor of tenure. (PSOF 104)[16] Defendants seemingly suggest that the votes of the majority were the result of a careful review of all of Plaintiff's peer reviewed and published scholarship. That is simply nonsense, as the Departmental report totally ignored Plaintiff's published and accepted peer reviewed articles, and is so devoid of substance with regard to Plaintiff's scholarship that it appears to be a distortion – a tactic now employed by Defendants and their counsel. The manner in which Plaintiff's written scholarship was evaluated is perhaps best exemplified by Patricia Werhane, a former DPU philosophy professor who voted against tenure. She claims that she read Plaintiff's draft book prospectus or introduction (she was not sure which), but just "looked over" Plaintiff's peer reviewed and published articles. Werhane conceded that the external reviews of Plaintiff's scholarship by Professor Charles Mills (Northwestern) and Shannon Sullivan (Penn State) had many positive things to say about Plaintiff's written scholarship (*see supra,* pp. 8-9), but the reviews did not pique Werhane's interest to actually read the articles "because I didn't have the time." (PSOF 105)

Typical of Defendants' distortion of the facts is found in DSOF #125, which suggests that on April 28, 2013 (sic)[17] Plaintiff wrongfully withheld information concerning an email from SUNY Press. The publication of any academic work is a lengthy staged process, and, in fact,

---

[16] Professor Chanter refused to sign the Department's tenure report because she did not think it was a fair and accurate record, and did not represent portions of the discussion. (PSOF 106) In Chanter's opinion, the vote against tenure was a result of institutional racism, demonstrated by anomalies in the procedure and the tone being different from any other tenure decisions she witnessed while at DPU. This is the classic mosaic. It goes beyond only one individual; it is a culture. (*Id.*) After Chanter supported Namita Goswami, Chanter was ostracized by Philosophy Department faculty, they did not acknowledge her, and with Birmingham assigning teaching schedules, did not get the class schedules requested, Chanter was assigned to teach at weird times (*Id.*). Her role in teaching Department's Teaching Practicum was taken away. (*Id.*) Chanter has since left DPU and lives in London. (*Id.*)

[17] The document could not have played a role in the Department's recommendation as it is dated April 28, 2010, well <u>after</u> the Philosophy Report majority recommended a denial of tenure.

SUNY is still on track to publish Plaintiff's manuscript. (PSOF 92) The SUNY reader who is referenced in the e-mail (Falguni Sheth) was then, and remains, enthusiastic about the book. In fact, Sheth (a Professor of Philosophy and Political at Hampshire College, who continues to be a current SUNY reviewer) believed that while revisions to the manuscript were needed, the manuscript should be published because it was both original and important, making a contribution to philosophy, feminism and post-colonial theory, and that it demonstrated sound scholarship.[18] (PSOF 119)

Pursuant to DPU's Faculty Handbook (§ 3.6.1), the tenure report was required to be "substantive and must provide specific, concrete examples to support" the decision. (PSOF 122) Here, the report (which was ultimately relied upon by the UBPT and Pres. Holtschneider) is devoid of the required substance. In fact, the report's authors virtually ignored all of the praise-worthy comments provided by Mills and Sullivan, and refashioned Sullivan's suggestion concerning the content of unwritten chapters into a claim that Sullivan had "reservations" about the manuscript. (*Id.*) Pres. Holtschneider conceded that the report omitted many of Sullivan's positive statements concerning Plaintiff's scholarship, and that the recommendation did not "adequately" summarize Sullivan's review. (PSOF135) He admitted that the report inaccurately claimed that Sullivan had "reservations" about Plaintiff's manuscript (*Id.*, p. 34: 9-18), and that all of Mill's praiseworthy comments had been reduced to just eight words. (PSOF 123) Defendants now seek to bolster their decision with the submission of substantially identical declarations from faculty who voted against tenure claiming that they had reserved judgment on Plaintiff's tenure until after they reviewed Plaintiff's scholarship. Those self-serving denials disclaiming discriminatory intent must be considered conclusory rather than probative. *Shaw v.*

---

[18] The revision process prior to the publication of academic scholarship is often rigorous and lengthy. Nevertheless, Plaintiff's manuscript remains on track to be published by the SUNY Press. (PSOF 92)

11

*W. Elzie Danley, Sr.*, 2000 U.S.App. LEXIS 545, (6th Cir. 2000). Summary judgment affidavits cannot be "conclusory" and "self-serving opinions without objective criteria" are not considered significantly probative. *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962 4th Cir. 1996). Here, the declarations executed by faculty members who voted against tenure are remarkable for their total lack of objective criteria. Moreover, the suspect nature of the faculty declarations is perhaps best illustrated by Elizabeth Rottenberg's declaration where she claimed she did not make her decision to vote against Plaintiff's tenure until she considered her tenure application. (Defs. Exs. Tab 113, ¶ 8) Compare that with Rottenberg's emails, written before Plaintiff's September, 2009, tenure application and the October external reviews where Rottenberg had counted those who would vote "with us" and against tenure! (PSOF 71)

After the Departmental vote, Plaintiff's tenure application was reviewed by the College Personnel Committee ("CPC") and College of Liberal Arts and Social Sciences Dean Charles Suchar, who unanimously rejected the decision to deny Plaintiff tenure, calling the Departmental Report, among other things, "unfair" and "offensive, baseless and illogical," and questioning the conclusions about the quality of Plaintiff's scholarship. They noted their concern that the generally positive external reviews by Mills and Sullivan "were sampled" for "negative sounding comments" (PSOF 126), and found Plaintiff to be an "outstanding teacher" with an "excellent to outstanding" service record, "impressive" for a faculty member during the probationary period. (PSOF126) The CPC and Dean Suchar recommended that Plaintiff be granted tenure. (PSOF 26)

The recommendation of the CPC and Dean Suchar was forwarded to the University Board of Promotion and Tenure ("UBPT") which voted 6 to 1 to accept the department's

12

recommendation against tenure. (PSOF 130)[19]  It summarized its recommendation as being based upon the department report. (*Id.*)[20]  In the UBPT report, it disclosed that every one of the twenty white tenure applicants was recommended for tenure, while only four of the ten other tenure applicants (of color) were recommended for tenure. (PSOF 131)[21]

Pres. Holtschneider accepted the UBPT recommendation to deny tenure, basing his decision on the Departmental report's opinion concerning her scholarship. (Ans., ¶ 145)  He too never read a word of Plaintiff's written scholarship, relying on the Departmental Report, which had inaccurately summarized the outside evaluation of Plaintiff's written scholarship.  (PSOF 134)

The treatment of Plaintiff was then reviewed by the University's Appeal Review Board ("Review Board"), appointed by DPU's Faculty Council. (Ans., ¶146)  In its report, it found: (a) the Philosophy Department and the University had violated numerous policies and procedures set out in the Faculty Handbook in the various reviews leading up to the tenure denial, and (b) the denial of tenure and the process which preceded the denial were marked with numerous violations of Plaintiff's academic freedom, including the use of traditional philosophical criteria

---

[19] Those voting against tenure were a costume designer in DPU's Theater School, and professors in the Colleges of Law and Education, and the Departments of Economics, Modern Language and Chemistry. Although all submitted declarations (Def. Exs., Tabs 100, 101, 102, 109, 112 and 119), not one claims to have read any of Plaintiff's written scholarship or to have the expertise to evaluate her scholarship.

[20] Pursuant to the Faculty Handbook, a graduate student who had prepared a report of Plaintiff's teaching was required to attend the UBPT meeting. However, Lee neglected his responsibility to advise that student of the meeting date  in a timely manner – perhaps a blessing given the hostility the student had experienced when she presented the report to the Department. (PSOF 103 and 128).

[21] When Pres. Holtschneider learned of the racial disparity he stated: "we realized, 'oh my gosh, all the candidates getting no votes are people of color.'" (PSOF 104) While not usually sufficient in itself to prove discrimination, statistical evidence can be very useful to prove discrimination. *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 423 (7th Cir. 2000); *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990).  The fact that every white tenure applicant, but only 40% of applicants of color, were recommended for tenure, is telling.

to evaluate her work, when she was hired to do inter-disciplinary scholarship and teaching. (PSOF 2)

Pursuant to the Faculty Handbook, once the Review Board found a violation of academic freedom, the Dean of the College of Liberal Arts and Social Sciences was required to recommend that "another contract be offered [to Plaintiff] or a review of the case be conducted in accord with those procedures ordinarily reserved for tenured faculty being dismissed for cause." (PSOF 138) He was ordered by the Provost not to do so, and the University President simply "rejected" the decision of the Review Board. (PSOF 141, 145)

The University President then created a new appeal process (one available only for Plaintiff and one other faculty member) whereby the tenure denial would again be reviewed, but with the burden of proof shifting from the University to the faculty members seeking tenure to establish their right to tenure by "clear and convincing evidence. (PSOF 146) Plaintiff chose not to participate in that process and her career at DePaul was finished.

## ARGUMENT

### I
### GENUINE ISSUES OF MATERIAL FACT PRECLUDE THE ENTRY OF SUMMARY JUDGMENT AGAINST PLAINTIFF ON HER TITLE VII AND CIVIL RIGHTS ACT CLAIMS

**A.     Overview.**

In Count III of her complaint, Plaintiff alleges race and color discrimination in violation of 42 U.S.C. § 1981. In Count IV, Plaintiff alleges discrimination on the basis of race, color, national origin and gender in violation of Title VII (42 U.S.C. § 2000e *et seq.*). Summary judgment can be granted only where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show there is no genuine issue as to any material

fact, and that the moving party is entitled to judgment as a matter of law. *Sample v. Aldi, Inc.*, 61 F.3d 544, 597 (7th Cir. 1995) (quoting *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). The Court must view the facts in a light most favorable to Plaintiff, drawing all reasonable influences in her favor. *Vanasco v. National-Louis University*, 137 F.3d 962 (7th Cir. 1998). That standard is applied with added rigor in employment discrimination cases where intent and credibility are crucial issues. *Sample v. Aldi, Inc.*, 61 F.3d 544, 547 (7th Cir. 1995)

Plaintiff can overcome Defendants' motion for summary judgment either by putting forth enough evidence, direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a *prima facie* case under the formula established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir. 1997); *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 719 (7th Cir. 2005). Because a complete examination of the record demonstrates genuine material issues of fact that (along with reasonable inferences), that must be construed in Plaintiff's favor – *Adelman-Reyes v. Saint Xavier University*, 500 F.3d 662, 665 (7th Cir. 2007) summary judgment cannot be granted.

**B.     DPU's Tenure Decisions Are Not Exempt From Scrutiny.**

Contrary to DPU's suggestion:

> ". . . an employee's right not to be denied tenure for discriminatory reasons prevents the insulating of the tenure process from any judicial review. As in other forms of employment, an inference of discrimination can be derived from a showing that University's given reasons for denying tenure to plaintiff were 'obviously weak or implausible,' or that the tenure standards prevailing at the tenure decision were 'manifestly unequally applied.'" (Kumar *v. Board of Trustees, University of Massachusetts,* 774 F.2d, 1, 12-15 (1st Cir. 1985), *cert. denied* 475 U.S. 1097 (1986).

As the Seventh Circuit noted in *Namenwirth v. Bd. of Regents*, 769 F.2d 1235, 1243 (7th Cir. 1985), "faculty votes should not be permitted to camouflage discrimination, even the unconscious discrimination of well-meaning and established scholars." Long ago Congress removed academia's exemption from Title VII scrutiny (Pub.L. No. 92-261 Sec. 3 – codified at 42 U.S.C. *See* 2000e-1) Thus, the Seventh Circuit has noted that "Congress must have recognized that in order to achieve its legislative goals, courts would be forced to examine critically university employment decisions." *Davis v. Weidner*, 596 F.2d 726, 731 (7th Cir. 1979).

**C.   Plaintiff Can Prove Her Discrimination Claims Under Both The Direct And Indirect Methods of Proof.**

Plaintiff's race discrimination claims under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000 *et seq.*) and 42 U.S.C. § 1981utilize the same analysis (*Smith v. Bray*, 681 F.3d 888, 895-96 (7th Cir. 2012)); a separate analysis for both claims is unnecessary. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 n. 1 (7th Cir. 2012). Under both statutes, a plaintiff may oppose summary judgment under the direct and indirect methods of proof. *Coleman v. Donahoe*, 667 Fd.3 835, 845 (7th Cir. 2012). Weighing evidence and making credibility decisions are jury functions, and it is not appropriate for a judge to assume those functions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bob-Maunuel v. Chipotle Mexican Grill, Inc.,* 014 U.S.Dist. LEXIS 5447 *9 (N.D.Ill. 2014). Accordingly, the court "appl[ies] the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on issues of intent and credibility." *Krchnavy v. Limagrain Genetics Corp.,* 294 F.3d 871, 875 (7th Cir. 2002).

A plaintiff survives a summary judgment motion under the direct method of proof, by presenting direct or circumstantial evidence allowing the inference that the adverse action was

motivated by a discriminatory intent. *See Dickerson v. Bd. Of Trs. Of Cmty. Coll. Dist. No. 522,* 657 F.3d 595, 601 (7th Cir. 2011). Direct evidence ordinarily requires a statement or admission by a decision maker that shows his or her actions were based on prohibited animus. *See Walker v. Bd. Of Regents of Univ. of Wis. Sys.,* 4010 F.3d 387, 394 n. 7 (7th Cir. 2005). However, an absence of direct evidence concerning the decision maker's discriminatory intent is not fatal to a plaintiff's claim here because under the "cat's paw" theory, liability may be imposed on an employer where the evidence shows that an employee with "discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Smith v. Bray,* 681 F.3d 888, 897 (7th Cir. 2012), quoting *Dey v. Colt Construction & Dev. Co.,* 28 F.3d 1446, 1459 (7th Cir. 1994).

Plaintiff's direct method claim can also be preserved with circumstantial evidence; that is, a "convincing mosaic" which would allow a jury to infer intentional discrimination by a decision maker that may include "suspicious timing, ambiguous statements and oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *See, Mateo v. City Colleges of Chicago,* 2013 U.S.Dist. LEXIS 133258 *2-3, 6 (N.D.Ill. 2013), quoting *Silverman v. Bd. Of Educ. Of the City of Chicago,* 637 F.3d 729, 734 (7th Cir. 2011). *See also Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003).

The indirect method has three steps. *See McDonnell Douglas Corp., v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973), requiring the plaintiff must make a *prima facie* case of discrimination, by establishing "(1) she is a member of a protected class; (2) she was qualified for tenure; (3) she was denied tenure; and (4) a similarly situated applicant outside the protected class was granted tenure." *Sun v. Bd. Of Trs. Of Univ. of Ill.,* 473 F.3d 799, 814

(7th Cir. 2007); *see also Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662 (7th Cir. 2007). If the plaintiff makes a *prima facie* case, the burden shifts to the defendant, which must offer a non-discriminatory reason for denying the plaintiff tenure. *See Adelman-Reyes*, 500 F.3d at 665; *Sun*, 473 F.3d at 814. If the defendant meets that burden, the burden shifts back to the plaintiff, who must provide evidence that the defendant's stated reason is pretext. *See Adelman-Reyes*, 500 F.3d at 665; *Sun*, 473 F.3d at 814. However, where a defendant has offered a nondiscriminatory reason for an employment decision, the court may skip an analysis of the *prima facie* case, and proceed to an evaluation of pretext. *Adelman-Reyes*, 500 F.3d at 665. In that evaluation, the denial of tenure must be rooted in a good faith basis. *Mateo v. City Colleges of Chicago*, 2013 U.S.Dist. LEXIS 133258 *8 (N.D.Ill. 2013).

Here, as shown below, Plaintiff has met her burden under the direct and indirect methods.

**D.      Plaintiff's Evidence, Under The Direct Method Of Proof, Requires A Denial Of DPU's Summary Judgment Motion.**

In their Memo (p. 9), Defendants suggest that the Court could scour the record in vain to find competent evidence of discrimination by any member of the Philosophy Department who found Plaintiff's work "inadequate."

Defendants have apparently overlooked an email from Rottenberg to Birmingham where Rottenberg commented that Plaintiff could only find a job with the assistance of "her white boy husband."   Birmingham not only did not object to this discriminatory comment, she agreed, writing to Rottenberg, "I checked the website and discovered that her husband (Brendan) is at Indiana State University at Terre Haute, a third rate place.  She is there too.  He did get her the job!  So, we were right: whatever she does, she needs her husband to do it.  Nothing sexist about it." (PSOF 148)  Given the pivotal roles that Birmingham (the Department's Acting Chair and

18

Associate Chair) and Rottenberg (now the Department's Associate Chair) played in the tenure denial, this is significant evidence of discriminatory animus.

But, there is more.

Other faculty members and administrators who were involved in the May, 2009 review and 2010 departmental tenure process believed that the department's actions were unfair, offensive, illogical, and discriminatory, and that Plaintiff was treated differently from ███, a white male. For instance:

• Professor Bill Martin believed that the procedure leading to the recommendation to "terminate" Plaintiff's contract was neither "fair nor right." (PSOF 57)

• Dean Suchar believed that the May, 2009 procedure was "strange" and "disappointing," and that the department's January, 2010 recommendation of tenure denial was "unfair," and "offensive, baseless and illogical." (PSOF 58)

• Professor Mary Jeanne Larrabee testified that the tenure denial was the result of racism, which included Birmingham saying that Plaintiff was not "grateful" to her and that Plaintiff did not act like a South Asian female should. (PSOF 155)

• Professor Tina Chanter testified that she believed the departmental vote to deny tenure was a result of racism, demonstrated by anomalies in the procedure, that the department decision discussion of Plaintiff's tenure application was different in tone to any she had ever witnessed, that different standards were used to evaluate Plaintiff than used for other tenure applicants, and that the department's tenure report was not a fair and accurate record because it did not represent portions of the discussion. (PSOF 106, 107 and 108)

19

- Professor Elizabeth Millan Zaibert felt that junior female faculty of color had been treated unfairly, that Birmingham's harassment of them "must stop," and that the tone of the faculty meeting concerning Plaintiff's tenure application was abusive. (PSOF 109)

- Professor Frank Perkins accused the department majority of twisting the evidence, and of a "disregard for procedure and criteria." In his opinion, the department members were "racists" for not tenuring ███████ and Plaintiff. (PSOF 110)

- Professor Darrell Moore believed that the bias against Plaintiff, following a campaign against Plaintiff mounted by Birmingham, was racist. (PSOF 59)

**E.    Plaintiff's Evidence, Under The Indirect Method Of Proof, Requires A Denial Of DPU's Motion For Summary Judgment.**

DPU does not argue that Plaintiff is not a member of a protected class, and concedes that when Plaintiff was denied tenure, ███████████, a white male in the Philosophy Department was granted tenure. Thus it is clear that a similarly situated applicant not in the protected class was granted tenure. At issue then, is whether Plaintiff has presented evidence that DPU's reason for the denial of tenure was a pretext. Because the evidence demonstrates that a genuine issue of material fact exists as to Plaintiff's qualifications for tenure, DPU's summary judgment motion must be denied.

**1.    Convincing Evidence Demonstrates That Plaintiff Was Qualified For Tenure.**

A wealth of facts, construed in a light most favorable to Plaintiff, demonstrate that Plaintiff was qualified for tenure:

- Two external reviewers praised Plaintiff's written scholarship, and six tenured Philosophy Department faculty members voted in favor of tenure. Two felt strongly enough about the recommendation to author a minority report (Defs. Exs. Tab 91), wherein they praised Plaintiff's scholarship. And five wrote individual letters to the Appeal Board concerning, *inter*

*alia*, the improprieties, differential treatment and racism in Plaintiff's tenure process.  (PSOF 142)

- The Dean and all members of the College Personnel Committee recommended, in a strongly worded report to the UBPT,[22] that Plaintiff be granted tenure, based upon her teaching, service and scholarship. The Dean and Committee called her scholarship "excellent," her service "excellent to outstanding," and her teaching record "outstanding."  (PSOF 126)

- DPU's Appeal Review Board found that numerous procedural violations during Plaintiff's probationary years (including inconsistency, arbitrariness, and informality) and tenure review had a negative effect on her bid for tenure, and that criteria underlying the denial of tenure constituted a violation of her academic freedom. (PSOF 62,137)

Given the expertise of those who found Plaintiff's scholarship to be worthy of tenure, and those who favored tenure, this case differs significantly from the tenure denial decisions relied upon by Defendants. For instance:

In *Adelman-Reyes v. Saint Xavier University*, 500 F.3d 662 (7th Cir. 2007), one college committee recommended tenure, a Dean and University Committee did not. At Saint Xavier University, a Dean's recommendation was considered "very central" and "very crucial."  (500 F.3d at 664)  The plaintiff's claim failed due to her "failure to come forward" with sufficient evidence to prove pretext.  In *Blasdel v. Northwestern University*, 687 F.3d 813 (7th Cir. 2012), there was concern about plaintiff's uneven productivity, moderate publication record and problems getting external funding, and members of her department's tenure committee and her Dean unanimously recommended against tenure, and she had "tepid" recommendations from

---

[22] Ironically, DPU, having based its motion on the availability of a multi—level tenure review process, dismisses the report from the Dean and The College committee as "venomous."  (Memo, p. 32)

outside reviewers. (687 F.3d at 820) The decision is silent with respect to the quality of plaintiff's scholarship.

*Namenwirth v.Bd. of Regents*, 769 F.2d 1235 (7th Cir. 1985), was not a summary judgment case. There, after a trial, a magistrate judge ruled against the plaintiff, who alleged that a tenure denial was a result of sexual discrimination. A committee in plaintiff's department did not recommend tenure, and outside scholars had concerns with plaintiff's scholarship.

In *Vanasco v. National-Louis University*, 137 F.3d 962 (7th Cir. 1998), plaintiff's application for tenure had no support. In affirming a grant of summary judgment, the Seventh Circuit noted that plaintiff failed to engage in a detailed comparison of her qualifications to other candidates who were granted tenure, and her failure to present evidence of pretext. (137 F.3d at 967 and 969)

In *Kuhn v. Ball State University*, 78 F.3d 330 (7th Cir. 1996), the Seventh Circuit affirmed the grant of summary judgment where there was no evidence of pretext and scholarship does not appear to have been at issue. In *Lim v. Trs. of Ind. Univ.*, 297 F.3d 575 (2002), the Seventh Circuit affirmed a grant of summary judgment in favor of defendants in a gender discrimination/tenure case. Plaintiff had almost no support for tenure, and the plaintiff had been repeatedly warned about her publication "rate."[23] In affirming the District Court, the Seventh Circuit noted that plaintiff had failed to prove a *prima facie* case of gender discrimination because the undisputed evidence showed that Plaintiff failed to meet publishing standards as to quantity (297 F.3d at 581).

The fact that DPU has offered no tenure case where a court chose to disregard substantial evidence of good scholarship in granting summary judgment is telling. In that regard, a recent decision by Judge Joan Lefkow in a tenure/discrimination case is instructive.

---

[23] After an internal appeal, tenure was again denied.

In *Mateo v. City Colleges of Chicago*, 2013 U.S.Dist. LEXIS 133258 (N.D.Ill. 2013), an Asian woman, claimed that the denial of tenure and the termination of her employment was based on discrimination. One faculty member (White) had supported the plaintiff's tenure application, while one (McDuffy) had not. Judge Lefkow found that because one faculty member who had reviewed plaintiff's portfolio favored tenure, plaintiff met "her burden of showing she was at least qualified for a tenure position." Judge Lefkow also found it significant that the faculty member who recommended against tenure (McDuffy) had made her decision before the plaintiff had submitted her final tenure document (a "proposal"), thus calling "the legitimacy of that recommendation into question." (*Id.* at *9) Here, not only did Plaintiff receive substantial support for tenure based upon her scholarship, but a wealth of evidence demonstrates that many faculty members (including Birmingham, Rottenberg, Steeves, Krell, and Pellauer) had decided to vote against tenure in May and June, 2009 – several months before Plaintiff submitted her tenure application, and at least six months before external reviews of Plaintiff's written scholarship were added to her tenure dossier. Of course, Plaintiff's record of service and teaching were stellar: she received the coveted University Award for teaching in 2007. (PSOF 101) Birmingham believed that Plaintiff received the Award because she was a woman of color. (PSOF 24)

## 2. Substantial Evidence Demonstrates, Under The Cat's Paw Theory Of Liability, That Dpu's Motion For Summary Judgment Must Be Denied

DPU argues (Memo pp. 7-9) that there is no evidence that Pres. Holtschneider acted out of discriminatory motivation, and that Plaintiff cannot show that he was influenced by someone who is prejudiced. Thus, citing *Cerutti v. BASF Corp.,* 349 F.3d 1055 (7th Cir. 2003), DPU argues that even if one faculty member was prejudiced, that is not enough to prove that the voters in a majority were influenced.

Not only does the evidence fail to support DPU's conclusion, but its reliance on *Cerutti* is misplaced. In *Cerutti* (a termination case), the plaintiff alleged that co-workers made racists comments. The court held that those comments could not be used to support claims of discrimination under the direct method because the speakers had no involvement or influence in the termination decision making process. Here, of course, racist comments were made by persons who were involved in the tenure process,[24] and who made comments about Plaintiff's scholarship which found their way into the written report relied upon by Pres. Holtschneider.

Significantly, racism permeated Plaintiff's years at DPU in a manner similar to that experienced by ████.[25] In Plaintiff's case the department's white faculty appear to have recycled complaints made about ██. (*See infra,* p. 26) All of this provides a convincing mosaic of discrimination and pretext. The racist comments should be considered part of the mosaic and the cat's paw analysis, despite DPUs' claim that lower level racism is inconsequential because the tenure process requires intermediate steps between the Philosophy Department recommendation and the President's decision. The Seventh Circuit has effectively weakened that argument, quoting (with apparent approval) the Fifth Circuit in *Professional Ass'n of Coll. Educators v. El Paso Cmty. Coll. Dist.,* 730 2d 257, 266 (5th Cir. 1984) ("if an improper motive sets in motion the events that lead to termination that would not otherwise occur, intermediate step[s] in the chain of causation do not necessarily defeat the plaintiff's claim.") (*See Smith v. Bray,* 681 F.3d 888, 899 (7th Cir. 2012)).

---

[24] Such racist comments include referring to Plaintiff's "white boy husband," and stereotyping her , suggesting that people like Plaintiff should be denied tenure because they need a good "kick in the pants," that she was angry and had a "thinking problem," and references to only white philosophy professors as "serious" colleagues (PSOF 20, 112, 124, 147, 148, 151)

[25] ██ and Plaintiff are the only two persons who the Philosophy Department did not recommend for tenure in the past eleven years. (PSOF 110, 111)

### 3. Substantial Evidence Demonstrates That Plaintiff Was Treated Less Favorably Than A White Candidate For Tenure

Plaintiff and a white male, ███████████, were to be considered for tenure in 2010.[26] Leading up to the tenure applications for ████████ and Plaintiff, in a series of meetings and emails with Professor Eugene Beiriger, Birmingham and Rottenberg tried to devise a strategy that would preclude Plaintiff from even applying for tenure because (a) she was a thorn in Birmingham's side (a reference to Plaintiff's complaints regarding discrimination), and (b) that her qualifications would be perceived as better than ████████. (PSOF 69, 85)[27] In fact, Plaintiff's qualifications were not merely perceived as better, they were better.[28]

Plaintiff's service was remarkable for a probationary employee (PSOF 7), and was clearly superior to ████████. And, Plaintiff had ten peer reviewed publications in journals and edited volumes after arriving at DPU. ████████ had five published works, only one of which was peer reviewed. Two were short conference presentations, one was an invited article, and one was a review article for a journal edited by ████████████████████. (See PSOF 159 for a comparison)

At the time of the department meeting on January 8, 2010, Plaintiff possessed an advance contract with SUNY Press. (PSOF 92) In contrast, ████████ revision of his dissertation had been rejected outright by Cambridge University Press and he needed Krell's help to get it

---

[26] In its May 29, 2009 meeting, the Department itself chose to compare Plaintiff to ████████. (PSOF 156)
[27] The disputed treatment is best exemplified by how Professor David Krell treated ████████ written scholarship. Krell, three months before Plaintiff submitted her tenure application, offered (to Birmingham and Rottenberg) to write a "6 page 'stunning' report on [Plaintiff's] research." (PSOF 72) According to Krell, after receiving ████████ manuscript, which had already been rejected for publication, he (Krell) helped ████████ by spending three months of "pretty hard work going through the book," generating "lots of suggestions" concerning changes to make to improve the manuscript. After Krell completed his work, he thought it was a wonderful book. He then wrote to Dee Mortenson (Indiana University Press) and John Sallis (Boston College) to say it was a "great book" and should appear (Id.), and asked Mortenson to send Lee "a letter of interest." (PSOF 97)
[28] A comparison of Plaintiff's and ████████ teaching service and written scholarship is found in PSOF 159.

published.  Previously ███████ had promised to complete the revisions in the summer of 2005, the fall of 2006, and the summer of 2007. By the spring of 2009, he had "almost completed" the manuscript). (PSOF 99)  By January 8, 2010, ███████ manuscript was completed, but had not been accepted for publication.

Plaintiff's external reviewers of her published work were laudatory, but "sampled" (*supra*, pp. 11-12), while the department ignored criticism of ███████ work. One reviewer, ██████████████████████, noted that ███████ could have pursued a line of analysis further and more precisely. (PSOF 100) The second, ███████████████, had been the beneficiary of David Krell's charity. Krell had suppressed a negative review of Schmidt's work so as to not damage Schmidt's career. (PSOF 101)  Although Schmidt deemed ███████ work "quite interesting," he expressed disappointment that ███████ book manuscript had not pushed his conclusion further. ██████████████ negative comments were not referenced in the Department's recommendation. (PSOF 100, 101)

Despite ███████ inferior record, ███████ department vote was 17-0 in favor of tenure.  Clearly, Birmingham, Rottenberg, and their followers had succeeded in building up ███████ by omitting the negative portions of his record, and they brought Plaintiff down by omitting positive statements from her reviewers.

The quality of Plaintiff's scholarship, as found by the external reviewers selected by Lee, as well as the opinions of Dean Suchar, the College Personnel Committee, and six Philosophy Department faculty with expertise aligned with Plaintiff's, is sufficient to establish pretext. (*Mateo v. City Colleges of Chicago, supra*)  Substantial evidence, viewed in a light most favorable to. Plaintiff, demonstrates she was treated less favorably than ███████

26

In addition, the Department's treatment of ███████, a man of color ███████, closely paralleled with its treatment of Plaintiff. In Plaintiff's case, the department's white faculty recycled the complaints they had used against ██.

1.      Both ██ and Plaintiff were portrayed as having problems with "collegiality," and were criticized as needlessly confrontational, and unwilling to accept advice. (PSOF 20, 114)

2.      ██ writing was deemed to lack a theoretical framework , while Plaintiff's writing was criticized as deemed to lack a conceptual framework.[29]  (PSOF 112 and 113)

3.      Pellauer had told ██ to keep his mouth shut and to be like Steeves (a white male), while Birmingham had upbraided Plaintiff for radical comments.   (PSOF 116)

Defendants, citing *Vanasco*, 137 F.3d 962 (7th Cir. 1998),[30] seemingly suggest that Plaintiff cannot demonstrate less favorable treatment because of her inability to "speak to the motivations" of people who voted against tenure defeats any pretext argument. Of course, the *Vanasco* decision says nothing about "motivation."  Instead, the *Vanasco* plaintiff had testified that she had no reason to doubt that those who denied tenure were stating their "honest opinions."  Plaintiff offered no such testimony, and the record reflects that she repeatedly complained about discrimination, that other members of the department knew about the discrimination complaints, and, most importantly, members of the department who voted in favor of tenure believed that race motivated the negative tenure votes.

In their memorandum, Defendants, citing *Frederick v. Metro State Univ. of Denver*, 535 Fed. App'x. (10th Cir. 2013) and *Qamhiyah v. Iowa State Univ. of Sci. & Tech.,* 566 F.3d 733 (8th Cir. 2009), suggest that Plaintiff's claims "cannot survive" because Pres. Holtschneider

---

[29] ██ abstained from voting on Plaintiff's tenure application, he was rewarded with a promotion to full professor by Pres. Holtschneider. Out of gratitude, ██ then volunteered to support Pres. Holtschneider in Plaintiff's challenge to her tenure denial, offering to "play the race card." (PSOF 117)

[30] In *Vanasco,* not one person supported the plaintiff's second tenure application.

undertook his own independent review. As for the *Qamhiyah* decision, putting aside, for the moment, that the Eighth Circuit's standard for cat's paw liability is different than that of the Seventh Circuit,[31] it is nonsense to suggest that Pres. Holtschneider made an independent review of Plaintiff's scholarship. He did not read any of her work and, instead, admits doing nothing more than to "accept" the tainted opinion of the department majority – a majority clearly led by Birmingham.

The *Frederick* decision does not help Defendants either. There, the court found that the plaintiff had presented no facts that suggest that the ultimate decision maker relied upon "anyone else's comments" and that he independently reviewed the candidate's dossier. Here, again, Pres. Holtschneider not only relied on the negative comments in the tainted departmental report, but he admitted that he had not reviewed any of the very work the decision was based upon – Plaintiff's written scholarship. That can hardly be considered an "independent review."

## II
## GENUINE ISSUES OF MATERIAL FACT REQUIRE A DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM

Plaintiff claims, under Title VII and § 1981, that her tenure application was denied, and her employment by DPU was terminated, in retaliation for her complaints about discrimination. DPU argues that it is entitled to summary judgment because Plaintiff did not engage in protected activity before the denial[32] and "undisputed facts negate any caused link between Plaintiff's [2009] complaint to the Dean," and that the retaliation claim fails under the indirect method of proof. Birmingham argues that she cannot be individually liable for retaliation. (Memo, pp. 25-6)

---

[31] In the Eighth Circuit, an employer cannot shield itself from liability where the decision maker is merely a "conduit, vehicle or rubber stamp." (566 F.3d at 742)

[32] Once tenure was denied, pursuant to the DPU policy, Plaintiff's employment ended after the expiration of her contract.

As shown below, the Defendants advance their arguments only by twisting Plaintiff's actual claim, and disregarding documents produced by Defendants.

## A.    Applicable Law.

To avoid summary judgment on her retaliation claims against DPU and Birmingham under the direct method, Plaintiff must present direct evidence of (1) her statutorily protected activity;[33] (2) a materially adverse action by DPU and/or Birmingham;[34] and (3) a causal connection between the two. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012). Plaintiff's claim against Birmingham individually survives if Birmingham's improper motive can be shown to have set in motion events which led to an adverse action. *See Smith v. Bray*, 681 F.3d 888, 898-9 (7th Cir. 2012). As with Plaintiff's discrimination claims, cat's paw liability can be imposed on DPU if "the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." (*Smith v. Bray*, 681 F.3d at 987, quoting from *Alexander v. Wisconsin Dept. of Health & Family Services,* 263 F.3d 673, 684 (7th Cir. 2001).

To establish a *prima facie* case of retaliation under the indirect method, Plaintiff must satisfy the first two elements under the direct method, and must further show she was (1) meeting DPU's legitimate expectations; and (2) was treated less favorably than a similarly employee who did not engage in protected activity. *Smith v. Lafayette Bank & Trust Co.,* 674 F.3d 655, 657-8 (7th Cir. 2012). To survive a summary judgment motion, a plaintiff needs to provide enough direct or circumstantial evidence to allow a jury to conclude that she suffered an

---

[33] Even an informal complaint may constitute protected activity for the purposes of a retaliation claim. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).
[34] A refusal to rehire a faulty member is considered an adverse employment action. *Montgomery v. DePaul University*, 2012 U.S.Dist. LEXIS 128206 *8 (N.D.Ill.2012).

adverse employment action because of her statutorily protected activity. *Bob-Maunuel v. Chipotle Mexican Grill, Inc.*, 2014 U.S.Dist. LEXIS 5447 *16 (N.D.Ill. 2014).

**B.      Plaintiff Engaged In Protected Activity Before The Adverse Job Actions.**

DPU acknowledges that in 2005 and again in 2009, Plaintiff complained to her Deans (Mezey and Suchar) about harassment and a hostile work environment, but claims that Plaintiff made no reference to unlawful discrimination. However, in making its argument, DPU overlooks the long history of specific complaints about discrimination made by Plaintiff, which Birmingham and her followers within the Department never forgot:

- On April 20, 2005, Plaintiff met with College Dean Mezey and complained about Birmingham's distortions, misrepresentations and use of hearsay in her annual evaluations. Plaintiff expressed her belief that she was being discriminated against. (PSOF 15)

- On April 26, 2005, September 23, 2009 and October 9, 2009, Plaintiff met with Elizabeth Ortiz of the Office for Institutional Diversity and Equity ("OIDE"). During the meetings, Plaintiff told Ortiz that she believed she was a victim of discrimination by Birmingham. (PSOF 16)

- On April 27, 2005, Plaintiff met with Craig Munson, the University Ombudsman, and complained about discrimination. (PSOF 15)

- On March 30, 2009, Plaintiff, after receiving Birmingham's annual review for calendar year 2008, met with College Dean Charles Suchar and complained about Birmingham's evaluation and discrimination. (PSOF 41)

- On April 7, 2009, she met with Elizabeth Ortiz, Senior Executive for Institutional Diversity, during which she complained about discrimination. (PSOF 42)

- On May 5, 2009, May 15, 2009 and June 2, 2009, Plaintiff met with Jay Jones of OIDE during which she complained about Birmingham's discrimination. (PSOF 16)

- On November 1, 2009, after November 11, 2009 and January 25, 2010, Plaintiff met with Maya Omar and Barbara Shaffer. Shaffer was the Assistant Vice President for Diversity Investigations. At all three meetings Plaintiff complained about discrimination. During the second meeting, Omar and Shaffer advised Plaintiff not to file a discrimination complaint so as to avoid being seen as a troublemaker. (PSOF 16)

- In an email to Arlette Johnson, an OIDE investigator, Birmingham confirmed that she was told in 2005 (by then College Dean Mezey) that Plaintiff had gone to the DPU ombudsman with charges of "racial bias" against her. (PSOF 84)

- At the departmental tenure meeting on January 8, 2010, Birmingham made two statements concerning Plaintiff's complaints about discrimination:

1. "I was the chair for three years. And I just want to say this. I, of course, I was - - I'm not going to say what happened with that review. We all know what happened with that review. I ended up being taken to the ombudsman."

2. "And we all know what we're talking about here. The reason I think that - - and I can only speak for myself - - is that I - - this is not part of the document. The document needs to document what we want to do in here. I was going to say, I find it really rich to be saying we're so mean to Namita when my name has been so dragged through this department, through the college, through the profession."[35]

---

[35] The statements are contained in an audiotape of the meeting which is being filed under seal as Exhibit 6C. The first statement can be found at approximately 3:30:40 of the tape and the second at approximately 4:57:50 of the tape.

- Rottenberg also had knowledge of the discrimination complaint (PSOF 85-86) and was critical of Plaintiff for what she put Birmingham through. (*Id*) She called Plaintiff a thorn in Birmingham's side. (PSOF 69))

## C. Plaintiff Can Demonstrate A Causal Link Between Her Complaints Of Discrimination And The Adverse Actions.

DPU argues (Memo, pp. 26-27) that Plaintiff cannot show that members of the Department or the UBPT knew of the complaints of discrimination, and that although Pres. Holtschneider knew about Plaintiff's complaints to the Deans, he did not understand them to be complaints about employment discrimination. Citing *Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009), DPU argues that a superior cannot retaliate against an employee for a protected activity about which he had no knowledge. DPU goes on to argue that causation cannot be inferred because Plaintiff's 2009 complaint was far removed in time from the adverse action. DPU's arguments are wrong on the law and the facts.

The *Stephens* decision is simply not applicable here. There, the plaintiff was denied a promotion, and he claimed that the denial was in retaliation for protected activity. The court held (a) that <u>individual defendants</u> who had no knowledge of a protected activity could not be held liable for retaliation; and (b) one individual who did have such knowledge had absolutely no connection to the individuals who recommended no promotion. (569 F.3d at 788-9)  Birmingham had knowledge of the discrimination complaints and substantial connections to (and influence over) those who made the recommendation relied upon by Pres. Holtschneider.

As for the timing issue, the Seventh Circuit has never held that a gap in time means that retaliation did not occur. To the contrary, what the Seventh Circuit recently said is applicable here: "we reiterate what we have said consistently and repeatedly in retaliation cases stretching back more than a decade:  a long time interval between protected activity and adverse

employment action may weaken but does not conclusively bar an inference of retaliation." *Malin v. Hospira,* Case No. 13-2433, at 11, 7th Cir., August 7, 2014.[36] At most, the passage of time means that the timing of the action does not support the inference of retaliation, and thus plaintiff must come forward with other evidence that the action was in retaliation for her complaints of discrimination. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000); *Bob-Maunuel v. Chipotle Mexican Grill, Inc.,* 2014 U.S.Dist. LEXIS 5447 *17 (N.D.Ill. 2014). Here, there is ample evidence of discrimination and retaliation, and that race and Plaintiff's race were on the minds of the faculty.

Professor Birmingham never forgot that Plaintiff had complained about discrimination. In 2009, immediately after Dean Suchar rejected the "terminate contract" recommendation, Birmingham and her team (laid the groundwork to get Plaintiff denied tenure any way they could) so as to rid the Department of a person they deemed to be thorn in Birmingham's side. (PSOF 69, 71) Those actions included attempts to remove Lee as Chair because he supported Plaintiff, efforts to prevent Lee from representing the department in connection with Plaintiff's tenure application, threats to investigate financial improprieties (PSOF 73, 74), mentioning the discrimination complaints during the tenure review (PSOF 96), and by the submission of a departmental recommendation which Dean Suchar and the College Personnel Committee concluded was "unfair" and "offensive, baseless, and illogical" (PSOF 126), and which Pres. Holtschneider concluded had misrepresented or truncated the opinions of the external reviewers. (PSOF 135) (*supra,* p. 12)[37]

The discriminatory animus of philosophy department faculty is evident in the record for example, (a) Birmingham felt that Plaintiff lost her credibility as a third world feminist by

---

[36] In *Malin,* three years passed between the report of discrimination and the adverse action, during which time plaintiff's supervisor "had a long memory" and repeatedly retaliated against plaintiff.
[37] When the report was prepared, Lee was the Chairman and Birmingham was the Associate Chair.

marrying a "white guy" (PSOF 22); (b) Rottenberg believed that Plaintiff was only able to secure post-DPU employment with the help of her "white boy husband" (PSOF 148); (c) Birmingham stated Krell felt that Plaintiff's comments concerning suggestions for program speakers made him feel like a "passé old white guy" (PSOF 23); and (d) Birmingham expressed her belief that Plaintiff received the Excellence in Teaching Award because they needed a woman of color. (PSOF 24)

The retaliation did not end with the negative tenure recommendation. During the process, after the January 8, 2010 vote, Dean Suchar approached Professor Tina Chanter who was, at the time, co-Chair of the Women's and Genders Studies Program ("WGS"). He asked if WGS would consider a transfer of Plaintiff to that program. Chanter discussed it with WGS program faculty and they were unanimously enthusiastic. (PSOF 150) According to Dean Suchar, the idea came from Provost Helmut Epp, but when he told Epp of the program enthusiasm, Epp told him the transfer was "off the table" and Epp would not tell him the reason. (PSOF 150)[38]

Lastly, DPU's effort to insulate its liability by claiming that Pres. Holtschneider knew nothing about the discrimination complaint is legally insignificant, because he relied upon information provided by subordinates with discriminatory animus. *Smith v. Bray,* 681 F.3d at 897-9. Clearly, Birmingham and her followers retaliated against Plaintiff by putting in motion a scheme that led directly to Pres. Holtschneider's negative tenure decision.

## D. Plaintiff's Evidence Satisfies Their Burden Of Proof Of Retaliation Under The Indirect Method And Cat's Paw Theory.

The evidence also satisfies the cat's paw and indirect method of proof because Plaintiff has established a *prima facie* case that (a) she was qualified for tenure (*supra*, pp.7-12, 18-20); (b); DPU treated a similarly situated white male (Goldman) differently (*supra*, pp. 24-25); (c)

---

[38] Epp does not offer a reason in his affidavit submitted in support of DPU. (Def. Exs. Tab 103) A trier of fact might infer retaliation was the reason.

that the reasons given for tenure denial were pretexts for discrimination (*supra*, pp. 7-12, 18-20); and (d) that Birmingham, and others acting on her behalf, certainly influenced the decision maker, who did not read any of Plaintiff's scholarship but did rely exclusively upon the tainted departmental report.

### E.    Birmingham Can Be Individually Liable For Retaliation.

Birmingham argues (citing *Smith*, 681 F.3d at 899), that she cannot be liable for retaliation because Plaintiff cannot establish cat's paw liability. (Memo, p. 27)  Of course, Plaintiff has established sufficient evidence to support cat's law liability. (*See supra*, pp. 22-23) Moreover, as in *Smith v. Bray, supra* (where the court found sufficient evidence to support a claim of retaliation by a non-decision maker), Birmingham was "substantially involved at every stage" of the events leading to the tenure denial and non-renewal of Plaintiff's contract.

### III
### PLAINTIFF HAS MADE NO CLAIM
### OF HOSTILE WORK ENVIRONMENT

While the evidence overwhelmingly demonstrates that the Philosophy Department environment was indeed hostile (and worse), Plaintiff makes no claim under § 1981 based upon a hostile work environment. Defendants wrongly assert that Plaintiff "appears to assert a claim for harassment," and argue that such a claim is not supported by the evidence. (DPU Memo, pp. 27-31)

### IV
### DPU BREACHED ITS CONTRACT WITH PLAINTIFF

In its memorandum, DPU makes the following arguments concerning Plaintiff's breach of contract claim:

A.    The only contract between Plaintiff and DPU was Plaintiff's "Contract of Employment" and it did not promise tenure. (Memo, p. 31).

35

B.     DPU fulfilled its contractual obligations by providing Plaintiff a "full and fair" review of her tenure application, an opportunity for an advisory hearing process after her tenure application was denied, and pre-tenure reviews which conform to the Faculty Handbook. DPU goes on to suggest that the denial of the tenure application did not violate Plaintiff's academic freedom, and that Plaintiff suffered no damages. (Memo, pp.32-7)

None of DPU's arguments are persuasive, and they do not support the entry of summary judgment against Plaintiff on her breach of contract claim.

## A.     The Faculty Handbook Is Part Of Plaintiff's Contract.

DPU's suggestion that the Faculty Handbook ("Handbook") does nothing more than detail the qualifications and criteria for promotions and tenure is contrary to DPU's previous position, and Illinois law. In *Montgomery v. DePaul University*, 2012 U.S.Dist. LEXIS 128206 (N.D.Ill. 2012),[39] a tenure/discrimination case, DPU did "not argue that the Handbook was not a binding contract between it" and the plaintiff (*8). Under Illinois law, "handbooks do create enforceable contract rights" if traditional requirements for contract formation are present. *See Duldulao v. St. Mary of Nazareth Hosp. Ctr.,* 115 Ill.2d 482, 505 N.E.2d 314 (1987); *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007).

## B.     DPU Breached Its Contract With Plaintiff.

A fundamental violation of the Handbook (and thus a breach of contract) can be found by reviewing the Department's recommendation. (Def. Exs., Tab 105; Ex. A)  Section 3.6.1 of the Handbook provides that "[t]he departmental or school recommendations must be substantive and provide specific, concrete examples to support the position or negative decision."  Despite the fact that Plaintiff's written scholarship included ten peer reviewed and published articles, the

---

[39] In *Montgomery*, the court denied DPU's summary judgment motion on plaintiff's retaliation claim where plaintiff was not offered a new contract after he engaged in protected activity.

recommendation neither referenced any of the published articles nor provided even one specific, concrete example contained in any of Plaintiff's published articles which supported the negative recommendation.

Plaintiff does not claim there was such a promise of tenure. Plaintiff does claim that in reviewing her tenure application the provisions of the Handbook were not followed. Unquestionably, they were not, and Plaintiff's tenure process was neither full nor fair, and it failed to follow the Handbook in numerous respects.

Pursuant to the Handbook, consideration of the decision concerning Plaintiff's tenure application at the department level was to take into consideration the quality of her teaching and learning, scholarship and/or other activities, and service to the University (*Id.,* § 3.2.3). At the University level, there must be a consideration of combinations of teaching and learning, scholarship, research or other creative activities, service, the variety of roles through which faculty serve the institution, the differing needs of the individual units, the institutional demands made on faculty, and the various level of support available to faculty members in different units for these activities. (*Id.*) Specific evaluation criteria are set forth in section 3.3 of the Handbook.

Here, the department did not take into consideration Plaintiff's teaching, service, and scholarship. Instead, as the Review Board found, Plaintiff's contractual rights were first violated in 2009 when Birmingham improperly appointed and convened an *ad hoc* committee whose members purported to conduct a formal review of plaintiff's eligibility for tenure (when she was not due for a formal review) and recommended that the University breach its employment contract (which then ran until June 30, 2010) by "terminating" the contract on June 30, 2009. This was, of course, an effort to deny Plaintiff the opportunity to even apply for tenure. When

Plaintiff did apply for tenure, the recommendation to deny tenure was not based on Plaintiff's performance, but upon retaliation and personal animus.

DPU then breached its contract with Plaintiff (as set forth in §5.1.1of the Handbook) when:

1.  Following the November 19, 2010 decision and finding of the Review Board of a violation of Plaintiff's academic freedom, Dean Suchar was prohibited, by Provost Epp, from recommending that another contract be offered or that a review of the case be conducted in accord with those procedures ordinarily reserved for tenured faculty being dismissed for cause; and

2.  Following the November 19, 2010 decision and finding of the Review Board that the evaluation of plaintiff was not in accord with the policies and procedures in the Handbook, the University procedures did not "formally end," but instead, the University President, without authority to do so, disregarded the decision of the Appeal Review Board. (PSOF 140)

The finding of the Review Board that DPU failed to follow its internal procedures is significant because it constitutes evidence that Defendants' proffered reason for denying Plaintiff tenure is a pretext for discrimination. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005); *Bob-Manual v. Chipotle Mexican Grill, Inc.*, 2014 U.S.Dist. LEXIS 5447 *12-13 (N.D.Ill. 2014). If there is a question of fact as to the believability of the employer's purported reason for an employment decision, it suffices to defeat the employer's summary judgment motion. (*Pat Mythes v. City of Janesville*, 181 F.App'x 596, 598 (7th Cir. 2006), quoting *Rudin*, 420 F.3d at 726). Because the Review Board found that the tenure denial also violated Plaintiff's academic freedom, Defendants' proffered reason for denying Plaintiff tenure can also be considered a pretext for discrimination. (*Id.*) Upon that finding, Dean Suchar was required to

offer one of two types of remedies: (a) a new contract, or (b) a hearing using the procedures for a faculty member being discharged for cause. (PSOF 138, 139)

**C.    The Process Was Not In Accord With DPU's Policies And Procedures.**

In his deposition, Suchar admitted that despite the decision of the Appeal Review Board, he did not offer the Plaintiff another contract or the required hearing, because he was ordered not to do so by Provost Epp. (PSOF 141)  Suchar testified that he found the Handbook, which specified that the University process on questions of academic freedom ends with the decision of the Review Board, confusing. (*Id.* pp. 145: 5-10; 189: 13-16) So did Pres. Holtschneider, who found the Handbook language to be "ambiguous" and "confusing." (PSOF 157)  He then decided to  simply ignore the Handbook altogether, to "reject" the decision of the Appeal Review Board, and to concoct what DPU now calls "an advisory hearing process" available only to Plaintiff and one other professor (an African-American chemistry professor who was also denied tenure). (PSOF 146)[40]

**D.    Plaintiff's Damages.**

In its memorandum (at pp. 39-40), DPU argues that since Plaintiff received a "terminal year following the denial of her tenure application," she suffered no damages.

Plaintiff spent 7 years at DPU, during which she unquestionably represented the University well in teaching, service and at conference. Her written scholarship was published in ten peer reviewed journals, well representing the University and Philosophy Department.  In Plaintiff's final year at DPU her yearly salary was $58,255.00.  Had Plaintiff received tenure, her yearly salary would have been increased by $8,000.00. (PSOF 158)

---

[40] Without any evidentiary support, DPU suggests this process, made available on a one-time basis for two faculty members, was a *de facto* "amendment" to the Handbook.

When DPU failed to provide Plaintiff with a new contract, or the required hearing, as set forth in the Handbook, Plaintiff found a job teaching Philosophy at Indiana State University at Terra Haute.[41] In addition to having to uproot herself and her son from Chicago, Plaintiff's yearly salary was less than she would have been paid at DPU. She was clearly damaged by virtue of the breach of contract.

## V
## CONCLUSION

For all the foregoing reasons, Namita Goswami respectfully requests this Court deny, in its entirety, the motion for summary judgment filed on behalf of DePaul University and Peg Birmingham.

Namita Goswami,
Plaintiff,

By:  /s/Stuart D. Gordon
One of her Attorneys

Stuart D. Gordon
Law Offices of Stuart D. Gordon
330 North Wabash
Suite 2100
Chicago, Illinois  60611
312-377-4455
(stuart@stuartgordonlaw.com)

Carrie A. Herschman
Richard M. Karr
Karr, Herschman & Eggert LLP
150 North Wacker Drive
Suite 940
Chicago, Illinois  60606
312-377-4450
(cherschman@khelaw.com)

---

[41] Birmingham, in an email to Rottenberg, dismissed that University as "third rate."  (PSOF 147)

40

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | | |
|---|---|---|
| NAMITA GOSWAMI, | ) | |
| Plaintiff, | ) | Case No. 12 CV 7167 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| DEPAUL UNIVERSITY, and | ) | Jury Trial Demanded |
| PEG BIRMINGHAM, | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, Stuart D. Gordon, an attorney, certify that on September 16, 2014, I caused a true and correct copy of the forgoing Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to be filed with the Court by electronic filing protocols, and that same will therefore be electronically served upon all attorneys of record registered with the Court's ECF/CM system, including:

Amy Schmidt Jones
Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Suite 3300
Milwaukee, Wisconsin 53202

Kerryann M. Haase
Sarah E. Flotte Porter
Katherine Lee Goyert
Michael Best & Friedrich LLP
Two Prudential Plaza
180 North Stetson Avenue
Suite 2000
Chicago, Illinois 60601

By: /s/Stuart D. Gordon

| | |
|---|---|
| | Carrie A. Herschman |
| | Richard M. Karr |
| Stuart D. Gordon | Karr, Herschman & Eggert LLP |
| Law Offices of Stuart D. Gordon | 150 North Wacker Drive |
| 330 North Wabash | Suite 940 |
| Suite 2100 | Chicago, Illinois 60606 |
| Chicago, Illinois 60611 | 312-377-4450 |
| 312-377-4455 | (cherschman@khelaw.com) |
| (stuart@stuartgordonlaw.com) | |