# EXHIBIT A

1

```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3
   NAMITA GOSWAMI,                    )
 4                                    )
                  Plaintiff,          )
 5                                    )
        vs.                           )   Case No.
 6                                    )   1:12-cv-07167
   DEPAUL UNIVERSITY and              )
 7 PEG BIRMINGHAM,                    )
                                      )
 8                Defendants.         )

 9

10

11                    VOLUME I

12

13           The deposition of NAMITA GOSWAMI, Ph.D.,

14 taken in the above-entitled cause before Denielle P.

15 Mathys, CSR, and Notary Public within and for the

16 County of Kane and State of Illinois, taken pursuant

17 to the Federal Code of Civil Procedure for the

18 United States District Court, Northern District of

19 Illinois, Eastern Division at Two Prudential Plaza,

20 Suite 2000, in the City of Chicago, Illinois, on

21 March 5, 2013, at the hour of 9:08 a.m.

22

23

24
```

Namita Goswami vs.
DePaul University, et al.

NAMITA GOSWAMI, Ph.D. - Vol. I
March 05, 2013

---

Page 113

1 was pretty well covered.
2    Q   And they were excited about those new
3 perspectives they expected you to bring?
4    A   Yeah.
5    Q   Did anyone in the course of the interview
6 process promise you that you would get tenure?
7    A   Do you mean in the suite?
8    Q   At any point in the interview process with
9 DePaul, did any representative of DePaul promise you
10 that you would receive tenure at the university?
11    A   No.
12    Q   I'm going to represent to you that Peg
13 Birmingham was a strong advocate in support of
14 giving you an offer of employment. Do you dispute
15 that?
16    A   I'm unable to comment on the hiring
17 process.
18    Q   I'm going to represent to you that she
19 enthusiastically supported hiring you. Do you
20 dispute that?
21    A   I'm unable to talk about anything about
22 the hiring process.
23    Q   To your understanding, did anyone in the
24 department oppose hiring you?

---

Page 114

1    A   Later on I found out.
2    Q   That someone opposed you at the time of
3 hire?
4    A   Uh-huh.
5    Q   And who opposed you at the time of hire?
6    A   What I -- okay. This is a bit of a
7 long -- I mean, it involves several years, several
8 conversations, so I'm not exactly sure what point of
9 time you're asking about or --
10    Q   Well, I'm just asking you -- you're saying
11 that someone indicated to you that at the time you
12 were hired, there was someone in the department that
13 opposed your hire. Who was it that supposedly
14 opposed your hire?
15    A   Professor Michael Naas.
16    Q   And did you ever hear this directly from
17 Dr. Naas?
18    A   No.
19    Q   And did anyone ever share with you why he
20 articulated he was opposed to hiring you?
21    A   I'm sorry, repeat that question.
22    Q   Did anyone ever articulate to you why
23 Dr. Naas supposedly said he was against hiring you?
24    A   Several people did.

---

Page 115

1    Q   And what were you told as to what he
2 articulated for the "why"?
3    A   Some of it was secondhand conversation.
4 Some of it was people who had directly spoken to
5 him.
6    Q   Okay. But what did they say as to the
7 "why"?
8    A   I'm not going to be able to remember every
9 instance or every comment, but at this moment off
10 the top of my head, I was told that
11 Professor Birmingham had said that Professor Naas is
12 opposed to my hire because he doesn't want a woman
13 of color in the department.
14        Professor Moore had said that
15 Professor Naas was asking for things that had been
16 asked of no other job candidate.
17        Professor Moore told me that
18 Professor Naas dismissed my work as not philosophy.
19        Both Professor Hill and Professor Moore
20 told me that Professor Hill had questioned the
21 meeting and said, "Why is someone who looks at the
22 Holocaust considered a philosopher, but someone who
23 looks at widow burning in India, that's dismissed as
24 sociology and not philosophy?"

---

Page 116

1        Both Professor Moore and
2 Professor Birmingham asked me why I had shown a
3 grant proposal to Professor Naas because he was
4 opposed to my work.
5    Q   Any other comments that you recall about
6 why Michael Naas was opposed to your hire?
7    A   There is a comment that he makes in the
8 January 8 meeting that's recorded, but I cannot
9 remember the exact words.
10    Q   Any other comment that was made to you
11 about why Michael Naas did not want you hired?
12    A   I think there were some others about how I
13 don't do European philosophy; that my fields are not
14 philosophy. At this moment, this is what I recall.
15    Q   Who made the comment to you that Peg
16 Birmingham said that he didn't want a woman of
17 color, who said that?
18    A   It was either Jason Hill or Darrell Moore.
19 Gosh, this was, like, almost eight or nine years
20 ago. I mean, I'm not able to accurately say.
21    Q   Now, the philosophy department at
22 DePaul -- strike that one second.
23        You said that Hill and Peg Birmingham
24 asked you why you showed a grant proposal to Michael

---

Namita Goswami vs.
DePaul University, et al.

NAMITA GOSWAMI, Ph.D. - Vol. I
March 05, 2013

Page 117

1 Naas because he opposed your work. Were those their
2 exact words?
3    A    It was Darrell Moore. Did you say Hill?
4    Q    I put down the wrong name. You made
5 reference to a comment being made to the effect that
6 you shouldn't have shown him your grant proposal
7 because he's opposed to your work. Were those --
8    A    You mean verbatim?
9    Q    Yeah.
10    A    Oh, gosh, this was, like, maybe 2004,
11 2005, 2003. I can't say if that was verbatim, but
12 it was about just a priori my work.
13    Q    Did they say what about your work he did
14 not care for?
15    A    Again, I'm not going to be able to recall
16 verbatim what was said because these conversations
17 happened a long time ago. From what I can remember,
18 it was that my work is not philosophy because it is
19 not focused on the European tradition in some way.
20 I don't know what way.
21    Q    So the philosophy department at DePaul has
22 a doctoral program, correct?
23    A    Uh-huh.
24    Q    And it's one of only three academic

Page 118

1 departments at DePaul that have a doctoral program,
2 correct?
3    A    I think so, yes.
4    Q    And you would agree that DePaul has the
5 right to determine its curriculum for its students?
6    A    Yes.
7    Q    And DePaul has the right to determine what
8 academic foundation students studying in philosophy
9 need to have?
10        THE WITNESS: Could you repeat the
11    question?
12        MS. JONES: Can you read it back?
13        (Question read as requested.)
14    A    Again, I'm not sure what that question
15 means. Could you explain?
16 BY MS. JONES:
17    Q    DePaul has the right to decide whether
18 students taking -- majoring in philosophy need to
19 have instruction on the canon?
20    A    As long as that's not used as a pretext
21 for discrimination.
22    Q    But they have the right to determine the
23 academic content of the major of philosophy,
24 correct?

Page 119

1    A    Again, I'm not sure I understand your
2 question because --
3    Q    Well, DePaul has academic freedom, too,
4 right? The institution has a right to academic
5 freedom, correct?
6    A    I don't understand the question. What do
7 you mean by the right to -- that DePaul has a right
8 to academic freedom?
9    Q    Well, does DePaul have academic freedom?
10    A    Like, do people have academic freedom at
11 DePaul?
12    Q    No, does the institution itself have
13 academic freedom?
14    A    How does a -- I don't understand what
15 you're asking me.
16    Q    Do you think it is important for a student
17 majoring in philosophy in a department that focuses
18 on continental philosophy to study canonical texts
19 at some point in their education?
20    A    I'm not sure I understand what you mean by
21 "a department that focuses on continental
22 philosophy" because the job ad says main emphasis
23 continental philosophy, history of philosophy,
24 political and social thought, and critical race and

Page 120

1 feminist theories.
2    Q    You understand that DePaul is renowned for
3 being at the top of the field for continental
4 philosophy, correct?
5    A    What do you mean by continental
6 philosophy? Are you asking it as somehow separate
7 from critical race and feminist theory, or critical
8 race and feminist theory as a part -- and
9 postcolonial theory as a part of continental
10 philosophy and indistinguishable from it?
11    Q    Well, let's start with the first one,
12 separate from critical race, feminist theory,
13 whatever. DePaul is renowned for being at the top
14 of the field for continental philosophy?
15    A    You're going to have to explain what you
16 mean by continental philosophy. Do you mean --
17    Q    I'm going with your first definition.
18    A    -- European philosophy alone?
19    Q    European philosophy. If I want to get a
20 Ph.D. and I love European philosophy, DePaul is one
21 of the top places to go for that, right?
22    A    Well, their -- Tina Chanter is there,
23 Darrell Moore is there. You know, there's a lot of
24 other --

324

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NAMITA GOSWAMI,                     )
                                    )
              Plaintiff,            )
                                    )
       vs.                          )   Case No.
                                    )   1:12-cv-07167
DEPAUL UNIVERSITY and               )
PEG BIRMINGHAM,                     )
                                    )
              Defendants.           )

        I, NAMITA GOSWAMI, Ph.D., being first duly

sworn, on oath say that I am the deponent in the

aforesaid deposition taken on March 5, 2013; that I

have read the foregoing transcript of my deposition,

consisting of pages 1 through 326 inclusive, and

affix my signature to same.

        _____   No corrections have been made.

        _____   Corrections have been made and
                  are included with the following
                  errata sheet(s).

                  _____

                  NAMITA GOSWAMI, Ph.D.

SUBSCRIBED AND SWORN TO
before me this _____
day of _____ 20   .
_____

     Notary Public

542

1   CASE:  Goswami v. DePaul University, et al.

2   DATE TAKEN:  6-12-13          RETURN DATE:  7-25-13

3   DEPONENT:  NAMITA GOSWAMI, Ph.D., VOLUME II

4   PAGE   LINE                        ERRATA SHEET

5   _____  _____  CHANGE: _____

6   _____  _____  REASON: _____

7   _____  _____  CHANGE: _____

8   _____  _____  REASON: _____

9   _____  _____  CHANGE: _____

10  _____  _____  REASON: _____

11  _____  _____  CHANGE: _____

12  _____  _____  REASON: _____

13  _____  _____  CHANGE: _____

14  _____  _____  REASON: _____

15  _____  _____  CHANGE: _____

16  _____  _____  REASON: _____

17  _____  _____  CHANGE: _____

18  _____  _____  REASON: _____

19  _____  _____  CHANGE: _____

20  _____  _____  REASON: _____

21  _____  _____  CHANGE: _____

22  _____  _____  REASON: _____

23  (SIGNED) _____  DATE _____

24  REPORTER:  Denielle P. Mathys, CSR

D-Squared Reporters, Inc.

327

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NAMITA GOSWAMI,                    )
                                   )
             Plaintiff,            )
                                   )
     vs.                           )   Case No.
                                   )   1:12-cv-07167
DEPAUL UNIVERSITY and              )
PEG BIRMINGHAM,                    )
                                   )
             Defendants.           )

VOLUME II

        The continued deposition of NAMITA

GOSWAMI, Ph.D., taken in the above-entitled cause

before Denielle P. Mathys, CSR, and Notary Public

within and for the County of Kane and State of

Illinois, taken pursuant to the Federal Code of

Civil Procedure for the United States District

Court, Northern District of Illinois, Eastern

Division at Two Prudential Plaza, Suite 2000, in the

City of Chicago, Illinois, on June 12, 2013, at the

hour of 10:07 a.m.

D-Squared Reporters, Inc.

Namita Goswami vs.
DePaul University, et al.

NAMITA GOSWAMI, Ph.D - Vol. II
June 12, 2013

Page 399

1 significant when you drafted these?
2    A   Yeah, but you wouldn't really focus too
3 much on stuff you were working on because that
4 wasn't what -- at least in a merit review you would
5 not.
6    Q   But for a formal review or an informal
7 review, you would want to focus on what your
8 scholarship work was, right?
9    A   I don't think an informal review required
10 a self-evaluation from what I recall, yeah.
11    Q   Well, this particular self-evaluation has
12 a fairly long discussion of your research, right?
13    A   I'm not sure what you mean by particularly
14 long but, yeah, sure.
15    Q   Well, why don't you take a minute, if you
16 could mark the time, I'd like you to read the
17 section on research and tell me if you omitted any
18 significant activity in the area of research that
19 you were doing at that time. So just note the time
20 when she starts to read and let us know when you're
21 done.
22    A   Okay.
23    Q   Okay. Thank you. So the question was
24 having reviewed that, did you omit anything

Page 400

1 significant that you were working on in the time in
2 the area of research?
3    A   Not that I can recall since this was ten
4 years ago.
5    Q   Did you submit a minimally revised copy of
6 your dissertation to is it Routledge or Rutledge?
7    A   Routledge I think. Yes.
8    Q   And were you seeking to have it published
9 as a book?
10    A   They actually sought me, and I told them
11 that I don't think it would be appropriate for their
12 series, but they said send it anyway.
13    Q   Were they looking at it to be published as
14 a book?
15    A   Yes.
16    Q   And they declined it?
17    A   For the religion series -- yeah, it was
18 the religion series that asked for it, yeah.
19    Q   And did they consider it for any other
20 series?
21    A   No, I didn't -- it was only the religion
22 editor who contacted me.
23    Q   Did they give any reason other than they
24 didn't think it was appropriate for their series?

Page 401

1    A   They -- from what I remember, what the
2 individual said was that you were right. It wasn't
3 a religion book.
4    Q   Did you ever submit to any other publisher
5 your dissertation for consideration for publication?
6    A   No.
7         (Goswami Exhibit No. 36
8          marked for identification.)
9 BY MS. JONES:
10    Q   Looking at Exhibit 36, this was the annual
11 merit evaluation that you received from Peg
12 Birmingham for 2003, correct?
13    A   Yes.
14    Q   And this covered just your initial time
15 period at DePaul; is that right?
16    A   I believe that would be one quarter.
17    Q   Okay.
18    A   Yeah.
19    Q   And this review contains positive feedback
20 for you from your chair?
21    A   Just looking at it quickly, yeah.
22    Q   Now, Peg Birmingham appointed you chair of
23 the critical race committee; is that right?
24    A   Yes.

Page 402

1    Q   And did you appreciate that appointment?
2    A   Yes.
3    Q   And was that a leadership position?
4    A   Yes.
5    Q   And did you accept the appointment?
6    A   Yes.
7    Q   And was your appointment to that role in
8 line with your areas of specialization --
9    A   Yes.
10    Q   -- as a scholar?
11         Now, at the time of this Exhibit 36,
12 Michael Mezey was the Dean, correct?
13    A   Yes.
14    Q   Were you ever present for any discussion
15 between Dean Mezey and Peg Birmingham as to what he
16 expected with respect to these annual merit reviews?
17         MS. HERSCHMAN: Objection to the extent
18         that it's vague. If you want to --
19 BY MS. JONES:
20    Q   Go ahead.
21    A   I'm not sure what you're asking.
22    Q   Were you ever present for any discussion
23 between Dean Mezey and Peg Birmingham where he
24 discussed how she should go about doing these

Namita Goswami vs.
DePaul University, et al.

NAMITA GOSWAMI, Ph.D - Vol. II
June 12, 2013

Page 411

1  sure. I don't know if I saw -- if I was -- I may
2  have been given the evaluation right then and there
3  because I seem to remember Professor Birmingham
4  pulling out sort of a pile of papers and rummaging
5  through them, but I don't remember exactly. My
6  sense would be that I would have seen it before, but
7  I can't remember exactly.
8      Q   Who called the meeting?
9      A   Professor Birmingham.
10     Q   So going back to my original question, do
11 you remember anything that was actually said in the
12 meeting?
13     A   Yeah, that people have been coming to her
14 and complaining but no one was named.
15     Q   Did she say what they were complaining
16 about?
17     A   Just the stuff that was written in the
18 evaluation itself and under the "Service" section.
19 I think -- I'm not able to recall completely because
20 I was holding on -- I was trying really hard not to
21 cry, and I had to go teach shortly thereafter.
22     Q   The question is what was said during the
23 meeting?
24     A   Yeah, I'm explaining why I don't remember

Page 412

1  as much as I could.
2      Q   And I don't need the explanation. I just
3  want to know what was said in the meeting.
4      A   At this point, that's all I remember.
5      Q   Now, the overall rating given to you by
6  Professor Birmingham was very good, correct?
7      A   Yes.
8      Q   So it's not the highest rating you could
9  get, right?
10     A   Yes.
11     Q   That's not a bad rating, is it?
12     A   No.
13     Q   And you understood in Peg Birmingham's
14 view that there was some room for improvement --
15     A   Yes.
16     Q   -- going forward?
17     A   Yes.
18     Q   Now, in this review, Dr. Birmingham
19 expressed concerns with your teaching, correct?
20     A   Yes.
21     Q   And she was indicating to you that she --
22 that the classroom should not be a forum for any
23 particular political view, right?
24     A   That's what she says right here, yes.

Page 413

1      Q   And she was cautioning you against
2  teaching ideology, right?
3      A   That's what she says right here, yes.
4      Q   And that's not the purpose of the courses
5  offered by DePaul in philosophy, is it, to teach
6  ideology?
7      A   Well, political -- multiculturalism was a
8  political movement, so there are ideologies behind
9  it.
10     Q   But does DePaul offer classes in
11 philosophy so its faculty can espouse their own
12 ideologies?
13     A   No.
14     Q   Your self-evaluations were marked 37 and
15 38. Is it your testimony that no reasonable person
16 could read what you said about your own teaching and
17 classwork and conclude that you were teaching
18 ideology and politics?
19     A   I don't know what you mean by a reasonable
20 person.
21     Q   Well, your self-evaluations talk about
22 your course being hard hitting, right?
23     A   Yes.
24     Q   And you talk about multiple difficult

Page 414

1  moments with students, right?
2      A   Yes.
3      Q   And you talk about sharing your own
4  personal experiences of race issues, right?
5      A   At a particular instant in the class, yes.
6      Q   And you talk about -- you do use the word
7  "privileged" with respect to your students, right?
8      A   Not in the way that Professor Birmingham
9  has represented it.
10     Q   Or not the way she took it maybe, right?
11 You did use the word "privileged," right?
12     A   Yes, the word "privileged" is there, yes.
13     Q   Okay. But it's your belief that no one
14 could read this and have a concern with your
15 approach to teaching?
16     A   My belief is that I was stereotyped as
17 someone who is walking into a classroom and purely
18 engaging in politics as opposed to an intellectual
19 endeavor. My belief is that I was stereotyped as
20 being in a confrontational, angry relationship with
21 my students. My belief is that I was stereotyped as
22 a cliché; that I just look at white people and say
23 they're privileged.
24     Q   I'm not asking your belief. I'm just

Namita Goswami vs.
DePaul University, et al.

NAMITA GOSWAMI, Ph.D - Vol. II
June 12, 2013

Page 415

1 asking you is it your position that no one could
2 read your self-evaluations? No one could have -- no
3 reasonable person could have a concern that
4 Dr. Goswami might be going in a direction with her
5 teaching that is using her classroom to teach her
6 political views?
7 A Given the fact that I was not teaching my
8 political views and that the self-evaluation goes
9 into great detail as to what was actually being
10 taught at the moment that a certain student erupted
11 and what another African-American student then
12 related to the class, there was no discussion on my
13 part about my personal views.
14 MS. JONES: Can you read back the
15 question, please?
16 (Question read as requested.)
17 A I'm saying that my response is that I do
18 not understand what you mean by "a reasonable
19 person."
20 And, secondly, having been the person who
21 wrote that self-evaluation, what I was conveying was
22 the fraught space of teaching multiculturalism from
23 philosophical perspectives which is a discussion
24 that the department has had many times.

Page 416

1 BY MS. JONES:
2 Q Not my question. I mean a student
3 actually said, "I feel more stubborn now," after
4 taking your class --
5 A Uh-huh.
6 Q -- right?
7 A Yes.
8 Q Was that your objective with the class, to
9 make your students more stubborn?
10 A I said --
11 Q Yes or no, was that the objective of your
12 class, to make your students more stubborn?
13 A In some ways, yes.
14 Q Okay.
15 A Yes.
16 Q So this is a yes-or-no question again.
17 Could a person read your self-evaluations in your
18 view and conclude that you were going in that
19 direction of teaching politics instead of
20 philosophy?
21 A I do not know what you mean by "a
22 reasonable person."
23 Q I didn't use reasonable. I just said a
24 person.

Page 417

1 A Any person on the planet? Yes.
2 Q Do you believe that Dr. Birmingham, when
3 she read that, didn't honestly have a worry that
4 that's what was happening in your classroom at the
5 time she read your self-evaluation?
6 MS. HERSCHMAN: Objection, calls for
7 speculation. Go ahead.
8 A I can only speculate. What I did read in
9 her evaluation was reductiveness and stereotyping
10 and misrepresentation of what had actually gone on
11 in that class, what I said in my self-evaluation,
12 and which student actually said, "I feel more
13 stubborn now."
14 BY MS. JONES:
15 Q Yes or no, do you believe that
16 Dr. Birmingham -- strike that. I'm going to put it
17 this way.
18 Dr. Birmingham honestly believed at the
19 time she wrote your annual merit evaluation,
20 Exhibit 39, that your teaching was veering into
21 teaching politics instead of philosophy. Do you
22 agree or disagree with that statement; that she
23 honestly believed that at the time?
24 A How can I tell you what she honestly

Page 418

1 believes?
2 Q So you don't know, is that your answer?
3 A I -- I know how I was stereotyped.
4 Q That's fine, but I'm asking about her
5 honest belief. Do you know whether she honestly
6 believed at the time that you were moving into
7 teaching politics instead of philosophy?
8 A Yes.
9 Q So your answer is that she did honestly
10 believe that?
11 A I've lost the train of the question. The
12 question was that could she have honestly
13 believed -- is that the question, could she have
14 honestly believed that my class was veering into
15 politics?
16 Q Right.
17 A Is that the question?
18 Q Sure.
19 A Again, having said everything that I said,
20 I'll answer yes.
21 Q Okay. Now, she makes the statement that
22 you were in a quandary about your dissertation?
23 A Where is that again?
24 Q It says she is -- well, I should phrase it

Page 419

1  the way she did. "She is in a bit of a quandary
2  about publishing her dissertation." Do you see
3  that?
4      A   Where?
5      Q   Under "Research."
6      A   Oh, yeah, okay.
7      Q   Were you in a bit of a quandary about
8  publishing your dissertation?
9      A   Yeah, because Rick Lee and I had, you
10 know, talked and met in my first quarter, and I
11 think we only got to, like, chapter 2 or even
12 chapter 3. And he said, you know, it's pretty clear
13 you've moved on from this project; that you're
14 actually interested in something else, so I think
15 you should sit on it for a while.
16     And, you know, being a young professor in
17 my first year and knowing the pressure for
18 publication, I was kind of weighing what I really
19 wanted to do with the tenure clock, so yeah.
20     Q   Okay. Now, under the "Service" section,
21 she raises a number of concerns about your
22 interactions with your colleagues, correct?
23     A   Yes.
24     Q   Now, you understood at the time and

Page 420

1  throughout your probationary period that if you want
2  the best chance of getting tenure, you want to have
3  the support of your departmental colleagues,
4  correct?
5      A   Yes.
6      Q   And it would be good to know as a junior
7  faculty member if you were antagonizing your
8  colleagues, correct?
9      A   Yes.
10     Q   And Peg Birmingham was communicating to
11 you her understanding that you were antagonizing
12 some of your colleagues, right?
13     A   Yes.
14     Q   Do you dispute that Peg Birmingham
15 honestly believed at that time that you were
16 antagonizing your colleagues?
17     A   No.
18     Q   Now, with respect to Jason Hill's tenure
19 meeting, there is a reference in here to a comment
20 made in his tenure meeting. What exactly did you
21 say?
22     A   I think we talked about this last time I
23 was here. I remember the discussion was about his
24 strictness in class; that there was -- maybe it was

Page 421

1  early on in his teaching; that somebody had said in
2  his evaluation that he doesn't even allow us to chew
3  gum. And so the discussion was about the
4  strictness.
5      And I -- having talked to Jason about the
6  difference between the American educational system
7  and the British educational system, from what I
8  recall, he said that he had also gone through the
9  British educational system which is stricter. I
10 said perhaps that's --
11     Q   I'm just going to stop you now because I
12 think my question was only what did you say in the
13 meeting?
14     A   I think I said that perhaps his strictness
15 is about having come from a different educational
16 system, the British educational system.
17     Q   Did you use the phrase -- or did you talk
18 about poor people living in houses with no walls and
19 a dirt floor?
20     A   No.
21     Q   You didn't use that phrase at all?
22     A   No.
23     Q   Anything like that?
24     A   I might have said something about taking

Page 422

1  advantage of the opportunities that an institution
2  offers.
3      Q   Anything else that you said in that
4  meeting?
5      A   I mean, I -- there was quite a bit of a
6  discussion at that meeting, so my understanding is
7  you're asking about this particular comment, right?
8      Q   Right.
9      A   No, not that I can recall.
10     Q   Now, when you got this review, you said
11 when you talked to Peg Birmingham, you were upset at
12 what she was saying, correct?
13     A   Yes. Oh, I apologize, I think I remember
14 something else. I think in relation to the comment
15 about opportunities that an institution affords and
16 Jason's emphasis on that, and again, I was simply
17 talking about some of the things that he had told me
18 and speculating, I think there was an earthquake at
19 that time in Pakistan and there was a news item
20 about what --
21     Q   Dr. Goswami --
22     A   -- the schools --
23     Q   I know you're setting context, but I don't
24 have time for context. I just need to know what was

Namita Goswami vs.
DePaul University, et al.

NAMITA GOSWAMI, Ph.D - Vol. II
June 12, 2013

Page 423

1   said. If you were going to add something to what
2   was said, which was actually the question presented,
3   please do, but otherwise, I'll give you another
4   question.
5       A   Okay, I'm sorry, I don't remember the
6   exact words, so that's why I'm saying that I might
7   have made a reference to the earthquake in Pakistan.
8       Q   Okay. You were worried when you got this
9   review, Exhibit 39, right?
10      A   Yes.
11              (Goswami Exhibit No. 40
12              marked for identification.)
13  BY MS. JONES:
14      Q   Now, Exhibit 40 is the letter that you
15  sent to Dean Mezey regarding this merit evaluation
16  that was Exhibit 39, correct?
17      A   Yes.
18      Q   And you prepared this document shortly
19  after the 2004 evaluation, right?
20      A   Yes.
21      Q   And your memory was pretty fresh at the
22  time, correct?
23      A   Yes.
24      Q   And you were careful in drafting it,

Page 424

1   right?
2       A   Yes.
3       Q   And you originally had a much longer
4   draft; am I correct?
5       A   That I don't remember.
6       Q   Do you remember having a 20-page
7   single-spaced response to her 3-page review?
8       A   No.
9       Q   Now, with respect to your research, you
10  indicated that she omitted your scholarship and
11  research agenda; is that right?
12      A   Where are you? Oh, page 3, yes.
13      Q   And you said in this letter to Dean Mezey
14  that you had an article in press at South Asian
15  Review, correct? This is page 3 of the letter under
16  the heading "Third"?
17      A   Yes.
18      Q   Now, when you say that was in press, when
19  was that article published?
20      A   I think it came out in 2006.
21      Q   Okay. And then you said you had an
22  article under review at Hypatia?
23      A   Hypatia.
24      Q   Hypatia. Had that article been finally

Page 425

1   accepted for publication at that time?
2       A   In April I don't know. I don't remember.
3       Q   You indicated that you had just gotten a
4   revise and resubmit. Does that refresh your memory
5   as to whether --
6       A   Oh, yeah, uh-huh, yeah.
7       Q   Had that article been accepted for
8   publication by Hypatia?
9       A   At the time I don't think so.
10      Q   And you indicate you applied for a
11  Pembroke -- is that a grant, a fellowship? You
12  applied for the Pembroke fellowship, correct?
13      A   Yes.
14      Q   Did you get that?
15      A   I'm trying to -- yes. No, no, I didn't
16  get it. Sorry.
17      Q   Okay. Now, on page 2 at the top under the
18  heading "Second," at the end of that paragraph you
19  make the representation, "She also states that all
20  my evaluations state that I am 'biased' and
21  'emotional.'"
22          Can you please tell me where in Exhibit 39
23  Peg Birmingham makes the statement that all your
24  evaluations state that you were biased and

Page 426

1   emotional?
2       A   Let's see. "In the spring, her ISP 200
3   course was again well received, but a criticism that
4   comes up in all her ISP 200 courses is some students
5   find her to be a bit biased and emotional."
6       Q   So did Peg Birmingham state that all your
7   evaluations state you are biased and emotional?
8       A   What it says here is that in all her ISP
9   200 courses.
10      Q   Some --
11      A   Some criticisms that come up --
12      Q   Some. Some students feel?
13      A   Yes. ". . . a criticism that comes up in
14  all her ISP 200 courses is some students find her to
15  be a bit biased and emotional."
16      Q   That's different from saying all the
17  evaluations state you're biased and emotional,
18  right?
19      A   I can see that, yes.
20      Q   What do you mean -- what did you mean when
21  you said that -- when you used the phrase that this
22  course is a radical confrontation with what being an
23  American has come to mean?
24      A   I was using the language of some of the --

Namita Goswami vs.
DePaul University, et al.

NAMITA GOSWAMI, Ph.D - Vol. II
June 12, 2013

Page 447

1   time that you had gone to Liz Ortiz and met with
2   her?
3       A   Again, I don't know if I told her. I
4   might have told her during the meeting with
5   Professor Chanter, but I don't recall.
6       Q   Now, let's talk about the meeting between
7   you, Dr. Birmingham -- before I do that, did you
8   file a complaint with OIED when you met with Liz
9   Ortiz?
10      A   No.
11      Q   And let's talk about your meeting with
12  Dr. Chanter and Dr. Birmingham. My understanding is
13  the meeting was in June 2005; is that correct?
14      A   Yes. Sorry. I thought you were checking
15  the date.
16      Q   And was anyone else present besides you,
17  Dr. Birmingham, and Dr. Chanter?
18      A   No.
19      Q   Did you prepare any notes going into the
20  meeting?
21      A   Yes.
22      Q   And are those notes in your production?
23      A   They should be, yes.
24      Q   Did you take any notes during the meeting?

Page 448

1       A   No. I don't think so.
2       Q   Did you take any notes after the meeting?
3       A   I don't think so.
4       Q   What was said in that meeting?
5       A   I'm not going to be able to recall
6   everything, but I think I just went through some of
7   the concerns that I had. And I think I also might
8   have said something to the effect of it would have
9   been helpful had the colleagues in question come
10  directly to me; and that not knowing who they are, I
11  mean, I could guess given what I know, was very
12  scary because you got these anonymous complaints
13  from I don't know how many people.
14          And I think I also might have said
15  something to the effect of that it would have been
16  helpful for me to know that this was going on before
17  finding out in an evaluation that had already gone
18  to the Dean.
19      Q   What else was said in that meeting with
20  Dr. Birmingham?
21      A   That's as best as I can recall.
22      Q   Were you sitting with your feet up in her
23  office?
24      A   No.

Page 449

1       Q   Did Dr. Birmingham cry while you were
2   there?
3       A   She started crying at the end.
4       Q   Did she ask you to leave?
5       A   I think so. I think we were -- by that
6   time we were done.
7       Q   Did you feel bad that you had reduced her
8   to tears?
9       A   I was surprised because she is my
10  supervisor, and I'm a junior faculty member.
11      Q   Do you see anything in your tone or
12  commentary during that meeting that would warrant
13  reducing your supervisor to tears?
14      A   No.
15          (Goswami Exhibit No. 42
16          marked for identification.)
17  BY MS. JONES:
18      Q   This is Exhibit 42. Exhibit 42 is e-mail
19  correspondence between you and Dr. Birmingham dated
20  June 7, 2005, correct?
21      A   Yes.
22      Q   And that was the date of your meeting with
23  Dr. Birmingham, correct?
24      A   I think so yes, "our meeting this

Page 450

1   morning," yes.
2       Q   Now, your e-mail was copied to the Dean,
3   correct?
4       A   Yes.
5       Q   And she indicated she was going to put an
6   e-mail -- attached a copy of your e-mail to your
7   evaluation in your personnel file?
8       A   Yes.
9       Q   Now, you've taken the position that
10  that -- she never did that, correct?
11      A   Yes.
12      Q   And do you know one way or the other
13  whether Dr. Birmingham asked that this be placed in
14  your personnel file?
15      A   I think the personnel files are in the
16  chair's office, so I don't -- no.
17      Q   Other than Tina Chanter, Mary Jeanne
18  Larrabee, and Ann Russo, did you share with anyone
19  else in your department Exhibit 40, your letter to
20  Dean Mezey?
21      A   Yes.
22      Q   Who did you share it with?
23      A   Professor Sandra Jackson.
24      Q   In your department?

539

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NAMITA GOSWAMI,                    )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )   Case No.
                                   )   1:12-cv-07167
DEPAUL UNIVERSITY and              )
PEG BIRMINGHAM,                    )
                                   )
            Defendants.            )

          I, NAMITA GOSWAMI, Ph.D., being first duly

sworn, on oath say that I am the deponent in the

aforesaid deposition taken on June 12, 2013; that I

have read the foregoing transcript of my deposition,

consisting of pages 327 through 541 inclusive, and

affix my signature to same.

          _____   No corrections have been made.

          _____   Corrections have been made and
                    are included with the following
                    errata sheet(s).


                         _____

                         NAMITA GOSWAMI, Ph.D.


SUBSCRIBED AND SWORN TO
before me this _____
day of _____ 20___.

_____

      Notary Public


D-Squared Reporters, Inc.

327

1    CASE:  Goswami v. DePaul University, et al.

2    DATE TAKEN:  3-5-13          RETURN DATE: 4-11-13

3    DEPONENT:  NAMITA GOSWAMI, Ph.D.

4    PAGE    LINE                    ERRATA SHEET

5    _____   _____  CHANGE: _____

6    _____   _____  REASON: _____

7    _____   _____  CHANGE: _____

8    _____   _____  REASON: _____

9    _____   _____  CHANGE: _____

10   _____   _____  REASON: _____

11   _____   _____  CHANGE: _____

12   _____   _____  REASON: _____

13   _____   _____  CHANGE: _____

14   _____   _____  REASON: _____

15   _____   _____  CHANGE: _____

16   _____   _____  REASON: _____

17   _____   _____  CHANGE: _____

18   _____   _____  REASON: _____

19   _____   _____  CHANGE: _____

20   _____   _____  REASON: _____

21   _____   _____  CHANGE: _____

22   _____   _____  REASON: _____

23   (SIGNED) _____ DATE _____

24   REPORTER:  Denielle P. Mathys, CSR

D-SQUARED REPORTERS, INC.
(312) 332-2515

540

1    STATE OF ILLINOIS        )
                              ) SS.
2    COUNTY OF COOK           )

3            I, DENIELLE P. MATHYS, Certified Shorthand

4    Reporter No. 084-003933, and Notary Public within

5    and for the County of Kane and State of Illinois, do

6    hereby certify that on June 12, 2013, at 10:07 a.m.,

7    Two Prudential Plaza, Suite 2000 in the City of

8    Chicago, Illinois, the deponent, NAMITA GOSWAMI,

9    Ph.D., personally appeared before me.

10           I further certify that NAMITA GOSWAMI,

11   Ph.D. was by me duly sworn to testify the truth and

12   that the foregoing is a true record of the testimony

13   given by NAMITA GOSWAMI, Ph.D.

14           I further certify that the deposition

15   terminated at 4:17 p.m.

16           I further certify that there were present

17   at the taking of the said deposition the persons and

18   parties as indicated on the appearance page made a

19   part of this deposition transcript.

20           I further certify that the signature of

21   the witness to the foregoing deposition was reserved

22   by agreement of counsel; and that I am not counsel

23   for nor in any way related to any of the parties to

24   this suit, nor am I in any way interested in the

D-SQUARED REPORTERS, INC.
(312) 332-2515

1    outcome thereof.

2         IN TESTIMONY WHEREOF, I have hereunto set

3    my hand and affixed my notarial seal on this 25th

4    day of June, 2013.

5

6                    OFFICIAL SEAL
                     DENIELLE P MATHYS
7              Notary Public - State of Illinois
            My Commission Expires Sep 26, 2016

8

9

10

11              *Denielle P. Mathys*

12        DENIELLE P. MATHYS, CSR
          Notary Public
13        License No. 084-003933

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT B

Goswami vs. DePaul University
Darrell Moore - 09/11/2013

Page 34

1          A.    Since "I see you were coming up for tenure,"

2     yeah.  Okay.

3          Q.    Okay.  So is there a procedural irregularity

4     that you see in what his direction is in Exhibit 3?

5          A.    Well, Namita shouldn't have gotten this

6     e-mail.  Namita should not have gotten -- should not

7     have been reviewed in 2009 because she had been reviewed

8     in 2008.

9          Q.    Other than -- I'm asking for what -- is

10    there -- assuming that the formal review was

11    appropriately happening in May of 2009 -- we'll get to

12    that second issue later.  Okay?

13         A.    Uh-huh.

14         Q.    Assuming the review was appropriately

15    happening in the spring of 2009, is there --

16         A.    Assuming that it was appropriately happening,

17    yes.

18         Q.    Is there a procedural irregularity in what he

19    is telling the three untenured faculty members to

20    provide to the committee?

21         A.    No.  No.

22         Q.    Now, Jason Hill was on this ad hoc personnel

23    committee?

24         A.    Yes.



Goswami vs. DePaul University
Darrell Moore - 09/11/2013

Page 48

1    colleagues in my department, and the extent --

2         Q.    Let's start with people on the personnel who

3    actually were doing the review at that time.

4         A.    That's why I said "some."

5         Q.    So who on the personnel committee would you

6    have put in the category of those who were suspicious of

7    her?

8         A.    Oh, well, such -- Interesting question.   Let

9    me just be very clear about this:   Your question that

10   you're asking me has very little to do with this e-mail.

11   The "some are suspicious of you" is -- it's a

12   disciplinary problem, and it's a disciplinary problem --

13   because our department is part of the discipline, it's

14   going to be lots of people in the department.

15             So, as I said earlier, if I'm remembering

16   correctly, Peg supported Namita to -- supported Namita

17   for the job but -- but there were people on the

18   committee who did not support Namita, and they did not

19   support Namita because of her providence, because --

20        Q.    When you say "her providence," what are you

21   referring to?

22        A.    Because she has a degree.   She has a Ph.D. in

23   women's studies and not in philosophy even though there

24   are -- even though philosophers on her committee.



Goswami vs. DePaul University
Darrell Moore - 09/11/2013

Page 49

1    So from the very beginning in our meetings

2   there, that we had very robust arguments about whether

3   or not a person with a degree in women's studies should

4   be hired.   There were members on the search committee

5   who thought that members of the department -- and this

6   had never been done before and I was actually kind of

7   shocked by it -- made copies of her dissertation that

8   dealt with philosophers and said, "This is not the work

9   of a philosopher on a philosopher," talking about

10  Foucault and Adorno.

11      So from the very beginning -- And we could

12  actually take a step back.   One of the things that --

13      Q.   Can I --

14      A.   Yeah.   Yeah.   Yeah.

15      Q.   Well, I want to go back to my question which

16  is dealing with your reference here saying "some are

17  suspicious."

18      A.   Right.

19      Q.   Were you including in that group of suspicious

20  people anyone who was on the personnel committee in the

21  spring of 2009?

22      A.   Oh, okay.   Difficult to parse out that.   But,

23  yes.   I know that David Pellauer didn't appreciate her

24  work, and I know that Peter did, neither.



Goswami vs. DePaul University
Darrell Moore - 09/11/2013                                    Page 53

1        A.    Absolutely.

2        Q.    And everyone knew her area of scholarships?

3        A.    Absolutely.

4        Q.    Everyone knew what she indicated what she

5   expected to pursue when she was at DePaul?

6        A.    Absolutely.

7        Q.    And she did, in your view, attempt to pursue

8   what she said at the beginning she was going to pursue?

9        A.    I think so.  Yes.  I think so.  Yes.  Yes.

10  Absolutely.

11       Q.    And in terms of who was looking at her

12  dissertation, who was that?

13       A.    Michael Naas.

14       Q.    And he was articulating a concern at that time

15  with her writing, correct?

16       A.    No.  It was -- It was more of an analysis.  It

17  was more -- It wasn't a -- The questions about writing

18  come up -- come up much later.

19       Q.    Do you remember him talking about her writing,

20  though, at that point in time?

21       A.    No.  What I remember is this:  That it was a

22  shallow analysis of Foucault and Adorno.  And this might

23  have been Michael, but it might have been someone else.

24  The reason I remember the Michael is it was just a



Goswami vs. DePaul University
Darrell Moore - 09/11/2013

Page 54

1  gesture of coming in with the copies which kind of

2  shocked me.

3          But the conversations about, "This is good

4  sociology -- great sociology."  Is it philosophy,

5  though?  The question put to the committee:  Is it

6  philosophy, though?

7          So the -- And so the coming in with the copies

8  is -- constitutes an event, in my mind.

9      Q.   Was he pointing out differences in versions of

10 her work that she had given the University, in terms of

11 the quality of the writing?

12     A.   That, I don't -- I don't think so, no.  I

13 don't think so.

14     Q.   Is it possible?

15     A.   I don't -- No.  Because her dossier was the

16 dossier.  She didn't send in -- I don't recall her

17 sending in more than one dossier.  Her writing sample

18 was from her dissertation.

19          And this sort of -- Be really clear about

20 something.  There are arguments that people can have

21 about whether or not they think that a particular

22 applicant is right for the position or whether a

23 particular applicant is good for the position which

24 comes with the territory.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-07167 Document #: 172-2 Filed: 09/16/14 Page 24 of 149 PageID #:7648

Goswami vs. DePaul University
Darrell Moore - 09/11/2013

Page 61

1      Q.    Had you read her prospectus, at that point in

2   time?

3      A.    No.   I read the prospectus after.

4      Q.    When did you read it?

5      A.    That's a great question.   It was definitely

6   after -- after this -- after this date.   It might have

7   been over that -- over that summer between 2009 and

8   20- -- between the spring quarter and the fall quarter.

9           One of the -- Part of the conversations that

10  Namita and I had was that the committee had a -- it was

11  a draft that the committee was working with.

12     Q.    Did you read the prospectus before the

13  department met on May 29, 2009 to discuss the personnel

14  committee's recommendation?

15     A.    No.   I read maybe, at that point, about

16  40 pages of it.

17     Q.    So you read a portion of it prior to the

18  department meeting?

19     A.    Right.

20     Q.    Okay.   Did you read any -- any other pieces of

21  her work prior to the personnel -- prior to the

22  department meeting on May 29th, 2009?

23     A.    Yeah.   I read -- I don't remember at this

24  point, but I had read her work well prior to that

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

Goswami vs. DePaul University
Darrell Moore - 09/11/2013

Page 83

1    that had come out in the year previous.  It is the duty

2    of the committee doing the evaluation, right, especially

3    if this is their assessment to say, "Okay.  If I'm on

4    your formal committee and I read your prospectus and I

5    say -- and my colleagues -- my three colleagues agree

6    this is horrible.  This kind of work does not deserve

7    tenure," then if I were a responsible value evaluator, I

8    would say, "Okay.  We've got the CV" -- what is the

9    point of having a CV?

10          "We've got the CV.  Let's see what this other

11   published work.  Is there too much pressure on her?  Is

12   she trying to do something too quickly?

13        Q.    So this is all what you would do but having

14   never served on a formal review committee?

15        A.    Absolutely.  Absolutely.  Absolutely.

16        Q.    Okay.

17        A.    But I've served on other evaluating --

18   evaluation committees, but this is absolutely what a

19   responsible faculty member would do.

20        Q.    In your opinion?

21        A.    In my opinion, as never having served on a

22   formal review in the philosophy department.

23        Q.    Now, 2008 --

24        A.    Uh-huh.



Goswami vs. DePaul University
Darrell Moore - 09/11/2013

Page 85

1    a procedural flaw in a probationary faculty member's

2    evaluation process?

3        A.   It would absolutely be a procedural flaw.

4        Q.   And might that be a justification, then, for

5    doing a proper formal review the following year?

6        A.   It might be a justification for doing a proper

7    retake.

8        Q.   Did you --

9        A.   I just took --

10       Q.   -- take the original prospectus or --

11       A.   I took, yeah, Exhibit 9.

12       Q.   You just might want to keep it with your

13   other --

14       A.   Okay.

15       MS. HERSCHMAN:   You can put it on the ground, if

16   you want a little more room.

17   BY MS. SCHMIDT JONES:

18       Q.   You raised a question as to why you were not

19   on the personnel committee for Dr. Goswami.

20            Would it be appropriate for the faculty

21   member's mentor to serve on their evaluation committee?

22       A.   At that point, I don't know whether or not I

23   was her mentor, but I don't see why that would be a

24   problem.   I don't think that that would be a problem.



# EXHIBIT C

```
0001
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF ILLINOIS
 3                      EASTERN DIVISION
 4   NAMITA GOSWAMI,              )
 5              Plaintiff,        )
 6         -vs-                   ) Case No. 12 CV 7167
 7   DE PAUL UNIVERSITY and       )
 8   PEG BIRMINGHAM,              )
 9              Defendants.       )
10           The deposition of JASON HILL, called for
11   examination pursuant to the Rules of Civil
12   Procedure for the United States District Courts
13   pertaining to the taking of depositions, taken
14   before ATHANASIA MOURGELAS, a notary public within
15   and for the County of Cook and State of Illinois,
16   at 150 North Wacker Drive, Suite 940, Illinois, on
17   the 23rd day of May, 2013, at the hour of 10:00
18   o'clock a.m.
19
20
21
22
23   Reported by:  Athanasia Mourgelas
24   License No. 084-004329
0002
 1        APPEARANCES:
 2
 3             GORDON & KARR, by
               MS. CARRIE A. HERSCHMAN,
 4             MS. LAURA E. FAHEY,
               150 North Wacker Drive, Suite 940,
 5             Chicago, Illinois  60606,
               (312) 377-4450,
 6             cherschman@gordonkarr.com,
                    Representing the Plaintiff;
 7
 8             MICHAEL BEST & FRIEDRICH, LLP, by
               MS. AMY SCHMIDT JONES,
 9             100 East Wisconsin Avenue, Suite 3000,
               Milwaukee, Wisconsin  53202-4108,
10             (414) 271-6560,
               asjones@michaelbest.com,
11                  Representing the Defendants;
12
               DePAUL UNIVERSITY,
13             Office of the General Counsel, by
               MS. KATHRYN A. STIEBER,
14             One East Jackson Boulevard,
               Chicago, Illinois  60604,
15             (312) 362-8564,
               kstieber@depaul.edu,
16                  Representing the Defendants.
17
```

```
18
19
20
21
22
23
24
0003
 1                            I N D E X
 2   WITNESS                              EXAMINATION
 3   JASON HILL, Ph.D.
 4       By Ms. Herschman                      5
 5       By Ms. Jones                        177
 6       By Ms. Herschman (further)          181
 7       By Ms. Jones (further)              182
 8
 9
10
11                         E X H I B I T S
12   NUMBER                             MARKED FOR ID
13   (None marked.)
14
15
16
17
18
19
20
21
22
23
24
0004
 1                    (Whereupon, the deposition
 2                    commenced at 10:09 o'clock a.m.)
 3                    (Witness sworn.)
 4       MS. HERSCHMAN:  Good morning, Dr. Hill, my name
 5   is Carrie Herschman and I'm one of the attorneys
 6   representing Namita Goswami.
 7            Have you ever been deposed before?
 8       THE WITNESS:  No, I have not.
 9       MS. HERSCHMAN:  Okay.  Let me tell you a little
10   bit about how it works.  I'm going to ask you a
11   series of questions.  If you don't understand the
12   question that I'm asking, just let me know and I'll
13   rephrase it.  It's important that you not nod but
14   that you make an audible response when responding
15   to my questions so the court reporter can take it
16   down.
17            Do you understand that?
18       THE WITNESS:  Oh, sure.  Yes.
19       MS. HERSCHMAN:  Okay.  Good.  If you'd like to
20   take a break at any time, that's not a problem just
21   so long there's not a question pending.
```

```
 3    supporter.  She really, really wanted Namita to be
 4    at DePaul.
 5            There were people who wanted to see
 6    Namita's work before she had completed her
 7    dissertation, and I had raised serious objections
 8    to this on behalf of Namita before she was even
 9    hired, I said this might be not fair.  It's not
10    that it would have violated some kind of protocol.
11    I think any department has the right to see a
12    candidate's dissertation, or what it's completed.
13            But I wanted to make a strong loyal case
14    for why this was not in the best of interest of
15    both Namita and the department, that we should give
16    her time to finish her work.  And the meeting
17    became a little bit tense.  So I had conversations
18    with Namita afterwards about how her work might
19    have been characterized in that meeting.  How in
20    spite of how it was charactered, people were --
21    most people to the best of my knowledge or memory
22    were still on board about having her there.
23            But one specific conversation that I did
24    have that I can remember since you asked about the
0090
 1    culture and my positioning of myself as a person of
 2    color had to do with the extent to which people
 3    thought she was -- she might be the kind of scholar
 4    she was representing herself to be, not in terms of
 5    women's studies or in terms of Roop Kanwar or
 6    postcolonial theory but in terms of other
 7    continental figures that people had then spent 40
 8    to 30 something years of their lives working on.
 9    People, you know, academics tend to be very -- it
10    acts as kind of a proprietorship of their work.
11            And so people wanted to see those parts of
12    the dissertation, which had not been completed I
13    think, and I said this is not fair.  It's not
14    violating protocol or it's not -- the department
15    has every right to do this, but I wanted to make a
16    case for let's give her the best chance to finish
17    her dissertation.  Because I know what it was like
18    to be on the job market after only having finished
19    three chapters of a five chapter dissertation.
20    It's rough.  And so I made certain comments.
21       Q.   What I'd like to hear about from you,
22    Dr. Hill, are what comments you made to Dr. Goswami
23    about the bias that you experienced as a man of
24    color at DePaul?
0091
 1            MS. JONES:  Object to the form of the question
 2    and it mischaracterizes his testimony.  Go ahead.
 3            THE WITNESS:  Well, I was leading up to that.
 4    BY MS. HERSCHMAN:
 5       Q.   Okay.  Yeah, go ahead, please.
 6       A.   So because I positioned myself as someone
```

7  who was along with Peg and so I -- there were a
8  cadre of us, a coterie of us, myself, Peg, Mary
9  Jeanne Larrabee I think and Tina Chanter who -- and
10 Darrell Moore, who are really, really behind
11 Namita.  We wanted her no matter what.  We were
12 going to make sure this was going to happen.
13         I can't -- so I can't say that there were
14 people who didn't want her.  There were skeptics
15 about how she was positioning her scholarship.  And
16 I said, look, we take it at face value.  We take a
17 candidate's report, his, her expertise at face
18 value.  We don't ask people to really demonstrate
19 their proficiency.
20         So I said, this department really
21 fetishizes (phonetic) figures and texts to the
22 exclusion of the rest of us like my -- and I
23 started including Namita.  People who are concerned
24 about the world and concerned about problems in the
0092
1  world and we want to use theory and philosophy to
2  sort of shed light on those problems.
3         Subsequently, those comments were viewed
4  very, very negatively, and I shared with Namita a
5  view point to that.  And it was -- it was just my
6  understanding.  You know, it was an opinion.  It
7  was a speculative utterance on my part that I think
8  that because I wasn't doing the traditional kind of
9  Kant work and continental philosophy that was being
10 done and because I was very vociferous and vocal,
11 very, very vocal in my support of Namita and in
12 support of the kind of work that she was doing,
13 although it didn't fit the overall tenure of a
14 continental department.
15         For example, that I said I think that I'm
16 being judged as a person of color maybe, maybe
17 sticking up for another person of color.  That was
18 one conversation I recall us having, or a person of
19 color who is doing this kind of philosophy because
20 he's the first person of color.
21         I think I remember telling Namita that the
22 disrespect that I was getting from the graduate
23 students was not being handled -- I think I said to
24 her if I were white and graduate students had been
0093
1  disrespecting me as they had continued to do so
2  that it would have been taken care of.  But I
3  remember saying to her I think maybe it's just, you
4  know, my age doesn't probably matter that much in
5  the department or to some people in the department
6  not -- I could never make a statement like the
7  whole department because clearly there were people
8  like Peg who was always my advocate and always on
9  my side and Mary Jeanne and Tina and other people
10 in the department but sort of maybe -- not even a

```
11   handful.  A few people in the department might view
12   me a certain way.  But --
13       Q.   What way do you mean?
14       A.   You know, being outspoken in faculty
15   meetings and being told that -- being explicitly
16   told -- okay.  Yes.  Being explicitly -- to tell
17   the truth, the whole truth and nothing but the
18   truth.  There was one faculty member said you
19   should learn to sit in meetings and keep your mouth
20   shut.  I saw other faculty members who are either
21   both junior professors not keeping their mouth
22   shut, being very vocal, not even as deferential and
23   respectful as I was because I would always practice
24   by saying I want to say this respectfully but say
0094
1    it very, very forcefully.
2            And I had one faculty member who said to
3    me, you should follow Peter Steeves, who I think
4    was a junior faculty at that time.  I can't
5    remember if he had gotten tenure yet.  But Peter
6    listened.  He doesn't say anything.  He keeps his
7    mouth shut, and you should, too.  And I remember
8    saying to Namita, can you imagine that this was
9    said to me where there are whites in the department
10   who are saying a lot of things much more
11   aggressively than I am and they're getting away
12   with it, and I am being reprimanded over and over
13   again for pointing out -- or for opening up my
14   mouth and just being a human being in the
15   department.
16           So I had a conversation with her about
17   that.  And I said just, you know, try to be very
18   careful that both as a woman and as a person of
19   color that you -- you know, you're not walked over,
20   I mean.  So we had very general conversations about
21   how -- because race fuses so much of Latin America.
22           It's so very hard to sort of ostensibly
23   point to one situation with complete accuracy and
24   say that is racism.  But you live certain things
0095
1    and you make observations and then you come to a
2    judgment, right.  So I wanted to sort of equip her
3    very early on that there might be -- not the
4    department.  But like I said, people in the
5    department really, really did to the best of my
6    memory did want Namita, but that there might be
7    some people who would just object to a woman, maybe
8    a person of color or maybe a woman of color having
9    strong opinions, saying them in a certain way.  My
10   biggest grouse at that time was the graduate
11   students.  Right.  But I had had these experiences
12   with people.
13       Q.   What faculty member advised you to act
14   like Peter Steeves?
```

```
15        A.    David Pellauer.
16        Q.    You talked about some other faculty
17   members who gave you that impression, is that fair
18   to say?
19        A.    I can't say for absolute -- with absolute
20   certainty.  As a fact, no.  I mean, I could just
21   point to that case because there -- when he said it
22   to me, I felt singled out in that isolated moment.
23   So in the same that I can ostensibly point to the
24   graduate student saying, you know, we're going --
0096
1    one graduate student and then a handful of them
2    joining in the course line, and if you commit a
3    crime, we're going to deport you because you're
4    from Jamaica and using the F word to me a couple of
5    times.  That's not what he F'g means, this
6    particular thing for Kant.
7              There I just didn't think I needed to make
8    any kind of conjectural or speculative move on my
9    part.  It just seemed very, very real.  I'm always
10   looking for -- it's like riding an elevator and
11   somebody who is white looking at you up and down
12   and you say hello and the person doesn't answer
13   you, I don't want to say that person is racist
14   because I want to say, okay, that person could just
15   be having a bad day.  Maybe he or she just got
16   diagnosed with cancer the day before.  But I feel
17   like, wow, maybe he's not saying hello to me for
18   the second time because I'm black.
19             So I'm very careful and I was -- I try to
20   be very careful even during the whole time I was
21   friends with Namita to make a distinction between
22   subjective feelings I might be having in a
23   certain -- on a certain day and then things that I
24   can ostensibly point and say, see, no, I think
0097
1    that's a case where I'm being singled out or one is
2    being singled out.  And so I wanted to communicate
3    this to her.  Now, we did have other conversations.
4         Q.    Tell me about those.
5         A.    No.  No.  Well, we had lots of
6    conversations about -- I mean, I don't know --
7         Q.    Fair point.
8         A.    Yes, there's lots of conversations we
9    had --
10        Q.    Fair point.
11        A.    Yeah.
12        Q.    Let's make it -- let's narrow it a bit.
13   You told me about what happened with the graduate
14   students?
15        A.    Yeah.
16        Q.    And you told me what David Pellauer said.
17   What other experiences did you have as a man of
18   color that made you feel that you were being
```

# EXHIBIT D

Namita Goswami vs.
DePaul University, et al.

**Contains Confidential Information**

MARY JEANNE LARRABEE, Ph.D.
October 30, 2013

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3  NAMITA GOSWAMI,            )
                               )
 4            Plaintiff,       )
                               )
 5       vs.                   )  Case No.
                               )  1:12-cv-07167
 6  DEPAUL UNIVERSITY,         )
    PEG BIRMINGHAM, and        )
 7  ELIZABETH ROTTENBERG,      )
                               )
 8            Defendants.      )

 9

10

11         THIS DEPOSITION CONTAINS

12         CONFIDENTIAL INFORMATION

13

14       The deposition of MARY JEANNE LARRABEE,

15  Ph.D., taken in the above-entitled cause before

16  Denielle P. Mathys, CSR, and Notary Public within

17  and for the County of Kane and State of Illinois,

18  taken pursuant to the Federal Code of Civil

19  Procedure for the United States District Court,

20  Northern District of Illinois, Eastern Division at

21  Two Prudential Plaza, Suite 2000, in the City of

22  Chicago, Illinois, on October 30, 2013, at the hour

23  of 9:10 a.m.

24
```

---

**Page 2**

```
 1          A P P E A R A N C E S:

 2

 3     GORDON & KARR LLP
       BY:  MR. STUART D. GORDON
 4          150 North Wacker Drive, Suite 940
            Chicago, Illinois  60606
 5          (312) 377-4450
            sgordon@gordonkarr.com
 6
               On behalf of the Plaintiff;
 7

 8     MICHAEL, BEST & FRIEDRICH, LLP
       BY:  MS. AMY SCHMIDT JONES
 9          100 East Wisconsin Avenue, Suite 3300
            Milwaukee, Wisconsin  53202-4108
10          (414) 271-6560
            asjones@michaelbest.com
11
               On behalf of the Defendants.
12

13     ALSO PRESENT:

14     DePAUL UNIVERSITY
       MS. LAURA D. WARREN
15     Senior Associate General Counsel
       1 East Jackson Boulevard
16     Chicago, Illinois  60604-2287
       (312) 362-8543
17     lwarren@depaul.edu

18
       MS. ELIZABETH ROTTENBERG
19

20

21

22

23

24
```

---

**Page 3**

```
 1              I N D E X

 2  WITNESS EXAMINATION      DX    CX    RDX   RCX

 3  MARY JEANNE LARRABEE, Ph.D.

 4    By Ms. Jones           5           301

 5    By Mr. Gordon                285

 6

 7

 8          E X H I B I T S

 9  DEPOSITION EXHIBITS                     MARKED
    Larrabee Exhibit No. 1                     31
10  Larrabee Exhibit No. 2                     38
    Larrabee Exhibit No. 3                     40
11  Larrabee Exhibit No. 4                     46
    Larrabee Exhibit No. 5                     49
12  Larrabee Exhibit No. 6                     61
    Larrabee Exhibit No. 7                     62
13  Larrabee Exhibit No. 8                     67
    Larrabee Exhibit No. 9                     74
14  Larrabee Exhibit No. 10                    78
    Larrabee Exhibit No. 11                    79
15  Larrabee Exhibit No. 12                    82
    Larrabee Exhibit No. 13                    90
16  Larrabee Exhibit No. 14                    91
    Larrabee Exhibit No. 15                    95
17  Larrabee Exhibit No. 16                   110
    Larrabee Exhibit No. 17                   112
18  Larrabee Exhibit No. 18                   115
    Larrabee Exhibit No. 19                   121
19  Larrabee Exhibit No. 20                   122
    Larrabee Exhibit No. 21                   123
20  Larrabee Exhibit No. 22                   125
    Larrabee Exhibit No. 23                   128
21  Larrabee Exhibit No. 24                   134
    Larrabee Exhibit No. 25                   143
22  Larrabee Exhibit No. 26                   145
    Larrabee Exhibit No. 27                   149
23  Larrabee Exhibit No. 28                   153
    Larrabee Exhibit No. 29                   155
24  Larrabee Exhibit No. 30                   159
```

---

**Page 4**

```
 1          E X H I B I T S (Cont'd)

 2  DEPOSITION EXHIBITS                     MARKED
    Larrabee Exhibit No. 31                   160
 3  Larrabee Exhibit No. 32                   161
    Larrabee Exhibit No. 33                   164
 4  Larrabee Exhibit No. 34                   180
    Larrabee Exhibit No. 35                   182
 5  Larrabee Exhibit No. 36                   189
    Larrabee Exhibit No. 37                   189
 6  Larrabee Exhibit No. 38                   192
    Larrabee Exhibit No. 39                   201
 7  Larrabee Exhibit No. 40                   258
    Larrabee Exhibit No. 41                   264
 8  Larrabee Exhibit No. 42                   266
    Larrabee Exhibit No. 43                   266
 9  Larrabee Exhibit No. 44                   270
    Larrabee Exhibit No. 45                   271
10  Larrabee Exhibit No. 46                   273
    Larrabee Exhibit No. 47                   274
11  Larrabee Exhibit No. 48                   291

12

13  Lee Exhibit No. 10 previously              99

14

15

16

17

18

19

20

21

22

23

24
```

---

Namita Goswami vs.
DePaul University, et al.

Contains Confidential Information

MARY JEANNE LARRABEE, Ph.D.
October 30, 2013

---

**Page 5**

1  MARY JEANNE LARRABEE, Ph.D.,
2  called as a witness on behalf of the defendants,
3  being first duly sworn, was examined and testified
4  as follows:
5  **DIRECT EXAMINATION**
6  BY MS. JONES:
7  **Q   Could you, please, state your name and**
8  **spell it for the record?**
9  A   My name is Mary Larrabee, M-a-r-y,
10  L-a-r-r-a-b-e-e, B as in Buffalo.
11  **Q   Dr. Larrabee, I'm Amy Schmidt Jones.  I'm**
12  **an attorney for DePaul University in the case that**
13  **has been brought by Namita Goswami in federal court**
14  **here in Northern Illinois.  Do you understand that?**
15  A   May I clarify what you mean for the
16  university?
17  **Q   I am representing the university in the**
18  **federal court case that's been brought by Namita**
19  **Goswami --**
20  A   Correct.
21  **Q   -- in the Northern District.**
22  A   There are various ways to be legal counsel
23  for the university.  Are you a member of the
24  university general counsel office?

---

**Page 6**

1  **Q   I am not.  I'm outside counsel.  I'm with**
2  **the law firm of Michael Best & Friedrich.**
3  A   Okay.  And who hired you?
4  **Q   The university.**
5  A   The university hired you?
6  **Q   Correct.**
7  A   Correct.  Thank you.
8  **Q   And I understand you've appeared by**
9  **consent here today; is that correct?**
10  A   That is correct.
11  **Q   And you were given a copy of a subpoena by**
12  **Kathy Stieber in the Office of General Counsel,**
13  **correct?**
14  A   I was given that.
15  **Q   And you understand that there have been**
16  **attempts to serve you by certified mail as well?**
17  A   Yes.  There was an attempt when I was out
18  of my home on Monday night.
19  **Q   There was an attempt by a process server**
20  **to come to your home?**
21  A   I don't know if that was who it was, but
22  there was someone who came and insisted on giving me
23  a subpoena when I wasn't there.
24  **Q   And have you also received notices of a**

---

**Page 7**

1  certified letter waiting for you?
2  A   There was one about three weeks ago, but I
3  never was able to get to the post office due to my
4  workload.
5  **Q   But you're appearing by consent today?**
6  A   I've said that already.
7  **Q   I'm going to -- have you been deposed**
8  **before?**
9  A   I have never been deposed for anything.
10  **Q   Then I'm going to go through a series of**
11  **guidelines --**
12  A   Okay.  Great.
13  **Q   -- for our discussion today for how this**
14  **deposition will go.**
15  I am going to be asking you a series of
16  questions, and you are required to answer those
17  questions under oath.
18  A   Okay.
19  **Q   There may be objections to a question that**
20  **I asked by counsel for Namita Goswami, who is**
21  **sitting next to you at the table.  And if that**
22  **happens, I'm going to ask that you pause briefly**
23  **while we have our discussion, but you will be**
24  **answering those questions subject to those**

---

**Page 8**

1  objections.  Do you understand that?
2  A   Yeah, if I can understand the objection.
3  **Q   And please wait until I finish my question**
4  **before you start answering, okay?**
5  A   Which question?
6  **Q   Any question.**
7  A   Okay.
8  **Q   Please let me finish --**
9  A   Listen to the question --
10  **Q   See, here, we're speaking over.  What I'm**
11  **asking is let's not talk over one another, and this**
12  **is for the ease of the court reporter who is**
13  **transcribing everything you say.**
14  A   Right.
15  **Q   And it's more difficult if we're talking**
16  **over each other than if I ask my question first and**
17  **then you answer when I'm done asking my question.**
18  **Understood?**
19  A   I understand but you are making a
20  statement, and I was trying to clarify it.  So if
21  you could pause during some of your longer
22  statements so that I actually can say if I have
23  something to ask to clarify, that would help me.
24  **Q   I'm going to make one thing clear about a**

---

Namita Goswami vs.
DePaul University, et al.

Contains Confidential Information

MARY JEANNE LARRABEE, Ph.D.
October 30, 2013

---

Page 109

1  two lists and the chair choosing one from each list
2  until he gets two people.  As to what else goes on,
3  professional ethics is -- plays a role there.  So it
4  depends upon whether a person has professional
5  ethics or not maybe, and professional ethics only in
6  my view of it, which is somewhat more stringent than
7  a lot of other people, including those in my
8  department.
9      Q   But from your perspective, the external
10 review process was handled appropriately with Namita
11 Goswami?
12     A   I have no idea other than we ended up with
13 two letters about whether it was attended to
14 properly except that in the departmental meeting,
15 there was some challenge to Rick Lee as to how he
16 chose the two letters.  And he went through the
17 thing, and it sounded to me like it was an
18 appropriate process, or I should say followed the
19 procedures as prescribed by the university handbook.
20     Q   Now, in Exhibit 15, Namita Goswami sent
21 you an e-mail on 6-29-2009 at 2:12 p.m., and this is
22 on DPU9587, the number at the bottom of the page.
23     A   Okay.  Just tell me the exhibit number.
24 Are we still on 15?

---

Page 110

1      Q   We're still on 15.
2      A   And which date?
3      Q   The bottom of the page, the number is
4  DPU9587.
5      A   Okay.  Uh-huh.
6      Q   And she sent you an e-mail on June 29,
7  2009, 2:12 p.m., correct?
8      A   Yes, correct.
9      Q   And she indicated to you at that time --
10 she wanted to let you know that she was relaxing and
11 working steadily at that point in time, right?
12     A   Uh-huh.
13     Q   Right?
14     A   Yes, she does indicate that in the letter.
15     Q   And do you have any reason to believe she
16 was not working steadily at that point in time?
17     A   All I know is what she said in the e-mail.
18 I didn't know whether it was a fact or not.
19          (Larrabee Exhibit No. 16
20          marked for identification.)
21 BY MS. JONES:
22     Q   I'm showing you what's been marked
23 Exhibit 16.  Exhibit 16 is more e-mail communication
24 between you and Namita Goswami, this time from

---

Page 111

1  September 2009, correct?
2      A   It appears to be that, yes.
3      Q   Okay.  The top e-mail is from Namita to
4  you from September 4, 2009, at 9:04 a.m.
5      A   Uh-huh.
6      Q   And her statement to you is, "The
7  'arrangement' is that both Rick and Pellauer will be
8  going through the different levels with me to ensure
9  that 'both sides' are represented."
10         My question to you is, did you hear from
11 anyone other than Namita Goswami that an arrangement
12 had been made for David Pellauer to accompany Rick
13 through the tenure process in January of 2010?
14     A   I'm sorry, I don't recall the various ins
15 and outs and ups and downs with this particular
16 discussion prior to the procedure actually
17 happening.
18     Q   So you don't remember --
19     A   No.  This --
20     Q   -- if you heard that from anybody else?
21     A   This might have been a flutter of a
22 possibility, and I don't know who would have said
23 it, and I don't know whether the dean had been in on
24 it.  There may have been just discussion in the

---

Page 112

1  department because people were afraid that if Rick
2  do it, it might be biased and that somehow both
3  sides -- I just can't remember this.
4          Oh, well, she mentions the
5  behind-the-scene shenanigans.  I wasn't involved in
6  those, so I don't know what they were.
7              (Larrabee Exhibit No. 17
8              marked for identification.)
9  BY MS. JONES:
10     Q   Showing you what's been marked
11 Exhibit 17 --
12     A   Uh-huh.
13     Q   -- this is e-mail communication between
14 you and Namita Goswami also from September 2009,
15 correct?
16     A   That appears to be so.
17     Q   And did you suggest to Namita that she
18 should indicate on her CV what had been double-blind
19 peer reviewed as opposed to peer reviewed?
20     A   Yes, I did, since it's important at the
21 university level that they recognize the objective
22 review process that happened.
23     Q   And so when you refer to double-blind
24 review, what kind of process are you referring to?

---

Namita Goswami vs.
DePaul University, et al.

Contains Confidential Information

MARY JEANNE LARRABEE, Ph.D.
October 30, 2013

Page 113

1    A   I'm referring to a process in which the
2    editor of the journal decides who -- what -- usually
3    two reviewers will review an article that's been
4    submitted.  These two reviewers are sent the article
5    without the name of the submitter, the writer in
6    question.
7        I know that Signs has such a double-blind
8    process.  Several journals don't.  They resist
9    double-blind.  This, of course, opens the
10   possibility for other people to consider a friend
11   was involved in reviewing and accepting an article.
12   In fact, the reviewers don't accept articles.  They
13   propose whether the article is of various levels of
14   quality.
15       So it's important -- I consider it
16   important to put in where there is blind reviewing
17   because no one had been mentioning blind reviewing
18   before.  In fact, it wasn't mentioned in the
19   department tenure review in January 2010.
20   **Q   Now, you indicated you know Signs has a**
21   **double-blind peer review.  Is that something they**
22   **publish?  I mean, is that something they make public**
23   **that that's the process they use?  Is that -- the**
24   **question is, how do you know Signs uses that process**

Page 114

1    **where they don't identify the writer to the**
2    **reviewer?**
3        A   I have been a reviewer for Signs'
4    articles, so I know I do not know who has written.
5    In fact, it is fairly much a standard from the
6    beginning that all women's studies journals,
7    academic journals are blind reviewed at a time when
8    there is resistance to have even single-blind
9    reviewing happening.
10   **Q   Is there any other way you would know?  I**
11   **mean, is that something the journals put up on their**
12   **website or --**
13   A   They very -- they very well may do that.
14   I'm sorry, I can't respond which ones do and which
15   ones don't.
16   **Q   Have you served as a reviewer for any of**
17   **the other journals that were listed on Namita's CV**
18   **other than Signs?**
19   A   I'd have to look at her CV.  I know I
20   haven't for Angelaki.  It's a fairly new journal.  I
21   haven't reviewed for Southeast Asian or South Asian
22   journal.
23   **Q   Here, I have a copy of her CV.**
24   A   I have reviewed for Hypatia.  They have

Page 115

1    double-blind, but I think that might be something
2    that was under review at the time.
3        I know that SPEP, a very important
4    conference organization for our program because it's
5    continental philosophy, double-blind reviews their
6    conference submissions.  I see a shake of the head.
7    Someone says no.  So maybe it's only single-blind
8    reviewed.  As I said, there has been resistance in
9    the philosophical community to do double-blind.
10       MS. JONES:  I thought I had her CV.  Here
11   it is.
12           (Larrabee Exhibit No. 18
13           marked for identification.)
14   BY MS. JONES:
15   **Q   I'm showing you what's been marked**
16   **Exhibit 18.  I'll represent to you that this was the**
17   **CV that was submitted at the time of Namita**
18   **Goswami's tenure application.**
19   A   Right.
20   **Q   So if you could just indicate for me which**
21   **of the publications --**
22   A   Okay.  Simply Signs, I was not a reviewer
23   in any of the book-chapter compilations.
24   **Q   So then separate from double-blind peer**

Page 116

1    **review, which you've just described, what is peer**
2    **review?**
3        A   Peer review is that a person in the
4    subject field with expertise in the subject field
5    usually understood by the fact that they have
6    published to some extent, more than just, you know,
7    beginning things but across a record, in the subject
8    field in which the essay is located.
9        So it can be very narrow.  It's not
10   necessarily, oh, you're a woman's studies scholar,
11   so anyone of you sort of can review any essay for
12   Signs.
13   **Q   So in that context, the person would**
14   **actually know who wrote the piece in peer review as**
15   **opposed to double-blind?**
16   A   No.  Peer review is a generic term.  It
17   can be either single-blind, double-blind, or no
18   blind whatsoever.
19   **Q   But if you --**
20   A   So peer just means there is someone who
21   has expertise in the area of the essay being asked
22   to review an essay.
23       If it's not blind at all, both sides know
24   who's reviewing.  If it's single-blind, it usually

Namita Goswami vs.         Contains Confidential Information       MARY JEANNE LARRABEE, Ph.D.
DePaul University, et al.                                          October 30, 2013

**Page 117**

1 means the submitter does not know who is reviewing.
2 If it's double-blind, neither knows who is doing the
3 job, who is the writer or the reviewer.
4     **Q  Well, when you reviewed Namita Goswami's**
5 **CV at the time of her tenure application, you**
6 **understood she had a distinction between**
7 **double-blind peer review and then peer review. So**
8 **did you understand what was listed as peer reviewed**
9 **had been reviewed by someone who knew who she was,**
10 **but she didn't know who they were, subject matter**
11 **expert?**
12     A  Okay. Given that she responded to my
13 advice to her to put in double-blind versus where it
14 was the case and just peer review where it wasn't,
15 this CV is written on my recommendation to indicate
16 that. So what is your question about?
17     **Q  I'm just trying to understand what your**
18 **understanding was of what it meant when she listed**
19 **just peer reviewed on her CV?**
20     A  It meant that she didn't know that it was
21 double-blind. That's all I know. But I can't read
22 her mind. I just know what I advised her to do.
23     **Q  Have you done peer reviews where you knew**
24 **the identity of the person writing the piece?**

**Page 118**

1     A  Again, 30 years of doing reviews for a
2 variety of -- I'm sure there is some where I did
3 know, but I can't remember.
4     **Q  If you were to get a request to conduct a**
5 **review, and they actually did provide the name of**
6 **the person and you knew the person very well, is**
7 **that something -- would you complete the review?**
8     A  No. Actually, I'd return it and say I
9 couldn't review since I knew the person to an extent
10 to which it would not be possible to do a fair
11 review. This is a professional call.
12     **Q  So would you categorize a piece as being**
13 **peer reviewed if the only person that reviewed it**
14 **was a personal friend of yours who solicited the**
15 **piece?**
16     A  Since I've already indicated that my
17 definition of peer review is that the peer is
18 someone who has established expertise in the area of
19 the essay, I really don't know what else I would use
20 to characterize a peer review. That is my
21 definition of peer review.
22     I don't have any recollection myself of
23 personal experience of people who are other -- had
24 other relationships with someone -- it's all

**Page 119**

1 determined by the editor and what the editor wants
2 to accomplish.
3     I do know that in getting books published,
4 editors often will just find someone that knows the
5 person, also is an expert, and they'll do the review
6 because the editor wants to publish the thing.
7 There are all kinds of people --
8     MR. GORDON: Can I ask you to speak up,
9 please?
10     THE WITNESS: I'm sorry, yeah. I'm just
11 indicating that just the fact of peer review, my
12 understanding, is a person of expertise, established
13 expertise. What editors do in terms of selecting
14 those peer reviewers, I have no idea. I've never
15 been an editor.
16 BY MS. JONES:
17     **Q  Do you recall in Namita Goswami's tenure**
18 **box that she submitted a letter from the editors of**
19 **this "De-Liberating Traditions," which is listed on**
20 **the second page of her CV, as forthcoming?**
21     A  I can't remember reading the letter
22 itself, but I took -- since I took this to be true,
23 I must have read the letter that substantiated it or
24 I would have called for substantiation.

**Page 120**

1     **Q  So in the usual case, do faculty members**
2 **who list forthcoming pieces on their CV at the time**
3 **of tenure provide letters to support the status of**
4 **the piece or the acceptance of the piece?**
5     A  You, more or less, have to do that because
6 otherwise it's just your word that it's accepted.
7     **Q  And --**
8     A  And there is no indication in print that
9 it's accepted for being in print, so that is an
10 established practice.
11     **Q  And did you know at the time of the tenure**
12 **decision that Namita Goswami and her husband had**
13 **edited the letter that came from the editors of**
14 **"De-Liberating Traditions" to make it sound more**
15 **certain that it would be published than it actually**
16 **was at the time?**
17     A  I have no idea what they would have done
18 with any letter that they submitted to the box if
19 they did anything.
20     **Q  Would you consider that in accordance with**
21 **policies and procedures in the tenure process?**
22     A  There are no policies and procedures that
23 say anything about something like that.
24     **Q  Would you -- would that be consistent with**

Namita Goswami vs.
DePaul University, et al.

Contains Confidential Information

MARY JEANNE LARRABEE, Ph.D.
October 30, 2013

Page 145

1  try to get a letter from the editorial board and a
2  full contract in hand in time for the UBPT meeting?
3     A  I say to any candidate that's a good plan,
4  including Kevin Stevens [sic] if he had sent out his
5  manuscript.
6     Q  There is no Kevin Stevens.
7     A  I'm sorry, that's someone else in
8  accounting.  Kevin Thompson.
9     Q  Did she ever tell you what she got from
10 SUNY prior to the UBPT meeting?
11    A  Since I'm only a mentor and I only have so
12 much time to mentor, no, she never told me what she
13 got.
14    Q  Did she ever show you any correspondence
15 she got from SUNY?
16    A  I don't recall that she did.  I am not in
17 her back pocket.
18               (Whereupon Ms. Warren re-entered
                  the deposition, after which the
19               following proceedings took
                  place:)
20             (Larrabee Exhibit No. 26
21               marked for identification.)
22 BY MS. JONES:
23    Q  Exhibit 26 is e-mail correspondence
24 between you and Namita Goswami in early

Page 146

1  January 2010, correct?
2     A  It appears to be so.
3     Q  And actually January 2nd and January 3rd,
4  2010; is that right?
5     A  January 3rd from her, January 2nd from
6  her, 3rd from me, correct.
7     Q  Your e-mail states simply, "I still lean
8  toward not putting them in the box."  And my
9  question is simply, what is "them" in that sentence?
10    A  I suspect that I thought procedure best
11 if all people concerned know that something is going
12 to be added to the box, and since there had not yet
13 been time for that, that I didn't want her just to
14 go put it in the box.  So whatever the "them" was
15 doesn't matter.  It's putting something new in the
16 box without the process of checking at least with
17 the chair.
18            In other words, we want verification that
19 she is putting something in the box on a certain
20 date.  That verification should at least come from
21 the chair and not just be due to the fact that she
22 wants to put something in the box.
23    Q  So you were talking about her putting
24 something in the box without it coming from Rick Lee

Page 147

1  announcing it had been put there?
2     A  At least that Rick Lee knew it was going
3  to be put there, and he should follow through and
4  let people know it had been put there so that he
5  could follow through.
6     Q  Looking at the e-mail, is there anything
7  else you can do to flesh out what the "them" is?
8     A  As an analyst of writing, it would appear
9  that the "them" could include the writing assignment
10 that David Pellauer asked for, the second chapter of
11 the book, and given a reference to it, the first
12 chapter of the book.
13    Q  The chapters were added to the box,
14 correct, before the meeting?
15    A  I don't know.
16    Q  You don't remember a discussion about that
17 at the department meeting on January 8th?
18    A  There was a discussion about people not
19 knowing it was in the box, and they weren't going to
20 read them in the box, but I actually had read them
21 on the online version.  They were put into the
22 online box.
23    Q  So the chapters were put into the box
24 before the meeting?

Page 148

1     A  I said I don't know because I didn't read
2  the material in the box.  I read them online in the
3  online version of the box.
4     Q  So there is an online and a hard copy
5  version of the box?
6     A  That's correct.
7     Q  So the chapters were added to the
8  electronic version of the box?
9     A  That's correct.  To clarify, I read
10 electronic copies of them.
11    Q  In the electronic version of the box?
12    A  All I could say exactly and carefully
13 given I'm under oath is that I read electronic
14 versions of the chapters.
15    Q  What were those final chapters about?
16    A  Those weren't final chapters.  They were
17 chapter one and chapter two.
18    Q  The final chapters added to the box, what
19 were they about?
20    A  They're about the identity of subject in
21 relationship to Foucault's theory.  The first
22 chapter was sort of setting up the entire thing, the
23 critique on the basis of postcolonial identity.  If
24 you want me to remember in detail, I will have to

Namita Goswami vs.
DePaul University, et al.

Contains Confidential Information

MARY JEANNE LARRABEE, Ph.D.
October 30, 2013

Page 149

1 look at the materials as I have in each instance.
2       (Larrabee Exhibit No. 27
3       marked for identification.)
4 BY MS. JONES:
5   Q   9618 and 9619 is e-mail communication on
6 which you were a sender or recipient from January 4,
7 2010, correct?
8   A   It appears to be so.
9   Q   And the issue of this e-mail communication
10 was whether preceding informal and formal reviews
11 would be a part of the tenure file, correct?
12   A   I haven't read these two pages yet, so I
13 can't say. May I have time to read them so I can
14 respond to your question?
15   Q   You can read them.
16       MS. JONES: Just keep the time.
17       THE WITNESS: Your question?
18       MS. JONES: Can you read the question?
19       (Question read as requested.)
20   A   That appears to be the content.
21 BY MS. JONES:
22   Q   And you expressed the view that such
23 reviews should not be required to be made a part of
24 the file, correct?

Page 150

1   A   I expressed a view that it currently is
2 not -- it currently is -- I have to read because I'm
3 not saying --
4   Q   You say, "These reviews may be added by
5 the candidates as they will, but cannot be demanded
6 by any level of the process," correct?
7   A   My view is that is the current practice,
8 and there is no further policy on that.
9   Q   Now, when you prepared a minority report
10 following the department meeting in January of 2010,
11 you cut and paste the, quote, minority report from
12 May 2009 and included it in that submission,
13 correct?
14   A   Actually, I agreed that it be submitted.
15 It was Tina Chanter who decided to put that --
16 append that effectively as part of the text.
17   Q   Do you see -- and you thought that was
18 consistent with fair play after you had adamantly
19 opposed that the actual review be included in the
20 file?
21   A   Okay. First of all, any minority report
22 has a completely separate status from the formal and
23 informal pre-probationary tenure track reviews.
24   Q   But the point is your minority report cut

Page 151

1 and paste the prior minority report, right?
2   A   I'm saying that this procedure, this
3 established procedure applies only to the
4 departmental documents which are the recommendation,
5 the official recommendation of the department on up
6 to the dean and whoever else. The minority reports
7 are simply comments on that. They do not have the
8 same status. I could distribute them to anyone I
9 wanted to. I could deal with them differently than
10 what the department can do with what is in effect a
11 personnel record. A minority report is not an
12 official personnel record under any law so --
13   Q   But the fact is you cut and paste a
14 document that was a response to a document you said
15 that should not be part of the file and didn't show
16 it to anyone in the department, right?
17       MR. GORDON: I'm going to object to the
18 characterization of her testimony and --
19   A   Actually, that's wrong. Everyone in the
20 department saw that 2009, quote, minority report.
21 BY MS. JONES:
22   Q   No, I'm talking about the 2010 minority
23 report where you included the 2009 minority report.
24 Did you circulate that to the members of the

Page 152

1 department?
2   A   I was not in charge of that document.
3 Tina Chanter was in charge of that document.
4   Q   Did you circulate it to the members of the
5 department?
6   A   I was not in charge of circulating it to
7 anyone except --
8   Q   I don't care if you were in charge or not.
9 I'm just asking if you did?
10   A   I didn't because I wasn't supposed to,
11 okay? As I said, I wasn't in charge of it. I
12 didn't even write, append, whatever.
13   Q   You just signed it?
14   A   I approved Tina Chanter putting that in;
15 although, I wasn't sure it was the best approach.
16 Besides which, that minority report was really not a
17 comment so much on the departmental document as a
18 full scale evaluation of all of Namita Goswami's
19 achievements, some of which were not even mentioned
20 in the departmental. So it was more like an
21 alternative document.
22   Q   An alternative document --
23   A   Which is not an official personnel
24 document and, therefore, may or may not be shared

Namita Goswami vs.
DePaul University, et al.

Contains Confidential Information

MARY JEANNE LARRABEE, Ph.D.
October 30, 2013

---

Page 177

1   writes well?
2       A    She can write well.
3       Q    Is all of her work that you've reviewed
4   well written?
5       A    On my standards of being well written, it
6   is well written when it is in a publishable state.
7   Her prospectus --
8       Q    So did you find her prospectus well
9   written?
10      A    That was not a professionally written text
11  submitted for publication.
12      Q    Did you find it well written?
13      A    I can't remember.
14      Q    When you say it was not professionally
15  written --
16      A    I understood what it was saying, so it was
17  sufficiently well written for someone understanding
18  the types of things that you discuss in postcolonial
19  identity theory and women's studies theory to
20  understand well what she said. If one can
21  understand it, then I guess it's well written on
22  that standard.
23      Q    A prospectus is something you send to a
24  publisher to see if they would be interested in

---

Page 178

1   publishing your book, correct?
2       A    That is correct.
3       Q    And it's to describe the overall project
4   that the book is engaged with, correct?
5       A    Just to the extent that at the time you
6   write it, you have some idea of where it's going to
7   go particularly given brand new projects. You may
8   have -- write it in a way that gives what you
9   suspect will be the arc of the argument and the text
10  you will engage with.
11      Q    So my question is, did you think the
12  prospectus was well written?
13      A    It was well written for what it was, a
14  prospectus to publishers, not a finished academic
15  publishable piece.
16      Q    So you hold it to a lower standard in
17  terms of the quality of the writing?
18          MR. GORDON: Objection, characterization
19  of a lower standard. She didn't say it was a lower
20  standard.
21          MS. JONES: I'm asking the question.
22      A    All writing has certain standards. It
23  depends on the audience and the type of thing that's
24  going to be accomplished. If a philosopher wrote in

---

Page 179

1   a newspaper, a column, I would not expect the same
2   level of philosophical expertise to be displayed,
3   even the appropriate acknowledgment of sources to be
4   displayed.
5   BY MS. JONES:
6       Q    So do you hold prospectuses to a lower
7   standard in terms of what would be considered good
8   writing?
9       A    I hold them to the standard of prospecti,
10  period.
11      Q    And is that standard lower than what you
12  would expect to see in published work?
13      A    You see, what you're missing is I just
14  said that one standard used -- there is a standard
15  that you'd use to evaluate a philosopher writing a
16  pop ed column.
17      Q    No, I understand what you just said. You
18  said there is a standard for different context
19  depending on the purpose of the piece.
20      A    Right.
21      Q    And I'm asking you, is the standard you
22  use for a published piece in a journal higher than
23  what you would apply in evaluating the quality of
24  the writing in a prospectus? That's what I'm asking

---

Page 180

1   you.
2       A    Ah, the difficulty is, is I say
3   differences are differences, and you say differences
4   belong on a hierarchy. I don't put differences on a
5   hierarchy. Different standards do not belong on a
6   hierarchy. They belong on a level where for each
7   context there is a standard.
8       Q    Well, is bad writing okay in a prospectus?
9       A    No. But I said already that that was good
10  writing.
11      Q    And you're going to stand by that, right?
12      A    I've already said several times that I
13  could understand it. It was clear. I understand
14  her cogency of her argument and where she's going
15  with it given it was a prospectus. And, therefore,
16  it was good writing, yes, I'll stand by that.
17          (Larrabee Exhibit No. 34
18          marked for identification.)
19  BY MS. JONES:
20      Q    Showing you what's been marked Exhibit 34,
21  which was previously marked Chanter Deposition
22  Exhibit 8. Exhibit 34 is the minority report
23  prepared by Tina Chanter following the department
24  meeting in January 2010, correct?

---

Namita Goswami vs.
DePaul University, et al.

Contains Confidential Information

MARY JEANNE LARRABEE, Ph.D.
October 30, 2013

Page 233

1  used. That was in January of 2010.
2     Q   So you're talking about the department
3  meeting in January of 2010?
4     A   January 2010 or 2009, I'm not sure.
5     Q   So to the extent Peg Birmingham made a
6  comment about Namita not showing gratitude to her
7  for being hired, it would be on the recordings of
8  the January or May meetings?
9     A   It might be depending if the recordings
10 actually recorded everything.
11    Q   Do you recall her explaining what Namita
12 had done that made her feel that she had not shown
13 gratitude?
14    A   Namita had made her -- made her appear
15 before someone. If she didn't say it, I assume that
16 was the ombudsperson. And there was something else
17 about her having to apologize. I'm not sure if that
18 was on the record.
19        But, yeah, it was -- it was -- it was over
20 this whole thing of -- I mean, the very fact that --
21 I know that Peg said something to the effect that
22 Namita hadn't gone into her first before seeing the
23 ombudsperson and getting it all straight but that
24 failed to understand that Peg was still chair, and

Page 234

1  you don't complain to your chair when you're very
2  early in your tenure process. You first get advice
3  before -- advice before complaining to your chair
4  that they misconstrued your record.
5     Q   I'm confused. You talked about Peg saying
6  that Namita had not shown sufficient gratitude.
7     A   Yeah.
8     Q   These comments seem to be going to
9  something different. What did Peg say about
10 Namita --
11    A   One way she failed to show gratitude was
12 that she went through this process which was outside
13 of Peg's control, and that Peg had -- was pulled
14 into it because she had to go talk to the
15 ombudsperson.
16    Q   Did Peg ever say, "Namita did not show
17 gratitude to me for hiring her"?
18    A   I thought it was sufficient that she said
19 she did not show gratitude for or support of her or
20 something like that, I don't know, specifically
21 about hiring her. But in either case, gratitude is
22 not what you show, what you expect. You expect good
23 work.
24    Q   Do you know whether Avery Goldman

Page 235

1  expressed gratitude to Peg Birmingham for getting
2  hired?
3     A   I have no idea because no one had said one
4  way or the other whether Peg expected him to be
5  grateful.
6     Q   You said something about that you
7  suspected that Peg Birmingham was unable to read her
8  work because she doesn't understand critical theory?
9     A   Excuse me, I probably said it in the
10 general because I don't like to make pointed
11 comments when I'm not sure if they're accurate.
12        I said that given that institutional
13 racism includes the possibility that people have a
14 narrow construal of reality but think of themselves
15 as nonracist, because they haven't read anything
16 about institutional racism or very little, that in
17 fact one element of institutional racism is that you
18 are unable to read things that are highly critical
19 of your central position and power.
20    Q   What was it Namita Goswami wrote that was
21 highly critical of Peg Birmingham's central position
22 and power?
23    A   I think if you read the letter from her
24 expert, her experts, you will see that they talk

Page 236

1  about that.
2     Q   So to the --
3     A   Everything she wrote was highly critical
4  of the white establishment, the Eurocentric
5  establishment, and the colonialist establishment.
6  That's what she was hired to do.
7     Q   Exactly.
8     A   Yeah. And, in fact, she was called to
9  task by using that critical perspective in a talk.
10    Q   And what are you referencing there?
11    A   I do not have any idea.
12    Q   Okay. So when you made a reference in
13 your letter here to Peg Birmingham upbraiding
14 Dr. Goswami for making claims that were too radical
15 for the public's fear, is that this conference
16 you're talking about?
17    A   That wasn't a conference. I don't know
18 what it was, but I heard those comments.
19    Q   From Peg Birmingham?
20    A   Yes, it was I think in the corridor or
21 something. It was either at the talk itself, so it
22 was a departmental talk with an outside person, in
23 the discussion afterwards, or it was afterwards,
24 immediately afterwards.

Namita Goswami vs.
DePaul University, et al.

Contains Confidential Information

MARY JEANNE LARRABEE, Ph.D.
October 30, 2013

Page 237

1  Q   And what did you hear Peg Birmingham say?
2  A   I'm reading this because it's historically
3  probably more accurate.  Do you know where I said
4  that?  Oh, there, in line with this point -- I am
5  quoting my own document No. 35.  "In line with this
6  point, I have heard that ex-chair" -- that's Peg
7  Birmingham -- "upbraid Dr. Goswami for making claims
8  that were 'too radical' for the public space of
9  DePaul."
10  Q   So what did Peg Birmingham say that you're
11  referencing there?
12  A   Since I wish to be accurate, I can't know
13  that I said anything else than it was too radical.
14  Q   About what was she speaking?
15  A   Race, critical, and postcolonial critical
16  theory usually attacks the central aspect of power
17  in white and Eurocentric peoples.
18  Q   Other than the words "too radical," do you
19  remember anything else that Peg Birmingham said in
20  the comment that you heard?
21  A   Right now off the top of my head, I don't
22  except I -- except that I heard her say "too
23  radical."  Nothing is too radical to say in the
24  public space of DePaul University or any university.

Page 238

1  Q   And did you -- were you having a
2  conversation with her or did you overhear what
3  she --
4  A   I overheard that.  She was saying it to
5  Dr. Goswami herself.
6  Q   And did you speak to Peg Birmingham after
7  about the discussion you overheard?
8  A   Okay.  You'll only fight so many battles.
9  No, I did not.
10  Q   Now, the second person you mentioned as
11  voting based on racism was David Pellauer?
12  A   Uh-huh.
13  Q   Is it your testimony that David Pellauer
14  voted against Namita Goswami's tenure application
15  solely because of racism, or do you think he had
16  other motivations?
17  A   I have already said that every actor in
18  this play is acting on multiple motivations.
19  Q   So what were his other motivations?
20  A   I can't tell you.  I can't read his brain.
21  Q   So what is your basis for saying that one
22  of his motivations was racism?
23  A   Because he is implicated in the
24  institutional racism at DePaul as a whole and the

Page 239

1  department in specifics.
2  Q   Anything else?
3  A   The department in specific because they
4  have failed to fill an African philosophy position
5  and have shifted to a namby-pamby term like world
6  philosophy is possible, but they have never yet
7  hired then.  They only hire since.  The departure of
8  both of Africans by death and Namita Goswami of
9  post-colonialist theory.  They have only hired a
10  European white male who does European philosophy and
11  nothing else.
12  Q   And did you participate in that hiring
13  process?
14  A   I did.
15  Q   And did you review all of the applicants?
16  A   I did not.  I only reviewed the ones that
17  came on campus, which is standard procedure if
18  you're not a member of the review committee.
19  Q   So were you -- were you involved in
20  screening all the applicants that came in?
21  A   I was involved with everyone.  I was also
22  reviewing those who came on campus, which was only
23  about three or four.  I can't remember exactly.
24  Q   But were you involved in reviewing the

Page 240

1  initial applicant pool?
2  A   I told you I was not on that committee.  I
3  did not review them that I remember.
4  Q   Okay.  So what else do you believe shows
5  that David Pellauer was motivated by racism in the
6  sense he was implicated in institutional and
7  departmental institutionalized racism?
8  A   I have never seen him show any interest
9  whatsoever either in his written work or in other
10  ways that he has any interest in understanding
11  institutional, structural racism.
12  Q   Anything else you think shows he acted out
13  of racism?
14  A   All I can point to is the structural
15  elements that I'm aware of.  I don't read his mind
16  either.
17  Q   And those structural elements are what you
18  just told me about?
19  A   That's correct.
20  Q   Anything else in terms of the structural
21  elements?
22  A   Only vague memories of the discussion, for
23  example, of hiring a world philosopher instead of an
24  Africanist, but I can't remember much more than

Case: 1:12-cv-07167 Document #: 172-2 Filed: 09/16/14 Page 45 of 149 PageID #:7669

Namita Goswami vs.                  **Contains Confidential Information**        MARY JEANNE LARRABEE, Ph.D.
DePaul University, et al.                                                 October 30, 2013

---

**Page 241**

1   that.

2   **Q**   Anything else?

3   A   No.

4   **Q**   And David Krell was the last person who

5   you identified as acting out of racism and

6   recommending against -- strike that. I'll start

7   over.

8   David Krell is the last person you

9   identified as acting out of racism when he voted to

10  recommend against tenure for Namita Goswami?

11  A   Uh-huh.

12  **Q**   Is it your position that that was his sole

13  motivation or that he had multiple motivations?

14  A   As I've said, for every candidate, every

15  person involved, there are multiple motivations, so

16  I suspect he had some too.

17  **Q**   Are you aware of any motivations other

18  than racism that David Krell had?

19  A   No other legitimate professional reasons.

20  **Q**   Well, are there other illegitimate,

21  unprofessional reasons that you contend motivated

22  David Krell's vote?

23  A   No, but I could speak to the

24  professionally relevant ones.

---

**Page 242**

1   MR. GORDON: I'm sorry?

2   THE WITNESS: I can speak to the

3  professionally relevant ones.

4  BY MS. JONES:

5  **Q**   And what are those other motivations?

6  A   This actually goes back to the racism.

7  The level -- the hyperbolic level of his criticism

8  of Namita's use of Adorno and his claim of the

9  practical impossibility of her ever understanding

10  Adorno even with five years of language instructions

11  and German can only come from something like an

12  attitude that, number one, either -- now, these are

13  all hypothetical on my part; I don't read his brain

14  either -- hypothetical, that she is using Adorno for

15  a project that he considers completely illegitimate.

16  That on itself is racist. Her project is legitimate

17  in the sense of to show the ways in which

18  Eurocentric institutions, et cetera, including

19  philosophy, are themselves racist and have

20  maintained that racism. That's racist.

21  **Q**   Well, I'm going to tell you David Krell

22  has testified under oath that he thought the project

23  was worthwhile. His problem was with her execution

24  of it. So what do you have to show that that

---

**Page 243**

1   testimony given under oath was untrue?

2   A   I really can't. I'm actually rather

3  speechless, but I can understand why he would say

4  something like that. He can say anything he feels

5  like saying.

6   I can't respond any further unless I

7  actually see some of the things that David Krell --

8  that -- excuse me -- David Krell has actually

9  written about postcolonialist theory so . . .

10  **Q**   He also testified at length about his work

11  in critical race theory. Were you aware of that?

12  A   Yeah, he would. In fact, I suspect

13  Michael Naas talked about his work in feminist

14  theory.

15  **Q**   I don't remember that.

16  A   Oh, well . . .

17  **Q**   Anything else that you think motivated

18  David Krell other than racism, and that is in voting

19  to recommend against tenure?

20  A   He did not like it that Peg actually hired

21  Namita Goswami to begin with. It was against his

22  wishes.

23  **Q**   And what is your basis for saying that?

24  A   What Peg has said.

---

**Page 244**

1   **Q**   And what did Peg say?

2   A   She said something like that.

3   **Q**   Anything other than what Peg told you?

4   A   I think it was pretty clear what Peg told

5  me. It was not necessarily just me. It may have

6  been in a meeting.

7  **Q**   And did you ever talk to David Krell about

8  Namita Goswami's hiring?

9  A   David Krell was not really in my orbit of

10  interest, and I had no reason to see if what Peg

11  said she claimed was going on was what he took to

12  claim to be going on. It didn't matter to me.

13  **Q**   Anything else that you think was

14  motivating David Krell other than racism?

15  A   Probably sexism but I can't attest to that

16  much anyway, nor can I read his brain.

17  **Q**   So is there anything other than what

18  you've already testified to that leads you to

19  believe that he acted out of racism in voting

20  against Namita's tenure application?

21  A   Well, he was motivated out of some

22  misperception of her since he virtually claimed she

23  was something bordering on insane. In other words,

24  she had such an unrealistic view of herself, it was

---

309

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NAMITA GOSWAMI,                    )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )   Case No.
                                   )   1:12-cv-07167
DEPAUL UNIVERSITY,                 )
PEG BIRMINGHAM, and                )
ELIZABETH ROTTENBERG,              )
                                   )
          Defendants.              )

          I, **MARY JEANNE LARRABEE, Ph.D.**, being

first duly sworn, on oath say that I am the deponent

in the aforesaid deposition taken on October 30,

2013; that I have read the foregoing transcript of

my deposition, consisting of pages 1 through 311

inclusive, and affix my signature to same.

          _____   No corrections have been made.
            X      Corrections have been made and
                   are included with the following
                   errata sheet(s).

                   _____

                   **MARY JEANNE LARRABEE, Ph.D.**


SUBSCRIBED AND SWORN TO
before me this  27th
day of  November  20 13.

_____

     Notary Public

OFFICIAL SEAL
DENIELLE P MATHYS
Notary Public - State of Illinois
My Commission Expires Sep 26, 2016

D-SQUARED REPORTERS, INC.
(312) 332-2515

312

```
 1   CASE:  Goswami v. DePaul University, et al.

 2   DATE TAKEN:  10-30-13          RETURN DATE:  12-6-13

 3   DEPONENT:  MARY JEANNE LARRABEE, Ph.D.

 4   PAGE   LINE                    ERRATA SHEET

 5    7     20   CHANGE:  change '1' to '15'  [grammar]

 6   16     5    REASON:  add 'any' after 'not' [grammar]

 7   17     2    CHANGE:  [context - KS's comment was directed at a

 8                        Dean in The Handbook Taskforce

 9   17     6    CHANGE:  drop 'at'                            meeting]

10                REASON:  ungrammatical

11   17     9    CHANGE:  [context - "I had never heard that"-

12                REASON:  prior to my first meeting 12/2012]

13   17     16   CHANGE:  'some' to 'the same'

14                REASON:  meaning

15   17     23   CHANGE:  [clarification of who heard what -

16                REASON:  Lit. sant's attorneys heard lines 23-24 in Dec.

17                         2013; university attorneys know it ]

18   21     20   CHANGE:  add [the email ]

19                REASON:  missing piece of the statement

20   23     24   CHANGE:  add [The university's counsel + lawyer]

21                REASON:  clarification of "them"

22   24     9    CHANGE:  'There' to 'Them'

23                REASON:  'them' accuracy

24   (SIGNED) _____  DATE 11/27/13

     REPORTER:  Denielle P. Mathys, CSR
```

D-SQUARED REPORTERS, INC.
(312) 332-2515

312

```
 1   CASE:  Goswami v. DePaul University, et al.

 2   DATE TAKEN:  10-30-13          RETURN DATE:  12-6-13

 3   DEPONENT:  MARY JEANNE LARRABEE, Ph.D.

 4   PAGE    LINE              ERRATA SHEET

 5    29     15   CHANGE:  add 'and' after 'level'

 6                 REASON:  These are two separate entities

 7    31     23   CHANGE:  add [just now]

 8                 REASON:  clarification

 9    42     14   CHANGE:  after '21st' — [in the email stream in front of me]

10                 REASON:  clarification

11    48      2   CHANGE:  add % after 'paragraph' [of the committee report]

12                 REASON:  clarification

13    56     11   CHANGE:  'add after ')' — "just now"

14                 REASON:  clarification

15    83     22   CHANGE:  change 'springs' to 'submitting'

16                 REASON:  most likely word.

17    87     13   CHANGE:  add after 'it' [the discussion of her writing.]

18                 REASON:  clarification

19    87     21   CHANGE:  change 'is' to 'as'

20                 REASON:  grammar & accuracy

21   103     12   CHANGE:  change 'things' to 'these'

22                 REASON:  or clarify by adding [outside reviewers]

23   (SIGNED) _____  DATE  Nov. 27 '13

24   REPORTER:  Danielle P. Mathys, CSR
```

D-SQUARED REPORTERS, INC.
(312) 332-2515

312

1   CASE:   Goswami v. DePaul University, et al.

2   DATE TAKEN:   10-30-13              RETURN DATE:  12-6-13

3   DEPONENT:  MARY JEANNE LARRABEE, Ph.D.

4   PAGE    LINE                      ERRATA SHEET

5   107    12-15   CHANGE:  No change — Sentence would not be

6   ___    _____   REASON:          what I would say.

7   126    22    CHANGE:  'combat' → so "conviction" maybe

8   ___    _____   REASON:   'combat' don't make sense.

9   133    10    CHANGE:  change 'he' to 'she'

10  ___    _____   REASON:    referent was t. P. Birmingham.

11  133    24    CHANGE:   < 'acclamation'

12  ___    _____   REASON:   Spelling

13  152    20    CHANGE:  add 'report' after 'departmental'

14  ___    _____   REASON:   meaning.

15  175    8    CHANGE:  'qual' to 'qua' — two time

16  ___    _____   REASON:    misspelling.

17  ___    10    CHANGE:  'feminology' to 'phenomenology'

18  230    12    REASON:   'Their' — either 'thee or 'her'

19  245    12    CHANGE:  'cat' to 'shut'

20  ___    _____   REASON:    meaning

21  268    3    CHANGE:  'going' to "foregoing" / "not going"

22  ___    _____   REASON:  represents facts.

23  (SIGNED) _____   DATE  11/27/13

24  REPORTER:  Denielle P. Mathys, CSR

---

D-SQUARED REPORTERS, INC.
(312) 332-2515

312

```
 1    CASE:  Goswami v. DePaul University, et al.

 2    DATE TAKEN:  10-30-13          RETURN DATE:  12-6-13

 3    DEPONENT:  MARY JEANNE LARRABEE, Ph.D.

 4    PAGE    LINE                      ERRATA SHEET  A

 5    268    17-19  CHANGE: From 'I'm ... Cancel' is Both and
                             from 'I Think' on is Q

 6    _____  _____  REASON: _____

 7    _____  _____  CHANGE: _____

 8    _____  _____  REASON: _____

 9    _____  _____  CHANGE: _____

10    _____  _____  REASON: _____

11    _____  _____  CHANGE: _____

12    _____  _____  REASON: _____

13    _____  _____  CHANGE: _____

14    _____  _____  REASON: _____

15    _____  _____  CHANGE: _____

16    _____  _____  REASON: _____

17    _____  _____  CHANGE: _____

18    _____  _____  REASON: _____

19    _____  _____  CHANGE: _____

20    _____  _____  REASON: _____

21    _____  _____  CHANGE: _____

22    _____  _____  REASON: _____

23    (SIGNED) _____ DATE 11/27/13

24    REPORTER: Denielle P. Mathys, CSR
```

D-SQUARED REPORTERS, INC.
(312) 332-2515

Contains Confidential Information

310

1    STATE OF ILLINOIS          )
                                )  SS.
2    COUNTY OF COOK             )

3             I, DENIELLE P. MATHYS, Certified Shorthand

4    Reporter No. 084-003933, and Notary Public within

5    and for the County of Kane and State of Illinois, do

6    hereby certify that on October 30, 2013, at

7    9:10 a.m., Two Prudential Plaza, Suite 2000 in the

8    City of Chicago, Illinois, the deponent, MARY JEANNE

9    LARRABEE, Ph.D., personally appeared before me.

10            I further certify that MARY JEANNE

11   LARRABEE, Ph.D., was by me duly sworn to testify the

12   truth and that the foregoing is a true record of the

13   testimony given by MARY JEANNE LARRABEE, Ph.D.

14            I further certify that the deposition

15   terminated at 4:22 p.m.

16            I further certify that there were present

17   at the taking of the said deposition the persons and

18   parties as indicated on the appearance page made a

19   part of this deposition transcript.

20            I further certify that the signature of

21   the witness to the foregoing deposition was reserved

22   by agreement of counsel; and that I am not counsel

23   for nor in any way related to any of the parties to

24   this suit, nor am I in any way interested in the

Contains Confidential Information

311

1     outcome thereof.

2          IN TESTIMONY WHEREOF, I have hereunto set

3     my hand and affixed my notarial seal on this 6th day

4     of November, 2013.

5

6

7

8

9

10

11

12

13                  *Denielle P. Mathys*

                    ┌─────────────────────────────────┐
                    │         OFFICIAL SEAL            │
                    │      DENIELLE P. MATHYS          │
                    │  Notary Public - State of Illinois│
                    │  My Commission Expires Sep 26, 2015│
                    └─────────────────────────────────┘

                    DENIELLE P. MATHYS, CSR
                    Notary Public
                    License No. 084-003933

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT E

```
0001
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF ILLINOIS
 3                      EASTERN DIVISION
 4    NAMITA GOSWAMI,            )
 5           Plaintiff,          )
 6           -vs-                )   No. 12 CV 7167
 7    DEPAUL UNIVERSITY and      )
 8    PEG BIRMINGHAM,            )
 9           Defendants.         )
10
11        The deposition of PEG BIRMINGHAM, Ph.D., called
12    for examination pursuant to Notice and the Rules of
13    Civil Procedure for the United States District
14    Courts pertaining to the taking of depositions,
15    taken before KAREN D. FREEMAN, a notary public
16    within and for the County of Cook and State of
17    Illinois, at 150 North Wacker Drive, Chicago,
18    Illinois, on the 14th day of June, 2013, at the
19    hour of 9:37 o'clock a.m.
20
21
22
23
24
0002
 1    APPEARANCES:
 2         GORDON & KARR, by
           MR. STUART D. GORDON and
 3         MS. LAURA FAHEY
           150 North Wacker Drive, Suite 940
 4         Chicago, Illinois, 60606
           (312) 377-4450
 5         sgordon@gordonkarr.com
                Representing the Plaintiff;
 6
           MICHAEL BEST & FRIEDRICH, LLP, by
 7         MS. AMY SCHMIDT JONES
           100 East Wisconsin Avenue, Suite 3300
 8         Milwaukee, Wisconsin, 53202
           (414) 271-6560
 9         asjones@michaelbest.com
                Representing the Defendant;
10
           MICHAEL BEST & FRIEDRICH, LLP, by
11         MS. SARAH FLOTTE PORTER
           Two Prudential Plaza
12         180 North Stetson Avenue, Suite 2000
           Chicago, Illinois, 60601
13         (312) 661-2104
           sfporter@michaelbest.com
14              Representing the Defendant;
15         DEPAUL UNIVERSITY, by
           OFFICE OF THE GENERAL COUNSEL
```

```
16              MS. LAURA D. WARREN
                SENIOR ASSOCIATE COUNSEL
17              1 East Jackson Boulevard
                Chicago, Illinois, 60604
18              (312) 362-8543
                lwarren1@depaul.edu
19                  Representing the Defendant.
20
21
22
23      Reported by:  Karen D. Freeman, CSR
        License No.:   084-003008
24
0003
1                      I N D E X
        WITNESS                          EXAMINATION
2       PEG BIRMINGHAM, Ph.D.
           By Mr. Gordon                     6
3
                     E X H I B I T S
4       NUMBER                           MARKED FOR ID
            (EXHIBITS MARKED BY COUNSEL.)
5       BIRMINGHAM Deposition Exhibit
            No. 1                           31
6           No. 2                           33
            No. 3                           73
7           No. 4                           76
            No. 5                           82
8           No. 6                           84
            No. 7                           89
9           No. 8                           90
            No. 9                          120
10          No. 10                         148
            No. 11                         156
11          No. 12                         158
            No. 13                         167
12          No. 14                         170
            No. 16                         186
13          No. 17                         195
            No. 18                         204
14          No. 20                         210
            No. 21                         214
15          No. 22                         220
            No. 22                         227
16          No. 23                         234
            No. 24                         238
17          No. 25                         241
            No. 26                         248
18          No. 27                         250
            No. 28                         256
19          No. 29                         259
            No. 30                         263
20          No. 31                         266
            No. 32                         267
```

0101
1  published, her research evaluation couldn't be any
2  better than good, because she hadn't been
3  published, is that correct?
4       A.   I -- again, yes.
5       Q.   Thank you.
6            Now, on service, in the second paragraph
7  you said several members -- you wrote, Several
8  members of the department have complained to me
9  throughout the year about Namita's tendency to turn
10 every discussion and meeting into a critique of
11 someone's position on gender, race or capitalistic
12 practices, end quote.
13           Who are those several members?
14      A.   Mollie Painter-Morland, David Krell, Avery
15 Goldman, Elizabeth Rottenberg.  That is what I
16 remember.
17      Q.   Do you know what discussions or meetings
18 they were referring to?
19      A.   Yes.
20      Q.   Okay.  What was -- was it all -- was it
21 one -- strike that.
22           Tell me which discussions and meetings
23 they were referring to?
24      A.   There was a meeting of the -- the
0102
1  International Business Ethics Conference.  There
2  was a meeting of the public events committee, and
3  there was a happy hour.  I believe it was a happy
4  hour.  It was some discussion between Avery and
5  Namita.  I am not sure what the -- I thought it was
6  a happy hour.  Could have been something else.
7       Q.   So that Avery was complaining to you about
8  a discussion that he had with Namita at a happy
9  hour, and that made it --
10      A.   I don't --
11      Q.   Let me finish my question.  And that made
12 it into your annual merit evaluation?
13      MS. JONES:  Object to the argumentative nature
14 of the question.  It's been asked and answered.
15           Go ahead, Peg.
16      THE WITNESS:  Yes.
17 BY MR. GORDON:
18      Q.   Okay.
19      A.   And it was not just that occasion, by the
20 way.
21      Q.   And the rest of these people, were they
22 talking about these two events, the meeting of the
23 International Business Ethics -- Business and
24 Professional Ethics in October 2004?
0103
1       A.   I believe all three had been there.  I am
2  not -- I can't remember.  Certainly Mollie was
3  there, and I believe it was Ms. Rottenberg.  I also

```
 4    believe Michael Naas had mentioned this to me.
 5    That they were -- that Mollie had been very upset,
 6    and Molly, herself, told me that she had been upset
 7    by Namita's behavior, her intervention into this
 8    panel session.
 9         Q.   That occurred -- that conference was
10    October 2004?
11         A.   Yes.
12         Q.   Okay.  Who was the department's newest
13    untenured faculty member who organized it?
14         A.   Mollie Painter-Morland.
15         Q.   Were you at that conference?
16         A.   No.
17         Q.   Why not?
18         A.   I don't remember.  I might have been out
19    of town for a conference.
20         Q.   Was this a pretty big deal that you folks
21    were sponsoring this International Business in
22    Ethics Conference?
23         A.   Yes.  We -- it's sponsored by DePaul, I
24    believe every three years.
0104
 1         Q.   Okay.  And you are the chairman of the
 2    department?
 3         A.   Yes.
 4         Q.   But you didn't see to it to schedule
 5    yourself here to be at this conference?
 6         MS. JONES:  Object.  Argumentative, and it's
 7    been asked and answered.  Go ahead.
 8         THE WITNESS:  As I said, I probably had another
 9    engagement that prevented me from going to it.
10    BY MR. GORDON:
11         Q.   Okay.  So you didn't actually see the
12    members of the audience were speechless, whatever
13    that means?
14         MS. JONES:  Object.  Argumentative nature of
15    the question.
16         MR. GORDON:  It's an argumentative statement.
17         MS. JONES:  Object.
18         THE WITNESS:  That is what I was told by people
19    who had been there, and by Mollie, herself.
20    BY MR. GORDON:
21         Q.   What did you take that to mean that people
22    were speechless?
23         A.   That they were surprised.
24         Q.   Did Mollie tell you how they expressed
0105
 1    their surprise?
 2         A.   I don't recall the exact words she used,
 3    but it was conveyed.
 4         Q.   What was conveyed?
 5         A.   That people were surprised by this
 6    intervention.
 7         Q.   And Mollie felt insulted and humiliated?
```

```
 8          A.   That is what she told me.
 9          Q.   Now, in the next paragraph the P99, first
10   full paragraph, there is a quote about Namita's --
11   Namita reply of, quote, the same old, comma, same
12   old, end quote.
13               Now, that relates to a senior colleague
14   presenting possible names for consideration for
15   speakers.
16          MS. JONES:  Object to the form of the question,
17   if there is a question.
18   BY MR. GORDON:
19          Q.   Do you know who the senior colleague was?
20          A.   Yes.
21          Q.   Okay.  Who was that?
22          A.   David Krell.
23          Q.   Okay.  And what -- and Mr. Krell, I
24   suppose, is the one that told you -- correct me if
0106
 1   I am wrong that Namita said, quote, same old, same
 2   old?
 3          A.   Yes.
 4          Q.   Okay.  Now, what about same old, same old
 5   to you suggested that, quote, this colleague was
 6   just a passe, old white guy, end quote.
 7          A.   Because David Krell said that to me in a
 8   subsequent meeting.
 9          Q.   Okay.  So she said, quote, same old, same
10   old, end quote.  And you -- and Krell decided that
11   must be something relating to him being an old
12   white guy?
13          MR. JONES:  Object.  Foundation, personal
14   knowledge.
15   BY MR. GORDON:
16          Q.   Is that what Mr. Krell told you?
17          A.   Yes.
18          Q.   Okay.  Could same old, same old have more
19   than one meaning --
20          MS. JONES:  Object.  Calls for speculation.
21   BY MR. GORDON:
22          Q.   -- in your mind?
23          MS. JONES:  Same objection.
24          THE WITNESS:  I don't know.  I don't know.
0107
 1   BY MR. GORDON:
 2          Q.   If you heard the words, quote, same old,
 3   same old, end quote, would you think that that is a
 4   reflection on somebody being a passe old white
 5   guy?
 6          MS. JONES:  Object.  Calls for speculation.
 7   Argumentative.  Go ahead.
 8          THE WITNESS:  Because this was, as I say here,
 9   that there were several names for consideration,
10   and David felt that Namita had dismissed his name
11   out of hand, and so he was -- and I agree that same
```

12    old, same old suggested that these were just passe
13    names, names that we have had before, and that he
14    was out of step, and I don't know what that meeting
15    was, what they -- what people were talking about in
16    that meeting that led him then to associate it with
17    being not simply and old and passe but also white,
18    but since he had mentioned that to me, I passed it
19    onto Namita.
20    BY MR. GORDON:
21        Q.   And you took that as a needless
22    confrontation?
23        A.   I did.
24        Q.   Did you think that Namita should have kept
0108
1    her mouth shut about David Krell's possible names
2    for consideration?
3        MS. JONES:  Object to the form of the
4    question.  Go ahead.
5        THE WITNESS:  No.
6    BY MR. GORDON:
7        Q.   So you think that her commenting on them
8    was a needless confrontation?
9        MS. JONES:  Object to the form of the
10    question.
11        THE WITNESS:  I think Namita had --
12    was certainly welcome, and I would have
13    expected her input on names for the coming year
14    speakers committee.  I think the phrase, same old,
15    same old, as I say here, was needlessly
16    confrontational.
17    BY MR. GORDON:
18        Q.   Should she have said, "Can we have
19    something new instead of something old in your
20    mind?
21        MS. JONES:  Object to the form
22    of the question.  Calls for speculation.  Go
23    ahead.
24        THE WITNESS:  I would have suggested perhaps as
0109
1    I just did. "What about some -- those look good,
2    but what about some of these names?"
3    BY MR. GORDON:
4        Q.   What if she didn't think they looked
5    good?  Obviously she didn't.
6        MS. JONES:  Object.
7    BY MR. GORDON:
8        Q.   So I'll withdraw the question.
9        Your problem was with the use
10    of words, same old, same old.  You thought
11    that that was a needlessly confrontational
12    utterance?
13        A.   Yes.
14        MR. GORDON:  Objection.  Asked and answered.
15    BY MR. GORDON:

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4   NAMITA GOSWAMI,                 )

 5           Plaintiff,              )

 6      vs.                          )  No. 12 V 7167

 7   DEPAUL UNIVERSITY, et al.,      )

 8           Defendants.             )

 9        This is to certify that I have read the

10   transcript of my deposition taken in the

11   above-entitled cause by KAREN D. FREEMAN, Certified

12   Shorthand Reporter, on June 14, 2013, and that the

13   foregoing transcript accurately states the

14   questions asked and the answers given by me as they

15   now appear.

16                    _____

17                        PEG BIRMINGHAM, Ph.D.

18   SUBSCRIBED AND SWORN TO

19   before me this  24th  day

20   of  July        2013.

21   _____

22       Notary Public

23

24                                              318
```

DEBORAH BANKS
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
May 13, 2014

**I WISH TO MAKE THE FOLLOWING CHANGES FOR THE FOLLOWING REASONS:**

<u>PAGE</u>    <u>LINE</u>

10     5    CHANGE: Duquesne

            REASON: Misspelled

10    21   CHANGE: Duquesne

            REASON: Misspelled

208    8    CHANGE: Werhane

            REASON: Misspelled

____  ____  CHANGE: _____

            REASON: _____

____  ____  CHANGE: _____

            REASON: _____

____  ____  CHANGE: _____

            REASON: _____

____  ____  CHANGE: _____

            REASON: _____

____  ____  CHANGE: _____

            REASON: _____

____  ____  CHANGE: _____

            REASON: _____

____  ____  CHANGE: _____

            REASON: _____

SIGNED: Peg Brunningham

# EXHIBIT F

```
0001
 1              IN THE UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF ILLINOIS
 3                      EASTERN DIVISION
 4    NAMITA GOSWAMI,                 )
 5             Plaintiff,             )
 6             -vs-                   )   No. 12 CV 7167
 7    DEPAUL UNIVERSITY and           )
 8    PEG BIRMINGHAM,                 )
 9             Defendants.            )
10
11        The deposition of RICHARD A. LEE, JR., Ph.D.,
12    called for examination pursuant to Notice and the
13    Rules of Civil Procedure for the United States
14    District Courts pertaining to the taking of
15    depositions, taken before KAREN D. FREEMAN, a
16    notary public within and for the County of Cook and
17    State of Illinois, at 150 North Wacker Drive,
18    Chicago, Illinois, on the 30th day of May, 2013, at
19    the hour of 10:10 o'clock a.m.
20
21
22
23
24
0002
 1        APPEARANCES:
 2             GORDON & KARR, by
               MR. STUART D. GORDON and
 3             MS. CARRIE HERSCHMAN
               150 North Wacker Drive, Suite 940
 4             Chicago, Illinois, 60606
               (312) 377-4450
 5             sgordon@gordonkarr.com
                    Representing the Plaintiff;
 6
               MICHAEL BEST & FRIEDRICH, LLP, by
 7             MS. AMY SCHMIDT JONES
               100 East Wisconsin Avenue, Suite 3300
 8             Milwaukee, Wisconsin, 53202
               (414) 271-6560
 9             asjones@michaelbest.com
                    Representing the Defendant;
10
               DEPAUL UNIVERSITY, by
11             OFFICE OF THE GENERAL COUNSEL
               MS. LAURA D. WARREN
12             SENIOR ASSOCIATE COUNSEL
               1 East Jackson Boulevard
13             Chicago, Illinois, 60604
               (312) 362-8543
14             lwarren1@depaul.edu
                    Representing the Defendant.
15
```

```
16
17
18
        Reported by:  Karen D. Freeman, CSR
19      License No.:  084-003008
20
21
22
23
24
0003
 1                      I N D E X
        WITNESS                              EXAMINATION
 2      RICHARD A. LEE, JR., Ph.D.
            By Mr. Gordon                        4
 3          By Ms. Jones                        176
 4
 5
 6
                      E X H I B I T S
 7      NUMBER                          MARKED FOR ID
                (Exhibits marked by counsel.)
 8
        LEE Deposition Exhibit
 9          No. 1                            24
            No. 2                            36
10          No. 3                            49
            No. 4                            61
11          No. 5                            73
            No. 6                           109
12          No. 7                           151
            No. 8                           157
13          No. 9                           161
            No. 10                          166
14          No. 11                          168
            No. 12                          169
15          No. 13                          170
16
17
18
19
20
21
22
23
24
0004
 1                      (Witness sworn.)
 2          MR. GORDON:  Okay.  State your name, please.
 3          THE WITNESS:  Richard Lee.
 4              RICHARD A. LEE, JR., Ph.D.,
 5      called as a witness herein, having been first duly
 6      sworn, was examined and testified as follows:
 7                      EXAMINATION
```

```
22    letters of recommendation or praising her
23    suggesting that she should receive tenure, because
24    she was an outstanding teacher and professor in
0039
 1    their mind.
 2        A.   Uh-huh.
 3        Q.   And there were comments made by some of
 4    your fellow philosophy faculty members that some
 5    would construe as suggesting that she had solicited
 6    these letters of support.
 7             Do you remember those conversations?
 8        A.   Yes.
 9        Q.   Might have even made one of those
10    comments?
11        A.   I did.
12        Q.   Okay.  Did you think that just because she
13    was soliciting letters, that these letters of
14    support were not truthful?
15        A.   I did not.
16        Q.   Okay.  Well, then what was the
17    significance then of her solicited letters of
18    support?
19        A.   I just thought it was important that the
20    record reflect that they had been solicited.
21        Q.   And how did you know that?
22        A.   Because I was contacted by one of the
23    students.
24        Q.   So you knew one student was solicited?
0040
 1        A.   Right, and that is all I made claim to.
 2        Q.   Did you think that was improper?
 3        A.   No.
 4        Q.   During the process of -- Peg Birmingham
 5    was soliciting support for her, quote, side of the
 6    story, wasn't she?
 7        MS. JONES:  Object to the form of the
 8    question.
 9    BY MR. GORDON:
10        Q.   You can answer.
11        A.   I don't know.
12        Q.   You are not aware of Peg Birmingham asking
13    for people to support the no-tenure vote?
14        A.   I am not.
15        MS. JONES:  Object to the form of the
16    question.
17    BY MR. GORDON:
18        Q.   Returning then to Lee Exhibit No. 2, the
19    research evaluation went from very good to very
20    good minus.
21             What is -- in your mind what is the
22    difference between very good and very good minus?
23    I am not talking about whether it's another quarter
24    in her paycheck.
0041
```

```
 1        A.   No, I understand.  Well, as you see, in
 2   both cases I am pointing out that a lot of work
 3   seems to be in press or forthcoming or something.
 4   So already in this year I think I am trying to be
 5   attentive to the fact that we are still dealing
 6   with stuff that is forthcoming and so on.  And it's
 7   a difficult -- especially early on in an academic
 8   career, it's a difficult thing, because you publish
 9   things, and it takes a while to get them through
10   the pipeline, and I want to be sensitive to that,
11   reflect that there is not really much of a record
12   to go on at this point but also be sensitive to the
13   fact that it may take some time.
14        Q.   I appreciate your comments, but I think my
15   question was what is the difference between very
16   good minus and very good?
17        A.   Very good minus is less very good than
18   very good.
19        Q.   I can understand.  But in your mind how do
20   you decide whether to make it very good or very
21   good minus, or is it an insignificant difference in
22   your mind?
23        A.   For me I was -- in doing the annual merit
24   evaluations I was always attentive to the fact
0042
 1   that -- two things.  One is that this has to do
 2   with, however, small, merit -- writ salary
 3   increases and also that the grades are things that
 4   the university seems to pay attention to, and I try
 5   to figure out a way to use them to encourage and
 6   both encourage and accurately reflect, and so for
 7   me, you know, I didn't have, you know, if you have
 8   published X number of things, you get an
 9   outstanding, or, you know, anything like that.
10        So there may be inconsistency in a given
11   individual or the entire faculty, because for me
12   the grades weren't -- I didn't have a strict
13   standard.
14        Q.   Okay.  Let me try it a different way.  Why
15   did she go from very good to very good minus?
16        A.   I think that I mean as -- at this point it
17   was starting to worry me that the record should
18   have these things that were listed as forthcoming
19   and so on should have produced more results, and so
20   it was -- I just wanted to take note that she
21   should be attentive to this fact.
22        Q.   Okay.  Where in your review did you say
23   that?  I must have missed it?
24        A.   I don't believe I did.
0043
 1        Q.   Okay.  Do you think that if you were
 2   worried, that would be something that Namita should
 3   know?
 4        A.   If I were worried, that should be
```

0054
1    content.  I mean your impressions of it.
2        A.    Right.  I remember I asked a question, and
3    we had an interesting back and forth in that and --
4    no.  I think I thought it was a good, nicely-done
5    talk.
6        Q.    Okay.  Nicely done is a good enough for
7    me.
8            Going back to Exhibit 2, you talk about --
9    I am on the research section.  She published one
10   essay in a peer-reviewed journal.
11       A.    Uh-huh.
12       Q.    Did you read that essay?
13       A.    I don't believe so at that time.  No.
14       Q.    You said that she had a number of essays
15   that were accepted for publication and one that
16   appeared in print.
17       A.    Uh-huh.
18       Q.    Did you read any of those?
19       A.    No.  Not at that time, no.
20       Q.    Then you said you know that she had
21   success in turning conference presentations into
22   publications?
23       A.    Uh-huh.
24       Q.    Did you -- is that a yes?
0055
1        A.    Yes, I am sorry.  Yes.
2        Q.    Did you review any -- did you read any of
3    those?
4        A.    Read, no, I did not.
5        Q.    Okay.  Was that something that the chair
6    of the department usually does is read the
7    publications of the other faculty members that they
8    are reviewing or --
9        MS. JONES:  Object to the form of the question
10   and foundation.  Go ahead.
11   BY MR. GORDON:
12       Q.    If you know?
13       A.    Well, the only one I can speak of is
14   Michael Naas, who is the current chair, and I know
15   because we have just had this conversation that he
16   does not.  As I mentioned, we have 20 some odd
17   full-time tenured and tenured tract faculty
18   members, and at DePaul we are among the most
19   prolific of departments, and it's impossible.  It's
20   just impossible.
21       Q.    How big is the DePaul philosophy faculty?
22       A.    I don't know exactly, but 20 some, I am
23   guessing.
24       Q.    Okay.  And I thought you just said that
0056
1    you had 20 tenured track?
2        A.    Tenured and tenure track.
3        Q.    Oh, tenured and -- oh, okay.  How many

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| NAMITA GOSWAMI, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 12 CV 7167 |
| DePAUL UNIVERSITY, | ) | |
| Defendant. | ) | |

The deposition of DAVID KRELL, Ph.D.,
called for examination pursuant to the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before TRACY JONES, a notary public within
and for the County of Cook and State of
Illinois, at 150 North Wacker Drive, Suite 940,
Chicago, Illinois, on the 21st day of October,
2013, at the hour of 1:03 o'clock p.m.

Reported by:  Tracy Jones, CSR, RPR, CLR

License No.:  084-004553

1

1    process would be final; that there would be no

2    grace year.

3        Q.    So she would be employed through June

4    of 2010 but not thereafter?

5        A.    If she didn't get tenure.                    14:35:29

6        Q.    Yes.

7        A.    But I wanted the tenure thing to go

8    through.

9        Q.    You understood that the tenure

10   process -- Strike that.                                14:35:33

11             You understood that when a faculty

12   member applied for tenure, they submitted

13   materials in excess of what would have been

14   submitted to the personnel committee in May of

15   2009, didn't you?                                      14:35:44

16       A.    Sure.

17       Q.    Did you ever complain to Peg Birmingham

18   that Namita Goswami considered you a passé white

19   guy?

20       A.    Sorry, but I have to laugh.                  14:36:04

21             I'm not sure.  I remember Namita, we

22   had a discussion in one of our committees, but I

23   don't know where that phrase came from.  But it

24   makes me chuckle.

                                                       77

# EXHIBIT H

0001
1       THIS DEPOSITION CONTAINS CONFIDENTIAL INFORMATION
2
3                   UNITED STATES DISTRICT COURT
4               NORTHERN DISTRICT OF ILLINOIS,
5                     EASTERN DIVISION
6    NAMITA GOSWAMI,                )
7                Plaintiff,         )
8      vs.                          ) No. 12 CV 7167
9    DEPAUL UNIVERSITY, PEG         )
10   BIRMINGHAM, and               )
11   ELIZABETH ROTTENBERG,         )
12               Defendants.        )
13          The discovery deposition of TINA CHANTER,
14   taken in the above-entitled cause, before
15   SABRINA M. TOMICKI, a Certified Shorthand
16   Reporter at 10:00 a.m. on August 8, 2013 at 150
17   North Wacker Drive, Suite 940 Chicago, Illinois,
18   pursuant to subpoena.
19
20
21
22
23   Reported by: Sabrina Tomicki, CSR
24   License No.: 084-004755
0002
1      APPEARANCES:
2          GORDON & KARR, by
3          MR. STUART D. GORDON
4          MS. CARRIE HERSCHMAN
5          150 North Wacker Drive
6          Suite 940
7          Chicago, Illinois  60606
8          (312) 377-4450
9          sgordon@gordonkarr.com
10             Representing the Plaintiff;
11
12     MICHAEL BEST & FRIEDRICH, LLP, by
13     MS. AMY SCHMIDT JONES
14     100 East Wisconsin Avenue
15     Suite 3300
16     Milwaukee, Wisconsin  53202-4108
17     (414) 271-6560
18     asjones@michaelbest.com
19             Representing the Defendants;
20
21
22
23
24
0003
1                          I N D E X
2    WITNESS                              EXAMINATION
     TINA CHANTER

```
 3    By Mr. Gordon                    4, 319, 334
      By Ms. Jones                     152, 337
 4                     E X H I B I T S
 5    NUMBER                           IDENTIFICATION
      Chanter Exhibit No.
 6    No.  1                           8
      No.  2                           14
 7    No.  3                           45
      No.  4                           50
 8    No.  5                           51
      No.  6                           53
 9    No.  7                           88
      No.  8                           91
10    No.  9                           97
      No. 10                           100
11    No. 11                           110
      No. 12                           113
12    No. 13                           121
      No. 14                           126
13    No. 15                           143
      No. 16                           146
14    No. 17                           172
      No. 18                           178
15    No. 19                           190
      No. 20                           206
16    No. 21                           209
      No. 22                           250
17    No. 23                           253
      No. 24                           259
18    No. 25                           272
      No. 26                           274
19    No. 27                           278
      No. 28                           297
20    No. 29                           314
      No. 30                           315
21    No. 31                           340
22
23    ** CONFIDENTIAL TESTIMONY PAGES: 129, 142-151 **
24
0004
 1                 (Whereupon, the witness was duly
 2                 sworn.)
 3                 TINA CHANTER,
 4    having been first duly sworn, was examined and
 5    testified as follows:
 6                 EXAMINATION
 7    BY MR. GORDON:
 8       Q.   State your name, please?
 9       A.   Tina Chanter.
10       Q.   And your address?
11       A.   7431 North Greenview Avenue Number 3,
12    Chicago, Illinois 60626.
13       Q.   And the court reporter is probably
14    going to ask you to talk a little bit slower,
```

24
0104
1   BY MR. GORDON:
2       Q.   When you were in the philosophy
3   department, how many tenure applications were
4   recommended for denial?
5       A.   One.
6       Q.   And that would be Professor Goswami?
7       A.   That would be.
8       Q.   I'd like to call your attention to the
9   second paragraph on this document on the first
10  page regarding Professor Goswami and the Women's
11  and Gender Studies Program.
12          Can you tell us your recollection how
13  the Women's and Gender Studies Program became
14  intertwined with Professor Goswami's tenure
15  application?
16      A.   Yeah.   When I was co-directing the
17  Women's and Gender Studies Program, I and my
18  co-director approached by the dean with a
19  suggestion that since we were hiring in the
20  Women's and Gender Studies Program, we might
21  want to consider Professor Goswami as a
22  candidate.
23      Q.   Let me stop you right there.
24          Was this -- how were you approached,
0105
1   was it in person?
2       A.   I think it was by email actually, but I
3   can't actually recall.
4       Q.   Did you have a discussion with the dean
5   or did you just take the email and go with it?
6       A.   No, we had a discussion with the dean.
7       Q.   Was that in person?
8       A.   It was in person.
9       Q.   Was anyone else present?
10      A.   Susan Lee.
11      Q.   Susan who?
12      A.   My Susan Lee, my co-director.
13      Q.   And where did this take place?
14      A.   In his office.
15      Q.   Can you tell me what you recall that he
16  said and what you said?
17      A.   Again, this is awhile ago, but what I
18  recall is that he suggested that we take it to
19  the program -- at the time, it was the program,
20  not the department, to the Women's and Gender
21  Studies Program and run it by them and see what
22  they thought and we agreed to do that.   We did
23  do that, we held a program meeting.
24          There was a unanimous decision on the
0106
1   part of the faculty to see if we could consider
2   Professor Goswami as a candidate although we

```
 3    were also worried by violating procedures
 4    because we had already undertaken a search, and
 5    we didn't want to be unfair to the other
 6    candidates, but everyone was very enthusiastic
 7    about the possibility of having Professor
 8    Goswami on the faculty.
 9              The reason for that is because
10    Professor Goswami had taught a number of courses
11    including a course called Issues in Sex and
12    Gender several times with great success.
13        Q.   Issues in what?
14        A.   Issues in Sex and Gender, PHL 233.  So
15    people knew that she was an excellent teacher,
16    and knew her scholarship, and were aware of the
17    kind of work she was doing, and thought very
18    highly of her.  So we were -- should I go on?
19        Q.   Yes.
20        A.   So we were in the process of seeing how
21    to figure out the search, whether we were going
22    to invite candidates as well as her and how that
23    whole procedure might go ahead, when they were
24    abruptly told that the deal is off, and that we
0107
 1    weren't to pursue this any longer.
 2        Q.   Who told you that?
 3        A.   The dean.
 4        Q.   Dean Suchar?
 5        A.   Yes.
 6        Q.   Was that in person?
 7        A.   Yeah -- I think that was an email.  I
 8    don't think that was in person.
 9        Q.   Did you have a discussion with Dean
10    Suchar as to why the deal was off?
11        A.   I didn't, but I subsequently found out
12    from word of mouth, rumor, I think through my
13    co-director --
14        MS. JONES:  I'll object to the hearsay.
15        MR. GORDON:  You can finish your answer.
16        THE WITNESS:  That it was something that had
17    been issued by the provost at the time.
18    BY MR. GORDON:
19        Q.   Provost Epp?
20        A.   Yeah.
21        Q.   Did you ask to meet with the provost?
22        A.   Yeah, he refused to meet us.
23        Q.   Did he give you any reason why he
24    refused to meet with you?
0108
 1        A.   No.
 2        Q.   Now, on the second page of your writing
 3    here where you wrote that you thought that
 4    racism was a major factor in the negative
 5    departmental vote with respect to Professor
 6    Goswami's petition for tenure, can you tell me,
```

```
11                  identification.)
12  BY MR. GORDON:
13      Q.   It's a document entitled Statement of
14  Professor Tina Chanter Regarding Goswami Tenure
15  Denial.
16      A.   Uh-huh.
17      Q.   Which appears to be dated January 9th,
18  2011?
19      MS. JONES:  I'll just -- has this been
20  produced before?
21      MS. HERSCHMAN:  Yes.
22  BY MR. GORDON:
23      Q.   Have you seen this document before?
24      A.   Yes.
0111
1       Q.   With the exception of the first
2   paragraph, which is from somebody else, does the
3   rest reflect your statement with respect --
4       A.   Yes.
5       Q.   -- with respect to the tenure denial?
6       A.   Yes, it does.
7       Q.   I'm going to call your attention to the
8   third paragraph of the document where you
9   address a suggestion that your belief that
10  Dr. Goswami would have been subjected to a
11  double standard.
12      A.   Uh-huh.
13      Q.   Can you tell what you meant by that?
14      A.   Yeah.
15      MS. JONES:  Object to the form of the
16  question.
17      THE WITNESS:  I made a suggestion that her
18  publications were as a result of friends she had
19  or people she knew or favors that people did for
20  her, rather than having anything to do with
21  standards of publications.  If anyone knows
22  anything about the academic world, like any
23  other academic world, people know people, and
24  things get done through networks.
0112
1           In every other case, that's acceptable
2   and in this case, apparently it was not
3   acceptable.  That's what I mean by double
4   standard, those kinds of things.
5   BY MR. GORDON:
6       Q.   You reviewed her work and formulated an
7   opinion on the quality of the work?
8       A.   I did.
9       Q.   Were people questioning motives of
10  external tenure reviewers?
11      MS. JONES:  Object to the form of the
12  question.
13  BY MR. GORDON:
14      Q.   In your statement, you said they also
```

```
23   several years ago and there is no reason for me
24   to remember, you know, exactly which graduate
0117
 1   students -- grad reps change every year, so I
 2   don't remember exactly who the grad rep was.
 3           But for the record, I don't think I
 4   said anything that had to do with hearsay.  Let
 5   me put it like this.  I had no trouble believing
 6   -- the way of the climate of the department at
 7   that point, led me to have absolutely no trouble
 8   believing the graduate students in saying that
 9   they were being intimidated in graduate
10   seminars.
11           So I don't think it's hearsay.  If you
12   believe what a graduate student says, then you
13   believe what a graduate student says.  There's
14   no hearsay about it.
15       Q.   What was the climate in the philosophy
16   department at that time?
17       A.   It was very bad.
18       Q.   Can you be a little bit more
19   descriptive?
20       A.   Well, for example, I would talk through
21   the corridor and say hello to colleagues who I
22   had previously taken to be friends, and they
23   would ignore me and not acknowledge my
24   existence.  That's what I mean by the climate
0118
 1   being bad.
 2       Q.   Who was that?
 3       A.   That was Elizabeth Rottenberg and Peg
 4   Birmingham.
 5       Q.   Any other examples?
 6       A.   There are many other examples of me
 7   feeling marginalized in the department, but I
 8   can't -- there's really no point in recalling
 9   them at the moment.
10       Q.   This might be our only time to ask you.
11   If you can recall them now, I'd appreciate it.
12       A.   Look, you got to understand that there
13   were emails, as you know from the record, being
14   sent defaming my character to the (inaudible)
15   because I had agreed to send this email to the
16   president.
17           All I can say is that I didn't take
18   kindly to having my colleagues disparage my name
19   to, you know, hundreds of people across the
20   university and accuse me of moral cowardice.
21   That doesn't really create a very positive
22   atmosphere in the department where you're
23   teaching with colleagues who just stand there, a
24   corridor from you.
0119
 1       Q.   Anything else that made you feel
```

2    marginalized?
3        A.    Well, the fact my colleague, Professor
4    Goswami, who works on very similar areas to the
5    work that I do which is in Feminist Philosophy,
6    and, you know, to some extent Race Theory, was
7    being told that she had a thinking problem and
8    not a writing problem, did lead me to wonder
9    whether my colleagues held me in any single work
10   that I wrote, yeah, because I did similar work.
11   Like if they think that about her, what do they
12   think about me.
13       Q.    After you were publicly supportive of
14   Professor Goswami's tenure application, what
15   happened to your class schedules?
16       A.    They changed, and a number of the other
17   graduate students had class schedules that were
18   not the ones that they wanted, and there was a
19   distinct perception in the department that we
20   were being punished for the views that we held.
21       Q.    When you say your's changed, what does
22   that mean?
23       A.    It means I didn't get the classes I
24   asked for.  It means I was teaching at weird
0120
1    times.  It means I was teaching on days I didn't
2    want to teach.  It means that all of the stuff
3    that I could take for granted up until that
4    point in the department as a full professor,
5    suddenly changed for no apparent reason apart
6    from the fact that I disagreed with people on
7    this tenure case.
8            It means that I went to the Chair,
9    Michael Naas, at the time and spoke up in terms
10   of the graduate students' perception that the
11   people that disagreed strongly with Professor
12   Goswami's case, the decision made on her tenure
13   case, that they were complaining about the
14   teaching schedules and the sort of direct link
15   between the way they were being treated and
16   teaching schedules they were being given.
17           I had a meeting with the Chair and I
18   expressed this opinion and shortly thereafter,
19   some of the teaching schedules changed.
20       MS. JONES:  I'm going to object to the
21   hearsay any information in there for which she
22   lacks personal knowledge.  For the record, I'm
23   indicating that as a legal objection, not
24   speaking to your answer.  Go ahead.
0121
1    BY MR. GORDON:
2        Q.    Where did this meeting with Chairman
3    Naas take place?
4        A.    In his office.
5        Q.    Do you recall when that was

6    approximately?
7        A.   No.  I don't it was probably -- it must
8    have been subsequent to the tenure decision.  So
9    it must have been, you know, probably the
10   semester after that, but I don't recall exactly.
11       Q.   Was anybody else present during this
12   conversation?
13       A.   No.
14       Q.   Do you recall what he said?
15       A.   He expressed surprise, dismay,
16   disbelief, and then he changed the schedules.
17       Q.   Who made up the schedules?
18       A.   I believe it was Professor Birmingham
19   at the time.
20       Q.   Let me show you what's been marked as
21   Chanter Deposition Exhibit 13.
22              (Whereupon, CHANTER Deposition
23               Exhibit No. 13 was marked for
24               identification.)
0122
1    BY MR. GORDON:
2        Q.   In March of 2011, did you have an
3    opportunity to see this document and append your
4    name to it?
5        A.   Yeah.
6        Q.   What was the purpose of this
7    communication from Mary-Jeanne-Larrabee to
8    Father Holtschneider?
9        A.   I guess this was the petition that I
10   had mentioned before that they wanted to submit.
11   Yeah, this is the petition that the graduate
12   students had submitted.
13       Q.   So Exhibit 12 was a letter, and then
14   Exhibit 13 was communicating the petition, what
15   you're calling a petition?
16       A.   Yeah, it would seem so.  Sorry, I guess
17   I confused them, yeah.
18       Q.   With respect to the attachment to the
19   March 14th email --
20       A.   Yeah.
21       Q.   -- from 32 graduate students --
22       A.   Yeah.
23       Q.   Was there a reason, well -- strike
24   that.
0123
1             Did you verify that there were
2    signatories to this letter who were graduate
3    students?
4        A.   I saw the names, yes, otherwise, I
5    wouldn't have written this letter.
6        Q.   In June of 2011, did you have an
7    opportunity to meet with Father Holtschneider
8    with respect to Namita Goswami?
9        A.   Yes, I did.  I met with President

```
10    issued its report?
11         A.    Like I said, I don't remember.
12         Q.    Do you remember where you were in May
13    of 2009?
14         MR. GORDON:  Objection to the form of the
15    question.  Where she was in 2009?
16    BY MS. JONES:
17         Q.    With respect to your employment, were
18    you at DePaul teaching in May 2009?
19         A.    Yeah.  Why are you asking that?
20         Q.    Did you talk to anyone -- did you talk
21    to Dr. Goswami regarding the formal review
22    before it occurred?
23         A.    Did I talk to her before what occurred?
24         Q.    Before the formal review occurred,
0232
1     before she met with the Personnel Committee?
2          A.    If I didn't know about it, how could I
3     talk to her about it?
4          Q.    At the time that Personnel Committee
5     met and reviewed her, she had been working on
6     her book manuscript for several years, correct?
7          A.    I understand her to have been doing
8     that, yeah.
9          Q.    And we established before, you saw
10    chapters of that book almost two years prior,
11    correct?
12         A.    Yeah.  I mean, I think so, yeah.
13         Q.    And you understood that she had a full
14    year of leave -- a research leave, correct, to
15    work on her book?
16         A.    I'm actually not sure when that was.
17    When was that?
18         Q.    I believe it was in the 2007 timeframe.
19         A.    Yeah, I suppose.
20         Q.    Now, do you understand that she
21    submitted a prospectus of her manuscript to the
22    Personnel Committee in connection with her
23    formal review?
24         A.    I don't have much of an understanding
0233
1     of what happened there.  I do remember that the
2     procedures were -- and I don't remember exactly
3     when we had this conversation, but I do remember
4     the procedures were unclear, and that she was
5     told conflicting things about exactly what to
6     submit to that committee.  So I think that she
7     didn't necessarily submit finished work to that
8     committee.
9          Q.    Did you understand that she submitted
10    prospectus?
11         A.    You know, I think it's plausible that
12    that's what she was asked to submit, and that's
13    what she did submit, but I don't have the
```

14    details.
15       Q.    If you could pull out Exhibit 4,
16    please, which you've talked about before.
17            Now, you testified previously that you
18    don't recall ever seeing this document.  I just
19    want to ask you about some of the language in
20    it.
21            On the second page, second paragraph,
22    the first sentence reads, more specifically,
23    Professor Goswami was appointed six years ago in
24    the hope and with the expectation that she would
0234
1    help facilitate constructive conversations
2    between Postcolonialism, the various discourses
3    that inform Women's Studies, and the broad
4    tradition of European Philosophy to which the
5    department as a whole is committed.
6            Do you agree or disagree with that
7    statement?
8       MR. GORDON:  I'm going to object to the form
9    of the question, the compound nature of the
10    question.  Do you want her to agree with a
11    whole?
12       MS. JONES:  You can answer.  Do you agree or
13    disagree with that statement.
14       MR. GORDON:  Please don't interrupt me.
15       MS. JONES:  Well, you shouldn't be making
16    speaking objections.  If you object to the form,
17    say object to the form.
18       THE WITNESS:  I don't know that I agree with
19    it, no.
20    BY MS. JONES:
21       Q.    Which aspect of it do you disagree
22    with?
23       A.    My understanding was that she was
24    appointed to teach in a particular area.  I
0235
1    don't think that it was ever part of the
2    discussion that I remember and nor do I think it
3    should necessarily be a discussion of any
4    assistant professor that's hired, that they
5    should facilitate constructive conversations
6    between certain areas of academic study like
7    Postcolonialism and Women's Studies.
8    Constructive is a highly subjective term.
9       Q.    Anything else you disagree with on that
10    statement?
11       A.    That's about it.
12       Q.    The first sentence of the next
13    paragraph, her's is a task that requires a well
14    grounded orientation in the rich traditions that
15    inform contemporary work and in the field of
16    Women's Studies, Postcolonialism, and European
17    Philosophy.  Do you agree or disagree with that

22    A.   Not to my memory.

23    Q.   Have you ever read the version of the

24  prospectus that she submitted to the Personnel

0238

1  Committee in May 2009?

2    A.   No to my memory.

3    Q.   So on Page 3 of the Personnel

4  Committee's report, when the Personnel Committee

5  says the overall -- and this is speaking of the

6  prospectus, the overall thesis is not well or

7  clearly stated.  You wouldn't know whether

8  that's true or not because you never read it,

9  right?

10    A.   Well, I didn't say I never read it.  I

11  said I don't remember reading it.

12    Q.   So you have no way of saying whether

13  that's true or not because you have no memory of

14  the document, right?

15    A.   Right.

16    Q.   And when the Personnel Committee says

17  much of the writing in the prospectus is poor,

18  you can't say whether that's true or not because

19  you don't remember reading it, right?

20    A.   Right.

21    Q.   And when the Personnel Committee says

22  in here that she is not likely to be able to

23  produce the book she proposes in the foreseeable

24  future based on the prospectus, you wouldn't

0239

1  know whether that's true or not because you

2  never read it?

3    A.   Neither would they, that's a highly

4  speculative comment.

5    Q.   Which turned out to be true, right?

6    A.   Well, if you had been through what

7  Professor Goswami has been through in the last

8  couple years, I don't suppose you would have

9  been able to write a book either.

10    Q.   Were you aware that Dr. Goswami has

11  said many times before May 2009, that she was

12  going to have that book done prior to then?

13    A.   Books are hard to write.

14    Q.   I don't disagree with you there.

15    You are in no position to weigh in on

16  the quality of a prospectus that you don't

17  remember reading?

18    A.   I would say that's a fair comment.

19    Q.   Now, Dr. Goswami said the following

20  things in her deposition about her prospectus.

21    MR. GORDON:  Do you have the transcript?

22    MS. JONES:  I do.

23    MR. GORDON:  Are you going to read exactly

24  from it or are you going to paraphrase?

0240

```
 1          MS. JONES:  I will give you page numbers, and
 2     you can consult.
 3          MR. GORDON:  Okay.
 4     BY MS. JONES:
 5          Q.    She said it was a very rough draft,
 6     that's Page 515.  She said she had not even
 7     proofread it, that's Page 515.  She said it was
 8     not fit for public consumption, Page 515.  She
 9     admitted it had no clear structure, Page 519.
10     She said that she was horrified when she
11     submitted it, Page 517.  She said that she was
12     worried that if she put it in, it would not
13     reflect well on her, Page 517.  She described it
14     as messy and fraught, that's Page 519 to 520.
15              Has she ever shared similar views of
16     the prospectus she submitted with you?
17          A.    She shared the view that she was told
18     that she should submit work in progress.
19          Q.    Did she share with you what she thought
20     of her work in progress?
21          A.    Yeah, she said she didn't think it
22     would be as good as the work if it had been
23     finished, and she hadn't been asked to submit
24     work in progress.
0241
 1          Q.    And did she say anything else about the
 2     quality of the work in progress she was putting
 3     in?
 4          A.    Yeah, she said they was still working
 5     on it.
 6          Q.    Anything else?
 7          A.    I'm sure she said lots of things, but I
 8     don't recall.
 9          Q.    Would you agree that it's not a good
10     thing to submit something messy and fraught as
11     evidence of your most substantial long term
12     research --
13          A.    I would agree that it's not a good
14     thing for a Personnel Committee to tell a
15     candidate -- a tenure candidate, that they
16     should submit work in progress and then judge it
17     as if it was finished work.
18          Q.    What's your basis for saying that she
19     was directed to submit work in progress as
20     opposed to her choosing to put it in?
21          A.    Because that's what she told me, and I
22     believe her.
23          Q.    Anything else?
24          A.    No, that's it.
0242
 1          Q.    If the Personnel Committee had told the
 2     candidate -- the untenured faculty, that they
 3     could submit work in progress, but were not
 4     required to do so, would you agree that it's not
```

17      A.    No, it's not fair to say that, but you
18 know what I'm thinking is that these are minutes
19 of a meeting.  So I don't know what the Friday,
20 May 29th refers to, but -- yeah, I can't answer
21 that because it's too far away.  I don't
22 remember the details.
23      Q.    When you drafted your research section
24 of Exhibit 6 --
0249
1       A.    Yeah.
2       Q.    -- you said nothing about Dr. Goswami's
3 prospectus, correct?
4       A.    Well, maybe that's because -- you know,
5 what I was trying to do in this section was give
6 an informed judgment about her work, not about a
7 prospectus.  These are about chapters and
8 articles that already existed and that I read.
9 It would have been very hard for me to give a
10 judgment of a prospectus which, as you just
11 said, was not finished.
12      Q.    Did you review Dr. Goswami's personal
13 statement in support of her tenure application
14 before she submitted it?
15      A.    I don't know, maybe, possibly.
16      Q.    Did you help her draft it?
17      A.    No.
18      Q.    Did you give her Elizabeth Rottenberg's
19 personal statement to use as a model?
20      A.    There's a possible world in which that
21 might have happened.  I really don't recall.
22      Q.    Did you ask Elizabeth Rottenberg for
23 permission to take her personal statement and
24 give it to Dr. Goswami?
0250
1       A.    Well, since I don't remember whether I
2 gave it to her, I can hardly remember if I asked
3 her permission for it, but if I did, it would
4 hardly be an anomaly.  I mean, these things are
5 matters of public record.
6       Q.    Mark this.
7                   (Whereupon, CHANTER Deposition
8                    Exhibit No. 22 was marked for
9                    identification.)
10 BY MS. JONES:
11      Q.    Dr. Chanter, Exhibit 22, I'm going to
12 represent to you is the personal statement that
13 Dr. Goswami submitted as part of her tenure
14 application, do you recall this personal
15 statement?
16      A.    Yeah, and actually just looking at it,
17 I was just thinking how good it is.
18      Q.    And did you read it at the time she
19 applied for tenure?
20      A.    Yeah.

# EXHIBIT I

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

NAMITA GOSWAMI,　　　　　)

　　　Plaintiff,　　　　)

vs.　　　　　　　　) No. 12 CV 7167

DePAUL UNIVERSITY,　　　　)

　　　Defendant.

　　　The deposition of REV. DENNIS H.

HOLTSCHNEIDER, C.M., called for examination

pursuant to the Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before Tracy Jones,

a notary public within and for the County of

Cook and State of Illinois, at 150 North Wacker

Drive, Suite 940, Chicago, Illinois, on the

22nd day of August, 2013, at the hour of

11:55 o'clock a.m.

Reported by:　　Tracy Jones, CSR, RPR, CLR

License No.:　　084-004553

2

1    APPEARANCES:

2        GORDON & KARR LLP, by
         MR. STUART D. GORDON

3        150 North Wacker Drive
         Suite 940

4        Chicago, Illinois  60606
         (312) 377-4450

5        sgordon@gordonkarr.com

6           Representing the Plaintiff;

7    MICHAEL BEST & FRIEDRICH, LLP, by
         MS. AMY SCHMIDT JONES

8        Two Prudential Plaza
         180 North Stetson Avenue

9        Suite 2000
         Chicago, Illinois  60601

10       (312) 222-0800
         asjones@michaelbest.com

11
            Representing the Defendant.

12

13   ALSO PRESENT:

14       DePAUL UNIVERSITY
         OFFICE OF THE GENERAL COUNSEL

15       Mr. José Padilla

16

17

18

19

20

21

22

23

24

131

1      BY MR. GORDON:

2          Q.   Did the university procedures end, all

3      right, with the decision of the review board?

4          A.   No.

5          Q.   Now, in 2011, you created, did you not,

6      after consultation with I'm not sure who a

7      further appeal that was available to Namita

8      Goswami?

9          MS. JONES:  Object to the form of the

10     question.

11         THE WITNESS:  Yes, for her and for another

12     professor it was offered.

13             And in answer to your not knowing who

14     it was, it was negotiated with Faculty Council.

15     BY MR. GORDON:

16         Q.   I meant the individuals.  I know it was

17     the Faculty Council, but I don't know who you

18     negotiated with other than an entity.  And I

19     assume you didn't negotiate with everybody on

20     the Faculty Council?

21         A.   I generally talk with the president.

22     But others speak before I come into the

23     conversation.

24         Q.   I'm sure they do.

137

1    played some role.  And I'm sorry I didn't

2    prepare for it today, so I would need to do a

3    little bit more preparation to be precise.

4        Q.   Well, I only get one shot at this.  So

5    we're going to have to muddle our way through.

6        A.   I'll do my best.

7        Q.   I thought I heard you say that because

8    the faculty handbook was -- and it's my word --

9    ambiguous in whether or not the process stopped

10   with an appeal or with you as the president, you

11   decided to provide this further level of appeal

12   so as to eliminate the problem caused by the

13   ambiguity?

14       MS. JONES:  Object to the form of the

15   question.

16       THE WITNESS:  That's correct.  We began to

17   rewrite the handbook to --

18   BY MR. GORDON:

19       Q.   I'm just talking to you about this new

20   process.

21           But only Namita Goswami of the two

22   people this process was made available to had

23   been found to have had her academic freedom

24   violated; isn't that correct?

176

1     STATE OF ILLINOIS    )

2                 )  SS:

3     COUNTY OF C O O K   )

4         I, TRACY JONES, a notary public within

5     and for the County of Cook County and State of

6     Illinois, do hereby certify that heretofore,

7     to-wit, August 22, 2013, personally appeared

8     before me, at 150 North Wacker Drive, Suite 940,

9     Chicago, Illinois, REV. DENNIS H. HOLTSCHNEIDER,

10    C.M., in a cause now pending and undetermined in

11    the United States District Court, Northern

12    District of Illinois, Eastern Division, wherein

13    NAMITA GOSWAMI is the Plaintiff, and DePAUL

14    UNIVERSITY is the Defendant.

15      I further certify that the said REV.

16    DENNIS H. HOLTSCHNEIDER, C.M. was first duly

17    sworn to testify the truth, the whole truth and

18    nothing but the truth in the cause aforesaid;

19    that the testimony then given by said witness

20    was reported stenographically by me in the

21    presence of the said witness, and afterwards

22    reduced to typewriting by Computer-Aided

23    Transcription, and the foregoing is a true and

24    correct transcript of the testimony so given by

177

1    said witness as aforesaid.

2        I further certify that the signature to

3    the foregoing deposition was reserved by counsel

4    for the respective parties.

5        I further certify that the taking of this

6    deposition was pursuant to notice and that there

7    were present at the deposition the attorneys

8    hereinbefore mentioned.

9        I further certify that I am not counsel

10    for nor in any way related to the parties to

11    this suit, nor am I in any way interested in the

12    outcome thereof.

13        IN TESTIMONY WHEREOF:  I have hereunto

14    set my hand and affixed my notarial seal this

15    10th day of September, 2013.

16

17

18

19

20    TRACY JONES, CSR, RPR, CLR

21    LIC. NO. 084-004553

22

23

24

175

1        IN THE UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF ILLINOIS

3        EASTERN DIVISION

4

5    NAMITA GOSWAMI,      )

6       Plaintiff,     )

7    vs.          ) No. 12 CV 7167

8    DePAUL UNIVERSITY,    )

9       Defendant.

10     I, REV. DENNIS H. HOLTSCHNEIDER, C.M.,

11   being first duly sworn, on oath say that I am

12   the deponent in the aforesaid deposition taken

13   on the 22nd day of September 2013; that I have

14   read the foregoing transcript of my deposition,

15   consisting of pages 1 through 175 inclusive, and

16   affix my signature to same.

17

        REV. DENNIS H. HOLTSCHNEIDER, C.M.

18

19   Subscribed and sworn to

     before me this 3ʳᵈ day

20   of OCTOBER, 2013

21

22   Notary Public

OFFICIAL SEAL
MARY DEVONA STARK
Notary Public - State of Illinois
My Commission Expires Sep 28, 2016

23

24

**I WISH TO MAKE THE FOLLOWING CHANGES FOR THE FOLLOWING REASONS:**

<u>PAGE</u>    <u>LINE</u>

47    12    CHANGE: Delete "now"

REASON: Mistranscription

157    17    CHANGE: "do not" to "not to"

REASON: Mistranscription

170    14    CHANGE: "rather" to "matter"

REASON: Mistranscription

17    13    CHANGE: "critiques" to "critics"

REASON: Mistranscription

17    13    CHANGE: "support" to "supporters"

REASON: Mistranscription

___    ___    CHANGE: _____

REASON: _____

___    ___    CHANGE: _____

REASON: _____

___    ___    CHANGE: _____

REASON: _____

___    ___    CHANGE: _____

REASON: _____

___    ___    CHANGE: _____

REASON: _____

SIGNED: Rev. Dennis Holtschneider,

# EXHIBIT J

**ANNUAL MERIT EVALUATION 2004—NAMITA GOSWAMI**

**TEACHING**

In the area of teaching, Namita's teaching evaluations continue to improve. This past year she taught ISP 200 and PHL 233 "Sex and Gender" in the winter quarter, and ISP 200 and PHL 390, "Postcolonial Feminism" in the spring quarter, and PHL 385 "Feminist Philosophies" and another ISP 200 in the fall term.

Namita's ISP 200 course, "Philosophical Approaches to Multiculturalism" improved as the year went on, although there are concerns. Her winter 233, "Sex and Gender" class received very high marks with all quantitative responses well above the departmental mean. Many students wrote that she and the course were "awesome". Her winter ISP 200 course was also well received with good quantitative marks. Students comments were very good. In the spring, her ISP 200 course was again well received, but a criticism that comes up in all her ISP 200 courses is some students find her to be a bit biased and "emotional. Her spring PHL 390, "Post-Colonial Feminism" course received mixed evaluations. Her quantitative marks were on the whole slightly below the departmental mean. Students' written comments indicate that there were some difficulties with the course. Namita needs to take special care not to engage in a kind of "special pleading" for the issues she is presenting in these courses. In autumn 2004, she taught PHL 385 "Feminist Philosophies" and ISP 200 "Philosophical Approaches to Multiculturalism." Several students in her ISP 200 called for more writing, but otherwise the course was well received. Course evaluations for PHL 385 were very good with all quantitative responses above the department mean. Written responses were equally laudatory with students noting that she was very helpful and organized.

Namita's self –evaluation of her teaching is very worrisome, especially in regards to ISP 200. While it is fine to agree with Adorno that philosophy becomes ideology when it becomes "extra-social," there is also the very great danger, perhaps greater danger, that philosophy courses can become ideologies if they advance too heavily the instructor's own views and opinions on particular political or social issues. The classroom ought not to be a forum for any particular political view, no matter how worthy that view might seem to be. I am worried by Namita's self-evaluation in which she describes her courses as politically "hard-hitting." Moreover, to charge DePaul students with "privilege" as Namita's self-evaluation does seems wrong on two counts. First, it is simply not effective pedagogy to come into a classroom and make such a charge—students only come to real insights that they themselves have arrived at through careful consideration and deliberation facilitated by an instructor. Second, the charge of 'privilege' does not take into account the fact that while DePaul students might seem privileged in comparison to many others in the world, in another very real sense they occupy a class position that is far from privileged in the context of the United States. (It reminds me of my mother telling her children to remember the children of the "third world" when we complained of being hungry after a meal. While my mother was correct in her observation that we were better off than these children, nonetheless we were hungry and in a family where food was not plentiful.) I suggest that Namita stop this kind of discourse altogether as it is not helpful in getting students to think about the concepts and issues the course ought to be engaged with, nor is it accurate. Allow them come to insights via the readings and discussions and not through some charge or set of claims

DPU 000074

made from the outside. When a student wrote on the self-evaluation, "Honestly, I feel more stubborn now," I suspect that it was a reaction to Namita's pedagogy rather than to her or his fellow students or to the course material. I am also disturbed by her description of the goal of ISP 200 as a radical confrontation "with what being an American has come to mean in the present political, social, and economic reality at the expense of other possibilities." This was never an explicit goal of the course, again, it seems like ideology rather than a philosophical exploration of multiculturalism. Certainly "being an American" is itself a contested notion and means many different things depending on who one is, what position one occupies, what political principles one ascribes to. **Evaluation: very good, but I remain worried about her approach in the ISP 200 courses.**

## RESEARCH

During this last year, Namita has completed one article which is now in press. She co-organized with Darrell Moore a conference on Edward Said in October, 2004. By all accounts, it was very successful and well received. She is now seeking to publish the conference proceedings and has been in discussion with *Diacritics*. She has been active on the conference circuit and has presented papers at several conferences over the past year, including a conference at Penn State. She is in a bit of quandary about publishing her dissertation. To repeat what Namita's formal review committee's advised her in our meeting in November, 2004, she ought not to spend too much additional time revising the dissertation for eventual publication, particularly given her admission to the committee that she is uncertain of the direction of the thesis—mine it for one or two articles, and then let it percolate on the back burner for the next few years. Namita's research adds an important dimension to the department. **Evaluation: good**

## SERVICE

In the area of service, Namita is off to a strong start. There is, however, one problem that needs to be addressed immediately. Positively, during winter and spring 2003, she chaired the department's Critical Race Theory Committee. In that capacity, in October 2004, she co-organized a conference on Edward Said that was very successful. She serves on the department's Undergraduate Affairs Committee. She served on the USPC issues team investigating the issue of diversity. She was an indispensable member of this committee and spent many hours on this committee. She has just been elected to a two year term on the Women and Gender Studies Advisory Board. She also is a faculty advisor *Delta Phi Omega*, a sorority for South Asian women at DePaul University. All of this is very good.

Negatively, however, (and it mirrors my above comments regarding Namita's teaching), several members of the department have complained to me throughout the year about Namita's tendency to turn every discussion and meeting into a critique of someone's position on gender, race, or capitalist practices. Most disturbing is a complaint regarding Namita's performance while chairing a session organized by the department's newest untenured faculty member at the International Business Ethics Conference sponsored by DePaul University and the Institute for Business and Professional Ethics (October 2004). At the session, Namita launched into a critique of capitalist practices that indicted and left speechless the members of the audience, and left

DPU 000075

her colleague feeling personally insulted and humiliated. Our new colleague then had to spend time reassuring participants that they were welcomed, and that their work in business ethics was neither a moral nor a political failing. It seems as if in this instance she failed to understand that chairing a session carries with it the requirement of facilitating discussion, something quite distinct from silencing the room. More importantly, solidarity works both ways—regardless of Namita's views of business ethics and its ties to capitalism, certainly this new colleague ought not to have had her session undermined.

This same tendency to confront needlessly occurred last year in a visiting speakers meeting when a senior colleague presented several possible names for consideration. Namita's reply was "same old, same old," suggesting that this colleague was just a passé, old white guy—as he himself put it in a subsequent meeting with me. And, at a recent tenure and promotion meeting, I saw this same kind of thing when in a discussion about the candidate's perceived confrontational manner with students, Namita excused it with a long clichéd commentary on poor people living in houses with "no walls and a dirt floor." Many of Namita's colleagues in the department subsequently commented unfavorably about these clichéd remarks, pointing out that it is well known that the candidate comes from an upper middle class family (he himself describes it as "privileged") and, furthermore, he dismisses as unworthy of consideration, even as morally dangerous, culture and class from his own thinking and scholarship. The important point here is that these kinds of clichés uttered at meetings and other public discussions are starting to prevent Namita's thinking and work from being taken seriously by her colleagues in the department. **evaluation: very good, although the clichéd comments need to stop**

**Overall evaluation: very good. Namita continues to be off to a good start in her second year here at DePaul, but she needs to continue to improve her teaching, especially resisting what seems to be a tendency to be ideological rather than pedagogical, and be far more thoughtful and reflective in her contributions at department meetings and other public discussions.**

**DPU 000076**

**Self-Evaluation for Namita Goswami**
**1/1/2004-1/1/2005**

During this review period, my main goals have been to continue strongly developing my teaching, to further my research in postcolonial, feminist, and Continental philosophy, and to contribute to my department and the university. I believe I have met these goals. Without a doubt, the second year has been easier: not only do I know my way around DePaul but I have benefited from the experience of my students and the guidance of my colleagues.

I have learned much from teaching the *Sophomore Seminar on Multiculturalism* (ISP 200)—a course that I have now taught every quarter. This class has been both challenging and rewarding in various ways that I will discuss below. Apart from ISP 200, I have had remarkable success in my *Issues in Sex and Gender* course (PHL 233), taught in the Winter quarter (2004). In the narrative that follows, I address the successes in this as well as my other courses (PHL 390: *Postcolonial Feminisms*; PHL 385: *Feminist Philosophies*). I am looking forward to building on all of these teaching experiences and improving these courses for future quarters.

During this review period, I have been interested in building bridges within the university, both through advising for LA& S over the summer (August-September 2004) and through being nominated for and elected to the Advisory Board of the Women's and Gender Studies Program for a 2-year term. My course on *Postcolonial Feminisms* was cross-listed with Women's and Gender Studies. I also served on the University Strategic Planning Committee during my 1st year at DePaul University (October 2003- April 2004) and collaborated with my fellow Diversity team-members on a report on the status of and future directions for improving diversity among faculty (available at https://pres.depaul.edu/strpp/papers.asp). I am serving as the faculty advisor for *Delta Phi Omega*, a sorority for South Asian women at DePaul University. Additionally, I organized a Symposium in honor of the legacy of the late Dr. Edward Said (October 2004), for which I received a University Research Council Award.

Finally, my research has been one of the most rewarding and exciting areas of my work this past year. I completed an article over the summer of 2004, and it is forthcoming in 2005. I have had a productive year and look forward to not only seeing my submitted work published but also to completing many of the projects I have already begun or have planned.

**1. Teaching**

Undergraduate: During the Winter quarter (2004) I taught the *Sophomore Seminar on Multiculturalism* (ISP 200) and *Postcolonial Feminisms* (PHL 390), which is cross-listed with Women's and Gender Studies. The seminar on multiculturalism introduced students to the history and idea of multiculturalism from a philosophical framework and also provided case studies through which to further enhance and complicate the theories and ideas gleaned from more abstract philosophical tracts. In

DPU 000077

addition to the texts, I asked my students to keep abreast of and write on (as a final paper) issues relating specifically to current events, such as public housing, immigration, homelessness, education, civil and human rights, the invasion of Iraq and Afghanistan, and the (then) forthcoming presidential election.

I taught 2 sections of this course in the Autumn Quarter of 2003 and I adjusted the course according to this experience and the comments I received in the course evaluations. Some of the changes I incorporated involved the use of smaller group discussions and more informal 15-minute writing exercises. While changing the texts to include more recent material, I also improved on the manner in which the texts related at once to the philosophical question underlying the course ("What is a human being?") and, addressed what a multiculturally informed notion of a human being might be.

The class itself was very resistant to the course during the subsequent Winter quarter, at times expressing overt hostility to the material presented. One assignment that incited much anger was an ungraded, in-class geography exercise, which forced the class to confront the fact that most students were unable to locate "Iraq" on the map, while some could not even find the Pacific Ocean. On another occasion after having read, "What is Enlightenment?" the class was prompted to think through what informed consent might require of citizen-subjects in a democracy. Some students reacted with hostility and defensiveness. This led to further (sometimes heated) discussion about the difference between "opinion" and "argument"—a distinction, central to their final assignment, and one that we had discussed in class and for which I had provided detailed instructions and in-class practice exercises.

There were minority students in this class who were resentful of how the very existence of such a course assumes that the normative student is white and needs "education" on these issues. Many of my minority students did not wish to participate as they felt that it would be reinforcing the notion that it is *their* responsibility to educate their white peers. Homophobia, however, in some cases seemed to place both white and minority students on the same "side," so to speak, such that granting "outsider" status to "others" who they assumed were not members of their own class became the basis for commonality. Many students who did not possess the same race and class privileges as their peers expressed delight at some of the more provocative elements of the course, but felt inhibited from speaking up in class. As one of my students stated in his or her evaluation "Honestly, I feel more stubborn now." This reflects in many ways the (un-)intellectual posture of many students who take this class (a "bubble-gum course" as one student put it).

Clearly, as a teacher I refuse to place my minority students in the position of having to speak in defense of the people they are deemed to represent. The challenge for me lies in finding a balance such that *all* students can find something interesting and thought-provoking to discuss leaving seemingly transparent identity claims behind. Another challenge lies in enhancing my own professorial authority, something that is not necessarily forthcoming as a result of my own race, gender, and age. Students conflate the body that is standing before them with the material that is being taught in so far as (for them) my race and gender predispose me to have a stake in "multiculturalism" and that I am thereby incapable of having an "objective" stance. I have worked very hard at being able to curtail such speculation or to prevent these lines of thinking from becoming a part of the class discussion and to pedagogically mine such moments for further

DPU 000078

**Woitel, Marilyn**

| | |
|---|---|
| **From:** | Lee, Richard |
| **Sent:** | Friday, June 22, 2007 10:32 AM |
| **To:** | Woitel, Marilyn |
| **Subject:** | RE: |

Hi Marilyn--

We did formal reviews for:

Sean Kirkland: recommendation to renew
Avery Goldman: recommendation to renew

We did informal reviews for:
Elizabeth Rottenberg: recommendation to renew
Namita Goswami: recommendation to renew

I will forward the reports as soon as they are all approved by the personnel committee.

Best,
Rick


Richard A. Lee, Jr.
Professor and Chair
Department of Philosophy
DePaul University
2352 N. Clifton Ave.
Chicago, IL 60614
(773) 325-4502
(773) 325-7268 (fax)


-----Original Message-----
From: Woitel, Marilyn
Sent: Thursday, June 21, 2007 4:05 PM
To: Woitel, Marilyn
Subject:

Folks,

I have not yet received your departmental recommendations for the 3rd through final year probationary faculty in your departments.  If you have faculty who were reviewed formally in Autumn quarter for the 2007-2008 contract, all I need is an informal confirmation of your recommendation to continue the contract through academic year 2008-2009.  From here on in formal reviews should be done every other year in the spring during the faculty's probationary period.  If you have a faculty member who was on leave this year, you may also submit an informal review with the department's recommendation for the 2008-2009 contract.


AAUP guidelines state that faculty being reviewed for their 4th through final years' contracts should be notified of the decision by July 1.  As you know, next Friday, June 29th is my last day and I'd like to have this project completed when I leave.  Thanks for your cooperation.

1

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

DPU 007165

Friday, October 5, 2012 5:33 PM

**Subject: two requests**
**Date:** Wednesday, April 8, 2009 8:26 AM
**From:** Birmingham, Peg <PBIRMING@depaul.edu>
**To:** "\"Steeves, H. Peter\"" <PSTEEVES@depaul.edu>

*Dear Peter,*

*I hope this finds you well.  I am writing for two reasons: first, would you agree to be part of a small personnel committee that is convening to conduct the formal and informal contract renewal reviews of  Avery Goldman, Sean Kirkland, and Namita Goswami.  David Pellauer has gracefully agreed to chair the committee.  I really hope that you might have time to be part of this.  That said, I know how busy you are and understand completely if this is not possible.*

*On another note, I am able to offer Danielle a critical thinking course each quarter next year (2009-2010).  Would you have her email such that I could contact her directly with this news?*

*Again, I hope you are well. I look forward to seeing you at ▮▮▮▮ defense on Friday.  (I think you are one of her readers, yes?)  I am spending the day with the dissertation!*

*all best, Peg*

Peg Birmingham
Professor of Philosophy and Interim Chair
DePaul University
2352 N. Clifton St.
Chicago IL 60614
773.325.7266
pbirming@depaul.edu

Director, Collegium Phaenomenologicum 2009
"The Subject of Politics"
www.collegiumphaenomenologicum.org <http://www.collegiumphaenomenologicum.org/>

Subject: FW: hi from bill
Date: Thu, 28 May 2009 16:51:00 -0500
From: "Birmingham, Peg" <PBIRMING@depaul.edu>
To: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>

Bill's answer. he will write a letter to be read at the meeting--I think now the vote will be 8-8.
thoughts?

_____

Peg Birmingham
Professor of Philosophy and Interim Chair
DePaul University
2352 N. Clifton St.
Chicago IL 60614
773.325.7266
<mailto:pbirming@depaul.edu>pbirming@depaul.edu

Director, Collegium Phaenomenologicum 2009
"The Subject of Politics"
<http://www.collegiumphaenomenologicum.org/>www.collegiumphaenomenologicum.org


**From:** Woodbug1@aol.com [mailto:Woodbug1@aol.com]
**Sent:** Thu 5/28/2009 3:24 PM
**To:** Birmingham, Peg
**Subject:** Re: hi from bill

Dearest Peg,

I hope things aren't too nuts there at the moment. I find this note hard to write because we
disagree over Namita. I would be happy to look more at the writing, but I'm not sure which
writing should count, some of which is apparently draft material, or the publications, which are
apparently up to the same standard that seemed to work well enough for Kevin. But beyond this,
and quite apart from whether one likes Namita or not (and I know you have been through some
really difficult stuff with her), I don't think this procedure is right or fair, and I think the counter-
document, which I have signed, does an excellent job of showing this. Beyond the specific case
(of Namita), I think the whole effort (of the personnel committee document and its harsh
recommendation) makes the department look bad, and I think we would do well to not support
this, even those who wrote the thing and those who previously thought it was a good document
and a good call.

There is another issue at stake for me here, and perhaps it is what is personal in this for me in a
way that is similar to things that are personal in this for you. I realize that this is not the totality
of things here, but I think it is a significant part, namely the role of David Pellauer in this
document and recommendation. When I had my troubles with David in years past, I said to
numerous members of the department that I was not going to dwell on the past and I was not
going to devote myself to getting back at David, but that if I saw him doing something similar to
someone else, with his relishment for being the boss and for firing people, then I would do what I
could to stop it.

DPU 024319

I've written a letter as my contribution to the discussion tomorrow. I would prefer that someone read the letter out loud to the meeting, and I was thinking Jason would be a good person for this, though I haven't asked him yet. Of course, you can do it, too, if you feel comfortable with it, though I know it might be difficult if you disagree with most of the content and the overall thrust of it. The alternative is that the letter could simply be emailed to the tenured faculty, but I would want to do that by this evening if that is what is needed.

I'm reading Logics of Worlds and looking forward to the time when we can teach Badiou together again.

My hope is that people can just realize that this recommendation to not let Namita stand for tenure was a bad idea, regardless of what different members of the department think about Namita's possible future in the department, and that things can just settle down. Meanwhile, as always, I will take recourse to bike therapy.

hugs and warm wishes,

b.

DPU 024320

Subject: FW: Meeting of Philosophy Department faculty regarding formal reviews of Goldman, Goswami, Kirkland
Date: Sun, 31 May 2009 19:40:16 -0500
From: "Birmingham, Peg" <PBIRMING@depaul.edu>
To: "Pellauer, David" <DPELLAUE@depaul.edu>

Hi David,

Please find Chuck's response below. Given that Chuck wants a summary of the department's discussion on each of the reviews, I have taken ER's notes and tried to put polish them just a bit. Would you take a good look using your editor's eye"  I think the one that you sent is too blunt and while it will avert controversy, I don't think it will give the Dean a real sense of the discussion.  If we can get him to agree with the recommendation our job next year will be made much easier.  My fantasy is that he will somehow find a way to convince her to move to WMS. Please note that I took out the names as I think that is usual in these kinds of summaries, although I will put the names back in if you think it is appropriate to do so.

let me know your thoughts on the attached document.

all best, Peg

---

Peg Birmingham
Professor of Philosophy and Interim Chair
DePaul University
2352 N. Clifton St.
Chicago IL 60614
773.325.7266
<mailto:pbirming@depaul.edu>pbirming@depaul.edu

Director, Collegium Phaenomenologicum 2009
"The Subject of Politics"
<http://www.collegiumphaenomenologicum.org/>www.collegiumphaenomenologicum.org

**From:** Suchar, Charles
**Sent:** Sun 5/31/2009 5:12 PM
**To:** Birmingham, Peg
**Subject:** RE: Meeting of Philosophy Department faculty regarding formal reviews of Goldman, Goswami, Kirkland

Dear Peg, I'm beginning to see the issue you're presenting here.  It is usual for a formal review to include some reflection of the actual vote that took place during the departmental deliberation meeting.  The final report needs to both include the rationale for the negative votes on contract renewal which would be reflected in this case in the personnel committee reports that David is/has submitted. But the sense and rationale for the positive votes should also be reflected in the document and/or in a minority report What the final submitted materials need to reflect is the over-all sentiment of the department: the majority (in this case) vote on non-renewal and the minority vote in support of the candidate.  I can see now that if you only submit the personnel committee report, the sense of the minority sentiment will not come across unless there is a minority report. I'll leave it to you and the department to decide how their over-all sentiment of

DPU 024339

the department can be best expressed. As I've said, usually a department will include a document that summarizes the over-all result of the department's deliberations and its final vote for or against contract renewal.

Best,

Chuck

Dr. Charles (Chuck) S. Suchar
Professor and Dean
College of Liberal Arts and Sciences
DePaul University
Vincent dePaul Professor
Office of the Dean
990 W. Fullerton Ave. Office#s 4207-4208
Chicago, IL. 60614-3298
Phones: (773) 325-7305
                (773) 325-1858
    fax:  (773) 325-7304
e-mail: csuchar@depaul.edu


**From:** Birmingham, Peg
**Sent:** Sun 5/31/2009 4:17 PM
**To:** Suchar, Charles
**Subject:** RE: Meeting of Philosophy Department faculty regarding formal reviews of Goldman, Goswami, Kirkland

Dear Chuck,

Sorry to bother you again with this, but just to clarify: when you say that the "final documents are sufficient," do you mean the formal reviews and recommendations prepared by the Personnel Committee and voted upon by the tenured faculty? In Namita's case, the Personal Committee laid out in great detail the reasons for recommending non-renewal of contract. This was the document discussed and voted upon by the tenured faculty at Friday's meeting.    Or do you mean a document that details Friday's department meeting and discussion?

Thanks for clarifying.

my best, Peg


**From:** Suchar, Charles
**Sent:** Sat 5/30/2009 5:38 PM
**To:** Birmingham, Peg
**Subject:** RE: Meeting of Philosophy Department faculty regarding formal reviews of Goldman, Goswami, Kirkland

Dear Peg,

The final documents of the department on each candidate should be sufficient. The document on Namita should state the basic issues that the majority found with her contract renewal situation. Yes, the voting members need to sign the final documents for each candidate. If any minority position is articulated in writing, that should be forwarded as well with signatures. Thanks for providing me with a summary of the voting. We can talk about all of this on Monday Peg, if you wish. I'll be in the office at my usual time of about 8:30. All the best,

Chuck

Dr. Charles (Chuck) S. Suchar
Professor and Dean
College of Liberal Arts and Sciences
DePaul University
Vincent dePaul Professor
Office of the Dean
990 W. Fullerton Ave. Office#s 4207-4208
Chicago, IL. 60614-3298
Phones: (773) 325-7305
         (773) 325-1858
    fax: (773) 325-7304
e-mail: csuchar@depaul.edu


**From:** Birmingham, Peg
**Sent:** Sat 5/30/2009 8:38 AM
**To:** Suchar, Charles
**Cc:** Pellauer, David
**Subject:** Meeting of Philosophy Department faculty regarding formal reviews of Goldman, Goswami, Kirkland

Dear Chuck,

Sorry to intrude on your weekend, but I thought you would want to know of the results of yesterday's meeting of the tenured faculty of the Philosophy Department. As you know, we met to discuss and vote on the Personnel Committee's recommendations in the formal reviews of Avery Goldman, Namita Goswami, and Sean Kirkland. We had a very thorough and deliberative discussion. We voted on each case separately. The results of the votes cast by secret ballot are:

Avery Goldman: 14 in favor of contract renewal, 0 opposed, 1 abstention
Namita Goswami: 9 in favor of terminating contract, 6 opposed, 0 abstention
Sean Kirkland: 14 in favor of contract renewal, 0 opposed, 1 abstention

There are 17 tenured faculty in the Philosophy Department. 15 votes were registered. Rick Lee publicly cited "sanctity of leave" and did not participate (he also did not participate in the tenure and promotion application of Elizabeth Rottenberg. again for reason of sabbatical leave). One tenured member of the department away at a conference did not vote.

At this point, I am uncertain of next steps. As Chair of the Personnel Committee, David Pellauer will be sending you the recommendations for each of the three untenured faculty, along with supporting materials submitted in the context of the formal review. Do you also wish to have a document that provides details of yesterday's department discussion? Does each formal review

DPU 024341

Subject: RE: Summary of department discussion of personal committee's formal reviews
Date: Mon, 1 Jun 2009 10:09:28 -0500
From: "Perkins, Franklin" <FPERKINS@depaul.edu>
To: "Naas, Michael" <MNAAS@depaul.edu>,
    "Birmingham, Peg" <PBIRMING@depaul.edu>,
    "Pellauer, David" <DPELLAUE@depaul.edu>,
    "Hill, Jason" <jhill6@depaul.edu>,
    "Werhane, Patricia" <PWERHANE@depaul.edu>,
    <dfkrell@gmail.com>,
    "McNeill, William" <WMCNEILL@depaul.edu>,
    <woodbug1@aol.com>,
    "Chanter, Tina" <TCHANTER@depaul.edu>,
    "Moore, Darrell" <DMOORE1@depaul.edu>,
    "Thompson, Kevin" <KTHOMP12@depaul.edu>,
    "Larrabee, Mary Jeanne" <MLARRABE@depaul.edu>,
    "Millan-Zaibert, Elizabeth" <EMILLANZ@depaul.edu>,
    "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>,
    "Painter-Morland, Mollie" <MPAINTER@depaul.edu>,
    "Steeves, H. Peter" <PSTEEVES@depaul.edu>

Hi Peg,

Thanks for writing such a balanced report of the meeting. I don't want to cause trouble, but the deepest issue to me is that the personnel committee seemed to hold Namita to a higher standard than would be required for tenure. I think I said that a few ways, so I would like for it to be reflected somehow in the report, since it is the most important issue to me.

Two possibilities for that come to mind. The most accurate would be after the sentence "One of the faculty stated that it was unfair to recommend termination of contract six months before the tenure review" to add, "particularly since the committee report acknowledges that Prof. Goswami might receive tenure from the university." That was what I said and is the context for the comments that follow in the summary of the discussion. If that is too contentious, a different possibility would be to add at the end of Micheal's sentence, ", and that by only concentrating only on research, the committee is holding Prof. Goswami to a higher standard that would be used for tenure." That might be less contentious, although I'm not sure I exactly said that.

Thanks,
Frank

DPU 024349

Subject: RE: Summary of department discussion of personal committee's formal reviews
Date: Mon, 1 Jun 2009 10:21:04 -0500
From: "Birmingham, Peg" <PBIRMING@depaul.edu>
To: "Perkins, Franklin" <FPERKINS@depaul.edu>,
        "Naas, Michael" <MNAAS@depaul.edu>,
        "Pellauer, David" <DPELLAUE@depaul.edu>,
        "Hill, Jason" <jhill6@depaul.edu>,
        "Werhane, Patricia" <PWERHANE@depaul.edu>,
        <dfkrell@gmail.com>,
        "McNeill, William" <WMCNEILL@depaul.edu>,
        <woodbug1@aol.com>,
        "Chanter, Tina" <TCHANTER@depaul.edu>,
        "Moore, Darrell" <DMOORE1@depaul.edu>,
        "Thompson, Kevin" <KTHOMP12@depaul.edu>,
        "Larrabee, Mary Jeanne" <MLARRABE@depaul.edu>,
        "Millan-Zaibert, Elizabeth" <EMILLANZ@depaul.edu>,
        "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>,
        "Painter-Morland, Mollie" <MPAINTER@depaul.edu>,
        "Steeves, H. Peter" <PSTEEVES@depaul.edu>

Thanks, Franklin. Insofar as our document detailing our discussion should be as accurate as possible, my own view is that the document reflect what you actually said. Thus, unless other object, I will make your first suggested revision: After, "one of the faculty stated that it was unfair to recommend termination of contract six months before the tenure review, I will add, "particularly since the committee report acknowledges that Prof. Goswami might receive tenure from the university."

I am now leaving for an appointment downtown and will be off email until later this afternoon. I will respond to all additional revisions and suggestions at that time. Many thanks to everyone for weighing in. Again, hit "reply all."

my best, Peg

DPU 024350

Subject:
Date: Mon, 1 Jun 2009 10:21:30 -0500
From: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>
To: "Birmingham, Peg" <PBIRMING@depaul.edu>

Hi Peg,

Frank makes me so mad.  No way you can include the "higher standard"
line unless you also include the DP's refutation of Frank's claim that
she might get tenure...the DP went back to the text of the report, if
you remember, and showed how Frank had in fact misquoted the report.

If "higher standard" gets included than I want the majority section to
further emphasize that the quality of the work is so poor that it trumps
(and would trump) the other two categories in the event of tenure.  Not
a higher standard but the one criterion that makes her untenurable in a
doctoral program...

I'll write this in a public message as soon as I've calmed down.

I have to meet Andy in ten minutes.

Hugs.  e

DPU 024351

Subject: RE:
Date: Mon, 1 Jun 2009 10:26:17 -0500
From: "Birmingham, Peg" <PBIRMING@depaul.edu>
To: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>

Yes--reply immediately!!!!  Make a concrete suggestion as to the wording or at least indicate that
you will do so when you have more time later today.....

DPU 024352

Subject: RE:
Date: Mon, 1 Jun 2009 10:28:50 -0500
From: "Birmingham, Peg" <PBIRMING@depaul.edu>
To: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>

again, please write!!  I can't do this without you.....  ask DFK to respond positively to whatever it
is you propose.

DPU 024353

Subject: RE: Summary of department discussion of personal committee's formal reviews
Date: Mon, 1 Jun 2009 10:30:43 -0500
From: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>
To: "Perkins, Franklin" <FPERKINS@depaul.edu>,
  "Naas, Michael" <MNAAS@depaul.edu>,
  "Birmingham, Peg" <PBIRMING@depaul.edu>,
  "Pellauer, David" <DPELLAUE@depaul.edu>,
  "Hill, Jason" <jhill6@depaul.edu>,
  "Werhane, Patricia" <PWERHANE@depaul.edu>,
  <dfkrell@gmail.com>,
  "McNeill, William" <WMCNEILL@depaul.edu>,
  <woodbug1@aol.com>,
  "Chanter, Tina" <TCHANTER@depaul.edu>,
  "Moore, Darrell" <DMOORE1@depaul.edu>,
  "Thompson, Kevin" <KTHOMP12@depaul.edu>,
  "Larrabee, Mary Jeanne" <MLARRABE@depaul.edu>,
  "Millan-Zaibert, Elizabeth" <EMILLANZ@depaul.edu>,
  "Painter-Morland, Mollie" <MPAINTER@depaul.edu>,
  "Steeves, H. Peter" <PSTEEVES@depaul.edu>

Hi Peg,

I don't think you can include the "higher standard" language unless you also include (1) the refutation of what was in fact a misquotation of the report (the report does not say what Frank claims it says without qualification [David Pellauer responded to this in the meeting]); (2) the fact that the majority holds the quality of work as the one criterion that would make any faculty member untenurable in a doctoral program (this was said many times at the meeting by different people). I think you should leave the report as it stands.

Best. e

DPU 024354

Subject: RE:
Date: Mon, 1 Jun 2009 10:36:43 -0500
From: "Birmingham, Peg" <PBIRMING@depaul.edu>
To: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>
Cc: <davidfkrell@gmail.com>

Hi e. and d.,

david's email address is wrong on the group email and I have now corrected it.  no, your email was not ill-advised, but necessary.  David, can you weigh in supporting Elizabeth?  Perhaps you could suggest that we include Frank's statement but David P.'s refutation, quoting the report?

must run, Peg

DPU 024355

Subject: RE: Summary of department discussion of personal committee's formal reviews
Date: Mon, 1 Jun 2009 12:18:11 -0500
From: "Perkins, Franklin" <FPERKINS@depaul.edu>
To: "Painter-Morland, Mollie" <MPAINTER@depaul.edu>,
    "Birmingham, Peg" <PBIRMING@depaul.edu>,
    "Naas, Michael" <MNAAS@depaul.edu>,
    "Pellauer, David" <DPELLAUE@depaul.edu>,
    "Hill, Jason" <jhill6@depaul.edu>,
    "Werhane, Patricia" <PWERHANE@depaul.edu>,
    <dfkrell@gmail.com>,
    "McNeill, William" <WMCNEILL@depaul.edu>,
    <woodbug1@aol.com>,
    "Chanter, Tina" <TCHANTER@depaul.edu>,
    "Moore, Darrell" <DMOORE1@depaul.edu>,
    "Thompson, Kevin" <KTHOMP12@depaul.edu>,
    "Larrabee, Mary Jeanne" <MLARRABE@depaul.edu>,
    "Millan-Zaibert, Elizabeth" <EMILLANZ@depaul.edu>,
    "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>,
    "Steeves, H. Peter" <PSTEEVES@depaul.edu>

Hi Peg,

I'm surprised by the reaction to my suggestion. As understand it, the report is meant to reflect the discussion, and I think what I last sent is pretty close a transcription of what I said, and so I would like some version of it to be included. If someone wants to say that that discussion did not happen, that is a different case, but I remember it quite clearly.

So if "might' is an incorrect interpretation of the personnel committee's report, I'm not sure that is relevant, since the summary is a record of what was said, and that was the interpretation I spoke. At the same time, I take "unlikely" to be different from "impossible" or "almost certainly not," in that "unlikely" implies that it might happen. I think that is a correct understanding of the term, and it is supported by the sentence follows it, which proposes a hypothetical in which Namita would be granted tenure by the university, thus seemingly acknowledging that this "might" happen.

Frank

DPU 024361

Subject: RE: Summary of department discussion of personal committee's formal reviews
Date: Mon, 1 Jun 2009 12:24:21 -0500
From: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>
To: Perkins, Franklin; Naas, Michael; Birmingham, Peg; Pellauer, David; Hill, Jason; Werhane, Patricia; 'dfkrell@gmail.com'; McNeill, William; 'woodbug1@aol.com'; Chanter, Tina; Moore, Darrell; Thompson, Kevin; Larrabee, Mary Jeanne; Millan-Zaibert, Elizabeth; Painter-Morland, Mollie; Steeves, H. Peter

Dear All,

The only thing I am really opposed to (having fought on FGC for the primacy of the home unit's determination of tenure) is language that seems to support the possible overturning of a tenure decision on the home unit level (the committee report says just the opposite, as Mollie makes very clear). I do not understand why even a member of the minority would want to suggest that a majority decision made by the home unit might possibly be overturned by the university (it can happen, as we know, but it is not something we should hope for or support . . . ). Not, that is, if we think we have done our work properly. And I don't think anyone who was present at the meeting on Friday can argue that we did not do our work properly.

For those who have not seen the letter, Ann Russo is arguing just this point in a letter to Father Holtzschneider in support of Missy Bradshaw:
We draw your attention to the Faculty Handbook's framing of the role of the UBPT in the review process. It clearly states that the "determination that an individual meets these criteria [for tenure and/or promotion] is made primarily on the basis of the guidelines promulgated by the candidate's department" and that "[d]ecisions subsequent to that made at the initial level shall consider the method and care of application of the approved standards by the lower level unit(s), including matters of stringency, consistency, and fairness . . . Only in cases where lower level decisions are judged to be deficient in significant respects shall upper level units make their own application of the substantive criteria of the candidate's scholarly or artistic area" (FH, "Evaluation of Faculty," p. 3). Thus, the role of the UBPT is to ensure that the lower units are using the approved standards of the department and following the appropriate process

Best. e

DPU 024362

Subject: RE: Summary of department discussion of personal committee's formal reviews
Date: Mon, 1 Jun 2009 12:37:16 -0500
From: "Larrabee, Mary Jeanne" <MLARRABE@depaul.edu>
To: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>,
    "Perkins, Franklin" <FPERKINS@depaul.edu>,
    "Naas, Michael" <MNAAS@depaul.edu>,
    "Birmingham, Peg" <PBIRMING@depaul.edu>,
    "Pellauer, David" <DPELLAUE@depaul.edu>,
    "Hill, Jason" <jhill6@depaul.edu>,
    "Werhane, Patricia" <PWERHANE@depaul.edu>,
    <dfkrell@gmail.com>,
    "McNeill, William" <WMCNEILL@depaul.edu>,
    <woodbug1@aol.com>,
    "Chanter, Tina" <TCHANTER@depaul.edu>,
    "Moore, Darrell" <DMOORE1@depaul.edu>,
    "Thompson, Kevin" <KTHOMP12@depaul.edu>,
    "Millan-Zaibert, Elizabeth" <EMILLANZ@depaul.edu>,
    "Painter-Morland, Mollie" <MPAINTER@depaul.edu>,
    "Steeves, H. Peter" <PSTEEVES@depaul.edu>

May I say again—minutes should state what was actually said at the meeting and not import anything more than that.  Having taken minutes for two years for FC, I can say that it is impossible to have every exact statement made in the meeting show up in the minutes.  So why not just let the minutes stand?  The other two documents will be in the dean's hands as well, saying what they say.

Mary Jeanne

DPU 024363

Subject:
Date: Mon, 1 Jun 2009 12:43:17 -0500
From: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>
To: "Birmingham, Peg" <PBIRMING@depaul.edu>

Hi Peg,

I am suspicious of MJL's moderation, but she may be right in this case.
Just spoke to DFK who thought one line should be added to the majority
summary about teaching undergrads to write so the majority decision
wouldn't seem to concern only the graduate program. And DFK is right:
no "higher standard" if there are serious concerns about her ability to
teach undergrads to write . . .

You must be out of your mind.

Hugs. e

DPU 024364

Subject: RE: Summary of department discussion of personal committee's formal reviews
Date: Mon, 1 Jun 2009 13:26:05 -0500
From: "Perkins, Franklin" <FPERKINS@depaul.edu>
To: "Larrabee, Mary Jeanne" <MLARRABE@depaul.edu>,
    "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>,
    "Naas, Michael" <MNAAS@depaul.edu>,
    "Birmingham, Peg" <PBIRMING@depaul.edu>,
    "Pellauer, David" <DPELLAUE@depaul.edu>,
    "Hill, Jason" <jhill6@depaul.edu>,
    "Werhane, Patricia" <PWERHANE@depaul.edu>,
    <dfkrell@gmail.com>,
    "McNeill, William" <WMCNEILL@depaul.edu>,
    <woodbug1@aol.com>,
    "Chanter, Tina" <TCHANTER@depaul.edu>,
    "Moore, Darrell" <DMOORE1@depaul.edu>,
    "Thompson, Kevin" <KTHOMP12@depaul.edu>,
    "Millan-Zaibert, Elizabeth" <EMILLANZ@depaul.edu>,
    "Painter-Morland, Mollie" <MPAINTER@depaul.edu>,
    "Steeves, H. Peter" <PSTEEVES@depaul.edu>

I would prefer to have my comment included, since I said it and I at least took it as my most important point. The reason why I originally summarized it to say "particularly since the committee report acknowledges that Prof. Goswami might receive tenure from the university" was to not draw attention to the distinction that David made in his clarification, for the reason's that Elizabeth suggests. Perhaps we could just include that line, since that is what Peg originally agreed when I sent it. If it seems necessary to include David's clarification, that is fine too.

Frank

DPU 024365

Subject:
Date: Tue, 2 Jun 2009 10:46:47 -0500
From: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>
To: "Birmingham, Peg" <PBIRMING@depaul.edu>

Hi Peg,

Just read the "new and improved" minority report. I think it is excellent . . . very, very fair. I don't think the minority deserves such fairness (given their document), but I do think it will serve us well down the line (hopefully this year and if not this year then next year). You are a real pro.

more later.

hugs. e

DPU 024370

Subject: RE: letter regarding termination of Namita's contract
Date: Sat, 6 Jun 2009 11:27:51 -0500
From: "Birmingham, Peg" <PBIRMING@depaul.edu>
To: "Rottenberg, Elizabeth" <EROTTENB@depaul.edu>

Hi Elizabeth,

Thanks for keeping the file. In the end, Frank did sign the report. (The only person not to sign the department document was MJL--what a horrible person.) Everything is now at the Dean's office. I am going to meet with him this week, although I wasn't able to get in touch with Cathy O'Brien on Friday to make an appointment. I will do that first thing on Monday morning. Yes, let's see what he does. And you are right: we will bring out the big guns next year which is why I am not going to send her the department document now, although I am sure someone already has.

I will mention to Clare that she should go driving with you. My sense is that she needs to take a second driving "on the road" course and then start driving with you. But perhaps you can talk with her this week. Family night on Thursday? Anyway, should we meet for tea around 4:00 tomorrow. No word from anyone on the tenure meeting yesterday. Gene is not including me on any of the emails.....

many hugs, Peg

Subject: RE:
Date: Wed, 03 Jun 2009 16:50:29 -0500
From: "Birmingham, Peg" PBIRMING@depaul.edu
To: Elizabeth Rottenberg <erottenb@depaul.edu>

Hi Elizabeth,

Of course I am not mad--in fact, I think this makes for a much stronger case overall. Jason can sign the document attesting to accuracy of department discussion and hopefully he will not sign the minority report; those of us who are in favor of termination can sign both documents, agreeing with the accuracy and with the recommendation. I am not sure if Kevin will sign the recommendation document. We will see on Friday. I am going to wait until the very last moment to sign.

I haven't heard a thing from Gene, but I thought your email to him was great. How can you call into question the judgment of a Board who just awarded you tenure and promotion? I will forward you an email I sent to Gil Gott earlier this afternoon. I am increasingly concerned/appalled by the way WGS is publicly airing the Melissa Bradshaw case, but no concern is given to the woman in WRD--Matthew's colleague--who I thought impressive. I have to say I am beginning to hate WGS and all that it stands for. The only women who count are mediocre members of their club. Feels like high school to me. And of course they will be out in full force for NG next year if she is denied. At that point, I will write a stinging rebuke. Pat is right though: Chuck is a "wuss" and I am not hopeful that he will terminate contract this year.

Anyway, congratulations on finishing the french reading group. I am going for a run.

hugs, Peg

DPU 024378

# EXHIBIT K

Namita Goswami                                                    1

## Who Was Roop Kanwar: The Subject in Question in Contemporary Feminist Theory

Roop Kanwar's marriage took place on January 17, 1987. Her husband, Maal Singh, was a science graduate. Maal Singh's father, Sumer Singh, taught Hindi at the local government school. The family lived in a comfortable home in Deorala (**TELL THEM WHERE IT IS IN INDIA**).

On September 3, while having dinner, Maal Singh complained of stomach pains. Accompanied by Kanwar, he was taken to the local district hospital. Later that evening Kanwar returned to Deorala. Maal Singh died of gastroenteritis and his body was returned to Deorala by 6 a.m. on the morning of September 4. By some accounts, Kanwar expressed her desire to commit sati (widow-immolation/ **EXPLAIN**) after her husband's death. Others state that family members taunted her for bringing misfortune to the family. Some allege that she accompanied the funeral procession and sat on the pyre with her husband's head on her lap prior to it being lit. Others say that she ran through the village screaming and hid in a barn, only to be dragged to the pyre by family members and weighed down with wood and branches. Still others allege that she ascended the pyre after Maal Singh's 15 year-old brother ignited it.

Some reports indicate that 5000 people witnessed the event. Others state that the number had actually been about 12. A case was registered under Section 306 of the Indian Penal Code (abetment to suicide), and on September 9, Kanwar's brother-in-law was arrested under Section 302 I.P.C (murder). He was released on bail on September 14.

In response to women's groups, the Rajasthan High Court ordered the state government to hold no public function at the immolation site. On September 16, however, the *chunri mahotsav* (**EXPLAIN**) took place as planned. Prominent Rajput leaders offered prayers and made donations. There were reportedly between 200,000 and 400,000 people at the site and women outnumbered men.

On September 19, an article titled "India Widow's Death at Pyre Creates a Shrine," by Steven R. Weisman appeared on the front page of *The New York Times*. The village of Deorala became temporarily known throughout the world. On September 21, the National Federation of Indian Women demanded funds for widow rehabilitation, action against political leaders, and a total ban on the propagation or glorification of *sati*. On September 28, Rajiv Gandhi (**EXPLAIN HIS ELECTION MOTTO OF TAKING INDIA TO 21ˢᵗ CENTURY**) declared *sati* to be a "national shame." On October 1, the Prevention of Sati Ordinance was passed in the Rajasthan Assembly, although the Rajasthan High Court declared that the Ordinance would not retroactively apply to the Kanwar case. The Ordinance became Central law in November.

Her family describes Kanwar as a quiet, pious young woman, devoted to Rani Sati Mata, a fifteenth century Rajput noblewoman who became a *sati* on the death of her husband. Most of the major caste groups in eastern Rajasthan have their own Sati mother-goddesses who wield their protective powers in response to the veneration they receive from their devotees. It is the work of women to maintain the ritual cycles on behalf of their husbands. Hence, through the exercise of ritual action, wives are understood to be instrumental in their husbands' well being. The Indian media represent Rajputs as backward and intensely patriarchal, a portrayal they resent. For them, increasing

cosmopolitanism expresses the disintegration of distinctively Indian identity. The increasing visibility of women's organizations threatens their traditional ways of life. The State markets these exotic and romantic traditions for tourist dollars even as it disdains them as rustics in a modern and democratic society **(EXPLAIN-RAJPUTS ONLY GROUP BRITISH RESPECTED BECAUSE THEY WERE WARRIOR CASTE AND MASCULINE/EFFEMINISATION OF INDIAN MEN PREMISED ON EXTREME VIOLENCE TOWARDS WOMEN)** (Courtright).

Kanwar became a site for Hindu nationalists to imagine a nation with rigid caste (Brahmin), gender (male), and religious (Hindu and cleansed of Muslim presence) demarcations. For the state to proclaim its commitment to secularism and progress; and for feminists to condemn increasing female infanticide, low literacy rates, the condition of widows, increasing women's participation in right-wing fundamentalism, and waning legal and property rights. Moreover, the language of the Prevention Ordinance is about the status of the woman's will; her actions are either voluntary or involuntary. She is prosecuted for the offense of attempting sati if it is foiled. If it is completed, those involved are charged with abetment rather than murder (Sunder Rajan).

Spivak's statement the "subaltern cannot speak" rhetorically captures the foreclosure that occurs when Indian women are considered either abject victims or unworldly heroines who feel no pain when burning alive. The subaltern becomes either the object of protection from her own kind ("white men are saving brown women from brown men"), and hence complicit with imperialism, or a self-determining and thereby transparent subject ("the women wanted to die"). The subaltern cannot speak, not because she doesn't speak or hasn't spoken, but because she does not have a subject-

position which renders her voice intelligible (Deepika Bahri). If the western subject

bears problematic selfhood, then the subaltern cannot be lack, that is, authentic, unified,

and without a problematic self (Spivak). Kanwar is the subaltern because she has no

position from which she can speak. This is not simply because she is dead. Her voice is

unavailable to us because we are limited and over-determined or pre-determined by the

scripts available to us, the scripts that in fact make sense to us, regardless of our

particular politics.

The "antinomies and semiotic investments" (Spivak) we are left with are:

tradition vs. modernity, ritual vs. crime, subject vs. object, suicide vs. murder, religion

vs. secularism, and victim vs. goddess. As Rajeswari Sunder Rajan states "For

defenders of sati all are voluntary, and for its opponents all are coerced. But the

woman['s]... intention... can only be a matter of conjecture and, finally, ideological

conviction" (Sunder Rajan 18). Something about sati demands a response. Yet, one also

remains paralyzed.

Kanwar's various subject-positions rely upon different aspects of her identity

that become symbolic. If she survived, we can only surmise which "Kanwar" she would

choose to articulate. I am not driven by the search to locate or specify an authentic or

explicitly non-western subject. Instead, I resituate the feminist question, that is, sati as a

specifically patriarchal oppression under the guise of Hinduism and community identity

onto a different register. What are the other subject-positions available for her, and how

does one go about recuperating them responsibly?

I locate this question of subject-positions in a larger question, that is, what does

it mean for a subject to think freely. Although I will not delve into this latter question, I

Namita Goswami                                                                                    5

invoke it as the ethos within which knowledge attempts to enable, describe, and create

subjects that matter. Something in the way that we learn how to gain knowledge can

render us, whether or not we wish it, as vehicles for the propagation of the status quo.

Feminist critiques, despite being virulent, timely, and historically apt, require the

reflexivity that Spivak and other scholars call for in that we need to be careful about the

forms of freedom we demand and envision. I begin with Foucault's understanding of

Kant's seminal essay, "What is Enlightenment?" to invoke what he terms the "attitude

of modernity" inaugurated by Kant. Enlightenment is the age of critique. Foucault

builds his own genealogical critique upon Kant's essay through by foregrounding

technological and bodily practices that simultaneously enable and disable the subject of

modern power.

        The courage to use one's own understanding involves both recognition of limits

and the viability of exceeding them. According to Foucault, the vision of both limit and

its possible transcending are the "modes of problematization" that an age, epoch, or

historical era enables its inhabitants. I turn to Adorno after outlining the various

possibilities afforded by Foucault and Kant in order to argue that Adorno's account of

Enlightenment rationality anticipates Foucault. Adorno, obviously in the context of

Nazi Germany, illustrates how the philosophy of identity through which subjects are

made present to the world and gain knowledge in the world rather than empowering

them renders them more and more as cogs in a machine. I define the functional as that

which enables people quite simply to function or survive. That is, do we simply learn

how to gain knowledge that will enable us to make a living, fulfilling our goals as we

have deemed them? Or do we truly seek wisdom and the nurturing of those critical

Namita Goswami                                                                        6

capacities, be they reason or anything else, to maintain the critical and argumentative

stance that is not reducible to identity, but is in fact a necessity for active and

participatory citizenship?

I undertake this analysis through the various meanings that have been attributed

to Kanwar's immolation and the manner in which the discourse of rights and autonomy,

while premised on the inviolability of the individual, can be appropriated for both

feminist and Hindu fundamentalist ends. I argue that even in the spiritual or

transcendent realm of Hinduism and the goddess Sati this autonomous subject makes its

appearance in both the public and private realms of a Hindu/Rajput home in order to

anchor this practice. The autonomy of the Hindu woman that starts in the private sphere

becomes the spectacle of a burning body in the public. This body is in fact not a body

that is burning; it is the presence of an implicit divinity. In other words, the body that

burned is not Kanwar's at all. If it were, it would entail, according to Hindu nationalists,

who create Hinduism as they invoke it, that her person, that is, her divinity, is contained

in a vulgar and material form.

**The Subject in Question**

The connection between knowledge and ethics forms, I believe, the fundamental

impetus behind what Foucault terms "modern philosophy" or the philosophy that is

"attempting to answer the question raised so imprudently two centuries ago: *Was ist

Aufklärung?*" (Foucault Reader, 32). Kant's answer to this question indicts man's

inability to think freely through the use of his reason without the guide of an authority.

Maturity is the ability to think beyond the given and the immediate, and the ability to

recognize limitations.

Namita Goswami                                                                    7

Kant's response establishes the motifs that enchant and disenchant scholars engaged in the task of conceiving the form of society and the form of personhood inimical to the instrumental use of individuals. At root lies responsibility and attention towards the capacities and faculties nurtured by society for its members to be either capable of questioning or of remaining calculable functions of the *sensus communis*. Kant, therefore, proceeds to question, "But which form of restriction prevents enlightenment, and which, instead of hindering it, can actually promote it?" Aware of the need for a mechanism to prevent unbridled chaos, Kant establishes a distinction between public and private use of one's reason. "The public use of man's reason must always be free... the private use of reason may quite often be very narrowly restricted." Through this differentiation Kant recognizes the inherent social and community bound aspect of human life. The public use of reason entails "m[e]n of learning address[ing] the entire reading public" while the private use of reason concerns the "particular civil post or office" he occupies.

Reason is either instrumental in private or critical in public or reason is bifurcated in it-self and possesses public and private capacities. The subject transforms from indolence to active citizenship through publicly challenging laws on rational grounds. It is incumbent upon governing bodies to sustain this subject to ensure authority rather than subservience. Public debate and private obedience are the contract through which "freedom may exist without in the least jeopardizing public concord and the unity of the commonwealth."

The commonwealth, of course, refers to the state of Frederick II, the "enlightened despot." Kant's approbation of Frederick's enlightened policies, such as secularism and

Namita Goswami                                                                    8

an effective military, situate autonomy well within the interests of the state. Kant's "age

of enlightenment" contains a pre-condition or an antecedent procedure, that is, the

capacity to think freely presupposes a society where this activity can abide. Reason and

its use are situated in a community. There is no distinction between public and private

uses of reason; the private sphere is, in fact, the public realm where the individual

complies with duty. The challenge to Frederick, as Foucault points out, is that those

duties must abide by the universal laws of reason.

   Reason, however, seems to act as a dormant force and capacity waiting for the

right ruler, colonizer, or historical moment. The bearer of this form of reason is a subject

whose maturation is the course of history. Effectively, reason operates on an ontological

level. On a political level, it must be nurtured by the commonwealth's institutions. On a

psychological level, it may be thwarted and repressed. On an ethical level, it must be

given free reign in the public realm. Reason is the duty of active subjects. On the

historical or teleological level the state, reason, and freedom become superimposed upon

one another as freedom becomes the culmination of the state as guarantor of the natural

right of mankind. History is the narrative of freedom or maturity, that is, the "courage"

and the "ability" to effectively perform as subjects that use their "understanding."

   The motifs that Kant's text present have challenged and inspired philosophical

and critical thinking for over two centuries. It is critical to invoke the particular ethos that

drives Kant and forms the impetus for feminism and the Frankfurt School. Reason and

other capacities for the creation of knowledge and self-understanding such as body,

community, or filial and national bonds, are inextricably bound to their contexts. How

does one articulate a subject capable of transcendence and negation, that is, whose

Namita Goswami                                                          9

function does not precede existence and who is not an effect, product, and mimic of

contingency?

Foucault emphasizes that Kant's text and the three *Critiques* define "the

conditions under which the use of reason is legitimate in order to determine what can be

known, what must be done, and what may be hoped" (FR 38). Its "illegitimate" use leads

to "heteronomy" and "dogmatism." More importantly, however, Kant's text is situated at

the juncture of history, knowledge-construction, and self-reflection, that is, an attitude of

permanent critique towards the present and its necessary limitations. This requires a

genealogy of our self-constitution and recognition as "subjects of what we are doing,

thinking, and saying." One cannot, therefore, be simply for or against the Enlightenment.

Foucault's "historical ontology" (FR 44–45)

> will not deduce from the form of what we are what it is impossible for us
> to do and know… It is not seeking to make possible a metaphysics that has
> finally become a science (FR 46).

Instead, historical and critical investigations are brought to "bear upon a material,

an epoch, a body of determined practices and discourses," that is, they operate on a level

of "generality."

> [W]hat must be grasped is the extent to which what we know of it, the
> forms of power that are exercised in it, and the experience that we have in
> it of ourselves constitute nothing but determined historical figures, through
> a certain form of problematization that defines objects, rules of action,
> modes of relation to oneself.

This, I believe, is the most crucial element of Foucault's critical ontology; it

uncovers the historical form of general questions. The "modes" of "problematization" are

Namita Goswami                                                      10



those questions that a society enables its members to ask. Are these questions truly

radical, the difference that makes a difference?

I have utilized and privileged Foucault at the expense of other philosophers

because Foucault stands as the figurehead and over-determined signifier of a very

different form of discourse. The subject is the crystallization of power, space, and

knowledge, discernable perhaps only as an intuitive outline, glimmer, shudder, or trace.

The interior and exterior of the self bear little distinction, and are often incomprehensible

as distinct entities. The relation of "docility-utility" creates bodies and selves that are

more capacitated as they are more servile.[1] Foucault's ethics or care of the self is a

personal project away from the indignity and brutality of the "parade" and the "gaze."[2]

For Kant, it is the flourishing of the genuine and demonstrable capacities of reason rather

than metaphysical and dogmatic claims. Both recognize our complicity with and

participation in our "immaturity." Kant, perhaps, affords the subject more possibility for

choice. For Foucault, power and space overlap to an extent whereby there seems to be no

space that is not also power. Repressive and generative power become indistinguishable.

While Foucault's geography differs from Kant's over-determined circumspection of

reason, both attempt to recuperate a subject that matters, that is, a subject who is capable

of asking questions that matter.**(kant: rk's choice rational/fouc:**

**she is present through absence/outline/trace)**

Enlightenment rationality and the subject of enlightenment emerge precisely

because of the dialectical and implicitly hegemonic construction of European women as

---

[1] FR
[2] FR

symbolically and innately irrational.[3] This dialectic is compounded by the simultaneous

construction of the colonized native as irrational and feminine, whose unnatural

masculinity is constructed upon the extreme victimization of the native female.[4]

Moreover, as Kumkum Sangari emphasizes,

> [t]he disavowal of the objective and instrumental modalities of the social
> sciences occurs in the academies at a time when *usable* knowledge is
> gathered with growing certainty and control by Euro-America through
> advanced technologies of information retrieval from the rest of the
> world… [T]he operations of neo-colonialism… continue to be confidently
> carried out abroad and… "return" as the crisis of meaning, representation,
> legitimation at home (Politics of the Possible, 244).

Asha Varagdharajan asks, "If… the unity and self-sufficiency of th[e] subject is

possible only at the expense of the racial, ethnic, and feminine object, why has this

perception not produced the emancipation and self-acceptance of the object?" (xi).

Varagdharajan is interested in locating a discursive regime that will not render the object

a subaltern that cannot speak, except perhaps as an automaton to the neurotic and pushy

western scholar. For Varagdharajan, the subject must "prepare the ground for the

profession of the object's political desire" (29) rather than indulge the perennial process

of self-discovery. Yet, her account of the object whose account of itself to the subject is

always in abeyance or whose silence is the sign of its strategic resistance does not suffice.

The dialectics that emerges from the ontologically determinate status of the subject and

the object whereby the former is centered through its decentering while the latter is made

present through its absence removes, ironically, the very history which one seeks to

interrupt. The former is plagued by "epistemology *as* violation, representation *as*

---

[3] public/private ft.note
[4] explanation. sati. sources.

Namita Goswami                                                                                    12

colonization" and the latter, as "theory's insubstantial object," is bound to its particularity
and hence its difference from the subject. I argue, however, that it is this antecedent unity
of the subject as subject and the object as object that stands in question.

For Varadharajan, Theodor Adorno is "the figure who incorporates the insights of
poststructuralism without succumbing to its weaknesses" (28). Adorno and Horkheimer
mourn the lack of a true subject, an individual who can consider himself apart from the
whole, and has the ability to act against and resist social and political conditions. In the
*Dialectic of Enlightenment* they seek critical thought that breaks free from the *sensus
communis*. For them, "It is... unity of the collectivity and domination, and not direct
social universality, solidarity, which is expressed in thought forms" (22).

The "disenchantment of the world," premised on the end of metaphysics, mystery,
and mastery of nature or the supersensible world "draws the circle into which the
criticism of pure reason banished thought. Kant joined the theory of its unceasingly
laborious advance into infinity with an insistence on its deficiency and everlasting
imitation. His judgement is an oracle" (26). Functional and calculable subjects are unable
to "dismantle social tutelage" or "to hear the unheard-of with their own ears, to touch the
unappreciated with their own hands" (36).

At root lies the subject of reason. Either the ends that reason pursues are totally
arbitrary, and its power of "critique," its ability to transcend its own assumptions and
already "given" ends, is illusory. Or, it is possible to "think about thought" (25), as there
is some actual faculty apart from a "given" rationality or nexus of possible enunciations
through which the subject can liberate itself. Does reason have the capacity for critical

P80

rather than merely instrumental use? In Kantian terms, is it possible for reason to engage

in two different types of discourse?

The "polarity of subject and object" (ND 174) that has "become the thought form,

and without which there might be no thought" (ND 175) is one manner in which Adorno

engages both the critical and instrumental capacities of reason. I argue that Adorno

anticipates the destabilization of the subject and also examines the peculiar crystallization

of modern power whereby we are rendered more and more functional as we are rendered

more and more capacitated. In other words, for Adorno, as the subject becomes a subject

and performs as subject it is rendered more and more of an object. "It is not true that the

object is a subject, as idealism has been drilling into us for thousands of years, but it is

true that the subject is an object" (ND 179).

The "separation" of subject and object is "both real and illusory" because the

concepts are employed to "express... a coercive development." Yet, "forms of

subjectivity are not cognitive ultimates... cognition can break through them" (ND 187).

In other words, "the... separation must not be... magically transformed into an invariant"

(SO 139). Adorno begins with Kant's radical critique of reason, that is, the subjective

construction of knowledge. Objects are always already objects under description; they

cannot be accessed in any other manner. Yet, for Adorno,

> what defines the prior object as distinct from its subjective trappings is
> comprehensible in the conditionality of what conditions it, in that which in
> turn defines the categorial apparatus it is to be defined by, according to the
> subjectivist pattern. The categorial attributes without which there is no
> objectivity as yet, according to Kant, are posited also, and thus, if you will,
> they are really 'merely subjective'... But since primacy of the object
> requires reflection on the subject and subjective reflection, subjectivity...
> becomes a moment that lasts... subjectivity is grasped as the object's form
> (SO 144).

Namita Goswami                                                                    14

The "foundation of the ideology of the subject," (SO 144) emerges through the denial of

the fact that the "apriori and society are intertwined" (SO 145). In this, Kant's

"transcendental subject" is established at the expense of the "empirical subject" because

"the abstract concept of the transcendental subject — its thought forms, their unity, and

the original productivity of consciousness — presupposes what it promises to bring

about: actual live individuals" (SO 141). In other words, if objects are always already

under description and we have no access to the in-itself, then through what mechanisms

have the cognitive attributes, the in-itself of the mind, been established? The mind to

which the subject turns its gaze is as an object also always already under description.

Cognitive categories mutate into ontology, that is, the functioning of the mind

becomes a moment of its own self-realization and actualization. For Adorno, what

emerges, however, is a narrative whereby the individual founds itself as subject prior to

the social relationship, even though "thought… is a general relation, and thus, a social

one" (SO 142). The ontological problem becomes for Adorno an historical one in that the

subject "itself is to be brought to objectivity; its stirrings are not to be banished from

cognition" (SO 144). The subject must examine critically the "modes of

problematization" that its objectivity enables, the manner in which it is taught to inhabit

the subject-function, and at what cost.

Mindfulness of the "subjective mechanisms of mediation," (ND 171) that is, how

the subject creates objects and becomes present in the "objective," requires our perhaps

forgotten capacity to render ourselves the objects of our own critical enquiry. Our

"passivity" is our willful participation in the means of our own domination, the "object's

Namita Goswami                                                                                  15

objective determination" (ND 188). We are asked to use the "strength of the subject to

break through the fallacy of constitutive subjectivity" (ND xx), to "act as subjects... as if

something depended on our actions" (MM 15). Hence, "If one wants to reach the object,

on the other hand, its subjective attributes or qualities are not to be eliminated, for

precisely that would run counter to the primacy of the object" (SO 143). The primacy of

the object entails that the subject, recognizing itself as object, recognizes what it has

imparted to the object.

The individual can either be the node or module through which the *sensus*

*communis* propagates itself, such as the "lie" of the "original state of happy identity

between subject and object" (SO 140). Or, the individual can no longer remain

spellbound and alienated from himself, no longer consoled by either "the exaltation of

his mind" (SO 141) or the "sense of identity" that claims that to "be undifferentiated"

is to be "one" (SO 140). Indeed, "Nothing but the social self-reflection of knowledge

obtains for knowledge the objectivity that will escape it as long as it obeys the social

coercions that hold sway in it, and does not become aware of them. Social critique is

a critique of knowledge, and vice versa" (SO 143).

In other words, "To give the object its due... the subject would have to... free

itself as a subject. It is... subjectivity rather than objectivity [that] is indirect, and this sort

of mediation is more in need of analysis than the traditional one" (ND 171). For Adorno,

the "state of reconciliation" implies "neither the undistinguished unity of subject and

object nor their antithetical hostility" but "rather, the communication of what was

distinguished." Through this, "the concept of communication, as an objective concept can

come into its own." The "state of distinctness without domination, with the distinct

participating in each other" (SO 140) will release the "human consciousness" (ND 17).

This involves not the articulation of an ontology that yields certitude but the "historic

forms of problems" (ND 17) that will unleash capacities and forgotten strengths that the

subject can call upon. It will also enable continuity whereby one age does not necessarily

constitute a break from the next. Nor does one historical present simply entail the desire

to create something new. It is the recognition, so important for Kant, that responsibility

for one's own maturity, and the courage to use one's own understanding, is responsibility

towards those generations that will follow.

Race, class, gender, and sexuality, are not necessarily a corrective nor necessarily

*better* able to account for the dynamics that enable the constitution of the knowing

subject. The emphasis on particularization often renders the subject more functional as it

renders it more transparent; the subject becomes ontologically bound to categories of

identity that are itself historical. The ontological impulse emerges through the privileging

of gender, race, class, ethnicity, and sexuality, among other categories of identity, to

arrive at ontology by another route, albeit a more tortuous and circuitous one. Are race,

class, gender, sexuality, nationality, etc. to take their place alongside reason in the

repertoire of identity categories that are also analytical categories? Or, do these categories

of identity reveal the nature or identity of reason itself?

Adorno admits that there may be "no remedy" but "steadfast diagnosis" of oneself

and the attempt to "deny oneself the ideological misuse of one's existence." Negative

dialectics forms "a perennial method of criticism, a refuge for all the thoughts of the

oppressed, even those unthought by them… Its truth or untruth, therefore, is not inherent

in the method itself, but in the intention of the historical process" (MM 244). Feminism

becomes one diagnosis among many; gender is one ideology among many. It has no

privileged position; it cannot be the "unified theory of oppression" that Angela P. Harris

hopes for it to become. In spite of hyper-technological and hyper-military advancement,

more than two centuries after the competition that Kant did not, in fact, win, the question

of what it means to think freely still stands unanswered.

I place postcolonial feminism in conversation with Kant's understanding of

enlightenment because I argue that despite the discursive clamor to denaturalize and

destabilize identity categories, when it comes to their use, they become an ontological

experience even if they are not ontological categories. In the discursive regime of the law,

for example, by belonging to the category "woman," women can be expected to undergo

certain experiences. In the language of women's rights, choice, and autonomy, Kanwar,

deprived of choice, was forced to die. Autonomy and choice were once hers. Or, Kanwar,

replete with choice, willingly chose to die. Hindu religion, patriarchy, and the

postcolonial state are the stage where women's autonomy and women's lack are

performed. Sati purportedly can only occur through the presence of the divine goddess,

either through actualization of an implicit divinity as good wife or through the goddess

spirit's actualization (Hegel) in the body of the good wife. The goddess enters the good

wife and no other; the woman can receive the goddess because she is the good wife. She

becomes sati and actualizes her implicit ontology; she commits sati and actualizes her

implicit ontology. Her autonomy is inviolate.

Paul Courtright describes his visit to Deorala thus:

There was a sense of both forgetting and remembering at that place. There
was the India that wanted to forget that Roop Kanwar ever happened,
bursting in like a ghost from a pre-colonial past; and there was an India

that wanted to remember the heroic days when, as one Rajput retired military officer once told me, "Yes, in those days of Rajput kings, before British times, before independence, those women who became *satis*, they knew how to die like men." The longing for heroic presence in a post-heroic age, the longing for orders of gender separation and specificity in a post-gendered age, and the longing for an unambivalent sense of what it means to be Indian in an age of multi-national Indianness, those longings hung over the abandoned but guarded cremation ground in that out-of-the-way but immortalized place called Deorala (RPLSI 224).

Who was Roop Kanwar? I do not know. Adorno emphasizes, "By no means is the course of society anywhere as anarchic as it appears in the accidental and always irrational form of an individual fate." The attitude of modernity is not the "calculability of the world," the "calculability of the individual," or the "impossibility of uncalculating love" (Adorno). Instead, the blessing of our capacity to think of personhood and place recognizing themselves as mutually recognizing one another (Hegel), and the curse of it being always the elsewhere but not-yet caution us to envision a freedom that matters. To be a subject is to be perpetually and necessarily subject to question. The subject in question is the subject as question. Can we truly ask the question of ourselves? For Adorno, "True thoughts are those alone that do not understand themselves." We are both authoritative and authorized; or, as Judith Butler emphasizes, a foundation will always be accompanied by a foundering. How do we negotiate our own intelligibility without creating what Nietzsche calls our "longest lie," that is, that redemption and safety are on their way? Do we find lives we can live with, and reasons we can reason with, at least most of the time, with hope that fragments of our preoccupations will remain for those subjects that come to pass after we are gone (Corcoran)? Look if you like but you will have to leap (Auden).



**DePaul**

Department of Philosophy

TO: Members of the Tenure Appeal Board for
     Dr. Namita Goswami
FROM: Mary Jeanne Larrabee, Professor of Philosophy
     Director of the Peace, Justice, & Conflict Studies Program
     Vincent de Paul Professor
     Honors Program Distinguished Professor
DATE: October 1, 2010

You are considering Dr. Goswami's appeal of the denial of tenure by the President of DePaul, based on the recommendation of the University Board on Faculty Promotion and Tenure (UBPT). I understand that Dr. Goswami's appeal is on two grounds–that there was a violation of her academic freedom and that there was a review process, at all levels, that lacked integrity, that is, was inconsistent with the Faculty Handbook.

The first issue, the violation of Dr. Goswami's academic freedom, is a difficult issue to raise at this point, since it played no explicit role in her tenure request and the accompanying documents. The hopes of those who supported her, both the sizeable minority in her department and all those voting in the college-level deliberations (five of five members of the College Personnel Committee and the dean), rested on a clear articulation of the well-documented strong qualifications in all three areas under consideration and of several strategies for pointing to a long and complex series of procedural irregularities with the department reviews of Dr. Goswami in at least the time between her final pre-tenure review in May 2009 and the departmental tenure review in January 2010.

I will first point out why I think that the action of the UBPT, along with the subsequent acceptance of a single evaluative judgement from the UBPT, with its vote, by the President, is itself a continuation of this series of procedural irregulatiries. I will then address the issue of academic freedom.

In his recent memo to Phil Funk, Faculty Council President, dated 09/24/2010, Provost Helmut Epp attempts to clarify the role of the UBPT as it is stated in the Faculty Handbook, arguing for the role of the UBPT in making a substantive review where they so wish:
     The university-level review [by the UBPT] is a substantive review and it can only be done at the university level, where the strength of all of the tenure candidates' applications are viewed against each other. . . .

2

He also notes that the UBPT has the responsibility to review lower level decisions concerning significant deficiencies "in matters of stringency, consistency, and fairness."

The job you have as Review Board members is to review the process used by UBPT and the President to reach their decision, not in respect to their application of the Philosophy Department's substantive criteria, but in respect to the process used by the UBPT. I would argue that the UBPT and the President failed to take under serious advisement the accounts of unfairness and inconsistency in the process and judgements exercised by the majority block in the Philosophy Department, both as these appear in the majority's odd construals of Dr. Goswami's credentials and as these were clearly spelled out in the minority reports from the spring 2009 formal review of Dr. Goswami and the January tenure review meeting, as well as in the report of the College of Liberal Arts and Science dean and Personnel Committee.

Further, since part of the UBPT's charge, as noted in the above citation, is to view all of the tenure candidate's applications against each other, it is difficult to understand how the UBPT could have seriously done this comparison with respect to the two candidates from Philosophy. Dr. Goswami and her colleague received such vastly different reports from the department's majority even though there were substantive differences in the two records, with a balance in favor of Dr. Goswami (a teaching award vetted by faculty peers, a contract from a major press in their Philosophy series for a completed manuscript initiated three years before, and service ranging from chairing a committee in an organization highly important to the Philosophy Department, to getting funding for a research conference, and to serving in several units within DePaul), as compared to the colleague's lack of award, no contract for a revision of his dissertation, and service primarily in the Department. If these two reports from the Department had been read side-by-side and the resumes of each read side-by-side while reading the report, anyone would have been hard put to understand how such somewhat similar records of teaching, research, and service (with an objectively viewable slant toward Dr. Goswami's record) would receive such vastly different evaluations as expressed in the two reports. The report on Dr. Goswami seemed to take it upon itself not only to mention briefly the strong points of her record (delivered by the voices of the minority voters) but to use appreciable text to undermine that record, to cast aspersions on the letters of outside readers, and to re-define both her job description for which she was hired and the very nature of philosophy and philosophical texts in contrast to how the Department has historically understood these.

To discount the reports by the Philosophy minority voters and the College Curriculum Committee and dean and to justify their conclusion by referring to Dr. Goswami's scholarship as insufficient, thus reflecting the Philosophy Department majority viewpoint, makes the votes of the UBPT and the action of the President complicit in the racism that informed some of the majority's position in regard to Dr. Goswami's qualifications. So I will move to the second ground for appeal, the limitation of Dr. Goswami's academic freedom.

3

This undertaking by key members of the Department majority was motivated by racism (at least on the part of some members), a racism that expects certain things of those who are "other" in key respects in distinction from those who accepted as members of the in-group, the tribe. Dr. Goswami is "other"–she was hired as such, that is, as a faculty member from India who could teach post-colonial thought, drawing on perspectives of feminism and continental thinkers. She never deviated from that assignment in respect to the demands on her teaching and research, but she did deviate from the expectations of her being "other." To begin with, she did not display to the chair who was in support of hiring her the appropriate gratitude for her being hired; I have heard such comments from that now ex-chair concerning Dr. Goswami. This type of expectation, of behavior not documented in policies but only vaguely included under "collegiality" in the mind of some, is differential–in this case, expected of someone "other," a non-citizen from a "third-world" country, especially a woman, and not from the middle-class white male colleague. Its underlying tones are racist, sending mixed signals to a faculty member on what will serve as the basis of evaluation: "collegial" behavior or professional qualifications. These mixed signals are meant to tamp down certain types of behavior, including speech, and thus abridge academic freedom to speak one's mind, in this case, particularly about viewpoints that criticize racism in our culture. In line with this point, I have heard that ex-chair upbraid Dr. Goswami for making claims that were "too radical" for the public space of DePaul, I saw her in the first formal review of Dr. Goswami abridge her record of scholarship in the report sent to the dean, an action repeated in the next merit review. These limitations on Dr. Goswami's speech are instances of her academic freedom being limited.

Although the term "racist" is used nowhere in the minority and College reports that supported Dr. Goswami's application for tenure, it is clear that some underlying bias or prejudice is at work in the majority's statements concerning Dr. Goswami. My own minority report challenged the majority report's attempts to undermine the credibility and acceptability of Dr. Goswami's teaching and research by recasting both of these as non-philosophical and thus of insufficient quality. This point returns me to the first ground for this appeal–the procedural aspect as displayed both by the majority voters in the Philosophy Department and the UBPT. To have the UBPT seemingly uncritically accept the unsuitability of Dr. Goswami's research on the slim grounds the majority report provided (insufficiently philosophical and lacking the appropriate language skills), despite two positive letters from outside reviewers (one of whom considered one of the finest critical race scholars in the U.S.) indicates that the Board may not have done their job with the required "stringency, consistency, and fairness" demanded of all members in this tenure process, including them, nor have they really viewed "the strength of all of the tenure candidates' applications . . . against each other," particularly the two candidates from the Philosophy department. My charge here is not that the UBPT should not have carried out a substantive review of Dr. Goswami's qualifications, but that having done so they have not proceeded with regard to all the information in front of them, glossing over the strong evidence of bias in at least the proceedings during the January 2010 tenure review and those for her final pre-tenure review in May 2009, when the ex-chair functioning as interim chair thought it

4

appropriate for a Personnel Committee to recommend that the dean cancel Dr. Goswami's contract for 2009-10, one granted her after a positive fourth year formal review in spring 2008 and one following the Faculty Handbook.

To return to the ground of academic freedom, the UBPT ignored the fact that a re-framing of philosophy into a narrow construal that objects to the texts that Dr. Goswami selects is an abridgement of her academic freedom. It is also a biased re-framing because it is one specifically selected and phrased so as to impugn Dr. Goswami's credibility as a philosopher, one never used before within the department, where others teach the same or similar texts (e.g., in Greek and Modern/Contemporary Philosophy) and have received no criticism. This limitation is even in direct contradiction to the way the Department has conceived itself in the past three decades, as centrally inclusive. We have hired people with degrees that are not from Philosophy Departments because they are seen as doing the type of philosophy that is open to interdisciplinary work (twice a person with a Humanities degree). Dr. Goswami was explicitly hired within this broad framework and conducted her teaching and research throughout her pre-tenure period with no objections from anyone concerning the content of her courses. To demand a limit of the texts in her philosophy courses, where these are considered appropriate for the courses they are used in by philosophers both inside and outside DePaul, is an abridgement of her academic freedom.

Given the objective strength of her record on all counts and in comparison with her Philosophy colleague up for review in 2010 with her, the Department had to find seemingly serious problems to offset that objective strength. To attack her as somehow insufficiently philosophical is a ploy that disguises an increasing suspicion in the Department over "other" philosophies (we are three years without an Africanist to replace a lost colleague and will not advertise for one in the next job search). To attack her credibility as a writer and in fact to comment on her unreflective failure to understand her total inadequacy as a writer (comments couched in wondering why she is still in a classroom and not in a mental ward), is a display of prejudice, if not extreme dislike. To shut her up so that she can no longer train DePaul undergraduates and graduate students in the complex issues of race, especially of the post-colonial persons, many of whom are now part of DePaul as students and faculty, is the most efficient way to prevent further criticisms of the normative center of the Department, in which there is also a history of contention over bringing in graduate students and hiring and tenuring faculty who are capable of speaking such criticisms and directing them at the department (this majority also had difficulties with another critical post-colonial faculty member).

I am sure that Dr. Goswami will document other instances in which she was silenced in these two ways, either as a request to stop making critical remarks about the bias she discovered, both directed against her personally or endemic to institutions surrounding her, or as more subtle indications of differential expectations of her, including the double-bind that is both an expectation that she not do well as her career moved on (the racism that assumes we can hire

5

persons of color, but we can't expect them to meet our expectations) and the requirement that she outperform colleagues at the same level (we can't really value her work unless it is extraoardinarily better than anyone else at this level). This double-bind is documented in now decades of academic research on the performance and evaluation of persons of color, including in academia. The double-bind is racist in outcome, although it might not be articulated consciously by those imposing it. Dr. Goswami was subject to this racism. Those working years under such racism are subject to the subtle demand not to say what they need to say--and this is then a violation of their academic freedom.

Thus, the racism has functioned in both sides of Dr. Goswami's appeal, both in the failure of the integrity of processes leading to the recommendation of the Philosophy Department majority and that of the USPT, as well as the decision by the President, and in the abridgement of Dr. Goswami's academic freedom both in specific remarks and in the undermining of her professional legitimacy in selecting texts and working as the philosopher she was hired to be.

P2539

# INTEROFFICE MEMORANDUM

**TO:**      PHIL FUNK, FACULTY COUNCIL PRESIDENT

**FROM:**    HELMUT EPP, PROVOST

**SUBJECT:**  PROMOTION AND TENURE APPEALS

**DATE:**    SEPTEMBER 24, 2010

I am writing this memorandum because I am aware that unsuccessful tenure applicants have appealed their tenure decisions on the grounds that the evaluation of the candidate was not in accord with the policies and procedures set out in the Faculty Handbook. I hope that it will provide the faculty Review Boards with additional guidance as they begin their work hearing faculty tenure appeals.

## Introduction

Any faculty Review Board considering a faculty appeal of a negative tenure decision must look to the Faculty Handbook for guidance. I write this memorandum because I am concerned that unsuccessful tenure applicants may, through a selective reading of the Faculty Handbook, have an overly expansive view of the scope of a Review Board's review of negative tenure decisions. Accordingly, I have summarized below key aspects of the tenure procedures that, I believe, are often overlooked by faculty members appealing a negative decision. I would ask that all Review Board faculty members be made aware of these points before they begin their deliberations.

## Key Provisions of the Faculty Handbook

### 1. The Faculty Handbook Limits the Grounds for Appeal.

First and foremost, the Faculty Handbook specifically limits the grounds for appeal of a negative tenure decision to the following two procedural points: (1) that the faculty member's academic freedom was violated by the dismissal itself; or (2) that the evaluation of the candidate was not in accord with the policies and procedures set out in the Faculty Handbook. (Separation, Appeal Procedure for Nonrenewal of Nontenured and Tenured Track Faculty.)

The Faculty Handbook does not permit the Review Board to inquire into whether the process by which the decision was made applied inappropriate criteria or applied appropriate criteria unfairly or failed to meet reasonable standards of thoroughness. (Separation, Appeal Procedure for Nonrenewal of Nontenured and Tenured Track Faculty.) To do so would invite a Review Board to substitute its own decision for that of the Board. The Faculty Handbook does not allow for such a result. Nor should it. A tenure decision is the culmination of careful review and deliberation by faculty at every level of the university. Such a decision should not be overturned

P5302

on substantive grounds by an ad hoc Review Board authorized only to review the record and ensure that the candidate enjoyed the benefits and protections of the Faculty Handbook processes.

Indeed, the Faculty Handbook appeal process is concerned only with protecting academic freedom and the integrity of the tenure review process. Unless a Review Board is convinced that academic freedom has been violated or that the procedures were inconsistent with the Faculty Handbook, it must accept and affirm the tenure decision.

### 2. *The Faculty Handbook Authorizes the Board to Evaluate Tenure Candidates.*

A common argument made on appeal is that the Board substituted its own judgment for that of the sponsoring department or school. The argument that the Board improperly substituted its own judgment incorrectly suggests that the Faculty Handbook precludes the Board from conducting a substantive review of the candidates' applications. The Faculty Handbook language repeatedly makes it clear that this is not the case.

*First,* the Faculty Handbook specifically states that the Board shall have the following responsibilities:

1. to apply current university-wide standards and criteria for tenure and promotion;
2. to review: a) the candidates' application and supporting materials, b) recommendation from prior levels, and c) the application of departmental and/or college criteria to the candidate;
3. to recommend action for tenure and/or promotion of the candidate;
4. to review college/school guidelines and criteria to ensure consistency with stated university expectations as well as reasonable application of these criteria to the evaluation of faculty members.

(Evaluation of Faculty, Procedures and Timetable for Promotion and Tenure, University Board on Faculty Promotion and Tenure.)

In item number 1, the Faculty Handbook explicitly authorizes the Board to apply university-wide standards and criteria for tenure and promotion. This responsibility is separate and apart from the Board's obligation, in item number 2, to review lower level recommendations and the application of lower level criteria. This language clearly authorizes the Board to make independent evaluations of the tenure candidates and contradicts any argument that the Faculty Handbook limits the Board to reviewing the lower level recommendations.

*Second,* the Faculty Handbook specifically authorizes each level of review, including the university level, to review critically the lower level decisions. It states that each level "shall consider the method and care of application of the approved standards by the lower level unit(s), including matters of stringency, consistency, and fairness, in addition to any unusual implications the decision may have at the college/school or university level." (Evaluation of Faculty, Promotion and Tenure Review, General Criteria.) This section makes it clear that subsequent levels may evaluate a candidate's application both (1) to assess the application of standards by the lower level, *and* (2) to assess the decision itself at the higher levels.

Moreover, the Faculty Handbook states that the higher level may make their own application of the lower level substantive criteria only when the lower level decisions are deficient in significant

2

respect, such as in matters of stringency, consistency, and fairness. However, the Faculty Handbook places no similar limits on the higher level when assessing the unusual implications the decision may have at the college/school or university level. (Evaluation of Faculty, Promotion and Tenure Review, General Criteria.) Nothing in this language precludes higher levels from both reviewing the prior level decision and making a decision based on higher level concerns and considerations. Indeed, this is entirely consistent with the Board's separate authority to apply university-wide standards and criteria for tenure and promotion.

*Third*, the Faculty Handbook details the factors the Board should consider when conducting its substantive review of a candidate's application. It charges the Board with deliberating and considering the desired range of:

- combinations of teaching and learning; scholarship, research, and/or other creative activities; and service,
- the variety of roles through which faculty members serve the institution,
- the differing needs of the individual units,
- the institutional demands made on faculty, and
- the varying levels of support available to faculty members in different units for these various activities.

(Evaluation of Faculty, Promotion and Tenure Review, General Criteria.)

The university-level review thus clearly contemplates that the Board assess a candidate's scholarship, teaching, and service. Although the Faculty Handbook notes that the tenure candidate's peers are assumed to represent the university's best expertise in the relevant academic field, it also characterizes this evaluation as "initial" and "basic." (Evaluation of Faculty, Promotion and Tenure Review, General Criteria.) The Faculty Handbook requires that the university level review go beyond this initial and basic evaluation and "project the probable future performance of the faculty member in these areas as indicated by accomplishments and efforts during the probationary years." (Evaluation of Faculty, Promotion and Tenure Review, General Criteria.) This is a substantive review and it can only be done at the university level, where the strength of all of the tenure candidates' applications are viewed against each other and the university-wide desired range of considerations listed above.

Simply put, the frequently repeated suggestion that the Board may not overturn lower levels on questions of scholarship, teaching, or service cannot be reconciled with clear language in the Faculty Handbook. The university-level review includes the application of current university-wide standards and criteria for promotion and tenure.

*3. The Burden of Proof Rests on the Complaining Faculty Member.*

Finally, the Faculty Handbook also makes it clear that a decision to deny tenure stands unless a faculty member can establish a violation of either academic freedom or process. (Separation, Appeal Procedure for Nonrenewal of Nontenured and Tenured Track Faculty.) It is not enough for a complaining faculty member to make an argument that tenure could have been granted or that the faculty member made contributions to the university during his or her probationary period or that his or her scholarship is in some way significant or unique. Rather, the complaining faculty member must *establish* a violation of academic freedom or a violation of the policies and procedures set out in the Faculty Handbook.

3

It is important to remember that most tenure candidates come before the Board with – at a minimum – a plausible case for tenure. Every faculty member who completes the probationary period and secures the support of his or her department or school should be proud of these accomplishments. A denial of tenure is not a denial of those accomplishments. Rather, a denial of tenure reflects the university's measured conclusion that, on balance, the candidate does not have a record of scholarship, teaching, and service sufficient to warrant a lifetime, tenured association with DePaul University. In some cases, reasonable minds may differ as to whether the standard has been met. But it is not up to the Review Boards to assess whether the correct decision was made. The Review Boards can only determine if a complaining faculty member has met the burden of establishing a violation of academic freedom or a violation of the Faculty Handbook.

## Conclusion

If the Board overturns a lower level decision, it may be because the Board found flaws in the method and care of application of the approved standards by the lower level unit(s), including matters of stringency, consistency, and fairness, or because the candidate did not meet university-wide standards and criteria for promotion and tenure, or both. A faculty member who has been denied tenure cannot reverse that decision simply by arguing that the "wrong" result was reached at any level – department, college/school, or university. Rather, the faculty member must establish a violation of the policies and procedures set out in the Faculty Handbook. As the above discussion demonstrates, nothing in the Faculty Handbook precludes a substantive review of the tenure candidates' scholarship, teaching, and service at the university level. And nothing in the Faculty Handbook requires that the Board accept without question the lower level recommendation. To the contrary, it requires a critical review of the lower level and an independent substantive recommendation at the higher level. Accordingly, an unsuccessful tenure applicant may not successfully base an appeal on the contention that the Faculty Handbook was violated because the school/college or university-level reviews reached a different result than the lower level review. Rather, an unsuccessful tenure applicant must present facts demonstrating that tenure process steps and procedures listed in the Faculty Handbook were not followed. This is a matter of process, not of end result.

P5305