**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NAMITA GOSWAMI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12 C 7167** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **DEPAUL UNIVERSITY,** | ) | |
| **PEG BIRMINGHAM, and** | ) | |
| **ELIZABETH ROTTENBERG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

### INTRODUCTION

Namita Goswami was a professor at DePaul University for eight years until the University denied her application for tenure and terminated her employment. She claims that this was motivated by a number of discriminatory motives: gender, race, color, and national origin. (*Amended Complaint*, ¶ 1). She claims it was retaliatory, as well. She also claims that, in denying her tenure, DePaul didn't go by the book, in this case the Faculty Handbook, which set out the procedure by which professors were to be reviewed and considered for tenure. DePaul claims the decision to deny tenure was motivated by the poor quality of plaintiff's scholarship. The University has moved for summary judgment on plaintiff's claims.

The parties have amassed a leviathan of a record, spanning some 3,000 pages of exhibits. Briefs account for another 250 pages of material, and Local Rule 56.1 statements provide another 500 or so pages. The lion's share of that comes from DePaul, which, of course, has the burden of demonstrating that there is no genuine issue of material fact requiring a trial. Fed.R.Civ.P. 56;

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Moultrie v. Penn Aluminum Intern., LLC*, 766 F.3d 747, 751 (7ᵗʰ Cir. 2014). Ordinarily, under the local rules, a party is restricted to a factual statement of no more 80 *short* paragraphs. DePaul asked for and received 350, but in the end, produced a submission of 160. Plaintiff responded to each of those factual assertions and added another 159.

While it's not always the case that an unwieldy record and a mass of factual assertions mean that there must be a genuine issue of fact somewhere, *see, e.g., U.S. ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818 (7ᵗʰ Cir. 2011)(affirming grant of summary judgment in *qui tam* action concerning the sale and financing of 40 F-16 fighter jets to the nation of Greece, a deal that spanned seven years and cost more than $600 billion), that's often the result.[1] As the Seventh Circuit said in *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 417 (7ᵗʰ Cir. 2000), a discrimination case with a comparable record, but involving not one, but more than 50 plaintiffs, "[w]hile we appreciate the herculean efforts the district court made to wade through the voluminous materials on summary judgment that both sides presented, we conclude that the plaintiffs presented enough evidence to withstand the defendants' motions." *Id*. at 417.

. In light of the emotional pitch of the parties' presentations, it is appropriate to emphasize at the outset that this is a summary judgment proceeding, not a trial, and nothing contained in this Opinion should be construed as expressing any view on the merits of the case. For the reasons that follow, that determination will have to be made by a jury, which will be able to assess the witnesses' demeanor—a critical component of any credibility determination – and will have the benefit of an

---

[1] Despite the complexity and scope of a case like *Yannacopolous*, the size of the record amassed on summary judgment did not quite match the one the parties have put together here.

adversarial, evidentiary presentation in which the witnesses will be subject to cross-examination, that indispensable adjunct to the ascertainment of truth.[2]

## I.

## A.

It should be noted that it is not the volume of the materials that made the task of review here nearly impossible, but the structure of the parties' Local Rule 56.1 submissions. The local rule was designed to streamline the resolution of summary judgment motions. *Chelios v. Heavener*, 520 F.3d 678, 687 (7th Cir. 2008); *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 818 (7th Cir. 2004). On the one hand, the rule is meant to ensure that judges don't have to sift through the record to uncover material factual disputes. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir.1994). On the other, it forces attorneys to take a hard look at their case and present their positions in an organized fashion. *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).[3] After all, "[a]n advocate's job is to make it easy for the court to rule in his client's favor . . . ." *Dal Pozzo v.*

---

[2] Demeanor, tone and inflection can be important components of the decision whether to believe a witness. *Anderson v. Bessemer City,* 470 U.S. 564, 575 (1985); *Coleman v. Lemke,* 739 F.3d 342, 352 (7th Cir.2014); *United States v. Garrett*, 757 F.3d 560, 568 (7th Cir.2014). Indeed, "the demeanor of a witness...may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 408 (1962). Of course, this does not mean that disbelief of a witness is a substitute for proof. It is not. *Cf., Moore v. Chesapeake & O. Ry. Co.,* 340 U.S. 573, 576 (1951); *United States v. Zeigler,* 994 F.2d 845 (D.C.Cir.1993).

[3] The local rule pertaining to summary judgment – its original incarnation was as Local Rules 12(e) and 12(f) – was promulgated in the era of *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) and *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 254 (1986), Supreme Court rulings that had the effect of making summary judgment under Fed.R.Civ.P. 56 a more popular tool in case resolution than it had been previously. Without such a rule, summary judgment proceedings were little more than document dumps, with lawyers collecting the mass of data obtained through discovery and asking the judge to make sense out of the chaos.

*Basic Machinery Co., Inc.*, 463 F.3d 609, 613 (7th Cir. 2006). And yet, DePaul challenged the court to "scour the voluminous record." [Dkt. #162 at 9].

Under our Local Rule 56.1, a party moving for summary judgment ordinarily must file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to a judgment as a matter of law." N.D. Ill. L.R. 56.1(a)(3). The statement must "consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." N.D.Ill. L.R. 56.1(a)(3). The party opposing summary judgment must file a "concise response" to each numbered paragraph, along with any additional facts it feels preclude the entry of summary judgment. Again, each paragraph must be supported with specific citations to the record. N.D.Ill. L.R. 56.1(b)(3). "If parties fail to comply with local rules, they 'must suffer the consequences, harsh or not.'" *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Petty*, 754 F.3d at 420.

The parties did file statements and responses including citations to the record, but they repeatedly missed the mark. For the sake of brevity, only a few examples of the failures will be highlighted. At the heart of this case are the reviews plaintiff had to undergo as a tenure track professor. There seemed to have been two or three each year, called merit reviews or informal reviews or probationary reviews. DePaul's statement of facts contains numerous quotes from these reviews, as well as from emails and letters and self-evaluations. One would naturally expect that, in each case, DePaul would cite to the review itself. And so, the judge reads a quote, is directed to the review in question, and can check the accuracy of the quote and peruse the review for an idea of

4

context and overall tone.  But that's not the way DePaul's briefing proceeded.

**B.**

We begin with the posting for the position for which the plaintiff was hired.  In paragraph 15 of its statement of facts, DePaul quotes from that posting.  (Dkt. # 160, ¶15).  Surprisingly, though, it does not merely cite to the job posting in the record, but to five separate pieces of evidence, including snippets of deposition testimony – plaintiff talking about the announcement and her husband having written "jobs for philosophers" on it – and Professor Birmingham's Declaration in which she says that DePaul was looking to hire a tenure track professor.  These sorts of superfluous citations would not be significant standing alone. But DePaul pursued this course throughout its briefing.

Recall that DePaul was allowed to file an expanded statement of facts with more than triple the number of assertions allowed under the local rule.  So even if DePaul kept it to four extraneous citations per paragraph, a judge would have to refer, back and forth, to more than 1000 separate pieces of evidence to go through DePaul's Local Rule 56.1 submission.  But DePaul didn't keep it to four.  At paragraph 25, for instance, DePaul states that, on plaintiff's "2003 Annual Merit (Salary Adjustment) Review" or "Calendar Year 2003 Merit Review" – DePaul seems to use the titles interchangeably – Professor Birmingham gave plaintiff an overall rating of "very good."  (Dkt. # 160, ¶ 25).

This simple fact is supported, not by a simple citation to the review as it should have been, but to five other pieces of evidence as well, including deposition testimony.  The deposition testimony consists of plaintiff and Professor Birmingham saying, yep, that's the review.  But to assure it's nothing more than that – nothing *material* like the local rule requires it to be – each page

of transcript and document has to be consulted in turn. Things tend to escalate as one proceeds through DePaul's statement of facts. Paragraph 29, for example, is nothing more than a block quote from another review, but it is supported by citations to 12 separate pieces of evidence. (Dkt. # 160, ¶29). So is the block quote in paragraph 30. (Dkt. # 160, ¶30). And so is the block quote in paragraph 31 (Dkt. # 160, ¶31), which does not cite the review itself until it finally refers the court to Professor Birmingham's Declaration, which in turn refers to the actual review as an exhibit attached to that Declaration. (Dkt. # 160, ¶ 31).

So, one must thumb through page after page of evidence – nearly 50 pages of evidence – before arriving at the "specific reference." After all, that's what the local rule requires, a *specific* reference that "support[s] the facts set forth in that paragraph." Specific references are few and far between in DePaul's Local Rule 56.1 submission. Not once in any paragraph in DePaul's statement of facts does DePaul cite to a specific page of any multiple page document, even though the local rule was designed to relieve judges of the chore of sifting through reams of pages of evidence to locate support for a party's assertion.

These paragraphs are but a few examples to illustrate the format of nearly the entire submission. The block quote in paragraph 30 is supported by citation to 36 pages of evidence spread more than seven different exhibits. (Dkt. # 160, ¶ 30). The quote is from plaintiff's self-evaluation for 2004. In her Declaration, Professor Birmingham states that she relied on the self-evaluation to write her review, but the quote set forth in paragraph 30 is nowhere to be found in the self-evaluation Professor Birmingham claims she relied upon. (Def. Ex. 99, Ex. B). This underscores the fact that the court cannot simply glance at the multiple citations DePaul provides, because there is no guarantee that the fact DePaul is asserting is supported by any evidence at all.

The list goes on and on.  Incredibly, the simple assertion that Professor Birmingham rated plaintiff's research as "good" in paragraph 33 is said to be supported by 10 pieces of evidence.  (Dkt. # 160, ¶ 33).  One must sift through 23 pages of evidence to find the "good" rating.  The block quote from a review in paragraph 36 is supported by citation to 24 full pages of deposition testimony, snippets from nine other pages, and three exhibits.  (Dkt. # 160, ¶ 36).  A line of testimony from Professor Birmingham that is quoted in paragraph 39 is supported by citation to five pages of deposition testimony.  (Dkt. # 160, ¶ 39).  The block quote from an email Professor Birmingham sent to plaintiff that is also set forth in that paragraph requires reference to seven pages of deposition testimony from both Professor Birmingham and plaintiff.  (Dkt. # 160, ¶ 39).  Paragraph 41 is another block quote from another review, and it requires citation to not just the review, but another 18 pages of deposition testimony and 4 exhibits. (Dkt. # 160, ¶ 41).

Still, these examples are nothing compared to a paragraph like Paragraph 95.  All it is is a block quote from the Philosophy Department's report on tenure, but DePaul cites to 68 pages of evidence spread across 11 separate exhibits.  (Dkt. # 160, ¶ 95).  Whether the quote is accurate or not is any one's guess, because DePaul has not provided a specific page number from whatever exhibit it may have drawn that quote from.  The suspicion is that it likely can be found in either exhibit 51 or 99, but even so, that's 36 pages to sift through. A court is not required to scour the record to find evidentiary support for factual assertions the lay buried under multiple layers of information. *See Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l Inc.,* 533 F.3d 555, 562 (7th Cir.2008)("The district court cannot be expected to search through the entire record for evidence that may support a party's contentions....");*Qualls v. Cunningham,* 183 Fed.Appx. 564, 567 (7th Cir.2006) (the district court is

not required to "scour the record" in search of factual disputes or evidence in support of evidentiary representations); *BI3, Inc. v. Hamor* 2011 WL 1231156, 2 (N.D.Ill.2011)(summary judgment does not require the court to engage in a treasure hunt); *Kornely v. Carson's Ribs of Deerfield, Inc.*, 2000 WL 1788348, 2 (N.D.Ill.2000)(same). *Compare*, *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th Cir.1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.").

## C.

Many more examples could be given, but this sampling is sufficient to make the point. With 160 asserted facts spread over 56 pages, scouring 5 or 10 or 20 or 68 pages for each paragraph is a herculean task indeed. It is exactly what the local rule was designed to eliminate. The rule demands that the paragraphs be "short," that citations be "specific", and that those citations support the fact asserted in the paragraph. N.D.Ill. L.R. 56.1(a)(3). In paragraph after paragraph, the citations are not specific and often do not even support the fact asserted, and this is not a case like *Harmon v. OKI Systems,* 115 F.3d 477, 481 (7th Cir.1997), where the error is not harmful to analysis because the motion provided ample and ready notice of the easily determinable facts. And DePaul's local rule submission falls far short of the one reproved in *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004), where the court reminded parties that the rule requires:

> a specific reference to the affidavit or other part of the record . . . Citations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate. A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity. *See Waldridge*, 24 F.3d at 922 ("[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions."); *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989) ("A district court need not scour the record to make the case of a party who does nothing.").

368 F.3d at 817-18.

In *Ammons*, only two of the offending parties' paragraphs were supported by citations to multiple-paged exhibits. Here, nearly every one of the 160 is. DePaul's submission is not faithful to the local rule, and on that basis alone, its motion can be denied. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013).[4]

## D.

We do not mean to be critical of DePaul's exceptionally able counsel. The problem discussed above is not unique to this case; it is a recurring one, as the sampling of cases cited above shows. *See also, International Union of Operating Engineers v. Hobart Crane Rental, Inc.* 2009 WL 1191443, 8 (N.D.Ind.2009).[5] But the fact remains that the manner in which the motion for summary judgment is crafted has made it too problematic for the court to say with the necessary degree of confidence that there is no genuine issue of material fact precluding summary judgment. For example, the record that the court has been able to organize and review shows that the performance

---

[4] This discussion does not even touch on DePaul's reply to plaintiff's statement of facts. Under the Local Rule, such replies must be "concise." N.D.Ill. L.R. 56.1(a). But DePaul's reply to plaintiff's paragraph 15 is over 4 pages long. (Dkt. #179, ¶ 15). Dozens of other replies are 1 to 2 pages in length, and almost all cite not to specific parts of the record, but to multiple exhibits and multiple pages.

[5] In *Hobart Crane Rental*, the court said:

The court's task of digesting the exhibits offered with the briefings was not aided by the parties. An inordinate number of cites were to entire exhibits, leaving the court to sift through on its own in an attempt to locate the necessary information. Several cites simply were wrong—leading the court on a treasure hunt through depositions, searching for a statement or series of statements to support a fact asserted by the party. The citing method adopted by Local 150 involved using the initials of deponents followed by the year of the deposition and the page cite, rather than using the simple exhibit letters and page numbers—leaving it to the court to translate "LCD 2005 Exs. 6, 8–10" to Ex. K, L–N. All this searching is a waste of the court's time and a burden properly belonging to the parties, not the court. 2009 WL 1191443, 8

reviews done by Professor Birmingham and Professor Lee – both were chairs of the Philosophy Department for a period during plaintiff's time at DePaul – were starkly different. Professor Lee's were glowing, while Professor Birmingham's were decent, but focused on the negative.

For example, unlike Professor Lee, collegiality (which can be is a perfectly legitimate criterion in tenure decisions, *Kirk v. Hitchcock Clinic*, 261 F.3d 75, 77 (1st Cir.2001)) – considered under the category of service, along with teaching and scholarship – was a real sticking point for Professor Birmingham. She took plaintiff to task for a number of comments and actions that Professor Birmingham claims to have heard about from unnamed colleagues. For example, in the "Calendar Year 2004 Merit Review," Professor Birmingham rated plaintiff's service as "very good," but reported that several unnamed members of the Department complained that plaintiff had a tendency to turn every discussion into a critique of a person's position on race, gender, or capitalism. (Dkt. # 150,¶ 36).

According to Professor Birmingham, an unnamed colleague felt plaintiff's comments at a session she chaired left participants feeling insulted and unwelcome. (Dkt. # 160, ¶36; Def. Ex. 99, Ex. C). Professor Birmingham didn't hear this from the unnamed colleague who was at the event, but from Professor Rottenberg. (Def. Ex. 113, ¶ 5). But the unnamed colleague – Professor Painter-Morland as it turns out (Dkt. # 160, ¶35) – disagreed with this assessment. (Def. Ex. 28, at 21-23). She did allow that she felt plaintiff did not exercise professional judgment in making such provocative comments to an audience of capitalists. (Def. Ex. 28, at 21-23).

Professor Birmingham also made the accusation in the 2004 Merit Review of plaintiff that another unnamed colleague complained that plaintiff described his views as "same old, same old" as though he were just a passé old white guy. (Dkt. # 160, ¶ 36; Def. Ex. 99, Ex. C). Again,

Professor Birmingham didn't hear this from the colleague to whom the statement was allegedly made, but from Professor Rottenberg. (Def Ex. 113, ¶ 6).

In any event, Professor Rottenberg's charge was not quite accurate, and even Professor Birmingham had to concede that the "same old, same old" comment was merely to point out that the speakers being suggested for an event had been used before, and some new voices might be appreciated. (Dkt. # 172, ¶ 36). As one reads through the record, Professor Rottenberg emerges as the Iago to Professor Birmingham's Othello, whispering rumors about plaintiff in her ear. And Professor Birmingham's concerns tend to veer into gossip rather than valid points upon closer examination. Indeed, she garners her information from chatter over cocktails during happy hour. (Def. Ex. 9, at 102).

Continuing focus on paragraph 36 and the "Calendar Year 2004 Merit Review," we see that, in the main, in order to support the comments Professor Birmingham makes in her Review, DePaul relies on the testimony and Declaration of Professor Birmingham, who recounts things reported to her by unnamed faculty members (Dkt. # 160, ¶¶ 35, 36) and by Professor Rottenberg. If offered to prove the truth of the matters asserted *by the faculty members*, the evidence is hearsay and inadmissable. Fed.R. Civ.P. 56(c)(2); *Cortezano v. Salin Bank & Trust Co.,* 680 F.3d 936, 942 (7th Cir.2012); *MMG Financial Corp. v. Midwest Amusements Park, LLC,* 2011 WL 13859, 3 (7th Cir. 2011).

That the declarants are not identified is analytically irrelevant to the hearsay issue. What is decisive is that all Professor Birmingham can say competently under Rule 801, Federal Rules of Evidence, is what she was told by Rottenberg. She cannot say whether the statement Rottenberg claims was made to her, actually was made. Only Rottenberg or the faculty member is competent

to do that. And, Professor Birmingham most certainly cannot testify about the truth of the matters asserted in the initial Declaration by the faculty member. Under the hearsay rule, only the declarant/faculty member can say whether their claimed statements to Professor Rottenberg are true. (i.e., that they actually occurred). *See Jordan v. Binns*, 712 F.3d 1123 (7th Cir. 2013).[6]

But that does not end the matter of admissibility. Non-truth-related purposes for which out-of-court statements may be received are often divided into categories. *See generally United States v. Arteaga*, 117 F.3d 388, 397 (9th Cir. 1997)(Kozinski, J.). A commonly used one that could apply here is for statements offered for their effect on the hearer's state of mind or what motivated him or her to do or refrain from doing something. *United States. v. Leonard-Allen,* 739 F.3d 948, 954 (7th Cir. 2013);*Case v. New York Cent. R. Co.* 329 F.2d 936 (2nd Cir. 1964)(Friendly, J.).[7] If the conversations with Rottenberg and the unnamed faculty members are offered merely to show that they formed the basis for Professor Birmingham feeling as she did about the plaintiff, the evidence

---

[6] If the issue is merely whether they told Birmingham what she reported – and not whether what they reported actually occurred – there would be no need to cross-examine the unnamed declarants, since cross-examination is only needed to explore the credibility of the witness who testifies about the existence of the statement. Here, that is Professor Birmingham. *Williamson v. United States*, 512 U.S. 594, 598 (1994); *United States v. Montana,* 199 F.3d 947, 950 (7th Cir.1999)(Posner, J.); Advisory Committee notes to Rule 801(c). If truth counts, only the Declarant/faculty member can testify competently. But their Declarations are not provided.

[7] Judge Friendly's opinion in *Case* nicely illustrates and explains the principle. In *Case*, the court found no violation of the hearsay rule where an agent of the defendant was allowed to testify that he had interviewed certain employees and that none admitted knowing anything about the accident involving Mr. Case. The statements were offered, not to prove that the accident did not occur in the manner that the plaintiff contended, or even to prove that the men in fact knew nothing about it, but to show that the defendant reasonably believed that none of the men working in the yard had any knowledge and their non-production at trial thus could not properly be attributed to fear of their testimony. *See also United States v. Harris*, 942 F.2d 1125 (7th Cir. 1991)(love letters from the defendant's lover were *improperly* excluded since they were offered not to prove that their author loved Ms. Harris or enjoyed giving her things, but merely to demonstrate why she believed that what was given to her were gifts and thus not reportable on her tax returns).

is not hearsay. *See United States  v. Cain,* 671 F.3d 271, 301 (2nd Cir. 2012).  The problem is you

can't tell if that is what DePaul intended or whether the declarant's statements to Professors

Birmingham and Rottenberg are offered for the truth of their assertions.

Additionally, there appear to be  a number of instances where a jury could conclude that

Professor Birmingham's reviews are  arguably inaccurate or at least seemed to go out of their way

to put a negative spin on the facts.  For example, in what is called the "2004 Formal Probationary

(Contract Renewal/Progress-Toward-Tenure) Review," in the category of teaching, Professor

Birmingham noted after reading student evaluations, "[a] criticism that comes up in all her ISP 200

courses is some students find her to be a bit biased and 'emotional.'" (Def. Ex. 99, Ex. C)

5)(emphasis supplied).[8]  Later, when plaintiff writes a letter of complaint about the accuracy of the

review to the Dean, we learn that of 117 students, 6 claimed she was biased and only one out of 176

said she was emotional.  (Def. Ex. 64).

Professor Birmingham's more encompassing  phrasing, a jury might find in the context of

the entire record, was designed to unfairly insinuate that the criticisms were pervasive. The question

then becomes the underlying reason for the tendentious reporting, for unless animated by some

prohibited discriminatory intent, Professor Birmingham's alleged ill will is of no moment.

*Cf.,Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 80 (1998). Discrimination or

harassment, unconnected to a protected class is insufficient. *Orton-Bell v. Indiana,* 759 F.3d 768,

776 (7th Cir.2014).  The anti-discrimination laws in this Country "are not a code of civility," *Yuknis*

_____

[8] To add to the confusion and difficulty wading through the record, DePaul has submitted two versions of this review at two different places in the record.  (Def. Ex. 79, Def. Ex. 99, Ex. C).  The wording is slightly different: "[a] criticism that comes up in both the fall and spring . . . ."  (Def. Ex. 79).  The discussion above refers to what Professor Birmingham has attested to as being the "true and accurate" copy of her evaluation.  (Def. Ex. 99, ¶20).

*v. First Student, Inc.* 481 F.3d 552, 556 (7th Cir.2007), and they most assuredly do not seek to enact into law the Golden Rule in a vain attempt to require people to like each other. *Compare Sands v. Runyon,* 28 F.3d 1323, 1330-1331 (2d Cir.1994)("courts 'do not possess the power to compel co-workers to like each other.'").

Professor Birmingham wrote at length about plaintiff's self-evaluation for that year. She said she was worried about plaintiff injecting too much of her own political leanings into her courses. She was concerned that plaintiff described her courses as "hard-hitting" and her students as "privileged." The students at DePaul, Professor Birmingham wrote, may be privileged when compared to third world young people, but not in the context of the United States. She complained that plaintiff described the goal of one of her courses as a "radical confrontation with what being an American has come to mean in the present . . . reality at the expense of other possibilities." (Dkt. # 160, ¶ 30; Def. Ex. 99, Ex. C). The plaintiff does not argue that if true that is not a concern Professor Birmingham could reasonably have had without violating the law. The contention is that that was not the real reason for her animus toward the plaintiff, and that her take on plaintiff's self-evaluation was not accurate– thus belying her claimed motivation. In fact, the written evaluation Professor Birmingham refers to in her Declaration at paragraph 19 – Exhibit B to the Declaration – as providing the basis for her criticisms does not include the statements she claims it does. (Def. Ex. 99, Ex. B).

Nowhere does plaintiff call her class "hard-hitting." She does not say anything about her classes being a radical confrontation "with what being an American has come to mean . . . ." At one point, she does say that some of her students did not have the same race or class privileges as other of her students. (Def. Ex. 99, Ex. B). But that's an observation that would be true of many college

classrooms today; it is, a jury could find, not the same as "charg[ing]" her students with being privileged, as Professor Birmingham put it.[9] So, when the reviews from the two professors who chaired the Department are compared, the record presents an issue of fact not resolvable on summary judgment.

Then there is the *ad hoc* personnel committee Professor Birmingham put together in 2009, which voted to terminate plaintiff then and there. The opinion from more than one quarter is that this was a deviation from procedure. That the professors backing plaintiff's bid for tenure and her lawsuit against DePaul testified as such is not surprising. (Dkt. # 171, ¶¶ 57, 59, 60, 61). But Dean Suchar also held that opinion, saying that it was:

> strange because anyone who knows the rules of the university to doubt that she could go up for tenure is even, from my perspective, somewhat laughable. No one should doubt that anyone who goes -who is approved during the fourth year formal review has a right to go up for tenure, that's everyone's knowledge. The fact that these members of the department were doubting that, were thought that there anything they could do at that point would prevent it, is, at a minimum, disappointing.

(Dkt. #171, ¶ 58; Pl.Ex. 1(C), at 53).[10]

The Appeal Review Board called it one of "a number of procedural anomalies" that potentially had a negative impact on plaintiff's application for tenure, and that the procedure evinced

---

[9]At paragraph 30 of its statement of facts, DePaul provides what purports to be a block quote from plaintiff's 2004 self-evaluation. (Dkt. # 172, ¶ 30). But it is a mystery from where the quote is taken because DePaul cites to 10 separate pieces of evidence covering over two dozen pages. It certainly does not come from the self-evaluation Professor Birmingham references in, and attaches to, her Declaration. (Def. Ex. 99, ¶ 19, Ex. B).

[10] Even here, DePaul claims that the Dean's statement was in reference to something unrelated, but the testimony it claims supports that characterization indicates it was, indeed, regarding Professor Birmingham's email about the *ad hoc* committee's decision and stating that half the Department was against plaintiff. (Def. Supp. Ex. 3, at 52).

a "misalignment with the Faculty Handbook." (Dkt. #171, ¶ 62).[11] The evidence suggesting that the procedures to review plaintiff's performance were not in keeping with the Faculty Handbook means that summary judgment on plaintiff's contract claim is inappropriate. As for her discrimination claim, there is, at least, a bit too much smoke to say as a matter of law there was no fire.

It is clear that plaintiff was worried about what she perceived as discrimination (this is not to say her claimed perceptions were genuine or valid) as early as April 2005, when she wrote to Dean Mezey to complain about Professor Birmingham's most recent review. She expressed concern that she was negatively evaluated due to her areas of race and feminist theory, and that criticisms regarding her collegiality were "being used to enforce homogeneity and [maintain] practices that exclude persons on the basis of their difference from a perceived norm." (Def. Ex. 64, at P102).[12] DePaul argues this and other complaints were not sufficiently specific. But there are no "magic words" that a plaintiff must use in order to indicate that the supervisor's behavior is unlawful. *Tate v. Executive Management Services, Inc.*, 546 F.3d 528, 533 (7th Cir.2008). *Cf., Briscoe v. Bank of Commonwealth of Kentucky*, 36 U.S. 257, 347 (1837)(Story, J.)("There is no magic in words.").

Whatever the actual source of the feelings of Professor Birmingham and Professor Rottenberg and a few others about plaintiff, the atmosphere in the Philosophy Department was

---

[11] DePaul calls the paragraph cited from the Appeal Review Board's report "vague and argumentative" (Dkt. #179, ¶ 62), but it is an accurate quote from the report. Other than that, DePAul can only point out that the Board's decision was not unanimous.

[12] Plaintiff was not the only professor who had this impression that concerns over "collegiality" were employed as code to cover subtle discrimination. (Pl. Ex. 1E, at 93-94, 101-02). Dr. Goswami testified that she believed she:

was stereotyped as someone who is walking into a classroom and purely engaging in politics as opposed to an intellectual endeavor. My belief is that I was stereotyped as being in a confrontational angry relationship with my students. My belief is that I was stereotyped as a cliché; that I just look at white people and say they're privileged. (Def. Ex. 8, at 414).

certainly not serene. The gist of the record is that once the Dean did not approve their *ad hoc* committee move to terminate plaintiff and short circuit her chance to apply for tenure, rather than allowing the application and review process to take its course, a jury could – but of course would not be compelled to – find that she was targeted. Professor Rottenberg wrote to Professor Birmingham, saying that if the Dean rejected their recommendation to terminate plaintiff, they would "bring out the big guns. . . . It won't be pretty." (Pl. Ex. 2CC). They would be on a mission "to prove that [plaintiff's] service/teaching record is mediocre at best." (Pl. Ex. 2CC). Professor Birmingham indicated that they needed to review what went wrong and put together a strategy and a file. (Pl.Ex. 2CC). If Professor Birmingham had any trepidations about going through with the "mission," her cohorts were there to buck her up, including Professor Krell:

> DO NOT RESIGN. Sit tight. . . . The watchdog effect must begin on all fronts NOW. Do not rule yourself out as an "interested party" in the [plaintiff] fiasco. You are not. Your [sic] are ACTING CHAIR. . . . KEEP THIS ALIVE, STAY IN POWER. Even those who resisted the vote [to terminate plaintiff] felt enormously loyal to you. . . . Fuckin' A. You're our LEADER. . . . maybe I should just write a 6 page "stunning" report on [plaintiff's] research. Oh yeah, I can stun.

(Pl.Ex. 2DD).[13] The group even tried to have Professor Lee – the author of plaintiff's outstanding reviews – removed as chair for claimed financial irregularities. (Pl. Ex. 1B, at 101-02).

While those not supporting Professor Goswami had the right to resist her tenure application if they thought she was unqualified, the tone of the exchanges among the professors aligned against plaintiff is so arguably agitated and even vitriolic that it is difficult, in the context of a summary judgment proceeding and on this record, to conclude that nothing more than a concern for the quality of her scholarship and perceived lack of collegiality were at work. A number of professors were

---

[13] Professor Krell had issues with the quality of plaintiff's writing.

17

deeply suspicious of the majority's motives.[14]  While their speculations and suspicions are not outcome-determinative – indeed, they are not even evidence – their  motives do not appear above reproach either (more on that later)  – the fact remains that  the manner in which the majority proceeded against plaintiff was arguably different from that in any other previous tenure application process (with the possible exception of Professor Hill, who was also a person of color).  It will be for the jury to decide the matter.

Then, there is the exchange of emails between July and November 2010 between Professor Birmingham, Professor Rottenberg, and Professor Abraham in the wake of plaintiff's termination. Professor Birmingham was delighted to learn that plaintiff had taken a tenured position at Indiana State because when she checked the school's website, she discovered that plaintiff's husband was there, too.  Professor Birmingham wrote to her "ancient" – Professor Rottenberg – that plaintiff's husband "did get her the job!  So we were right: whatever she does, she needs her husband to do it. Nothing sexist about it."  She was also excited because in her view Indiana State was a "third rate place."  (Pl.Ex. GGG).

Standing alone, these remarks prove nothing other than the declarants had a low opinion of the plaintiff and her ability to function autonomously.  But, the following remark by Professor Rottenberg when the topic was raised in the 2010 email chain in the wake of the tenure vote stands on a different footing: she said that plaintiff got "a little help from her white boy husband." in getting the job at Indiana State University. (Pl.Ex.  HHH). While statements "may be relevant to the question

---

[14] In light of the procedural anomalies, the tone of the majority, the granting of tenure to two white male candidates, and the way they perceived whites to be treated in the Department compared to how professors of color were treated, those aligned with plaintiff could see no explanation other than racism and/or sexism, institutional or otherwise.  (Pl. Ex. 1D, at 77, 78, 79, 164-65, 185, 192; Pl. Ex. 1G, at 225-26, 227, 297-98; 1F, at 88-90, 108, 161-62; 1E, at 93-95, 101-02).

of pretext...even though they do not constitute direct evidence of discriminatory intent,'" *Indurante v. Local 705, Intern. Broth. of Teamsters, AFL-CIO,* 160 F.3d 364, 367 (7th Cir.1998), DePaul insists this statement is nothing more than a "stray remark." But a comment cannot be labeled as "stray" and thus dismissed as insignificant and irrelevant because it is was made only once. Even an isolated remark can raise an inference of discrimination in the right circumstances as cases like *Radentz v. Marion County* 640 F.3d 754, 759 (7th Cir.2011) and *Thanongsinh v. Board of Educ.*, 462 F.3d 762, 782 (7th Cir.2006) teach.[15] And while the timing of the remark is important, it is not always decisive.

As Judge Posner's decision in *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763 (7th Cir. 2006) shows, labeling a remark as "stray" does not automatically require exclusion of the evidence:

> The evidence in this case, based on remarks made at just one meeting, fell so far short of proving a pervasive culture of discrimination that had the judge been concerned that the evidence would extend the trial unduly, or confuse or prejudice the jurors, he would have been within his rights to exclude it under Rule 403 of the evidence rules. That might well have been the better ruling. But bearing in mind the deference that appellate courts give to evidentiary rulings, we cannot say that he committed reversible error in allowing the evidence to be presented. One of the three fired employees testified that he was fired on the verge of being entitled to a full pension, which is what happened to Mattenson. And in this day and age, for executives at the vice-presidential level of a major business enterprise to be talking openly about the desirability of getting rid of old employees is at least some evidence of the discriminatory workplace culture of which we spoke. Not that testimony about a work-place "culture" as such is admissible; it is too vague. But testimony based on the personal knowledge of the testifying employees can provide a basis for an

---

[15] In *Radentz* the court held that the district court erred in refusing in a summary judgment context to consider the statement by Mr. Ackles that he wanted to replace white workers with African–Americans, and that he wanted to hire an African–American pathologist. The court found "[t]hose statements provide some support for the plaintiffs' claim that their termination was race-based." And in *Townsend*, also reversing a grant of summary judgment for the defendant, the court said: "[c]onstruing the evidence in the light most favorable to Mr. Thanongsinh,...Mr. Javetz's remark about the plaintiff's English language abilities [and suggesting he learn English] shows pretext. Although the defendants characterize this comment as a 'stray remark[ ]' and as helpful advice, ... the context of the statement ... leads us to conclude that the statement could be interpreted reasonably by a juror as probative evidence that Mr. Javetz harbored animus against persons for whom English is a second language."

inference that discriminatory attitudes permeate a firm's employment policies and practices.

Language in some judicial opinions suggests that prejudicial remarks are always to be excluded unless they are made by someone who had input into the decision to terminate (or take other challenged adverse employment action against) the plaintiff. This language should not be taken literally, however. The admissibility of "stray remarks," as the cases call them, is governed by Rule 403 of the evidence rules, which establishes a standard rather than a rule-and a standard that tilts in favor of admissibility; the probative value of the evidence must not merely be outweighed, it must be substantially outweighed, by its negative consequences, to be excludable. And that will depend on context-the circumstances in which the remarks were made, such as the number of similar remarks, when they were made, and by whom and to whom they were made.

*Id*. at 770 -771 (citations omitted)(parenthesis in original).

Of course, a jury could find that the objections to Dr. Goswami were not based on impermissible criteria at all, but stemmed from a genuinely held belief that her scholarship was wanting and from personal antipathy having nothing to do with her race, gender, or national origin. But on the present record, and given the difficulties the defendants' presentation poses to analysis, it cannot be determined that there are no disputed issues of material fact. Nor can it be said that the so-called "stray remark"cannot be considered in deciding the motion for summary judgment. It will be for the jury to decide where the truth lies.

## II.

## A.

The focus thus far has been on DePaul because it is DePaul's burden in the first instance to demonstrate entitlement to summary judgment. But plaintiff's Local Rule 56.1submission comes with its own frustrating citations. In paragraph after paragraph, when quoting a document, plaintiff cites not the document itself but to excerpts from DePaul's answer to the complaint. (Dkt. # 171,

¶¶ 19, 29, 34, 39, 40). Then, there are numerous instances where plaintiff – surprisingly, given her issues with Professor Birmingham – relies on obvious hearsay. In Paragraph 21, for example, plaintiff submits that Mary Amico told her that Professor Birmingham told her that plaintiff married her husband in order to get a green card. The only citation is to plaintiff's own Declaration. (Dkt. #171, ¶21). If true, the evidence is arguably relevant. But only Birmingham or Amico can say, consistent with the hearsay rule, whether Birmingham made the statement attributed to her. *See* discussion *supra* at 11.

Plaintiff relies on more hearsay in Paragraph 22, where she says Professor Martin told her that Professor Birmingham believed she (Goswami) lost credibility as a feminist by marrying a "good-looking white guy." (Dkt. #171, ¶ 22). Plaintiff cannot say without offending the hearsay rule whether the statement was actually made by Birmingham to Martin. And that is all that is relevant. Only Martin or Birmingham can competently say whether it was. *See* discussion *supra* at 11. The same is true of the statement that Professor Martin told her that Professor Birmingham said that she (Birmingham) felt plaintiff received DePaul's teaching excellence award because they had needed to give it to a person of color. (Dkt. # 171, ¶ 24). Plaintiff's Declaration is liberally seasoned with this sort of inadmissible hearsay. (Pl.Ex. 4A, ¶¶ 10, 12, 14, 15, 16, 17).[16]

---

[16] Plaintiff's response to DePaul's factual assertions has similar problems. For example, in response to Depaul's paragraph 20, plaintiff claims that Professor Naas did not say he had problems with her writing, but that he had problems with her being a woman of color and with her field of study. (Dkt. # 172, ¶ 20). But her cited evidence is her own Declaration claiming others told her this. The hearsay rule bars this evidence. She also cites Professor Moore and Professor Larrabee as testifying that Professor Naas made no mention of plaintiff's writing during her hire, and that others besides him voted against hiring her. But two of the deposition pages plaintiff cites to are not in her excerpt of Professor Moore's deposition (pages 53 and 54; her excerpt skips from page 49 to 72) and the other cited portions of Professor Moore's testimony are not about her hire but about her personnel committee review in 2009. (Pl. Ex. D, at 48-49). Also, the plaintiff does not include the cited page from Professor Larrabee's deposition transcript – page 243 – either (her excerpt skips from page 228 to 297). (Pl. Ex. G).

Worse, there are points when plaintiff mischaracterizes the record. For example, in Paragraph 3 from her statement of facts, she quotes Professor Naas as saying that "Professor Goswami did exactly the kind of work we thought she would in exactly the areas she promised . . . ." (Dkt. #171, ¶ 3). But, the ellipsis creates a "misleading impression of the meaning of the quoted passages," *May Department Stores Co. v. Federal Ins. Co.,* 305 F.3d 597, 599 (7th Cir.2002), by editing out the obviously important remainder of the Professor's quote: " the problem was with the quality of that work." (Pl.Ex. 2(C), at 011871). Using an ellipses "to excise relevant and decisive [material] in a way that benefits the [party's] case is looked upon with great disfavor." *United States v. Johnson,* 187 F.3d 1129, 1132 (9th Cir.1999). Another mischaracterization is paragraph 33, where plaintiff insinuates that she submitted what she had completed of her book on Theodore Adorno to a committee for review in 2008, when she testified that she didn't think she had. (Def. Ex. 9, at 490, 493-94).

Again, as with DePaul's submission, these are just representative examples. The examples are fewer for no other reason than that, with it clear upon perusal of DePaul's Local Rule 56.1 statement that DePaul's motion had to be denied, there was no need to delve deeply into plaintiff's submissions.

**B.**

The record in this case proves that academics do not exist in splendid isolation, immune to the provocations and slights to which less Olympian men and women fall prey. But the record is such – perhaps just barely – that a jury must determine what truly underlay the actions and motivations of the parties. As the discussion above and below show, some of the evidence on both sides is problematic.

The Departmental vote against granting Professor Goswami tenure was 11-7. That it ran along lines that plaintiff characterizes as white versus minority (*Amended Complaint*, ¶ 128), is the beginning not the end of analysis. The vote, a jury could conclude, says as much or more about the motivations of plaintiff's cadre than it does about Professor Birmingham's. For example, one of the African American tenured faculty who voted in Professor Goswami's favor, Professor Darrell Moore, testified at length at his deposition regarding his suspicions. He thought it odd that Professor Goswami's periodic reviews had been favorable, but that she was denied tenure because she was unable to do what she claimed she could. (Pl.Ex. 1D, at 76-77). He also thought it odd that, when one of the *ad hoc* committees regarding termination of Professor Goswami's contract met, he and another of her supporters were out of town (Pl.Ex. 1D, at 76-77).

But as Professor Moore conceded, he had no "smoking gun evidence" that anyone among the 11 who voted against plaintiff receiving tenure intentionally discriminated against her. (Pl.Ex. 1D, at 165). And, more importantly, Professor Moore agreed that plaintiff "needed to go," that hers was a "bad prospectus," and that her "overall thesis [wa]s . . . not well and clearly stated" – he insinuated it was "crap" (Pl.Ex. 1D, at 77). [17] Yet, he nevertheless voted in favor of granting plaintiff tenure.

Professor Tina Chanter, who also voted in plaintiff's favor, testified that she took it personally that plaintiff was criticized as having a "thinking problem" because she also worked in Feminist Philosophy and Race theory, and the criticism of plaintiff's work made her wonder what her colleagues thought of her. (Pl. Ex. 1F, at 119). She also felt that anyone in the Philosophy Department who did not work in areas like she and the others who supported plaintiff did – Race

---

[17] By the same token, it must be added that Professor Moore was of the opinion that others with "crap" theses had not been so summarily dismissed; that they had been assisted along the path to tenure. (Pl.Ex. 1D, at 77-78).

Theory, Post-Colonial Theory, Feminist Theory – but studied white male philosophers like Kant, Plato, or Heidegger, were not in a position to judge plaintiff's work. (Pl.Ex. 1D, at 85-86).

It is not quite apparent what relevance this testimony is supposed to have, but carried to its logical conclusion, it would seem to preclude professors who taught more traditional philosophy classes from participating in tenure approval for people like Dr. Goswami. And, her approach would seemingly exclude from critical faculty involvement in tenure decisions a whole segment of the faculty. But Professor Chanter's apparent approach is not DePaul's system or that of any other school in the country. Moreover, a lack of qualification to judge the plaintiff is not what the Complaint in this case charges.[18]

While Professor Chanter refused to testify that the vote of any individual member of the department was motivated by racism, she blamed the vote on "a culture of institutional racism" that had nothing "to do with the intentions of one individual." (Pl.Ex. 1D, at 161-62). This charge, often discussed approvingly in the law reviews, including articles on faculty appointments,[19] has received an inhospitable reception by the courts and would likely not get far at a trial. *See e.g., Jaramillo v. Adams County School Dist. 14*, 680 F.3d 1267, 1270 (10th Cir. 2012)(in affirming grant of summary judgment despite testimony identical to that in this case about institutional racism, the court said:"Nothing in Mr. Quintana's testimony, other than vague references to institutional racism and

---

[18] Of course, this begs the question whether Professor Chanter, or other teachers who taught courses like those taught by Professor Goswami, was qualified to judge those who worked in the more traditional areas of philosophy.

[19] One author posits that "[f]aculty appointment and tenure decisions may represent a form of institutional racism, manifested through seemingly benign policies and practices designed to support so-called institutional standards; [but which] may unnecessarily generate disparately worse outcomes for people of color. Turner et al. found that many faculty of color perceived subtle and persistent racism that is generally not acknowledged or appreciated by majority-group faculty members." Loftus C. Carson, *Employment Opportunities and Conditions for the African-American*, Tex. J. on C.L. & C.R. 1, 23-24 (Fall2013).

past experience,' suggests that he could point to specific evidence of discriminatory intent by any of the decision makers in this case. ... Courts are understandably reluctant to allow theories of institutional racism to displace the requirement of personal knowledge of facts concerning adverse employment actions."); *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763 (7th Cir. 2006)("Not that testimony about a work-place "culture" as such is admissible; it is too vague."); *United States v. Singleton,* 82 F.3d 424 (9th Cir.1996)("Dr. Debro's report discussed for the most part the general problem of institutional racism in the criminal justice system, not whether the government in this case discriminated against Singleton. The report lacked any coherent, documented support for any of the generalizations."); *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743 (1st Cir. 1995); *Smith v. Attorney General of U.S.,* 2007 WL 2439951, 5 (C.D.Cal.2007)("bald assertions" of "institutional racism and discrimination" are "insufficient to suggest that Plaintiff's particular treatment was in fact the product of racial animus.").

Professor Chanter also testified that she observed Professor Goswami teach a class. It was, she said, "an amazingly accomplished display, absolutely brilliant pedagogy." (Pl.Ex. 1D, at 46). She thought "it was actually the best graduate class [she] had ever witnessed." (Pl.Ex. 1D, at 46). She thought the "students were enthralled." (Pl.Ex. 1D, at 46). Again, the capacity of this testimony to make less likely the core reasons offered by DePaul for denial of tenure appears to be rather attenuated.

Professor Mary Jeanne Larrabee – the plaintiff's staunchest champion – [20] echoed Professor Chanter's claim of institutional racism. She explained that she could not charge Professor Birmingham with intentional discrimination because "people who are institutionally racist, are complicit in that, do not necessarily intentionally do something in the sense of being on full consciousness that I am going to discriminate in this way against this person." (Pl.Ex. 1G, at 225). When pressed for some example of evidence that Professor Birmingham discriminated against plaintiff, Professor Larrabee complained that Professor Birmingham expected Professor Goswami "to be a certain type of person."

Although Professor Larrabee said she could not remember the incident exactly, she claimed Professor Birmingham was "aghast" when plaintiff used her position as a member of some Board to get her graduate students a position on a panel. Everyone did that, according to Professor Larrabee, including Professor Birmingham, so it was a double standard, based, she insisted, on plaintiff being South Asian. (Pl.Ex. 1G, at 226). Even taking this incident in a light most favorable to the plaintiff, it is difficult to see how the conclusion follows from the premise.

---

[20] Dr. Larrabee had not only voted in favor of plaintiff's tenure application, she had openly, vociferously, and repeatedly attacked those who did not agree with her views about tenure for Dr. Goswami. Indeed, her minority report of October 1, 2010 supporting Dr. Goswami's application for tenure accused those who opposed tenure of being "complicit in the racism that informed some of the majority's position in regard to Dr. Goswami's qualifications." ( *Pl.Br.,* Ex. 7 at 2; 3, *et. seq.*). When interviewed in May 2011 by DePaul's Office of Institutional Diversity and Equity, Dr. Larrabee refused to give the interviewers more than a half hour even though she had scheduled a full hour. The Report noted that Dr. Larrabee responded to many of their questions "in an argumentative and/or rhetorical manner." She made clear her views about the racial motivation of those who were opposed to tenure: those who disagreed with her assessment of things were racially motivated. The notion that there could be a reasonable difference of opinion over plaintiff's qualifications, was for Dr. Larrabee, unthinkable. She invariably ascribed a nefarious motive to any view or decision that was not favorable to Dr. Goswami. *Goswami v. DePaul University* 8 F.Supp.3d 1004, 1017 - 1018 (N.D.Ill.2014). Of course hunches, a species of speculation, aren't admissible.

Also unavailing is the testimony of Professor Jason Hill, who is African American and who abstained from voting on the tenure issue. He testified, among other things, that he is "always looking for" racism, giving the example of getting on the elevator and a white person not saying hello to him. The person might be having a bad day or had been "diagnosed with cancer the day before. But I feel like, wow, maybe he's not saying hello to me for the second time because I'm black." (Pl.Ex. 1E, at 96). Whatever this may say about Professor Hill's psychology, it proves absolutely nothing relevant to this case.

Professor Larrabee was also "astonished" that Professor Birmingham thought plaintiff ought to have shown her sufficient gratitude for supporting her in getting the DePaul job in the first place. (Pl.Ex. 1G, at 228). Common sense and human experience teach while there may be some who perform acts of kindness solely for the joy derived from the doing of a good deed, that sort of selflessness is exceedingly uncommon. And so, even if Professor Birmingham had not overcome "'the basic human desire for recognition,'" *Hart v. Electronic Arts, Inc.* 717 F.3d 141, 149 (3d Cir.2013), and, even if she was miffed at the plaintiff's perceived ingratitude, as Judge Easterbrook said in another context, "So What?...Who cares?...True, but irrelevant." *Israel Travel Advis. Serv. v. Israel Iden. Tours*, 61 F.3d 1250, 1259 (7th Cir. 1995). If anything, this tends to undercut the plaintiff's theory of the case by providing an alternative, non-discriminatory reason for Professor Birmingham's supposed hostility toward the plaintiff. It will be for the jury to unravel this skein.

Professor Larrabee also recounted Dean Suchar's reaction – he was "flabbergasted" – when the *ad hoc* committee tried to short circuit plaintiff's application for tenure and have her terminated. (Ex. 1G, at 46). If properly developed, the attempt to short circuit prescribed procedures is a relevant fact a jury will be permitted to consider.

## III.

The argument strenuously advanced by DePaul is that since there are no disputed issues of fact regarding the animus of the ultimate decisionmaker in this case, President Holtschneider, summary judgment must be entered in its favor even if Birmingham and others acted with the requisite discriminatory animus. Dr. Goswami's rejoinder is that she can succeed under what has come to be known in the law of employment discrimination as the "cat's paw" theory. *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011).[21]

In *Staub*, the Supreme Court reversed a Seventh Circuit decision that held that an employer is not liable "based on a nondecisionmaker's animus unless the 'decisionmaker' held that title only nominally," and evidence of illegal bias of non-decisionmakers should be excluded without a showing that biased employees exerted "singular influence" over the decision maker. The Supreme Court found these restrictions too throttling and inconsistent with basis tort law principles. It held that if a supervisor performs acts motivated by a discriminatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is the proximate cause of the ultimate employment action, then the employer can be liable under USERRA. An employer can be liable even if the *de facto* decisionmaker is not motivated by some discriminatory animus. So long as an earlier agent intended, for discriminatory reasons, that the adverse action occur, he has the scienter required for liability. Moreover, the decisionmaker's exercise of judgment cannot

---

[21] The term, cat's paw, appears in La Fontaine's Le Singe et le Chat, which began appearing in collections of Aesop's fables from the 17th century. It first appeared in a federal case in *United States v. Burr*, 25 F.Cas. 55, 131 (C.C.Va. 1807) and, according to Justice Scalia in *Staub*, in employment discrimination law in Judge Posner's opinion in *Shager v. Upjohn Co.,* 913 F.2d 398, 405(7th Cir. 1990). In the fable, a monkey induces a cat to remove chestnuts from a fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts, leaving the cat with nothing.

automatically be deemed a superseding cause of the harm and prevent the earlier agent's action from being the proximate cause of the harm. Here is how the Supreme Court put it in *Staub:*

> We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias "remote" or "purely contingent." The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes. Nor can the ultimate decisionmaker's judgment be deemed a superseding cause of the harm.

562 U.S. _,131 S.Ct. 1186, 1192 (emphasis supplied)(citation omitted).

*Staub* applies not only in USERRA cases, but in employment discrimination cases. *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 604 (7th Cir.2014); *Matthews v. Waukesha County,* 759 F.3d 821, 829 (7th Cir.2014); *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir.2013). Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged and excludes only those links that are too remote, purely contingent, or indirect. Liability can be imposed where a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action. *Matthews,* 759 F.3d at 829. That is the plaintiff's theory in this case and it will be up to the jury to determine its persuasiveness.

## CONCLUSION

For the foregoing reasons, DePaul's Motion for Summary Judgment [158, 161] is denied. Also, the Motion for Summary Judgment filed under seal [161] does not qualify for under seal treatment and the clerk of the court is ordered to unseal the document.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 1/20/15